# No. 23-4282

# United States Court of Appeals for the Fourth Circuit

―――――

**UNITED STATES OF AMERICA,**
*Appellee,*

**v.**

**MIGUEL MARQUIS HUTCHINSON,**
*Appellant.*

―――――

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

## RESPONSE BRIEF OF THE UNITED STATES

MICHAEL F. EASLEY, JR.
*United States Attorney*

BY:  DAVID A. BRAGDON *Assistant
United States Attorney* 150
Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4530

*Attorneys for Appellee*

# TABLE OF CONTENTS

Table of Authorities ................................................................... iv

Statement of Jurisdiction ............................................................ 1

Statement of Issues................................................................... 2

Introduction ......................................................................... 3

Statement of Facts................................................................... 5

Procedural History.................................................................. 5

Trial Evidence ...................................................................... 5

      Officers approach Defendant because he matches the description of a Family Dollar robber. .......................................................... 5

      Officer Earwood asks Defendant if he could talk with him; Defendant agrees and in conversation provides a false name and no ID. ............... 8

      Officers temporarily detain Defendant based on the false name and other reasonable suspicion. ........................................................ 9

      Officers begin a narcotics investigation after Defendant is cleared of involvement in the robbery.................................................... 11

      Defendant makes incriminating statements about the gun, marijuana, and his plan to flee. ............................................................. 12

Motion to Suppress ................................................................ 15

Presentence Investigation Report ................................................. 19

Sentencing Hearing................................................................ 20

Summary of Argument............................................................ 23

Argument .......................................................................... 25

**I.    The district court did not err in denying Defendant's Motion to Suppress.**

i

A.    Standard of Review.................................................... 25

B.    Discussion of Issue. ................................................. 25

    1.    Officer Earwood's initial approach of Defendant was not a seizure. ........................................... 25

    2.    When Officers Earwood and Reilly asked Defendant to get out of the car, they had reasonable suspicion. ....................................... 30

        a.  Reasonable suspicion of robbery. ............................... 30

        a.  Reasonable suspicion of marijuana. ............................ 32

**II.    The district court did not err in not holding a suppression hearing where the key facts were undisputed.**

A.    Standard of Review.................................................... 33

B.    Discussion of Issue. ................................................. 34

    1.    The undisputed facts show reasonable suspicion of robbery........................................................... 34

    2.    The undisputed fact that Officer Earwood smelled marijuana from the car supported reasonable suspicion. ....................................... 36

    3.    Any error in not holding an evidentiary hearing is harmless.................................................... 37

**III.    The government did not commit prosecutorial misconduct by referencing Defendant's own words about the consequences of his actions.**

A.    Standard of Review.................................................... 39

B.    Discussion of Issue. ................................................. 39

1.      The government's references to "three to five" were made for a lawful purpose. ...................................... 41

2.      Any error did not prejudice Defendant. ........................... 43

**IV.  The lack of sentencing explanation was harmless to Defendant where the district court imposed a 62% downward variance.**

A.    Standard of Review. .................................................. 46

B.    Discussion of Issue. ................................................. 46

Conclusion ............................................................ 49

Certificate of Compliance

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Crawford v. Washington*,
541 U.S. 36 (2004)..................................................................... 34

*Donnelly v. DeChristoforo*,
416 U.S. 637 (1974)..............................................................41, 43

*Fla. v. Bostick*,
501 U.S. 429 (1991)..................................................................... 26

*Gall v. United States*,
552 U.S. 38 (2007)..................................................................... 46

*Illinois v. Wardlow*,
528 U.S. 119 (2000)..................................................................30, 32

*Rosales-Mireles v. United States*,
138 S. Ct. 1897 (2018)................................................................. 37

*Terry v. Ohio*,
392 U.S. 1 (1968)..................................................................30, 36

*United States v. Benson*,
957 F.3d 218 (4th Cir. 2020) ..................................................... 40

*United States v. Black*,
707 F.3d 531 (4th Cir. 2013) ..................................................... 28

*United States v. Boulware*,
604 F.3d 832 (4th Cir. 2010) ..................................................... 47

*United States v. Brown*,
401 F.3d 588 (4th Cir. 2005) ..................................................... 26

*United States v. Cintron*,
724 F.3d 32 (1st Cir. 2013) ....................................................... 33

*United States v. Drayton*,
536 U.S. 194 (2002) ................................................................... 28

*United States v. Golson*,
  743 F.3d 44 (3d Cir. 2014) ...................................................... 31

*United States v. Gomez*,
  312 F.3d 920 (8th Cir. 2002) ................................................. 31

*United States v. Griffin*,
  811 F. App'x 815 (4th Cir. 2020) (unpublished) ...............................33, 34

*United States v. Harrelson*,
  705 F.2d 733 (5th Cir. 1983) ................................................. 34

*United States v. Humphries*,
  372 F.3d 653 (4th Cir. 2004) ................................................. 32

*United States v. Johnson*,
  587 F.3d 625 (4th Cir. 2009) .................................................40, 42

*United States v. Kim*,
  25 F.3d 1426 (9th Cir. 1994) ................................................. 27

*United States v. Lewis*,
  606 F.3d 193 (4th Cir. 2010) .................................................26, 28

*United States v. Lewis*,
  958 F.3d 240 (4th Cir. 2020) ................................................. 46

*United States v. Lynn*,
  592 F.3d 572 (4th Cir. 2010) .................................................33, 37

*United States v. McMiller*,
  954 F.3d 670 (4th Cir. 2020) .............................................. 39, 43, 45

*United States v. Mendenhall*,
  446 U.S. 544 (1980) .........................................................27, 28

*United States v. Meredith*,
  824 F.2d 1418 (4th Cir. 1987) ............................................. 41, 44, 45

*United States v. Montes-Pineda*,
  445 F.3d 375 (4th Cir. 2006) ................................................. 47

*United States v. Nance*,
   957 F.3d 204 (4th Cir. 2020) ...........................................46, 47

*United States v. Photogrammetric Data Servs., Inc.*,
   259 F.3d 229 (4th Cir. 2001) ................................................. 34

*United States v. Reagan*,
   694 F.2d 1075 (4th Cir. 1982) .............................................. 44

*United States v. Roane*,
   100 F. App'x 901 (4th Cir. 2004) (unpublished) ...................... 33

*United States v. Scheetz*,
   293 F.3d 175 (4th Cir. 2002) ................................................ 43

*United States v. Sokolow*,
   490 U.S. 1 (1989)................................................................ 31

*United States v. Tafuna*,
   5 F.4th 1197 (10th Cir. 2021) ................................ 26, 28, 29

*United States v. Unimex, Inc.*,
   991 F.2d 546 (9th Cir. 1993) ............................................... 34

*United States v. Watkins*,
   816 F. App'x 821 (4th Cir. 2020) ......................................... 26

*United States v. Watson*,
   703 F.3d 684 (4thCir. 2013) ...........................................25, 36

*United States v. White*,
   836 F.3d 437 (4th Cir. 2016) ............................................... 32

*United States v. Woods*,
   710 F.3d 195 (4th Cir. 2013) ............................................... 39

## Statutes

18 U.S.C. § 922(g)(1)............................................................. 5

18 U.S.C. § 924...................................................................... 5

18 U.S.C. § 3231 .................................................................... 1

18 U.S.C. § 3553(a) ............................................................ 46

18 U.S.C. § 3742(a) ............................................................. 1

21 U.S.C. § 841 ................................................................... 5

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 2255 ................................................................. 5

N.C. Gen. Stat. Ann. § 20-7(a) .......................................... 32

## Rules

Fed. R. Crim. P. 52 ........................................................37, 39

## Other Authorities

https://www.dictionary.com/e/slang/finna/ ......................... 14

## STATEMENT OF JURISDICTION

Defendant Miguel Marquis Hutchinson appeals from a judgment of conviction following a jury trial. J.A. 379–386. Jurisdiction to the district court was established by 18 U.S.C. § 3231.

Jurisdiction to this Court is provided by 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The judgment was entered on April 13, 2023, and Defendant filed a timely notice of appeal on April 18, 2023. J.A. 387.

# STATEMENT OF ISSUES

1.     Did the district court err in denying Defendant's motion to suppress where officers initially had a consensual talk with him and did not temporarily detain him until after he provided a false name?

2.     Did the district court err in not holding a hearing on Defendant's motion to suppress where Defendant did not dispute that he matched the description of a robbery suspect, that he gave a false name to officers, and that the lead officer smelled marijuana coming from the car?

3.     Under plain-error review, did the government commit prosecutorial misconduct by saying in closing argument, "Let's give him what he wants. Find him guilty of all these counts," after quoting Defendant from admitted evidence that he would "go back to the yard, three to five" for having a gun?

4.     Was the lack of sentencing explanation harmless to Defendant where the facts supported a guidelines-range sentence, but the district court imposed a 62% downward variance?

# **INTRODUCTION**

After the robbery of a Family Dollar, police were establishing a perimeter and watching for the suspect, who was described as a black man, with black pants, a black hoodie, a white bandana, and a silver gun. Officers saw Defendant, wearing a black hoodie and black pants, enter a McDonald's nearby and immediately leave. As he left, he stared at officers the whole way back to his car. Officer Earwood drove to the McDonald's and walked up to Defendant's car, smelling marijuana. Defendant had his window open, and Officer Earwood asked him if he minded talking for a second. Defendant agreed. In less than a minute, Defendant said he had no ID and provided a false name. Officer Earwood told Defendant there had been an incident across the street and asked if he could have a second. Defendant agreed. Four minutes later, Officer Earwood had run the name provided and discovered it was false. At that point, Officer Earwood had reasonable suspicion to temporarily detain Defendant. The court did not have an evidentiary hearing because these facts were not in dispute, and they fully supported reasonable suspicion.

As part of its trial evidence, the government introduced the body camera videos. In one of these videos, Defendant answered questions about his possession of a gun as a felon. During that questioning, he implicitly accepted responsibility by acknowledging that he would "go to the yard" and "do my push up" but explaining that "3 to 5" was not a big deal because "I'm still young." S.J.A. 3, at 04:10–04:47. The government played these recorded statements twice during closing argument to argue that Defendant was accepting responsibility for

his crime. J.A. 300; J.A. 320. The second time, after paraphrasing Defendant's statements, the government said, "Let's give him what he wants. Find him guilty of all these counts." J.A. 320. This statement was not intended to refer to punishment but to Defendant's acceptance of responsibility. And any error was harmless. Four transcript pages later, the district court instructed the jury not to consider punishment in imposing a sentence. J.A. 320.

At sentencing, the court engaged with the parties by asking questions but did not explain its 62% downward variance. Given Defendant's flimsy arguments for a downward variance, his past murder conviction, his multiple instances of possessing guns, cash, and drugs, his many prison infractions and supervised release violations, and his unwillingness to accept responsibility, the lack of explanation did not harm the Defendant. If anything, it harmed the government who had no explanation for a very large downward variance. Because the lack of explanation was harmless to Defendant, this Court should affirm.

## STATEMENT OF FACTS

### Procedural History

The grand jury charged Defendant with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) and § 924 (Count One); possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841 (Count Two); and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three). J.A. 16–17. At trial, a jury convicted him of all three crimes. J.A. 339. The court sentenced Defendant to 30 months' imprisonment on Counts One and Two and 60 months' consecutive on Count Three. J.A. 362–363; J.A. 367. Defendant's first appeal was dismissed for failure to prosecute. J.A. 375. Defendant filed a § 2255 habeas petition based on ineffective assistance of counsel, and the district court vacated and reentered the judgment to allow Defendant to pursue a direct appeal. J.A. 376–386. Defendant now appeals his conviction and sentence. J.A. 387.

### Trial Evidence

<u>Officers approach Defendant because he matches the description of a
Family Dollar robber.</u>

On February 3, 2019, Fayetteville Officers Kenneth Earwood and Daniel Reilly responded to assist with emergency traffic for a Family Dollar robbery that happened around 8:00 p.m. J.A. 150; J.A. 231–232. They and other officers were establishing a perimeter to catch the culprit fleeing. J.A. 150; J.A. 233. All officers were keeping an eye on the area to locate the suspect. J.A. 150. The

suspect was described "over the radio as a black male wearing a black hoodie, black pants and a white bandana around his face and a silver handgun." J.A. 151; J.A. 233. Officers initially saw a black man wearing all black, riding a bike towards the Family Dollar store. J.A. 151; J.A. 233. Officers interviewed him, but he was not the suspect. J.A. 151; J.A. 233.

After that, Officer Earwood and Officer Reilly saw Defendant wearing a black hoodie and black pants. J.A. 152; J.A. 234. He walked into



S.J.A. 5, at 02:53

McDonald's and immediately walked out. J.A. 152; J.A. 234. He had no food with him. J.A. 152. He "stare[d] at officers the whole way back to his car." J.A. 152; J.A. 234. The McDonald's was a block away and across the street from the

Family Dollar that had been robbed. J.A. 152; J.A. 187; J.A. 235. Officer Earwood decided to talk with the man "to see if he was a possible suspect or if he saw anything in the area." J.A. 152–153; J.A. 158. Officer Earwood pulled into the McDonald's parking lot. S.J.A. 1, at 00:26. He pulled near Defendant's car but did not block him in. S.J.A. 5, at 03:17. Officer Shellman arrived around the



S.J.A. 5, at 03:16.

same time, and Officer Reilly arrived a few minutes later. S.J.A. 1, at 06:24.[1] None of the officers activated their emergency lights. S.J.A. 5, at 3:39–04:00. Defendant was sitting in the Red Hyundai sedan with the driver's window down. S.J.A. 1, at 00:42.

---

[1]    Officer Shellman arrived at almost the same time that Officer Earwood did and approached behind officer Earwood. J.A. 46 (officer report); J.A. 234–235. She talked with Defendant when Officer Earwood went back to his car to check the database. J.A. 46 (officer report); S.J.A. 5, at 00:00–00:30.

<u>Officer Earwood asks Defendant if he could talk with him; Defendant agrees and in conversation provides a false name and no ID.</u>

As Officer Earwood approached the car, he smelled marijuana. J.A. 163. He asked the Defendant, "Hey, do you mind talking to me for just a second?"



S.J.A. 1, at 00:42.

S.J.A. 1, at 00:30. He then asked how long Defendant had been in the area and whether he had gotten something to eat from McDonald's. S.J.A. 1, at 00:34–00:49. Defendant told him that the lobby was closed. S.J.A. 1, at 00:50; J.A. 153. Officer Earwood asked for an ID, but Defendant claimed he did not have one. S.J.A. 1, at 00:53. Officer Earwood asked, "Do you mind if I get your name?" S.J.A. 1, at 00:55. Defendant spelled his name, M-I-G-U-E-L  H-E-N-D-E-R-S-O-N and, at Officer Earwood's request, provided his birthday. S.J.A. 1, at 00:57–01:15; J.A. 153–154. Officer Earwood, then said, "OK. Give me just a minute man. We had an incident happen across the street." S.J.A. 1, at 01:20. Officer Earwood continued, "If you're good, then give me just a second, okay?" S.J.A. 1, at 01:23; J.A. 154. Defendant responded, "Alright." S.J.A. 1, at 01:25.

8

Officer Earwood went back to his car and entered Defendant's information into police identification systems to check for his driver's license, criminal history, and any active warrants. J.A. 157–158. This took less than four minutes. S.J.A. 1, at 01:36–05:04; J.A. 177. During this time, Officer Reilly arrived. J.A. 235. After running the databases, Officer Earwood determined that Defendant had given them a fake name. S.J.A. 1, at 04:14; J.A. 158; J.A. 235.

### Officers temporarily detain Defendant based on the false name and other reasonable suspicion.

Officer Earwood returned with Officer Reilly and asked Defendant what his real name was. S.J.A. 1, at 05:16. Defendant said Miguel. S.J.A. 1, at 05:19. At that point, Officers Reilly and Earwood asked him to step out of the car. S.J.A. 1, at 05:25; S.J.A. 5, at 00:48. When Defendant dropped his hands, officers became concerned he was reaching for a weapon, so Officers Earwood and Shellman took his hands while he got out of the car.[2] S.J.A. 5, at 00:55–01:08; J.A. 159; J.A. 239. At this point, it was less than six minutes after officers first approached Defendant. S.J.A. 1, at 05:32.

While Officer Earwood was taking Defendant to his patrol car to pat him down, Officers Reilly and Shellman looked inside Defendant's car through the

---

[2]   The record describes this in a variety of ways, but the body camera video shows officers loosely holding his hands, opening the car door, and leading him out of the car. S.J.A. 5, at 00:55–01:08.

windows with a flashlight. S.J.A. 5, at 2:00–2:28. Officer Reilly said, "at a minimum, there's some weed in this car, because I can smell it." S.J.A. 5, at 02:14. Officer Shellman replied, "Yeah." S.J.A. 5, at 02:16.

Officer Earwood patted Defendant down and found $150 in his pocket. J.A. 160. Officer Earwood then radioed to see if any money had been stolen from the Family Dollar and determined that it had not. J.A. 160–161. While Defendant was being investigated for the robbery, he defended himself, saying that he did not do it. J.A. 164. He admitted he had not given them his real name, and he gave his real name. S.J.A. 1, at 06:42–07:45. Officer Earwood repeatedly told Defendant that they held him because of the false name, "If you would've just given me your real name, then we wouldn't be doing this right now." S.J.A. 1, at 07:27–07:31. While putting Defendant in the back of the patrol car, Officer Earwood said, "You're just being detained for the moment." S.J.A. 1, at 07:48.

After determining that Defendant's money did not come from the robbery, Officer Earwood checked on Defendant who admitted to giving a false name and provided an excuse for doing so. S.J.A. 1, at 09:33–09:48. Officer Earwood reiterated that the false name was the reason he was being detained. S.J.A. 1, at 9:48-9:51 and 10:10–10:17. While Officer Earwood was talking with the other officers, he told them, "We can probably search the car because I smelled weed when we were walking up to him." S.J.A. 1, at 11:12–11:16.

### Officers begin a narcotics investigation after Defendant is cleared of involvement in the robbery.

Officers requested that an Officer Joseph, who was at the Family Dollar, come and determine if Defendant was the suspect on the Family Dollar video cameras. J.A. 163; J.A. 240. Officer Joseph arrived and said it was not him. J.A. 163. At that point, officers told Defendant they were investigating him for narcotics. S.J.A. 2, at 00:38–01:06. Defendant said nothing. S.J.A. 2, at 00:38–01:10.

A K9 officer reported to the scene and did a canine search around the car, which took two and a half minutes. S.J.A. 4, at 00:30–3:00; J.A. 166. The canine alerted on the car and then alerted on the center console inside the car. S.J.A. 4, at 01:25– 01:50; J.A. 190–191; J.A. 242. Officers Earwood and Reilly searched the car. J.A. 166. Officer Earwood found a digital scale, a baseball sized bag of marijuana, and two plastic baggies in the center console. S.J.A. 4, at 03:03–03:16; J.A. 166; J.A. 244–245. He found a black Taurus handgun between the driver's seat and the console, handle facing up, loaded with one round

in the chamber and 11 rounds in the magazine. S.J.A. 4, at 03:34–04:05; J.A. 167; J.A. 170.



S.J.A. 17.

Officer Reilly determined that the gun had been stolen. J.A. 253. After they found the marijuana and were continuing to process the scene, Defendant told Officer Earwood that it was "good bud," and Officer Reilly should take a toke. J.A. 262; *see also* J.A. 254 ("Mr. Hutchinson admitted to smoking bud or marijuana.").

<u>Defendant makes incriminating statements about the gun, marijuana, and his plan to flee.</u>

Officer Reilly approached Officer Earwood's patrol car to speak with Defendant who was detained in the back. S.J.A. 3, at 00:26. Officer Reilly told Defendant that they approached multiple people about the robbery and that if

Defendant had given his correct name, this would not have happened. S.J.A. 3, at 01:02–01:08 and 01:46–02:04. Defendant told Officer Reilly that he "loves bud" and "smokes bud." S.J.A. 3, at 02:47–02:51. Officer Reilly said they did not care about the marijuana initially but had to investigate more once he gave them a false name. S.J.A. 3, 03:25–03:35.

Officer Reilly then asked Defendant about the potential gun charge:

> REILLY: Let me be straight with you, Mr. Hutchinson, ok? Convicted felon, yes or no?
>
> HUTCHINSON: Yeah.
>
> REILLY: You got a gun, right?
>
> HUTCHINSON: What gun?
>
> REILLY: Stolen gun.
>
> HUTCHINSON: What gun?
>
> REILLY: Don't play dumb with me ok. We've got your gun, alright?
>
> HUTCHINSON: What gun?
>
> REILLY: I gotcha.
>
> HUTCHINSON: Now possession is nine tenths of the law.
>
> REILLY: Were you in possession of that car?
>
> HUTCHINSON: Hell, hell yeah.
>
> REILLY: Alright.

> HUTCHINSON: Well, truthfully, listen man. I'm 33 man, 3 to 5, whatup, I'm still young man.
>
> REILLY: I gotcha.
>
> HUTCHINSON: I'm still young. You understand what I'm saying. I'm finna[3] go to the yard, get back big, do my push up. I'm ready to go to sleep though, man. Let's get this over with.

S.J.A. 3, at 04:10–04:47.

Defendant was arrested on the gun and drug charges. J.A. 262. Officer Earwood and Officer Reilly took him to jail. When they reached the jail, Defendant said that the reason he dropped his hands from the window of the car was to roll the window up so they could not get him out of the car. J.A. 171. He said he was going to drive his car through the ditch and onto Bragg Boulevard to get away. J.A. 171. That way, he could ditch the gun and not have to serve any more prison time. J.A. 171. About the marijuana, Defendant said he was giving it away but not getting paid for it. J.A. 171; J.A. 263 ("He had the baggies so he could distribute that marijuana to some young ladies."). He also said he could bond out easily and then he would get a new gun to protect himself. J.A. 172; *see also* J.A. 264 ("He made the statement that the streets were a violent place, and he was going to defend himself.").

---

[3] "Finna" is slang for "going to." https://www.diction-ary.com/e/slang/finna/.

## Motion to Suppress

In June 2020, Defendant filed a motion to suppress. J.A. 20–30. Many of the key facts he identified are undisputed:

- "[L]aw enforcement officers were investigating a Robbery at the Family Dollar located on Bragg Blvd. The cashier described the robbery suspect as a black male with a white handkerchief and wearing a dark hoodie and dark pants." J.A. 22.

- On February 3, 2019, Defendant "entered the McDonald's for a brief second then went to a red Hyundai Sonata, which was parked in the parking lot of the McDonald's." J.A. 21–22.

- Law enforcement officers saw Defendant leave the McDonald's and get into his car. J.A. 22.

- "He entered the front driver seat." J.A. 22.

- He "was wearing a black and gray hoodie and dark colored pants." J.A. 22.

- Defendant "was in the driver seat of a vehicle that was parked in the McDonald's parking lot located on Bragg Blvd. in Fayetteville, NC. J.A. 20.

- Defendant "provided the name of Miguel Henderson to officers," which was not his real name." J.A. 20.

- "Officer Earwood then ran the name through P2P, NCAWARE and DCI" "and it came back with negative results." J.A. 20; J.A. 22.

- "After determining that Mr. Hutchinson provided the incorrect name[,] law enforcement officers approached the car and requested [that] he exit." J.A. 21.

- Defendant had "begun to exit the car when law enforcement officers grabbed his arm and pinned it against the door,

opened the door, forced him out, and handcuffed" him. J.A. 21.

Defendant's motion to suppress claimed that "[w]hile the reports written by law enforcement officers stated they smelled an odor of marijuana[,] the video statements made by law enforcement officers were not as certain. One law enforcement officer said that he was not sure whether he smelled the odor of marijuana while another said that [Defendant] had a vape and that could have been where the odor was originating."[4] J.A. 23. Defendant never denied that Officer Earwood smelled marijuana coming from the car. J.A. 23. In fact, Defendant attached Officer Earwood's report to his motion to suppress. J.A. 31 ("I approached the vehicle to make contact with the male and smelled marijuana coming from the vehicle.").

Defendant's Motion to Suppress argued that law enforcement officers did not have reasonable suspicion to seize him for investigative purposes. J.A. 24–25. He said that the description of the Family Dollar robber was not detailed enough to create reasonable suspicion that Defendant had robbed the store. J.A. 24–25. He next argued that providing a false name would not support his arrest. J.A. 26–27. He argued that law enforcement did not have reasonable suspicion to search the car based on the smell of marijuana. J.A. 27–28. Finally, he argued that the K9 search was unconstitutional and does not provide probable cause to

---

[4] The government has reviewed the videos and is not aware of these statements being made. Defendant never raised these points at trial or cross-examined on this basis.

16

search the car. J.A. 29. Defendant raises only the first argument on appeal. Brief at 11–18.

In response, the government said that Defendant was detained when officers removed him from the car—not when Officer Earwood first approached to ask questions. J.A. 37. The government argued that reasonable suspicion was based on six factors, including matching the robber's description, the proximity to the robbery, his short visit to McDonald's, the smell of marijuana, and his use of a false name. J.A. 41.

On August 10, 2020, the district court denied the motion to suppress without a hearing. The Court explained that "an evidentiary hearing is not necessary" "[b]ecause the material facts necessary to resolve the motion to suppress are not in conflict." J.A. 52. As to the odor of marijuana, the court found that Defendant did not dispute that Officer Earwood smelled the strong odor of marijuana. J.A. 54. The court found that officers had reasonable suspicion to detain Defendant. J.A. 53.

## Trial

At trial, the government presented the evidence discussed above. It also presented evidence of other elements of the crime, including:

- A stipulation of Defendant's felon status and his knowledge of it. J.A. 148.

- Testimony that the firearm moved in interstate commerce. J.A. 221–231.

- Testimony from the forensic technician who evaluated the scene. J.A. 195–220.

- Testimony about drug packaging, use of items in the drug trade, such as scales, baggies, and firearms. J.A. 274–295

Defendant presented no evidence. J.A. 295. The court denied his Rule 29 Motion. J.A. 297.

As part of its closing arguments, the government mentioned that while that Defendant denied the robbery, he did not deny that the gun and drugs were his:

> You saw when he was -- when they first approached him, Officer Earwood approached him, said, hey, can I talk to you, get your information. When they asked him to get out of the car, because they realized that he had given false information, and they tell him -- he gets handcuffed. It's a little bit tense for about a second or two, right. He gets handcuffed. And then they tell him, hey, there's an armed robbery. What does he say? I didn't do an armed robbery, or something to that effect. And he is loud. I didn't do no robbery. I didn't do it, right.
>
> That's not what he does when he's confronted about the firearm. He kind of jokes around a little bit. What gun? What gun, you know. And then, I'll just do my time. I'll do three to five years. He never says, I didn't have a gun. That's not my gun. He knew that that gun was in that car so he knowingly possessed it.

J.A. 300. In its rebuttal, the government played the video of Defendant's statement again and reiterated this point:

> Never says, not my gun. I didn't have a gun. I'm 33 years old, I'll go back to the yard, three to five, that's what he says.

18

> Let's give him what he wants. Find him guilty of all these
> counts.

J.A. 320. The jury convicted on all counts. J.A. 339.

## Presentence Investigation Report

In addition to summarizing the facts in this case, the PSR discussed Defendant's conduct about ten months after the crimes charged at trial. J.A. 429, ¶ 10. On November 25, 2019, the Fort Bragg Military Police Traffic Unit saw a vehicle speeding and conducted a traffic stop. J.A. 429, ¶ 10. As officer approached, they smelled marijuana. Defendant was the rear seat passenger. J.A. 429, ¶ 10. Officers found a red bandana and $143 on the driver. J.A. 429, ¶ 10. They found a loaded 9mm pistol under the passenger's floorboard area, easily accessible to the front-seat passenger. J.A. 429, ¶ 10. A loaded .380 pistol was recovered from the driver's side floorboard. J.A. 429, ¶ 10. Officers located $16,980 from the rear seat where Defendant was sitting. J.A. 429, ¶ 10. They found a loaded AK-47 assault rifle with an extended magazine in the trunk, along with a white mask. J.A. 429, ¶ 10. Defendant had constructive possession of the AK-47, as the back seat had direct access to the trunk. J.A. 429, ¶ 10. Additionally, Defendant's cell phone had pictures of him holding an AK-47 assault rifle. J.A. 429, ¶ 10. A search of Defendant found three grams of marijuana and $1,119 on his person. J.A. 429, ¶ 10. A search of the front-seat passenger found 10 MDMA pills in his groin region, 4 grams of marijuana, and $1,315. J.A. 429, ¶ 10.

19

When Defendant was 18, he conspired with other people to kill Mavrick McKay Hill. J.A. 430, ¶ 17. He pleaded guilty to Second Degree Murder and Robbery with a Dangerous Weapon. J.A. 430, ¶ 17. He committed 31 infractions while in custody. J.A. 430, ¶ 17. When released, he violated his supervision by failing to meet monetary obligations, testing positive for drug use, failing to comply with security risk group program, and committing new criminal conduct. J.A. 430, ¶ 17. The new criminal conduct included stabbing a victim in the arm, punching the victim in the head, and threatening to kill the victim. J.A. 430, ¶17. He was released from custody for Second Degree Murder on August 23, 2017. J.A. 430, ¶ 17. He committed the crimes in this case less than 18 months later. J.A. 430, ¶¶ 8, 17.

Defendant's guidelines range was 78 to 97 months for Counts One and Two and 60 months consecutive for Count Three. J.A. 435, ¶ 60.

## Sentencing Hearing

At Defendant's sentencing, he allocuted, thanking the court for its fairness at trial and asserting his innocence. J.A. 345–346. His counsel discussed some concerns with the PSR's guidelines calculation. J.A. 346–349. The government responded that Defendant had not made any objections to the PSR and that its agent—who had been present at the first sentencing—was unable to come to this one. J.A. 350. The district court continued sentencing until the government could have its agent present. J.A. 351.

About two weeks later, the court held the final sentencing hearing. J.A. 353. Defendant withdrew his guidelines objections, explaining that they had smoothed things out and that "we're fine now." J.A. 354. The court invited Defendant to allocute again, and he told the court that the guidelines were too high for a nonviolent offense. J.A. 355–356.

The court then asked defense counsel questions to ensure it remembered the trial. J.A. 356–357. Defense counsel mentioned that it was only 19 grams of marijuana and the basis of distribution was the Defendant giving it away to women. J.A. 357–358. Counsel asked for a 60-month sentence. J.A. 358.

The government argued that Defendant had to be pulled out of the car because officers thought he was reaching for a gun. J.A. 358. Defendant said he was going to drive over the concrete parking curb to get away and discard the gun. J.A. 358–359. While on release pending these charges in state court, he was caught at Fort Bragg with $16,000 at his feet and three guns in the vehicle. J.A. 359. The government highlighted Defendant's criminal history. J.A. 359. And it pointed to Defendant's employment records to argue that he was a drug dealer, despite his claims to police. J.A. 359–360. The court then asked a series of questions to confirm that the Fort Bragg crime was related to a set of facts it had heard in a trial of one of the other people in the vehicle. J.A. 360–362. Defense counsel confirmed that it was. J.A. 361–362. Defense counsel then started to explain that in the Fort Bragg situation, Defendant did not have a firearm on his person, and the court said, "I understand." J.A. 362. The Court sentenced Defendant to 30 months on Counts One and Two, a 62% downward variance. J.A.

362. It then sentenced Defendant to a mandatory 60 month-consecutive sentence on Count Three, for a total sentence of 90 months. J.A. 362–363.

## SUMMARY OF ARGUMENT

1.      Defendant argues that the initial "stop" lacked reasonable suspicion. Brief at 11–18. But Officer Earwood's initial one-minute conversation with Defendant was consensual. Officer Earwood walked up to Defendant, who was sitting in a parked car with the window open, and asked if he could talk with him. Defendant agreed. During the consensual stage, Defendant had no ID and provided a false name. Those actions, combined with the description from the robbery and Defendant's suspicious behavior, provided reasonable suspicion for temporary detention. The strong smell of marijuana coming from the car independently provided reasonable suspicion.

2.      The district court did not err in denying the motion to suppress without a hearing. The undisputed facts support reasonable suspicion to temporarily detain Defendant. These facts included him wearing clothes that matched the description of the robber, quickly entering and leaving McDonald's, and providing officers a false name. Defendant also never contested that Officer Earwood smelled marijuana, and this fact independently provided reasonable suspicion. To the extent the court should have held a hearing, any error was harmless. Trial evidence—including the videos—shows no reason to doubt the facts the district court relied upon and no reasonable probability that the district court would have granted the motion to suppress if it had held a hearing.

3.      The government did not commit prosecutorial conduct by saying, "Let's give him what he wants," in its closing argument. The government played a recording of Defendant implicitly accepting responsibility by saying he was

young, was willing to go back to the yard for "3 to 5," do my push up. The government quoted Defendant's reference to "3 to 5" and going back to the yard for the proper purpose of showing he was implicitly accepting responsibility for his actions. Even if the statement improperly referred to sentencing, Defendant cannot show prejudice here. The remark was isolated, not distracting, and quickly corrected by the court's jury instructions that the jury not consider punishment.

  4. Defendant argues that the district court did not explain the sentence or address his nonfrivolous reasons. Brief at 25–29. We agree. But any error is harmless to Defendant. Defendant argued for a lower sentence based on the kind of drug involved, but his guidelines range was based on the gun offense—not the drug offense. And the Court imposed 62% downward variance despite his serious criminal history, many prison infractions and supervised release violations, and multiple cases of gun possession shortly after being released from second-degree murder. It did so even though Defendant went to trial and did not accept responsibility. If anyone was harmed by the court's failure to explain its sentence, it was the government—not Defendant.

# ARGUMENT

## I.   The district court did not err in denying Defendant's Motion to Suppress.

### A.   Standard of Review.

In reviewing a denial of a motion to suppress, the district court's legal conclusions are reviewed de novo, and its factual findings are reviewed for clear error. *United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013). Evidence is viewed in the light most favorable to the party prevailing below. *Id.*

### B.   Discussion of Issue.

Defendant argues that police did not have reasonable suspicion to stop and question him. Brief at 8, 11–18. But approaching a parked car and asking a person who has the window rolled down if you can ask a few questions is not a seizure that requires reasonable suspicion. When police later seized Defendant by instructing him to get out of the car and taking his hands, they had reasonable suspicion to temporarily detain him. He matched the description of the robber, made suspicious eye contact with police, had no driver's license, gave a false name, and was in a car that had a strong smell of marijuana.

#### 1.   Officer Earwood's initial approach of Defendant was not a seizure.

Defendant claims that he was seized when Officer Earwood first approached his car. Brief at 8; J.A. 20; J.A. 22. But Defendant was not seized until five minutes later when officers took his hands as he got out of the car. S.J.A. 5, at 00:55–01:08; J.A. 159; J.A. 239. For police-citizen encounters, there are three

categories: "(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." *United States v. Brown*, 401 F.3d 588, 592 (4th Cir. 2005) (citations and internal quotations omitted).

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Fla. v. Bostick*, 501 U.S. 429, 434 (1991). Such questioning "is consensual and no reasonable suspicion is required" "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Id.* (citations and internal quotations omitted). The "reasonable person test" is objective and "presupposes an innocent person." *Id.* at 437–38.

For this reason, approaching a parked car and asking questions does not usually require reasonable suspicion. *See United States v. Lewis*, 606 F.3d 193, 197-98 (4th Cir. 2010). In *Lewis*, several officers approached Lewis's car, and one asked Lewis for identification. *Id.* at 195. When Lewis rolled down his window, the officer "detected a faint odor of burnt marijuana." *Id.* This Court found that "Lewis was not 'seized' . . . when the officers approached his vehicle." *Id.* at 197. And the faint smell of marijuana provided probable cause for the search. *Id.* at 198. In *United States v. Watkins*, this Court applied the factors to find that an approach of a truck in a hotel parking lot was not a seizure. 816 F. App'x 821, 824 (4th Cir. 2020) (unpublished). Other circuits have reached the same conclusion. *See United States v. Tafuna*, 5 F.4th 1197, 1200–04 (10th Cir. 2021) (applying factors and determining that the approach of the defendant's car in the

parking lot, including the use of takedown lights and requesting the occupants to provide their names and dates of birth was not a seizure); *United States v. Kim*, 25 F.3d 1426, 1430 & n.1 (9th Cir. 1994) (holding that asking questions of a driver in a parked car is not a seizure and citing a treatise and cases from the Fifth, Eighth, and D.C. Circuits).

In *Kim*, the Ninth Circuit found that the agent's conversation was consensual even where the agent "block[ed] partially the egress of Kim's vehicle" and "asked [Kim and his passenger] to step out of the car for further questioning." *Id.* at 1428, 1431. It focused on the fact that the agent requested permission to question Kim and that the car did not totally block Kim's ability to leave. *Id.* at 1431.

The analysis of whether a particular encounter is consensual is objective, and a reviewing court is tasked with looking at "all of the circumstances surrounding the incident." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The relevant factors include:

(i)   the number of police officers present at the scene;

(ii)  whether the police officers were in uniform;

(iii) whether the police officers displayed their weapons;

(iv)  whether they touched the defendant or made any attempt to physically block his departure or restrain his movement;

(v)   the use of language or tone of voice indicating that compliance with the officer's request might be compelled;

27

(vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as "routine" in nature; and

(vii) whether, if the officer requested from the defendant some form of official identification, the officer promptly returned it.

*United States v. Black*, 707 F.3d 531, 537–538 (4th Cir. 2013) (citations and quotations omitted; paragraph separations added) (quoting *Mendenhall*, 446 U.S. at 554). Applying these factors, no seizure occurred from the beginning of the encounter until Officer Earwood approached a second time and asked Defendant to get out of the car.

**Small number of police.** Officer Earwood initially approached Defendant alone, followed shortly thereafter by Officer Shellman. J.A. 46; J.A. 234–235. Officer Reilly joined only when they asked Defendant to step out of the car. S.J.A. 1, at 05:16. In *Lewis*, "several officers" approached the defendant's car, *Lewis*, 606 F.3d at 195; here, it was two. J.A. 46; J.A. 234–235.

**Police in uniform**. The police officers were in uniform, but this factor by itself "'has little weight in the analysis.'" *Tafuna*, 5 F.4th at 1203 (quoting *United States v. Drayton*, 536 U.S. 194, 204 (2002)). "Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort." *Drayton*, 536 U.S. at 204.

**No display of weapons**. Police officers did not draw their weapons during the encounter with Defendant. S.J.A. 1, at 01:36–05:04.

28

*Police did not restrain Defendant's movements.* Police did not restrain Defendant's movement. They parked well clear of his car and did not block him in. *See* S.J.A. 5, at 03:16; S.J.A. 1, at 06:23.

*Office Earwood was conversational—not accusatory.* Officer Earwood spoke calmly and conversationally and made it clear that he was asking Defendant if he could talk with him. He began by asking, "Hey, do you mind talking to me for just a second?" S.J.A. 1, at 00:30. When Defendant did not have an ID, Officer Earwood asked, "Do you mind if I get your name." S.J.A. 1, at 00:55. After a discussion of less than minute, Officer Earwood asked, "If you're good, then give me just a second, okay?" S.J.A. 1, at 01:23. Defendant responded, "Alright." S.J.A. 1, at 01:25. Officer Earwood was not accusatory. S.J.A. 1, at 00:30 to 01:23. Both the tone and words strongly suggested that Defendant did not have to talk with Officer Earwood if he did not want to.

*Police did not retain Defendant's ID.* Officer Earwood asked Defendant for his ID but did not detain him even when Defendant had no ID. S.J.A. 1, at 00:53. He simply asked him, "Do you mind if I get your name." S.J.A. 1, at 00:55. He also asked for his birthdate and for a few minutes to run his information. S.J.A. 1, at 00:57–01:15; J.A. 153–154; S.J.A. 1, at 01:23. Unlike keeping an ID, Officer Earwood's actions did not restrain Defendant. *Tafuna*, 5 F.4th at 1203–04.

*Very quick conversation.* While not an explicit factor, the timing is also important. Officer Earwood's initial conversation with Defendant took less than a minute. *See* S.J.A. 1, at 00:30 to 01:25. It was only another four minutes when

29

Officer Earwood returned, having determined that Defendant had given him a false name. S.J.A. 1, at 01:36–05:04.

Applying these factors, Officer Earwood's initial encounter with Defendant was consensual and did not require reasonable suspicion.

## 2. When Officers Earwood and Reilly asked Defendant to get out of the car, they had reasonable suspicion.

Officers had reasonable suspicion when they asked Defendant to come out of the car and held his hands while he did so. An officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The test is objective—whether "a man of reasonable caution" would believe "that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

### a.    Reasonable suspicion of robbery

By the time officers detained Defendant, they had reasonable suspicion that Defendant had committed the Family Dollar robbery:

- He matched the description of the robber, a black man wearing a black hoodie and black pants. J.A. 152; J.A. 234.

- He entered but immediately left McDonald's. J.A. 152; J.A. 234. This was suspicious because it is unusual activity, and it is something that someone fleeing from a robbery might do— look for a safe place to hide out, and if the place does not appear safe, leave to look for another location.

- He stared at officers from the entire walk from McDonald's back to the car. J.A. 152; J.A. 234.

- He did not have a driver's license with him. S.J.A. 1, at 00:53.

- He provided a false name. S.J.A. 1, at 00:57–01:15; S.J.A. 1, at 04:14; J.A. 158; J.A. 235.

Courts have found reasonable suspicion where a false name is used. *See, e.g.*, *United States v. Golson*, 743 F.3d 44, 55 n.10 (3d Cir. 2014) (finding reasonable suspicion where postal authorities seized package based on fictitious and undeliverable return address, sent from known drug state, and use of fictitious name for addressee); *United States v. Gomez*, 312 F.3d 920, 921-26 (8th Cir. 2002) (finding reasonable suspicion where large Express Mail package had handwritten label and was marked "FRAGILE," postage was paid for in cash, package came from drug source state, sender and recipient had same surname, and carriers were unable to associate sender and recipient names with addresses on labels); *United States v. Sokolow*, 490 U.S. 1, 3 (1989) (holding that reasonable suspicion did exist where defendant purchased airline tickets in cash, was carrying $4000 in cash, gave the airline a false name and seemingly false telephone number, traveled from a known drug source city, Miami, stayed only 48 hours, appeared nervous, and checked no luggage).

Here, Defendant matched the description of the robber, entered and quickly left the McDonald's, and stared at police before Officer Earwood ever approached him. J.A. 152; J.A. 234. Then, Defendant, sitting in the driver's seat of his car, did not have his driver's license with him, S.J.A. 1, at 00:53, despite North Carolina's requirement that a person carry their driver's license while

31

driving a vehicle. *See* N.C. Gen. Stat. Ann. § 20-7(a). Finally, Defendant provided a false name. S.J.A. 1, at 00:57–01:15; S.J.A. 1, at 04:14; J.A. 158; J.A. 235. Not providing an ID and then providing a false name is suspicious because it shows a decision to conceal one's identity even where doing so risks legal consequences. These facts showed "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

> b.      Reasonable suspicion of marijuana.

The smell of marijuana also provided reasonable suspicion. Indeed, the smell of marijuana alone provides probable cause to search a vehicle—a higher standard than required here. *See, e.g., United States v. White*, 836 F.3d 437, 441-42 (4th Cir. 2016) (holding that officer's detection of the odor of marijuana is sufficient not only for reasonable suspicion but also establishes probable cause); *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) ("We have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.").

Here, Officer Earwood's testimony, report, and body camera all support his statement that he smelled marijuana when he first approached the car. At trial, Officer Earwood testified that when he approached the car, he smelled marijuana. J.A. 163; *see also* J.A. 33 (stating in his report that "I approached the vehicle to make contact with the male and smelled marijuana coming from the

vehicle."). While talking with other officers about 10 minutes after he first approached Defendant, Officer Earwood said, "We can probably search the car because I smelled weed when we were walking up to him." S.J.A. 1, at 11:12–11:16. And right after Defendant got out of his car, Officers Reilly and Shellman looked inside the car through the windows with a flashlight. S.J.A. 5, at 2:00–2:28. Officer Reilly said, "at a minimum, there's some weed in this car, because I can smell it." S.J.A. 5, at 02:14. Officer Shellman replied, "Yeah." S.J.A. 5, at 02:16; *see also* J.A. 46 (stating, in Officer Reilly's report that there was a strong smell of marijuana coming from the vehicle at this point).

Officers had two independent sources of reasonable suspicion: reasonable suspicion of Defendant's involvement in the robbery and reasonable suspicion of marijuana. The district court did not err in denying the motion to suppress.

## II.    The district court did not err in not holding a suppression hearing where the key facts were undisputed.

### A.    Standard of Review.

We agree with Defendant that "a district court's decision whether to hold an evidentiary hearing before ruling on a motion to suppress is reviewed for an abuse of discretion." *See United States v. Griffin*, 811 F. App'x 815, 816 (4th Cir. 2020) (citing *United States v. Cintron*, 724 F.3d 32, 36 (1st Cir. 2013)).[5]

-------

[5]    While Defendant did not object to the district court's decision not to hold a hearing, he preserved error by requesting an evidentiary hearing. J.A. 29; *Cf. United States v. Roane*, 100 F. App'x 901, 902 (4th Cir. 2004) (applying plain error review where there was no objection); *United States v. Lynn*, 592 F.3d

33

**B.    Discussion of Issue.**

"[A] hearing is required only if the motion to suppress is 'sufficiently definite, specific, detailed, and non-conjectural' to enable a district court to conclude that contested issues of fact going to the validity of the search are in question. *United States v. Griffin*, 811 F. App'x 815, 816 (4th Cir. 2020) (quoting *United States v. Unimex, Inc.*, 991 F.2d 546, 551 (9th Cir. 1993); and citing *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983)). In deciding whether the facts are material, this court may consider whether it would deny suppression, "[e]ven if we were to accept the version of events as set forth" by the party seeking suppression. *United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 240 (4th Cir. 2001), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).

### 1.    The undisputed facts show reasonable suspicion of robbery.

According to Defendant's motion to suppress, police were looking for the Family Dollar robber who was described "as a black male" "wearing a dark hoodie and dark pants." J.A. 22. Defendant "was wearing a black and gray hoodie and dark colored pants." J.A. 22. Defendant "entered the McDonald's for a brief second and then went to a red Hyundai Sonata, which was parked in the parking lot of the McDonald's." J.A. 21. Officer Earwood asked Defendant questions, and Defendant "provided the name of 'Miguel Henderson' to officers, which was not his real name." J.A. 20. "Officer Earwood then ran the name

---

572, 578 (4th Cir. 2010) (holding that where the district court denied a party's requested relief, the party does not have to object to the action to preserve error).

through P2P, NCAWARE and DCI," "and it came back with negative results." J.A. 20; J.A. 22.

As discussed above, these facts support reasonable suspicion. *See supra* § I. When officers "approached the car and requested [that] he exit," they knew he matched the general description of the robber and that he had provided a false name. J.A. 21. This supports their reasonable suspicion to temporarily detain him.

Defendant argues that the description of the hoodie as black and gray rather than black is material. Brief at 20. It is not. Officers could reasonably have thought that a black and gray hoodie might be described by a robbery victim as black or dark.

Defendant argues that the timing matters. Brief at 20. He explains that the government's description "implied an immediate chain of events from the report of the robbery" while Defendant "describes the seizure as being 'at least an hour later.'" Brief at 20; *see also* J.A. 22. But this is not a real discrepancy. Officer Earwood's report only says that he saw Defendant while he was still in the area. J.A. 31. It does not say how much time had passed. J.A. 31. And Defendant's matching description, quick entry and exit of McDonald's, and provision of a false name supported reasonable suspicion regardless of exactly how much time passed that evening between the robbery and seeing Defendant.

The key component of reasonable suspicion is Defendant providing a false name to police. A "reasonable man of caution" would believe that when police are investigating a robbery, it is "appropriate" to temporarily detain a person

who is wearing the same color clothes as the robber and who lies to police about his identity. *See Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (establishing the reasonable suspicion standard).

### 2. The undisputed fact that Officer Earwood smelled marijuana from the car supported reasonable suspicion.

Defendant's motion to suppress claimed that the video statements of some law enforcement officers questioned whether there was really a smell of marijuana. J.A. 23. Defendant claims that this factual difference also required a hearing. Brief at 19. It is notable that even now, Defendant does not identify any video footage that supports this bare claim in the Motion to Suppress. Brief at 19. But even if this were a factual dispute, it is not material because reasonable suspicion of the robbery supported temporary detention. And even if the smell of marijuana were required to support the search, there was no dispute that Officer Earwood smelled marijuana.

The district court found that the report of Officer Earwood "clearly states that he smelled the strong odor of marijuana when he approached the car." J.A. 53–54. Defendant never disputed this statement. J.A. 54. The court's factual determination of whether Defendant disputed Officer Earwood's statement is reviewed for clear error. *See United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013). The district court did not clearly err. Defendant never claimed that Officer Earwood did not smell marijuana. J.A. 23. And Defendant even attached Officer Earwood's report to his motion to suppress. J.A. 31.

The court found that there was reasonable suspicion because Officer Earwood smelled marijuana coming from the car. J.A. 54. For the reasons discussed above, this finding is correct. *See supra* § I.B.2.b. The fact that other officers may have questioned whether they smelled marijuana—even if this were true—does not change the fact that Officer Earwood had reasonable suspicion based on his smell.

### 3.    Any error in not holding an evidentiary hearing is harmless.

"Any error . . . that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). To "affect substantial rights," there must be a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018). "[T]he party defending the ruling below (here, the Government) bears the burden of demonstrating that the error was harmless." *United States v. Lynn*, 592 F.3d 572, 585 (4th Cir. 2010). Here, the government can show there was no reasonable probability of a different outcome.

In this case, Defendant had a trial. The body camera videos in evidence show the alleged seizure and the facts relating to reasonable suspicion. S.J.A. 1–5. The disputed facts are largely resolved by video.[6] For instance, the videos show that Defendant's hoodie was predominantly black with some gray coloring. S.J.A. 5, at 02:53.

---

[6] As discussed above, there was no actual dispute at the motion to suppress stage as to the timing of the stop. *See supra*, § II.B.1.

In Defendant's motion to suppress, he claimed that "the video statements made by law enforcement officers were not as certain [about the smell of marijuana]. One law enforcement officer said that he was not sure whether he smelled the odor of marijuana while another said that [Defendant] had a vape and that could have been where the odor was originating." J.A. 23. We are not aware of any such statements in the videos. The trial evidence shows no reason to doubt that officers smelled marijuana when they first approached Defendant's car. Less than a minute after Defendant was temporarily detained, Officers Reilly and Shellman agreed they smelled marijuana in the car. S.J.A. 5, at 02:14 to 02:16. And about ten minutes after first approaching the car, Officer Earwood said on video, "I smelled weed when we were walking up to him." S.J.A. 1, at 11:12–11:16. Officer Earwood's report and testimony were consistent. J.A. 33; J.A 163. Officer Reilly similarly testified that he smelled marijuana "as soon as I approached the vehicle with Mr. Hutchinson." J.A. 183.

There is no reasonable probability that the district court would have found that officers did not smell marijuana if it had issued an evidentiary hearing. There is no reasonable probability that the district court would have suppressed the evidence if it held an evidentiary hearing. Any error in not holding a hearing was harmless.

### III. The government did not commit prosecutorial misconduct by referencing Defendant's own words about the consequences of his actions.

#### A. Standard of Review.

A prosecutor's improper conduct at trial, without objection, is reviewed for plain error under Rule 52(b). *United States v. Woods*, 710 F.3d 195, 202 (4th Cir. 2013). "To establish plain error," the defendant "must show that an error occurred, that it was plain, and that it affected his substantial rights." *United States v. McMiller*, 954 F.3d 670, 674 (4th Cir. 2020). "Even then," this Court exercises its "discretion to correct the error only if it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation and internal quotations omitted).

#### B. Discussion of Issue.

Defendant argues that the government committed prosecutorial misconduct when it said at closing: "three to five . . . . Let's give him what he wants." Brief at 21–23; *see* J.A. 320. "Three to five" were Defendant's words in body camera video in evidence. S.J.A. 3, at 04:10–04:47. Defendant never objected to this body camera footage when it was introduced into evidence or played in closing argument. J.A. 238; J.A. 262; J.A. 300; J.A. 320. Even now, Defendant does not argue that the court erred in admitting his statements into evidence. Brief at 21–24. Instead, he argues that the prosecutor's use of the statements in its closing rebuttal improperly made punishment a part of the jury's consideration. Brief at 21–24.

At closing and rebuttal arguments, the government played this footage to show that at the time of the crime, Defendant disputed that he participated in a robbery but was accepting responsibility for the gun. J.A. 300, J.A. 320. The prosecutor's statement "Let's give him what he wants" was part of a final exhortation to "[f]ind him guilty of all these counts." J.A. 320. Defendant cannot show that making this statement was prosecutorial misconduct or that it violated his substantial rights.

To show prosecutorial misconduct during a closing argument, Defendant must establish: (1) that the prosecutor's remarks were improper; and (2) that the remarks "prejudicially affected his substantial rights so as to deprive him of a fair trial." *United States v. Benson*, 957 F.3d 218, 234 (4th Cir. 2020). This Court recognizes that "great latitude is accorded counsel in presenting closing arguments to a jury." *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009) (citations and internal quotations omitted). If prosecutors had to walk on "egg shells," the quality of advocacy would suffer. *Id.* at 633. As a result, closing arguments are "not be subject to a voluminous code of courtroom etiquette." *Id.* at 632. And this Court does not "parse through a prosecutor's closing statement for minor infelicities." *Id.* at 633.

Because closing arguments are often improvised, courts should not interpret ambiguous remarks in their most damaging way:

> Such arguments, like all closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general

40

> observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have the most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47 (1974). This is especially true of rebuttal arguments, which are even more improvised because they respond to Defendant's closing argument.

### 1.    The government's references to "three to five" were made for a lawful purpose.

A jury should reach its verdict without considering the sentence. *United States v. Meredith*, 824 F.2d 1418, 1429 (4th Cir. 1987). For this reason, a prosecutor should generally not tell a jury that the defendant might receive a light sentence. *Id.* Here, however, Defendant's words "3 to 5" showed that at the time of his arrest, he was accepting responsibility for his crime and was not denying the gun, even though he had strongly denied committing a robbery.

> HUTCHINSON: Well, truthfully, listen man. I'm 33 man, 3 to 5, whatup, I'm still young man.
>
> REILLY: I gotcha.
>
> HUTCHINSON: I'm still young. You understand what I'm saying. I'm finna go to the yard, get back big, do my push up. . . .

S.J.A. 3, at 04:33–04:47.

When police were investigating Defendant, he protested any claim that he had committed a robbery, J.A. 164; S.J.A. 1, at 06:42–07:45, but his comments

about the gun seemed to accept that he was guilty and would be punished, S.J.A. 3, at 04:33–04:47.

In closing arguments, the government played this portion of the video and emphasized that Defendant protested any involvement for the robbery but implicitly admitted his guilt as to the gun. J.A. 300. In rebuttal, it played the video again and reiterated the same point: "Never says, not my gun. I didn't have a gun. I'm 33 years old, I'll go back to the yard, three to five, that's what he says." J.A. 320. This point is based on admissible evidence that Defendant did not object to and does not challenge now. J.A. 238; J.A. 262; J.A. 300; J.A. 320; Brief at 21–24.

Defendant focuses on the government's final statement: "Let's give him what he wants. Find him guilty of all these counts." J.A. 320. Defendant claims that, "Let's give him what he wants," refers to "three to five." Brief at 22. But the prosecutor followed, "Let's give him what he wants," with exactly what it was referring to, "Find him guilty of all counts." J.A. 320. Just as Defendant was accepting responsibility at the time of arrest and willing to take the consequences, the government asked the jury to give him those consequences now by convicting him.

At most, this rhetorical flourish was a "minor infelicity[y]" that resulted from an improvised rebuttal. *See United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009). The government's core point—that the jury could consider Defendant's statements as an implicit acknowledgment of his guilt—was appropriate. This court should not construe "Let's give him what he wants" (J.A. 320) to

have the most damaging meaning. *Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47 (1974).

The fact that defense counsel did not object is another indicator that no one understood this remark at the time to be a request that Defendant get three to five years' imprisonment. And if the phrase "3 to 5" is ambiguous, that is because it is the Defendant's own words. The government never said that Defendant could or would receive this sentence. J.A. 300; J.A. 320.

Because Defendant is under plain error review, he also must show that any error was plain. He cannot establish that here based on the ambiguous nature of the government's remarks. *United States v. McMiller*, 954 F.3d 670, 674 (4th Cir. 2020).

## 2.    Any error did not prejudice Defendant.

"In evaluating the question of prejudice," this Court has "noted that a number of factors are relevant, namely: (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *United States v. Scheetz*, 293 F.3d 175, 185-86 (4th Cir. 2002).

In *Meredith,* this Court found that the prosecutor's statement that the judge could sentence the defendant to probation was not reversible error. *United States v. Meredith*, 824 F.2d 1418, 1429 (4th Cir. 1987). It focused on the district court's curative instruction and the fact that the defendant had discussed punishment to some degree in his closing. *Id.* Other circuits have also found that prosecutorial statements about sentencing are harmless when they are cured. *See, e.g., United States v. Reagan*, 694 F.2d 1075, 1080 (4th Cir. 1982).

***Little tendency to mislead and prejudice.*** At closing, the government's mention of three to five was focused on Defendant's implicit admission of guilt through his statements. J.A. 300; J.A. 320. At no point did the government say that three to five years was what Defendant would be likely to receive or that it would be an appropriate sentence. J.A. 300; J.A. 320. And there is little chance that these remarks would prejudice Defendant because a three-to-five-year sentence is still a very substantial sentence—not the sort that a jury would want to impose on weak evidence.[7]

***The remarks were isolated.*** The government's remarks were not extensive. Most of its references to "three to five" were completely proper. J.A. 300; J.A. 320. Its only arguably improper statement was, "Let's give him what he wants," six ambiguous words.

---

[7]  Defendant claims that three to five could mean three to five ***months*** rather than three to five ***years***. Brief at 22–23. But in its closing, the government specifically referred to "three to five years." J.A. 300. Nothing in the record suggests that "three to five" meant months.

***Strength of the Evidence***. The evidence against Defendant was strong, including his being the only person in the car, the location of the gun and drugs, and his later admissions at jail.

***The comment was not an intentional diversion.*** The government did not intentionally use the comment as a diversion. If anything, the context shows that the government intended the reference to "three to five" to be used for an entirely proper purpose, as an implicit admission of Defendant's guilt. J.A. 300; J.A. 320.

***Curative instructions***. Four transcript pages after the prosecutor's allegedly improper statement, the court instructed the jury not to consider punishment:

> The matter of punishment provided by the law for any offense is a matter exclusively within the control of the Court and should not be considered by you in any way as an impartial jury in arriving at your verdict as to guilt or innocence of the accused.

J.A. 324. The court likely would have done more if Defendant had objected at the time the comment was made, but he did not. J.A. 320.

Under plain error review, Defendant must also show that the error violated his substantial rights. *United States v. McMiller*, 954 F.3d 670, 674 (4th Cir. 2020). For the same reasons he cannot show prejudice, he also cannot show a violation of his substantial rights. Defendant, who failed to object here, should not be better off than a defendant who objected and received a curative instruction. *See, e.g., United States v. Meredith*, 824 F.2d 1418, 1429 (4th Cir. 1987) (affirming where the district court gave a curative instruction after the defendant

45

objected). Defendant bears a high burden to show a violation of his substantial rights and has not met that burden here.

## IV. The lack of sentencing explanation was harmless to Defendant where the district court imposed a 62% downward variance.

### A. Standard of Review.

This court reviews procedural reasonableness for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Nance*, 957 F.3d 204, 212 (4th Cir. 2020). When an abuse of discretion occurs, a sentence will not be vacated if the error was harmless. *United States v. Lewis*, 958 F.3d 240, 243 (4th Cir. 2020) (citation omitted).

### B. Discussion of Issue.

Defendant argues that the district court did not provide an individualized assessment of Defendant's sentence. Brief at 24–29. We agree. But the court's explanation error was harmless because there is no reasonable probability that it led to a higher sentence; if anything, the lack of explanation led to a lower one. Because Defendant benefited from the failure to explain, any error was harmless to him.

A district court must provide "an individualized assessment" to explain the sentence it imposes and "to permit meaningful appellate review." *United States v. Nance*, 957 F.3d 204, 215 (4th Cir. 2020). "Specifically, a district court's explanation should provide some indication that the court considered the § 3553(a) factors and applied them to the particular defendant . . . ." *Id*. at 212–

13 (citing *United States v. Montes-Pineda*, 445 F.3d 375, 380 (4th Cir. 2006)). In doing so, the court must address the defendant's non-frivolous arguments. *See Nance*, 957 F.3d at 213.

A failure to consider a defendant's argument is harmless where this Court finds with "fair assurance" "that the district court's explicit consideration" of Defendant's arguments would not have resulted in a lower sentence. *United States v. Boulware*, 604 F.3d 832, 838 (4th Cir. 2010). An explanation error is more likely to be harmless where the mitigation argument is weak. *Id.* at 839–40. In *Boulware*, the Court was unpersuaded by a mitigating argument "that imprisoning [the defendant] would negatively impact several other people that was "not atypical for a defendant." *Id.* at 839–40. Without any indication that "the effects on others from [the defendant's] imprisonment would be unusually severe," the Court found the "weakness" of that argument combined with the district court's consideration amounted to a harmless error such that "remand for resentencing would be a pointless waste of resources." *Id.*

Here, Defendant sought a 100% downward variance because the drug was marijuana and because he claimed he was not *selling* the marijuana, only giving it away. J.A. 358. But Defendant's guidelines range was not based on his drug conviction. J.A. 421, ¶¶ 48–57. Defendant's base guidelines level came from having "a semiautomatic firearm that is capable of accepting a large capacity magazine and [having been] convicted of one felony conviction of a crime of violence." J.A. 421, ¶ 48. It was no technicality that he had a crime of violence.

Defendant had been sentenced to 135 to 171 months in custody for Second Degree Murder and Conspiracy to Commit Robbery with a Dangerous Weapon. J.A. 416, ¶ 17.

Defendant then received a two-level enhancement for possessing at least three firearms based on two separate incidents, the second one where he also had about $17,000 at his feet. J.A. 415, ¶ 10; J.A. 421, ¶ 49. And he received another two-level enhancement because one of the guns he possessed was stolen. J.A. 421, ¶ 50. Since he went to trial, he received no reduction for acceptance of responsibility. J.A. 421, ¶ 54. Defendant's marijuana argument did not address the seriousness of the offense his guidelines range was based on.

Defendant also mentioned in passing that Defendant "was otherwise cooperative with law enforcement officers." J.A. 358. This claim fell flat where the undisputed PSR showed that Defendant was planning to drive over the concrete parking curb to get away but was prevented from police in doing so. J.A. 415, ¶ 9. Less than a year later, he had other guns and $17,000 in cash in another vehicle. J.A. 415, ¶ 10. He also went to trial, declining to accept responsibility for his actions. J.A. 415, ¶ 11.

If anyone was harmed by the failure to explain, it was the government. The court gave Defendant a 62% downward variance despite his twice having guns in cars in a one-year period, his past murder conviction, his many prison

48

infractions, his supervised release violations, and his new acts of violence.[8] J.A. 430, ¶ 17. Defendant committed this crime less than 18 months after being released from imprisonment for murder. J.A. 428, ¶ 8; J.A. 430, ¶ 17. The lack of explanation did not harm Defendant.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted, this 1st day of December, 2023.

MICHAEL F. EASLEY, JR.
*United States Attorney*


BY:  */s/ David A. Bragdon*
DAVID A. BRAGDON
*Assistant United States Attorney*
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: 919-856-4530


LUCY PARTAIN BROWN
*Assistant United States Attorney*

*Of Counsel*

---

[8]    If this Court remands under the theory that a full consideration of the facts and argument could lead the court to impose a different sentence, the district court should be allowed (with an appropriate explanation) to impose a higher sentence and not merely a lower one without any presumption of vindictiveness applying.

## **CERTIFICATE OF COMPLIANCE**

1.  Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief meets the page or type-volume limits of Rule 32(a) because, exclusive of the portions of the document exempted by Rule 32(f), this brief contains:

    ☐ _____ Pages *(may not exceed 30 pages for a principal brief or 15 pages for reply brief, pursuant to Rule 32(a)(7)(A))*; or

    ☒ _11,195_ Words *(may not exceed 13,000 words for a principal brief or 6,500 words for reply brief, pursuant to Rule 32(a)(7)(B))*.

2.  Further, this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016 using fourteen-point *Calisto MT*, a proportional-width typeface.

*/s/ David A. Bragdon*
DAVID A. BRAGDON
*Assistant United States Attorney*