No. 23-4705

# United States Court of Appeals for the Fourth Circuit

————

**UNITED STATES OF AMERICA,**
*Appellant,*

**v.**

**CARLOS ALSTON,**
*Appellee.*

————

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

————

## OPENING BRIEF OF THE UNITED STATES

————

MICHAEL F. EASLEY, JR.
*United States Attorney*

BY:   DAVID A. BRAGDON
SARAH E. NOKES
*Assistant United States Attorneys*

150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 856-4530

*Attorneys for Appellant*

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Introduction ........................................................................ 1

Statement of Jurisdiction ........................................................ 2

Statement of Issue ................................................................ 3

Statement of the Case ............................................................ 4

Summary of Argument ............................................................ 8

Argument ........................................................................... 9

**The District Court Erred in Finding 18 U.S.C. § 922(g)(3)
Facially Unconstitutional and Dismissing Indictment
Count Two.**

    A.    Standard of Review .................................................. 9

    B.    Discussion of Issue. ................................................ 9

        1. Legal Background ................................................ 9

        2. Defendant, as a regular unlawful drug user, is  not
           responsible citizen protected by the Second
           Amendment ................................................... 14

           a. This Court's precedent, holding that Second
              Amendment rights belong only to those individuals
              who are law-abiding and responsible, remains in effect
              post-*Bruen* ................................................ 14

           b. Alston, as a regular unlawful drug user, is not
              responsible ............................................... 17

           c. Alston's conduct, of possessing a firearm as
              an unlawful drug user or person addicted to     drugs
              is not protected by the Second Amendment ..................... 22

i

3.     Section 922(g)(3) is consistent with the historical tradition of firearms regulation. ........................................ 25

    a. Section 922(g)(3) addresses a problem in possession of firearms by unlawful drug users which did not exist at the time of the Founding. ........... 26

    b. Section 922(g)(3) is analogous to the tradition of disarming the mentally ill. ........................................... 27

    c. Section 922(g)(3) is analogous to the tradition of disarming the intoxicated. ............................................. 32

    d. Section 922(g)(3) is analogous to the tradition of disarming dangerous individuals. ................................. 36

4.     Section 922(g)(3) is at least constitutional in some applications, so Alston's facial constitutional challenge must fail ......................................................... 42

Conclusion ................................................................. 44

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*Beers v. Attorney General of the United States*,
   927 F.3d 150 (3d Cir. 2019), vacated, 140 S. Ct. 2758 (2020) ...............29, 33

*Bell v. Cone*,
   535 U.S. 685 (2002) .................................................................................. 19

*Buford v. United States*,
   532 U.S. 59 (2001) .................................................................................... 19

*Counterman v. Colorado*,
   143 S. Ct. 2106 (2023) .............................................................................. 17

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................ passim

*Drummond v. Robinson Twp.*,
   9 F.4th 217 (3d Cir. 2021) ........................................................................ 12

*Florence v. Board of Chosen Freeholders*,
   566 U.S. 318 (2012) .................................................................................. 19

*Hamilton v. Pallozzi*,
   848 F.3d 614 (4th Cir. 2017) .................................................................... 14

*Harmelin v. Michigan*,
   501 U.S. 957 (1991) ........................................................................ passim

*Johnson v. United States*,
   576 U.S. 591 (2015) .................................................................................. 21

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) .................................................................... 36

*Kendall v. Ewert*,
   259 U.S. 139 (1922) .................................................................................. 33

*McDonald v. Chicago*,
   561 U.S. 742 (2010) ...................................................................... 10, 11, 34

*Michigan v. Summers*,
   452 U.S. 692 (1981) ............................................................. 20

*Muscarello v. United States*,
   524 U.S. 125 (1998) ............................................................. 21

*National Treasury Employees Union v. Von Raab*,
   489 U.S. 656 (1989) ............................................................. 21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ........................................................... passim

*Ramirez v. Collier*,
   595 U.S. 411 (2022) ............................................................. 19

*Robertson v. Baldwin*,
   165 U.S. 275 (1897) ............................................................. 17

*Rosemond v. United States*,
   572 U.S. 65 (2014) ............................................................... 21

*State v. Shelby*,
   2 S.W. 468 (Mo. 1886) ......................................................... 34

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) ............................................... 26

*United States v. Black*,
   649 F.Supp.3d 246 (W.D. La. Jan. 6, 2023) ........................... 13

*United States v. Carpio-Leon*,
   701 F.3d 974 (4th Cir. 2012) ........................................... 15, 17

*United States v. Carter*,
   669 F.3d 411 (4th Cir. 2012) ........................................... 13, 15

*United States v. Carter*,
   750 F.3d 462 (4th Cir. 2014) ........................................... passim

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) ........................................... passim

*United States v. Claybrooks*,
　　90 F.4th 248 (4th Cir. 2024) ................................................................ 13

*United States v. Clements*,
　　No. 5:23-cr-01389, 2024 WL 129071 (D.N.M. Jan. 11, 2024) .............14, 18

*United States v. Connelly*,
　　668 F.Supp.3d 662 (W.D. Tex. Apr. 6, 2023)........................................... 14

*United States v. Daniels*,
　　77 F.4th 337 (5th Cir. 2023) ........................................................... passim

*United States v. Dugan*,
　　657 F.3d 998 (9th Cir. 2011) ................................................................ 22

*United States v. Harrison*,
　　654 F.Supp.3d 1191 (W.D. Ok. Feb. 3, 2023) ......................................... 14

*United States v. Hosford*,
　　843 F.3d 161 (4th Cir. 2016) ................................................................ 9

*United States v. Izaguirre-De La Cruz*,
　　510 F. App'x 233 (4th Cir. 2013) (unpublished) ...................................... 24

*United States v. Jackson*,
　　69 F.4th 495 (8th Cir. 2023) ............................................................37, 38

*United States v. Kelly*,
　　No. 3:22-cr-00037, 2022 WL 17336578
　　(M.D. Tenn. Nov. 16, 2022) (unpublished) ............................................. 29

*United States v. Lewis*,
　　2023 WL 4604563, ---F.Supp.3d--- (S.D. Ala. July 18, 2023) ...............13–14

*United States v. Moore*,
　　666 F.3d 313 (4th Cir. 2012) ................................................................ 15

*United States v. Patterson*,
　　431 F.3d 832 (5th Cir. 2005) ...........................................................21, 44

*United States v. Posey*,
　　655 F.Supp.3d 762 (N.D. Ind. Feb. 9, 2023) ........................................... 13

*United States v. Purdy*,
    264 F.3d 809 (9th Cir. 2001) ................................................................ 31

*United States v. Rahimi,*
    No. 22-915, 2023 WL 9375567 (U.S. Oral Arg. Nov. 7, 2023) ............17–18

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) ................................................................ 42

*United States v. Salerno*,
    481 U.S. 739 (1987) .................................................................... 9, 10, 43

*United States v. Sam*,
    No. 22-cr-87 (S.D. Miss. Oct. 3, 2023) ................................................ 14

*United States v. Seay*,
    620 F.3d 919 (8th Cir. 2010) ............................................................21–22

*United States v. Simmons*,
    No. 23-4607 ........................................................................................ 13

*United States v. Smoot*,
    690 F.3d 215 (4th Cir. 2012) ................................................................ 15

*United States v. Sperling*,
    400 F. App'x 765 (4th Cir. 2010) (unpublished) .................................... 31

*United States v. Wass*,
    954 F.3d 184 (4th Cir. 2020) .................................................................. 9

*United States v. Yancey*,
    621 F.3d 681 (7th Cir. 2010) .......................................................... passim

*Wong v. Belmontes*,
    558 U.S. 15 (2009) (per curiam) ............................................................ 19

## Statutes

18 U.S.C. § 922(g)................................................................36

18 U.S.C. § 922(g)(1)..........................................................23

18 U.S.C. § 922(g)(3)......................................................passim

18 U.S.C. § 922(g)(5)..........................................................24

18 U.S.C. § 922(g)(9)..........................................................23

18 U.S.C. § 922(n)........................................................passim

18 U.S.C. § 930....................................................................23

18 U.S.C. § 3231....................................................................2

18 U.S.C. § 3731....................................................................2

21 U.S.C. § 802(1)................................................................44

Statute of Northampton, 2 Edw. 3, c.3 (1328) ........................36

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662)..............36

1689 English Bill of Rights, 1 W. & M., ch. 2, § 7,
     in 3 Eng. Stat. at Large 441 ...........................................36–37

Act of Nov. 1, 1692, ch. 18, § 6
*Acts and Resolves of the Province of Massachusetts Bay* 52–53 (1869) ..................37

Act of June 14, 1701, ch. 7, 1 *Laws of*
*New Hampshire* 679 (Albert Stillman Batchellor ed., 1904) ............................37

*Acts of the General Assembly of the Province of New-Jersey* 303 (1752) ..................33

1775-1776 Mass. Acts 479 ..........................................................38

1776-1777 N.J. Laws 90 ..............................................................38

1777 N.C. Sess. Laws 231 ............................................................38

1777 Pa. Laws 63 ................................................................ 38

Act of Nov. 27, 1786, ch. 21,
*A Collection of All Such Acts of the General Assembly of Virginia, of
a Public and Permanent Nature, as Are Now in Force* 33 (1794) .......................... 37

*Laws of the State of New York* (vol. 2) 223 (1788) ............................................. 28

*A Collection of All Such Acts of the General Assembly of Virginia,*
(vol. 1) 234 (1792)............................................................... 28

*Acts and Laws of the State of Connecticut, in America*
(vol. 1) 236, 363–65 (1796) ........................................................ 28–29, 33

*Laws of the State of Maine* (vol. 1) 453 (1821) ................................................. 29

9 William Waller Hening, *Statutes at Large; Being a Collection of
All the Laws of Virginia* 281–83 (1821)............................................................ 38

1 William Waller Hening, *Statutes at Large;
Being a Collection of All the Laws of Virginia* 401–02 (1823).......................... 34

1837 Mass. Acts 273 ................................................................ 33

1837 Me. Laws 424................................................................ 33

1844 R.I. Pub. Laws 503 ................................................................ 33

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 ...................................... 39

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 ................................... 39

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25........................... 40

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .................................... 39

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112................................. 39

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 .................... 34, 39, 40

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170................................... 39

viii

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 .................. 40

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) .........................................39, 40

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274........................ 40

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355 ...................... 39

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ....................... 39

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879) ........................ 39

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ................................................. 39

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 ............................................ 39

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 ........................................ 39

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ................. 39

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 ............................... 39

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2 ............................ 39

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87 ...................... 39

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881) .......................... 39

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73 ................................................. 39

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112......................................... 39

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 ............................ 39

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421............................. 39

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 .................................. 39

1883 Mo. Laws 76, § 1 ................................................................................. 34

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ....................... 39

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws,
  Vol. 1 ..................................................................................34, 39, 40

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ................ 39

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 .............................. 39

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ....................... 39

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 .............. 39

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ................................... 39

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 .................................... 39

1890 Okla. Sess. Laws 495, art. 47, § 4 ....................................................... 34

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo.
  Territory Sess. Laws 140 ......................................................................... 39

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 ...................................... 39

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 ......................................... 39

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) .................................. 39

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 ......................... 39

5 *Colonial Laws of New York* ch. 1501, 244–46 (1894) ................................. 34

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ................. 39

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ..................................... 39

1899 S.C. Acts 97, No. 67, § 1 ....................................................................... 34

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ..................... 39

Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757 ....................... 40

Criminal Lunatics Act of 1800 ...................................................................... 27

Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251 ................................. 40

Gun Control Act of 1968, Pub. L. No. 90-618, § 102,
  82 Stat. 1220 .................................................................. 40

Vagrancy Act of 1744, 17 Geo. 2, c.5 ........................................ 27

Ala. Code § 13A-11-72(b) ...................................................... 18

Ark. Code Ann. § 5-73-309(7)(A) ............................................ 18

Cal. Penal Code § 29800(a)(1) ............................................... 18

Colo. Rev. Stat. Ann. § 18-12-203(1)(f) ...................................... 18

Del. Code Ann. tit. 11, § 1448(a)(3)……………………………………………18

D.C. Code § 7-2502.03(a)(4)(A)……………………………………………18

Fla. Stat. Ann. § 790.06(2)(e)-(f)……………………………………………18

Ga. Code Ann. § 16-11-129(b)(2)(I)-(J)…………………………………………18

10 Guam Code Ann. § 60109.1(b)(5)-(6) .................................... 18

Haw. Rev. Stat. § 134-7(c)(1) ................................................. 18

Idaho Code Ann. § 18-3302(11)(e)……………………………………………18

720 Ill. Comp. Stat. § 5/24-3.1(a)(3) ........................................ 18

Ind. Code § 35-47-1-7(5) ...................................................... 18

Kan. Stat. Ann. § 21-6301(a)(10) ............................................ 18

Kan. Gen. Stat., Crimes & Punishments § 282 (1868) ................................ 34

Ky. Rev. Stat. Ann. § 237.110(4)(d) .......................................... 18

Ky. Gen. Stat. ch. 29, art. 29, § 1, at 359,
  (Edward I. Bullock & William Johnson eds., 1873) ................................. 39

Mass. Gen. Laws ch. 140, § 131(d)(iii)(A) .................................................... 18

Md. Code Ann., Public Safety § 5-133(b)(5)………………………………………18

Minn. Stat. § 624.713(10)(iii) ...................................................................... 18

Miss. Rev. Code ch. 77, § 2964 (1880)...................................................... 39

Mo. Rev. Stat. § 571.070.1(2) ...................................................................... 18

N.C. Gen. Stat. § 14-415.12(b)(5)................................................................ 18

Nev. Rev. Stat. § 202.360.1(f) ...................................................................... 18

N.J. Stat. Ann. § 2C:58-3.c.(3)...................................................................... 18

N.Y. Penal Law § 400.00.1(e) ...................................................................... 18

6 N. Mar. I. Code § 10610(a)(3) ................................................................18-19

Ohio Rev. Code § 2923.13(A)(4)................................................................ 19

P.R. Laws Tit. 25, § 462a(a)(3) .................................................................... 19

R.I. Gen. Laws § 11-47-6.............................................................................. 19

S.C. Code Ann. § 16-23-30(A)(1) ................................................................ 19

S.D. Codified Laws § 23-7.7.1(3)………………………………………………19

Utah Code Ann. § 76-10-503(1)(b)(iv) ........................................................ 19

V.I. Code tit. 23, § 456a(a)(3) ...................................................................... 19

W. Va. Code § 61-7-7(a)(3) .......................................................................... 19

## Rule

Fed. R. App. P. 4(b)(1)(B)(i) .......................................................................... 2

## Federal Regulation

81 Fed. Reg. 53688 (Aug. 12, 2016) ............................................................ 19

## Constitution

U.S. Const. amend. II............................................................................9

## Other Authorities

Bronson et al., Jennifer, Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007–2009* (rev. Aug. 10, 2020) ................................................................. 20

Dowlut, Robert, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?* 36 Okla. L. Rev. 65 (1983) .......................................... 32

Fisher, Carl Erik, *The Urge: Our History of Addiction* 47 (2022) ....................... 33

Gray, Elizabeth Kelly, *Habit Forming: Drug Addiction in America*, 1776-1914 (2023) ................................................................................ 26

Kates, Don B. & Cramer, Clayton E., *Second Amendment Limitations and Criminological Considerations,* 60 Hastings L.J. 1339 (2009) ............................................................................ 30

Larson, Carton F.W., *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 Hastings L.J. 1371 (2009) ............................................................28, 30

Luna, Erik, Grant *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483 (1997) ................................................................ 26

Moran, Richard, *The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487 (1985) ............................................................ 27

Musto, David F., *Drugs in America: A Documentary History*, (NYU 2002) ............................................................................26, 27

Oser et al., Carrie B., *The Drugs-Violence Nexus
Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285
(Aug. 2009) ............................................................................. 20

Rawle, William, *A View of the Constitution of the United States of America*
(2d ed. 1829). ....................................................................... 37

Rublowsky, John, *The Stoned Age: A History of Drugs in America*
98 (1974) .............................................................................. 27

Rush, Benjamin, *An Inquiry into the Effects of Ardent Spirits Upon
the Human Body and Mind* 6 (1812) ....................................... 32–33

Vollmer, Arthur, 2 *U.S. Selective Serv. Sys., Military Obligation:
The American Tradition*, 96-97 ............................................... 33

Bureau of Justice Statistics, Office of Justice Programs,
U.S. Dep't of  Justice, *Drugs & Crime Data—Fact Sheet:
Drug-Related Crime* 3 (Sept. 1994) ........................................ 20

4 *Journals of the Continental Congress* 201–06 (1906) ..................... 38

*Records of Governor & Company of the Massachusetts
Bay in New England* 211–12 (Nathaniel B. Shurtleff ed., 1853) ......... 38

S.REP. NO. 90-1501 (1968) ........................................................ 35

15 *The Public Records of the Colony of Connecticut from May, 1775,
to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) ............. 38

Sir John Knight's Case, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) ......... 36

Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866) ......................... 37

# INTRODUCTION

It is a violation of federal law for an unlawful user of, or person addicted to, any controlled substance to possess a firearm that has moved in interstate commerce. 18 U.S.C. § 922(g)(3). The district court incorrectly found that this statute facially violates the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). While "[t]he Second Amendment … 'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense," *id*. at 26 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)), unlawful users of controlled substances are not responsible citizens and are not guaranteed unfettered Second Amendment rights. Similarly, the act of possessing a firearm by an unlawful drug user is not conduct protected by the Second Amendment. Moreover, Section 922(g)(3) is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 at 24, because it is analogous to historical laws that disarmed the mentally ill, the intoxicated and those deemed dangerous. Finally, the district court erred in striking down Section 922(g)(3) on its face because the statute is, at the very least, constitutional in some instances. This Court should reverse the district court's finding that Section 922(g)(3) is unconstitutional and its dismissal of Count Two.

## STATEMENT OF JURISDICTION

The United States appeals from the district court's order dismissing Count Two of the Indictment against Defendant–Appellee Carlos Alston in this criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered a memorandum opinion and order dismissing Count Two on October 24, 2023. J.A. 250–258. The government filed a timely notice of appeal on November 20, 2023. J.A. 259; *see* Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction under 18 U.S.C. § 3731.

## STATEMENT OF ISSUE

Whether 18 U.S.C. § 922(g)(3), which prohibits the possession of firearms by a person who "is an unlawful user of or addicted to any controlled substance," facially violates the Second Amendment.

# STATEMENT OF THE CASE

## Alleged Offense Conduct

On January 4, 2023, a Henderson Police Department officer approached Alston, a driver waiting in line at a restaurant drive-thru in Henderson, North Carolina. J.A. 170; J.A. 261. The officer told Alston that there were active warrants for his arrest and commanded Alston to show his hands. J.A. 170; J.A. 261. Alston instead retrieved and pointed a firearm at the officer. J.A. 171; J.A. 261. The officer drew his duty weapon and fired a shot at Alston, striking him in the lower body. J.A. 262. Alston exited his vehicle and ran from the officer. *Id*. Alston was apprehended after a brief pursuit, and Alston's firearm was recovered from his route of flight. *Id*. The firearm was a loaded, 9mm Smith and Wesson handgun which was not manufactured in North Carolina. *Id*.

Officers investigated the vehicle Alston left behind when he fled from police. J.A. 262. The vehicle emitted an odor of marijuana, and officers found a marijuana cigarette on the passenger seat of the vehicle. *Id*. A plastic baggie containing approximately 26 grams of marijuana was collected from the driver-side door pocket. *Id*. Officers also recovered digital scales and plastic baggies, both items commonly used in the drug trade. *Id*.

Alston's criminal history revealed a prior state conviction for possession of marijuana and a state probation revocation in resulting from a positive drug screen indicating the presence of marijuana and failure to register for drug treatment classes, among other violations. J.A. 262. Alston's criminal record also revealed that he was then under state indictment—and had been since December

2021—for assault with a deadly weapon with intent to kill inflicting serious injury (AWDWIKISI). J.A. 171.

On January 6, 2023, Alston was charged by Criminal Complaint with being an unlawful drug user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). J.A. 259–265. On January 18, 2023, Alston was taken into custody and interviewed by Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents. J.A. 171. During the interview, Alston admitted to using marijuana daily. *Id*. He also admitted to obtaining the firearm at issue in this case after he had been indicted by the state court for AWDWIKISI. *Id*. Alston admitted knowledge of the pending state indictment. *Id.*

## Procedural History

On January 24, 2023, a grand jury in the Eastern District of North Carolina returned an Indictment against Alston charging him with receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n) (Count One), and possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3) (Count Two). J.A. 8–10.

On February 28, 2023, Alston filed a motion to dismiss the Indictment, arguing both charged statutes facially violated the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). J.A. 11–43. In response, the government argued that neither Alston nor his conduct were protected by the Second Amendment. J.A. 49–53; J.A. 60–66. Furthermore, the

government argued both statutes are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 at 24; J.A. 53–59; J.A. 66–74.

Alston's motion was submitted to a magistrate judge. *See* J.A. 248. After hearing oral argument (J.A. 94–169), the magistrate judge recommended the motion to dismiss be denied as to Count One, charging a violation of 18 U.S.C. § 922(n), and granted as to Count Two, charging a violation of 18 U.S.C. § 922(g)(3). J.A. 170–211. As relevant to this appeal, the magistrate judge found that despite his ongoing illegal conduct, Alston was part of "the people" who enjoy Second Amendment rights. J.A. 180–183. The magistrate judge further found that Alston's conduct was "possession of a firearm" and that such conduct is covered by the Second Amendment. J.A. 190–191. Finally, the magistrate judge opined that 18 U.S.C. § 922(g)(3) was not consistent with the nation's historical tradition of firearms regulation. J.A. 191–209. The parties made timely objections to the magistrate judge's recommendations. J.A. 212–238; J.A. 239–247.

## Ruling Under Review

The district court concurred with the magistrate judge's recommendation, finding Section 922(g)(3) facially unconstitutional. First, the district court found that Alston is subject to the Second Amendment's protections because the term "the people" used in the Second Amendment "creates 'a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.'" J.A. 253 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581

(2008)). Second, the court found Alston's conduct of "receipt of a firearm"[1] was subject to Second Amendment protection. J.A. 254-255.

Turning to the *Bruen* analysis, the district court found Section 922(g)(3) inconsistent with the nation's historical tradition of firearms regulation. J.A. 258. First, the district court found that Section 922(g)(3) was not analogous to historical statutes disarming the mentally ill, because the government had not shown that the English legal tradition of disarming the mentally ill was continued in the colonies or early America. J.A. 255. Second, the district court found that Section 922(g)(3) was not sufficiently analogous to historical gun laws dealing with intoxicated individuals because those laws prohibited use, not possession, of guns during evens where participants were likely to drink and because later laws prohibited gun possession only by those who were actively intoxicated, not those likely to become intoxicated. J.A. 256. Finally, the district court rejected the historical disarmament of dangerous individuals as an analogue because the district court found that the purpose of disarmament of disloyal or disaffected groups was to prevent armed rebellion against the state, not to promote public safety (the purpose of Section 922(g)(3)). J.A. 256–258. In accepting Alston's arguments and the magistrate judge's recommendation, the district court apparently held that Section 922(g)(3) was unconstitutional on its face.

---

[1] It appears the district court conflated the *possession* charged in Count Two (the violation of Section 922(g)(3)), with *receipt* as charged in Count One (the violation of Section 922(n)). J.A. 8; J.A. 255. Regardless, the district court declined to consider the conduct at issue as the government framed it, as *possession by an unlawful drug user*. J.A. 254–255.

# SUMMARY OF ARGUMENT

Because they are not "responsible citizens," unlawful drug users and addicts do not have a Second Amendment right to possess firearms. *Heller*, 554 U.S. at 635. Similarly, the act of possessing a firearm by an unlawful drug user or addict is not conduct protected by the Second Amendment. *See Heller*, 554 U.S. at 625. Even if Alston and his conduct are protected by the Second Amendment, Section 922(g)(3) is constitutional because it is "consistent with the nation's historical tradition of firearms regulation." *Bruen*, 597 U.S. at 24. Section 922(g)(3) is analogous to historical laws that disarmed the mentally ill, the intoxicated and those deemed dangerous. Finally, the district court erred in striking down Section 922(g)(3) on its face because the statute is, at the very least, constitutional in some instances.

# ARGUMENT

**The District Court Erred in Finding 18 U.S.C. § 922(g)(3) Facially Unconstitutional and Dismissing Indictment Count Two.**

## A.    Standard of Review.

This Court "review[s] a district court's decision to grant a motion to dismiss an indictment *de novo*." *United States v. Wass*, 954 F.3d 184, 187 (4th Cir. 2020) (quotation marks omitted). Because Alston argued below that § 922(g)(3) is facially unconstitutional, he was required to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

## B.    Discussion of Issue.

Unlawful drug users and addicts like Alston do not enjoy Second Amendment rights and their conduct in possessing firearms while recent, regular drug users is similarly unprotected. Even so, Section 922(g)(3) is consistent with the nation's historical tradition of firearms regulation, and thus the statute survives facial challenge scrutiny post-*Bruen*.

### 1.    Legal Background.

The Second Amendment to the Constitution provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that the Amendment protects an individual right of law-

abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. Heller* made clear that the opinion should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Id.* at 626–27; *see also McDonald v. Chicago*, 561 U.S. 742, 786 (2010). *Heller* described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26. Over the next decade, courts of appeals, including this Court, applied a two-step test to determine the constitutionality of firearms regulations, which required both an examination of whether such statutes were consistent with the history of firearm regulation and application of intermediate, means-end scrutiny. *Bruen*, 597 U.S. at 17; *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010).

In *Bruen*, the Court "made the constitutional standard endorsed in *Heller* more explicit," holding that the two-step test applied by the courts of appeals was inconsistent with *Heller*'s holding, which only provided for analysis of the historical question, not means-end scrutiny. 597 U.S. at 17–19, 31. It elaborated

on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Applying that standard, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving existence of "proper cause." *Id.* at 12. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 31–33. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 31–32. This conduct, the Court concluded, fell within "the right to keep and bear arms" guaranteed by the Second Amendment. *Id.* at 33.

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the New York licensing law squared with historical tradition. *Id.* at 33–70. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 70. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly

11

used firearms for personal defense" or required a showing of special need to do so. *Id.*

*Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, *Id.* at 27. Thus, when considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* at 28. In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 28–29. Thus, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when in engaging in an analogical inquiry." *Id.* at 29 (emphasis and quotation marks omitted). The Court emphasized that this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue' . . . ." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Post-*Heller*, this Court examined the constitutionality of Section 922(g)(3)'s prohibition on firearm possession by unlawful drug users. The Court assumed, without deciding, that the Second Amendment was implicated by the prohibition against drug users' possession of firearms. *United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012). Nevertheless, the Court recognized that because unlawful drug users were not law-abiding citizens, "any infringement of [their] right to bear arms" did not implicate "a 'core' Second Amendment right." *United States v. Carter*, 750 F.3d 462, 464 (4th Cir. 2014). The Court then determined that the statute was constitutional using the means-end scrutiny test which the *Bruen* court has since disclaimed. *Id*. at 465–70.

Since *Bruen*, no court of appeals has ruled on a facial challenge to Section 922(g)(3), though the Fifth Circuit found the statute unconstitutional as applied to a particular defendant. *United States v. Daniels*, 77 F.4th 337, 355 (5th Cir. 2023), petition for cert. filed, No. 23-376. Several district courts have examined the constitutionality of the statute with differing results. *See United States v. Claybrooks*, 90 F.4th 248, 256 (4th Cir. 2024) ("The contours of *Bruen* continue to solidify in district and appellate courts across the nation, and yet there is no consensus.").[2] The statute's constitutionality is currently pending before this Court in *United States v. Simmons*, No. 23-4607.

---

[2]  In at least 45 instances, district courts have ruled Section 922(g)(3) constitutional (facially or as applied). *See, e.g., United States v. Black*, 649 F.Supp.3d 246 (W.D. La. Jan. 6, 2023); *United States v. Posey*, 655 F.Supp.3d 762 (N.D. Ind. Feb. 9, 2023); *United States v. Lewis*, 2023 WL 4604563, ---F.Supp.3d---

**2. Defendant, as a regular unlawful drug user, is not a responsible citizen protected by the Second Amendment.**

In the wake of *Heller*, and consistent with that opinion, this Court held that the Second Amendment protects the rights of "law-abiding, responsible citizens to use arms" for lawful purposes. *Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017) (citing *Heller*, 554 U.S. at 635). That precedent was undisturbed by *Bruen*. Alston, as a regular unlawful drug user, is not law-abiding or responsible, and thus he does not enjoy Second Amendment protections.

**a. This Court's precedent, holding that Second Amendment rights belong only to those individuals who are law-abiding and responsible, remains in effect post-*Bruen*.**

The district court found Alston to be amongst "the people" who enjoy Second Amendment rights. J.A. 254. The court cited *Heller* for the proposition that because the phrase "the people" refers, in six other constitutional provisions, "unambiguously . . . to all members of the political community," it creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." J.A. 253 (quoting *Heller*, 554 U.S. at 580).

---

(S.D. Ala. July 18, 2023); *United States v. Clements*, No. 5:23-cr-01389, 2024 WL 129071 (D.N.M. Jan. 11, 2024). At least four district courts (including the district court here) have found the statute unconstitutional facially or as applied to a particular defendant. *See, e.g., United States v. Connelly,* 668 F.Supp.3d 662 (W.D. Tex. Apr. 6, 2023); *United States v. Harrison,* 654 F.Supp.3d 1191 (W.D. Ok. Feb. 3, 2023); *United States v. Sam*, No. 22-cr-87 (S.D. Miss. Oct. 3, 2023).

In light of this language from *Heller*, the court summarily dismissed any connection between whether Alston was a law-abiding, responsible individual and his enjoyment of Second Amendment rights. J.A. 253–254.

However, in the immediate wake of *Heller*, this Court took a much more nuanced tack in examining whether appellants were amongst those who enjoyed Second Amendment rights, holding that "the right to keep and bear arms depends . . . on the relevant characteristics of the person invoking the right." *United States v. Carpio-Leon*, 701 F.3d 974, 977 (4th Cir. 2012) (quoting *Carter*, 669 F.3d at 415). This Court recognized that "[t]he *Heller* Court reached the Second Amendment's connection to law-abiding citizens through a historical analysis, independent of its discussion about who constitutes 'the people.'" *Id.* at 979 (citing *Heller*, 554 U.S. at 579–81). This Court thus held that Second Amendment rights were only enjoyed by "law-abiding members of the political community." *Id.* at 981; *see also United States v. Moore,* 666 F.3d 313, 320 (4th Cir. 2012) (referring to a defendant's being a law-abiding responsible citizen as a requirement for a successful Second Amendment challenge).[3]

---

[3] Notwithstanding the "streamlined analysis" the Court applied to regulations described as presumptively lawful in *Heller* (*see* J.A. 254), the Court did not rule out the possibility that an individual belonging to one of those categories of prohibited persons may be law-abiding and responsible and thus entitled to Second Amendment rights. *See United States v. Smoot*, 690 F.3d 215, 221–22 (4th Cir. 2012). There is no reason to believe, as the district court apparently did, that this Court intended courts to scrutinize whether an individual was law-abiding or responsible *only* where the challenged regulation was presumptively lawful.

In upholding the constitutionality of various gun laws post-*Heller*, this Court sometimes set aside "the first question" of "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" and decided cases using means-end scrutiny. *Chester*, 628 F.3d at 680 (internal citation omitted); *see, e.g., Carter* 750 F. 3d at 464–70 (holding Section 922(g)(3) constitutional based on means-end scrutiny). Though *Bruen* rejected use of means-end scrutiny, the justices' repeated mentions of Second Amendment rights belonging to "law-abiding, responsible citizens" further affirms this Court's precedent in holding that Second Amendment rights belong *only* to those individuals. *See Bruen* 597 U.S. at 2, 5, 7, 9, 30, 38, 60, 71, 74, 79.

In his concurrence, Justice Alito stressed *Bruen's* limited reach, saying the majority "holds that a State may not enforce a law . . . that effectively prevents its *law-abiding residents* from carrying a gun" to "defend themselves." 597 U.S. at 72 (Alito, J., concurring) (emphasis added). "That is *all* we decide," he emphasized. *Id.* (emphasis added).[4] "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.*; *see also id.* at 80 (Kavanaugh, J., concurring) ("Going forward, . . . the 43 states

---

[4] To the extent the Court does not read *Bruen*'s "law-abiding, responsible" language as a limitation on the Second Amendment right itself, the government argues in the alternative that *Bruen*'s analytical framework applies only to those cases dealing with law-abiding, responsible citizens, and a different analysis applies to category-based firearms regulations, like Section § 922(g)(3), that constrain the actions of non-law-abiding and/or irresponsible citizens.

that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

This Court's interpretation of the Second Amendment right belonging only to law-abiding and responsible individuals is consistent with the *Bruen* court's declaration that the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70. The Bill of Rights secures rights "inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions." *Robertson* v. *Baldwin*, 165 U.S. 275, 281 (1897). The First Amendment, for example, allows legislatures to ban true threats, even though a threat is a form of "speech." *See Counterman* v. *Colorado*, 143 S. Ct. 2106, 2114 (2023). And the Second Amendment allows legislatures to ban dangerous and unusual weapons, such as short-barreled shotguns, even though they are "arms." *See Heller*, 554 U.S. at 624–25. So too, history and tradition establish that the Second Amendment allows legislatures to disarm persons who are not law-abiding, responsible citizens, regardless of whether they are among "the people."

### b.    Alston, as a regular unlawful drug user, is not responsible.

To determine whether Alston is "law-abiding" and "responsible," the Court must define those terms. As the Court stated in *Carpio-Leon*, use of the term "law abiding" does not mean "any person committing any crime automatically loses the protection of the Second Amendment." 701 F.3d at 981. In *United States v. Rahimi*, a case now pending before the Supreme Court examining the

constitutionality of Section 922(g)(8), the government proffered definitions for the terms "law-abiding and "responsible," arguing that individuals are not "law-abiding" if they have committed felony-level conduct and that they are not "responsible" if some characteristic or quality they possess makes their possession of firearms particularly dangerous. *United States v. Rahimi*, 2023 WL 9375567, at *5–6 (U.S. Oral Arg. Nov. 7, 2023). These definitions alleviate courts' concerns over minor offenses and violations resulting in denial of a constitutional right. *See, e.g.,* J.A. 102; *United States v. Clements*, No. 5:23-CR-01389, 2024 WL 129071, at *4 (D.N.M. Jan. 11, 2024) ("If an otherwise law-abiding person with a concealed firearm is pulled over for speeding or running a stop sign, would their firearm possession still be protected by the Second Amendment?").

Alston's conduct, as a daily drug user, makes his possession of a firearm particularly dangerous and thus not "responsible." Armed drug users endanger society in multiple ways.[5] First, drug users may mishandle firearms—or use

---

[5] In recognition of the inherent dangerousness posed by unlawful drug users, at least 32 states and territories regulate firearm possession by unlawful drug users. *See* Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7)(A); Cal. Penal Code § 29800(a)(1); Colo. Rev. Stat. Ann. § 18-12-203(1)(f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C. Code § 7-2502.03(a)(4)(A); Fla. Stat. Ann. § 790.06(2)(e)-(f); Ga. Code Ann. § 16-11-129(b)(2)(I)-(J); 10 Guam Code Ann. § 60109.1(b)(5)-(6); Haw. Rev. Stat. § 134-7(c)(1); Idaho Code Ann. § 18-3302(11)(e); 720 Ill. Comp. Stat. § 5/24-3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(10); Ky. Rev. Stat. Ann. § 237.110(4)(d); Md. Code Ann., Public Safety § 5-133(b)(5); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Minn. Stat. § 624.713(10)(iii); Mo. Rev. Stat. § 571.070.1(2); Nev. Rev. Stat. § 202.360.1(f); N.J. Stat. Ann. § 2C:58-3.c.(3); N.Y. Penal Law § 400.00.1(e); N.C. Gen. Stat. § 14-415.12(b)(5); 6 N. Mar. I. Code §

firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *see Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). Marijuana intoxication, for example, causes disinhibition, impaired judgment, disorganized thinking, and can cause "euphoria, perceptual and other cognitive distortions, hallucinations, and mood changes," particularly in higher doses. 81 Fed. Reg. 53688; 53693–94 (Aug. 12, 2016).

Second, illegal drug users often "commit crime in order to obtain money to buy drugs"—and thus pose a danger of using firearms to facilitate such crime. *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment). Criminal cases are replete with examples of crimes motivated by drug habits.[6] And in one study, around 20% of state inmates—and nearly 40% of state inmates who were incarcerated for property crimes—stated that they

---

10610(a)(3); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); Utah Code Ann. § 76-10-503(1)(b)(iv); V.I. Code tit. 23, § 456a(a)(3); W. Va. Code § 61-7-7(a)(3).

[6] *See, e.g., Ramirez v. Collier*, 595 U.S. 411, 458 (2022) (Thomas, J., dissenting) ("the brutal slaying of a working father during a robbery spree to supply a drug habit"); *Wong v. Belmontes*, 558 U.S. 15, 15–16 (2009) (per curiam) ("bludgeoned [the victim] to death, . . . stole [her] stereo, sold it for $100, and used the money to buy beer and drugs"); *Bell v. Cone*, 535 U.S. 685, 703 (2002) ("In an apparent effort to fund this growing drug habit, he committed robberies."); *Buford v. United States*, 532 U.S. 59, 62 (2001) ("robberies had been motivated by her drug addiction").

committed their crimes in order to obtain drugs or money for drugs. *See* Jennifer Bronson et al., Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Special Report—Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007–2009*, at 6 (rev. Aug. 10, 2020).

Third, "violent crime may occur as part of the drug business or culture." *Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment). That violence can involve not only drug dealers, but also their customers. For example, violence may result from "disputes and ripoffs among individuals involved in the illegal drug market." Bureau of Justice Statistics, Office of Justice Programs, U.S. Dep't of Justice, *Drugs & Crime Data—Fact Sheet: Drug-Related Crime* 3 (Sept. 1994); *see, e.g.,* Carrie B. Oser et al., *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1288 (Aug. 2009) ("A drug deal gone wrong may frequently progress to victimization and violence."). Guns increase both the likelihood and the lethality of such drug violence.

Fourth, armed drug users endanger the police. "[D]ue to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers," and such encounters "threaten the safety" of the officers "when guns are involved." *Carter*, 750 F.3d at 469 (citation omitted); *see Michigan v. Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence."). Alston exemplified the danger drug

addicts with firearms pose to police on the night of the charged offense when he threatened a police officer with a loaded firearm.

Judicial decisions acknowledge the dangers posed by armed drug users. The Supreme Court has described "drugs and guns" as a "dangerous combination." *Rosemond v. United States*, 572 U.S. 65, 75 (2014) (citation omitted); *see Muscarello v. United States*, 524 U.S. 125, 132 (1998); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (holding suspicionless drug testing of federal employees who carry firearms is justified by "the extraordinary safety . . . hazards that would attend the promotion of drug users to positions that require the carrying of firearms," including concerns that employees "may suffer from impaired perception and judgment.") *see also Johnson v. United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting) ("Drugs and guns are never a safe combination."); *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment) ("[There is a] direct nexus between illegal drugs and crimes of violence."). And multiple courts of appeals, including this Court, have recognized that drug users are more likely than ordinary citizens to misuse firearms. *See Carter*, 750 F.3d at 470 ("[D]rug use, including marijuana use, frequently coincides with violence."); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("[U]nlawful users of controlled substances pose a risk to society if permitted to bear arms."); *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) ("[H]abitual drug abusers . . . are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."); *United*

*States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals.'") (citation omitted); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so.").

The Second Amendment protects the right to possess arms, but it does not entitle anyone "to simultaneously choose both gun possession and drug abuse." *Yancey*, 621 F.3d at 687. On the evening of January 4, 2023, Alston possessed a handgun while in the midst of felony drug possession and a dangerous drug addiction. Because he was not responsible at that time, he did not enjoy a protected Second Amendment right.

### c. Alston's conduct, of possessing a firearm as an unlawful drug user or person addicted to drugs, is not protected by the Second Amendment.

Before moving to *Bruen's* historical analysis, the Court must find that the conduct proscribed by Section 922(g)(3) is covered by the "Second Amendment's plain text." *Bruen*, 597 U.S. at 17. The district court held the conduct proscribed by Section 922(g)(3), which it defined as "the receipt of firearms" is covered by the Second Amendment. J.A. 255. It rejected the government's argument that the defendant's conduct was better characterized as possessing a firearm while being an unlawful drug user. J.A. 254. Per the district court, this

argument failed to adequately engage the *Bruen* analysis because that court analyzed whether petitioners were subject to Second Amendment protections separately from whether they had engaged in a protected course of conduct. J.A. 255. This is not the case.

The conduct prohibited by Section 922(g)(3) is not simply receipt (or possession, shipping or transporting) firearms, but rather possession of a firearm by a person who regularly and unlawfully uses drugs. To find, as the district court did, that the proscribed conduct is mere receipt of a firearm, would collapse nearly all gun regulations into one of a few simple acts instead of appreciating the nuance of each statute's prohibited conduct. Section 922(g)(3) does not prohibit mere "possession of a firearm" any more than Section 922(g)(1)'s felon-possession ban or Section 930's prohibition on firearm possession in federal buildings and courthouses proscribe mere "possession of a firearm." Second Amendment analysis based on "conduct," cannot selectively ignore some of a crime's elements.

As this Court noted, in a post-*Heller* inquiry into the constitutionality of a challenged gun law, "[t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Chester*, 628 F.3d at 680 (internal citation and quotation marks omitted); *see Bruen*, 597 U.S. at 17–19 (holding that this remains the first step of the Second Amendment analysis post-*Bruen*). In *Chester*, this Court analyzed whether 18 U.S.C. § 922(g)(9) (disarming domestic violence misdemeanants) passed constitutional muster. In answering "the first question" regarding whether the conduct

fell within the scope of the Second Amendment, the Court framed the question as "whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment." 628 F.3d at 680. Notably, the Court did *not* divorce the simple physical act (possession of a gun) from the characteristic which makes such possession unlawful (being a domestic violence misdemeanant) when making its determination of whether the conduct was covered by the Second Amendment. *See id*; *see also, e.g., United States v. Izaguirre-De La Cruz*, 510 F. App'x 233, 234 (4th Cir. 2013) (unpublished) (examining constitutionality of Section 922(g)(5) and describing the proscribed conduct as "possession of firearms by illegal aliens").

The Court should do the same here and hold that the conduct subject to the Second Amendment analysis is not merely *possession* (or receipt), but *possession by an unlawful drug user or addict*. Section 922(g)(3) does not proscribe possession of a gun; it proscribes possession of a gun by ongoing, long-term users of illegal drugs. Alston did not simply possess a gun in a vacuum. Rather, he possessed a gun while he had a raging drug use problem. This is the conduct proscribed by the statute, and it is not covered by the Second Amendment.

While the Second Amendment protects the rights of law-abiding individuals to possess guns within their homes for self-defense and to carry them outside the home for other lawful purposes, nothing about the Amendment's text protects a right "to simultaneously choose both gun possession and drug abuse." *Yancey,* 621 F.3d at 687. Such conduct— possessing a firearm by a regular unlawful drug user or addict— is not *clearly* covered by the plain text of the Second

24

Amendment, and because it is not, the district court should have ended its analysis at this step, without the burden shifting to the government to prove that there is a historical statute analogous to Section 922(g)(3). *See Bruen*, 597 U.S. at 17 (holding "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" after which showing, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation").

### 3.   Section 922(g)(3) is consistent with the historical tradition of firearms regulation.

If the Court finds that Alston and his conduct were covered by the Second Amendment, the burden shifts to the government to show that the regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Because Section 922(g)(3) addresses possession of firearms by unlawful drug users—an unprecedented problem at the time of the founding—the government need only show that it is relevantly similar to historical statutes. Section 922(g)(3) is relevantly similar to laws in existence both before and after constitutional ratification disarming (1) the mentally ill; (2) individuals who were intoxicated or likely to become so; and (3) individuals deemed dangerous. To determine whether Section 922(g)(3) is relevantly similar to these historical prohibitions on the possession of firearms by the mentally ill,

the intoxicated and those considered to be dangerous, *Bruen* instructs courts to examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 597 U.S. at 29.

> ### a. Section 922(g)(3) addresses a problem in possession of firearms by unlawful drug users which did not exist at the time of the Founding.

As the district court accurately recognized, the unlawful use of controlled substances was not a problem faced by the Founding Fathers. J.A. 255. Through much of the 19th century there was no need for firearm prohibitions addressing substances other than alcohol because drugs were not widely used as intoxicants in the United States until the late 19th and early 20th centuries. *See* David F. Musto, *Drugs in America: A Documentary History* 188–192 (NYU 2002); Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997) ("[N]arcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries."). Only in 1877 did Nevada became the first state to require a prescription for the purchase of any drug (in that case, opium). Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America*, 1776-1914 25 (2023). Because of this history, "[i]llegal drug trafficking," in particular, "is a largely modern crime." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (upholding sentencing enhancement for possessing dangerous weapon during drug offense after *Bruen*).

Marijuana is no exception. There are essentially "no accounts or reports" of "cannabis being used as an intoxicant during the period when the plant was

widely cultivated as an agricultural commodity." John Rublowsky, *The Stoned Age: A History of Drugs in America* 98 (1974). Even by the 1930s, Americans lacked "any lengthy or broad experience" with marijuana (Musto, *supra*, at 192) and prohibitions did not emerge until the early 20th century. Because the widespread use of and addiction to illegal controlled substances is a modern problem not confronted in the founding era, the government need only prove that there exists a relevantly similar historical analogue to Section 922(g)(3), not a "historical twin." *See Bruen*, 597 U.S. at 28, 30 (emphasis omitted).

### b.    Section 922(g)(3) is analogous to the tradition of disarming the mentally ill.

Historical statutes which provided for the detention or burdening of the rights of the mentally ill are relevantly similar to Section 922(g)(3)'s prohibition on firearm possession by unlawful drug users. English law in existence at the time of the founding can inform this Court regarding the Founders' understanding of the scope of nascent American rights. *See Bruen*, 597 U.S. at 39. English law at the time of the Founding, and shortly thereafter, allowed for at least some detention of the acutely mentally ill. In England, justices of the peace could confine dangerous "[l]unatics" and seize their property to pay the cost of securing them. *See* Richard Moran, *The Origin of Insanity As A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 515 (1985) (citing the Vagrancy Act of 1744, 17 Geo. 2, c. 5 and the Criminal Lunatics Act of 1800).

The district court was unconvinced by the government's argument that Section 922(g)(3) was analogous to historical statutes burdening the rights of the

27

mentally ill because "the government provide[d] no evidence that th[e] English practice [of detaining the mentally ill] 'was acted on or accepted in the colonies.'" J.A. 255 (quoting *Bruen*, 597 U.S. at 35). However, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Carton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009). The historical record bears this out. For example, a New York law authorized justices of the peace to apprehend "persons, who by lunacy or otherwise, are furiously mad, or are so far disordered in their senses that they may be dangerous to be permitted to go abroad" and to keep such persons "safely locked up in some secure place . . . and if the Justices shall find it necessary, to be there chained." Laws of the State of New York (vol. 2) 223 (1788). A Founding-era Virginia law allowed judicial officers to "inquire into the state of [] mind" of any person whom they or others suspected to be unsound and to commit such persons to the care of a friend who would be bound by surety or confine such persons to a hospital. A Collection of All Such Acts of the General Assembly of Virginia (vol. 1) 234 (1792). An 18th century Connecticut law required authorities to confine to home or another suitable place "any distracted or lunatic Person…who is dangerous and unfit to be without restraint," and if those responsible for the person "refuse[d] or neglect[ed] to confine" the person, then the authorities were to "take all proper and effectual measures" to keep the person "from going at large," including committing him "to the Gaol in that County where he or she dwells." Acts and Laws of the State

28

of Connecticut, in America (vol. 1) 236 (1796). A Maine statute from 1821 authorized justices to commit a person who was "lunatic, and so furiously mad as to render it dangerous to the peace or the safety of the good people" to the "house of correction, there to be detained till he or she be restored to his right mind…." Laws of the State of Maine (vol. 1) 453 (1821).

Given these well-established practices, no historical evidence suggests that anyone in the Founding-era believed the government lacked authority consistent with the Second Amendment to specifically disarm the mentally ill.[7] As the Third Circuit recently reasoned, in a decision vacated on other grounds, these severe restrictions on the liberty of the mentally ill made specific restrictions on firearm possession unnecessary at the time, as a detained individual was disarmed as a byproduct of his detention. *See Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), vacated, 140 S. Ct. 2758 (2020). The "longstanding" burdening of the rights of mentally ill individuals was also recognized in *Heller* and *Bruen*. *Heller*, 554 U.S. at 626 ("longstanding prohibitions

---

[7]    *See United States v. Kelly,* No. 3:22-CR-00037, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) ("[A] list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution. No reasonable person would, for example, think that the legislatures of today have adopted every single hypothetical law capable of comporting with our understanding of the Constitution, such that any law that has not yet been passed simply must be unconstitutional.").

on the possession of firearms by . . . the mentally ill" were among the constitutionally permissible regulations that the Court in *Heller* said should not "be taken to cast doubt on."); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

"[H]abitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685. Section 922(g)(3) is relevantly similar to the historical tradition of disarming (through detaining) the mentally ill by imposing a temporary restriction on an individual's lawful access to firearms during the period in the individual is incapable of safely and responsibly possessing a firearm.

Turning first to the *why* question, both historical regulations burdening the mentally ill and Section 922(g)(3) were crafted to protect the public. The existence of the historical regulations shows eighteenth century lawmakers were concerned with the dangerousness posed by those who were suffering from mental illness. Larson, *supra*, at 1377; *accord* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 Hastings L.J. 1339, 1361 n. 136 (2009). So too was Congress when, in 1968, it enacted Section 922(g)(3) "to keep guns out of the hands of presumptively risky people," including unlawful drug users. *Yancey*, 621 F.3d at 683. As the Seventh Circuit reasoned in *Yancey*, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.* at 685.

30

With regard to the *how* question, the statutes are undoubtedly different, but historical laws allowing for the physical detention of the mentally ill were necessarily more burdensome than simple disarmament. As the magistrate judge noted in finding that Section 922(n) *is* constitutional in this case, "it stands to reason" that if a statute that allows for the detention of an individual is constitutional, then the government "had the ability to impose lesser restrictions on a defendant's conduct, such as restricting a defendant's" firearms rights. J.A 186. Like the historical detention of mentally ill persons, which was temporary and only continued so long as the fit of madness lasted, Section 922(g)(3)'s disarmament lasts only so long as the person is a recent, regular, long-time user of unlawful controlled substances. *Yancey*, 621 F.3d at 687; *see United States v. Sperling*, 400 F. App'x 765, 767 (4th Cir. 2010) (unpublished) (citing *United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001)). Both regulations burden rights only temporarily, and Section 922(g)(3) is *less* restrictive than the historical detention of the mentally ill, because unlike the mentally ill individual, whose liberties were constrained based upon circumstances out of his ability to cease or control, a person subject to 922(g)(3)'s prohibition may regain his unfettered firearm possession rights at any time upon his choice to cease use of unlawful substances. *Yancey*, 621 F.3d at 686–87 ("[U]nlike those who have been convicted of a felony or committed to a mental institution and so face a lifetime ban, an unlawful drug user…could regain his right to possess a firearm simply by ending his drug abuse. In that sense, the restriction in § 922(g)(3) is far less onerous than those affecting…the mentally ill.").

Finally, both the *Heller* court and the Kavanaugh/Roberts concurrence in *Bruen* were careful to state that the court's decisions were not meant to cast doubt on regulations disarming "felons and the mentally ill." *Bruen*, 597 U.S. at 81 (Kavanaugh, J. concurring) (citing *Heller*, 554 U.S. at 626); *see* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). Because possession of firearms by unlawful drug users is analogously dangerous to possession of firearms by the mentally ill, *Bruen* does not cast doubt upon regulations prohibiting possession by unlawful drug users. *See Yancey*, 621 F.3d at 685. Because Section 922(g)(3)'s disarmament of those who are illegal drug users is analogous to the tradition of temporary detention of the mentally ill, Section 922(g)(3) is consistent with the nation's history and tradition of firearms regulation.

### c.   Section 922(g)(3) is analogous to the tradition of disarming the intoxicated.

Historical statutes which provided for the disarmament of those intoxicated by alcohol are analogous to Section 922(g)(3)'s prohibition on firearm possession by unlawful drug users. Though none of the historical statutes is a "historical twin" to Section 922(g)(3), these statutes are relevantly similar in both how and why they regulated the conduct of early Americans.

In the Founding era, drunkenness was equated to mental illness. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body*

*and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"); Carl Erik Fisher, *The Urge: Our History of Addiction* 47 (2022) (noting that "eighteenth-century writers" understood "habitual drinking" as a form of "insanity"). Many states enacted statutes that allowed "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as the mentally ill. *Kendall v. Ewert*, 259 U.S. 139, 146 (1922); *see, e.g.,* Acts and Laws of the State of Connecticut, in America (vol. 1) 363–65 (1796) (allowing judicial officers to commit drunkards to public workhouses). These greater restrictions on the liberty of habitual drunkards made firearm-specific restrictions unnecessary. *See Beers*, 927 F.3d at 157.

Early militia regulations also support the contention that the Founding generation regulated the possession of firearms by the intoxicated in order to protect the public interest. A 1746 New Jersey statute authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in Liquor." Acts of the General Assembly of the Province of New-Jersey 303 (1752); *see also* 2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation: The American Tradition, pt. 11 Pennsylvania, at 97 (1780 law disarming militia members "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). By the mid-nineteenth century, at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

Other historical statutes prohibited use of firearms at events where individuals were likely to become intoxicated. For example, in 1655, Virginia law

prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees actually became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401–02 (1823). In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)). In the era following ratification[8] of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald*, 561 U.S. at 749–50, many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kan. Gen. Stat., Crimes & Punishments § 282 (1868); 1878 Miss. Laws 175–76 § 2; 1883 Mo. Laws 76, § 1; 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 47, § 4; 1899 S.C. Acts 97, No. 67, § 1; *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

The district court found the government's analogy to restrictions on intoxicated individuals unpersuasive because "those laws apply only to actually intoxicated persons, not persons likely so to become." J.A. 256. This ignores the laws, cited above, which prohibited use of firearms at the exact times when individuals were likely to become intoxicated at certain events, *not* only once they

---

8   Historical evidence from around the time of the adoption of the Fourteenth Amendment is relevant to the *Bruen* analysis. 597 U.S. at 37–38, 60–64.

were actually intoxicated. The district court also drew a distinction between historical statutes as prohibiting *use* of firearms, while Section 922(g)(3) prohibits their *possession.* This analysis was also in error, in light of militia statutes which disarmed those who were drunk and post-ratification statutes which prohibited possession of firearms by the intoxicated. As a group, these historical statutes were designed to safeguard the public from irresponsible use of firearms by persons subject to the "temporary insanity" of intoxication. This is the same reason (the same *why*) Section 922(g)(3) was promulgated during passage of the Gun Control Act – to protect the public from people whose possession of firearms posed a safety risk. *Yancey*, 621 F.3d at 683-84 (quoting S.REP. NO. 90-1501, at 22 (1968)) ("[T]he ease with which any person can anonymously acquire firearms (including criminals, juveniles . . ., narcotic addicts, mental defectives, armed groups . . ., and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern."). These statutes provided for temporary restriction of firearm privileges, which is exactly the method (the same *how*) Section 922(g)(3) employs to achieve the same result. Both the historical statutes related to intoxication and the modern Section 922(g)(3) only temporarily restrain an individual's rights during the period in which he cannot be trusted to use or possess firearms responsibly. Because Section 922(g)(3) is thus relevantly similar to statutes imposing rights restrictions on the intoxicated, it does not violate the Second Amendment.

### d.   Section 922(g)(3) is analogous to the tradition of disarming dangerous individuals.

The "historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). Public safety was a key consideration in Congress's adoption of Section 922(g)(3), which was aimed at keeping guns out of the hands of illegal drug users. *See Yancey*, 621 F.3d at 683–84 (Congress's goal in passing § 922(g) was "to keep guns out of the hands of presumptively risky people" and to "suppress[ ] armed violence."). Accordingly, the burdens imposed by Section 922(g)(3) and the referenced historical analogues are "comparably justified." *Bruen*, 597 U.S. at 29.

English common law established the government's authority to disarm individuals posing a threat to the safety of others. Common law prohibited individuals from "go[ing] armed to terrify the King's subjects." *Bruen*, 597 U.S. at 44 (citing Sir John Knight's Case, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686)); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, provided that "'the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law,'" *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large

441). The wording of that provision indicates that Parliament could exclude those who broke the law or whose "[c]onditions" were unsuitable to firearm possession. *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023). Thus, when the "Second Amendment . . . codified [the] *pre-existing* right" to bear arms, *Heller*, 554 U.S. at 592, it codified a right that was "not unlimited," *id.* at 626, and was not understood to extend to lawbreakers and the irresponsible.

The tradition continued in early American legislatures. Early American statutes allowed for the confiscation of arms from individuals who carried them in a manner that spread fear or terror. *See Bruen*, 597 U.S. at 49–50; *see, e.g.,* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52–53 (1869); Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force* 33 (1794). As one early nineteenth century scholar noted, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). That understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908–09 (1866).

Other early statutes disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[9] or the Revolution's cause.[10] These laws likely would not pass constitutional muster today, but for Second Amendment purposes, they remain instructive. These laws demonstrate that the Second Amendment was not historically understood to pose an obstacle to disarming, as a class, certain persons deemed dangerous. *See Jackson*, 69 F.4th at 503.

As firearms technology advanced throughout the nineteenth century, states began to enact more regulations on firearms. By the turn of the twentieth century, at least 29 jurisdictions had age restrictions on purchasing or possessing

---

[9]  1 *Records of Governor & Company of the Massachusetts Bay in New England* 211–12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[10]  *See, e.g.*, 4 *Journals of the Continental Congress* 201–06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281–83 (1821) (1777 law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

firearms.[11] States enacted laws prohibiting firearm possession by persons of un-

sound mind[12] or by vagrants.[13] Several states prohibited intoxicated persons from

---

[11]  *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[12]  *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[13]  *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves

carrying firearms.[14] Beginning in the 1930s, Congress began enacting a series of statutes that restricted firearm access to those deemed potential threats to public safety. Congress initially disqualified violent criminals, fugitives, and persons under felony indictment and then added, in the 1960s, all other felons, habitual drug users and addicts, and persons with mental illnesses. *See* Federal Firearms Act, ch. 850, § 2(d)-(f), 52 Stat. 1251; Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1-2, 75 Stat. 757; Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1220.

In short, "there is an undeniable throughline in all [the] historical sources: Founding-era governments took guns away from persons perceived to be dangerous," and governments have continued to do so throughout American history. *Daniels*, 77 F.4th at 352, petition for cert filed, No. 23-376 (finding Section 922(g)(3) unconstitutional as applied to a particular defendant despite this "undeniable throughline in all historical sources"). Because drug users of the type prohibited from possessing firearms by Section 922(g)(3)—that is those whose use is recent and regular—pose a danger to the public when in possession of firearms, Congress has disarmed them. *See Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring in part and concurring in the judgment); *Yancey*, 621 F.3d

---

110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[14] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

at 685. Section 922(g)(3)'s prohibition on possession of firearms by unlawful drug users is merely a (relatively) recent iteration in a long line of statutes disarming dangerous individuals and as such it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

The district court erred in its analysis of whether Section 922(g)(3) is relevantly similar to the historical tradition of disarming the dangerous in two ways. First, the district court found that the operation of the historical statutes (the *how*) was disarmament of "those disaffected to the cause of America." J.A. 256 (internal quotation marks omitted). In fact, as detailed above, a much broader group of individuals were disarmed, including those whose possession of arms spread fear or terror, disorderly individuals and vagrants, showing early legislatures' goal of keeping guns from those whose possession would endanger the public. Section 922(g)(3)'s operation is the same as these historical statutes, in that each provide[d] for at least temporary disarmament of individuals considered by legislatures to be dangerous.

The district court similarly erred in describing too narrowly the reason historical statutes existed (the *why*) as "colonial and early American laws preventing dangerous individuals from owning guns reflected a fear that those guns might be used to overthrow the government," finding that the purpose was not analogous to Section 922(g)(3), which "simply seeks to promote public safety." J.A. 257. Section 922(g)(3)'s purpose is undoubtedly to protect the public, as were historical statutes meant to prevent individuals from carrying arms in a manner that would spread fear or terror, or those disarming the disorderly or

41

vagrants. It is clear that early legislatures were concerned with protecting *both* the public from those who would use firearms irresponsibly in a manner that would risk public safety *and* the state from armed rebellion. Accordingly, Section 922(g)(3) matches at least one of the goals of historical statutes aimed at disarming individuals considered dangerous. Because Section 922(g)(3)'s operation and purpose match those early statutes, Section 922(g)(3) is relevantly similar to such historical statutes.

**4.    Section 922(g)(3) is at least constitutional in some applications, so Alston's facial constitutional challenge must fail.**

The only court of appeals to have ruled Section 922(g)(3) unconstitutional post-*Bruen* did so *as applied* to a particular defendant while "emphasizing the narrowness of [its] holding" and "not invalidat[ing] the statute in all its applications." *Daniels*, 77 F.4th at 355 (cert. petition pending). The *Daniels* decision was controlled, at least in part, by the Fifth Circuit's decision in *United States v. Rahimi*, for which the Supreme Court has granted certiorari. 61 F.4th 443 (5th Cir. 2023)*, cert. granted,* No. 22-915, 143 S. Ct. 2688 (June 30, 2023)*.* Relying on *Rahimi*, the *Daniels* court erred in rejecting the government's argument that unlawful users of controlled substances are not "law-abiding, responsible citizens" and thus not entitled to Second Amendment rights. *Daniels*, 77 F.4th at 342–43. The *Daniels* court also demanded too close a historical analogue for Section 922(g)(3) and incorrectly rejected the "undeniable throughline in all [cited] historical sources," that "Founding-era governments took guns away from persons

perceived to be dangerous" as a historical analogue for Congress's disarmament of dangerous illegal drug users. *Id*. at 352–55. The United States has petitioned for certiorari in *Daniels*, asking the Supreme Court to hold the case pending a decision in *Rahimi*. *See* Petition for Certiorari, *United States v. Daniels*, No. 23-376 (filed Oct. 5, 2023).

Regardless, because Alston has made a *facial* constitutional challenge, he must demonstrate that there is no set of circumstances under which Congress could constitutionally prohibit individuals who regularly and unlawfully use illegal drugs from possessing firearms. *See Salerno*, 481 U.S. at 745. In sustaining Alston's facial constitutional challenge, the district court here went even further than the *Daniels* court, which did "not invalidate the statute in all its applications." 77 F.4th at 355. There are, at minimum, *some* circumstances in which Section 922(g)(3) is constitutionally sound. For example, the Constitution cannot require society to suffer a drug user actively ingesting drugs (say, smoking methamphetamine) while holding a firearm. Just as such a person could be properly seized despite otherwise existing Fourth Amendment protections, he could be properly disarmed even if he is entitled to Second Amendment rights. This would conform with the *Bruen* court's directive that the Second Amendment should be understood as equal to other rights guaranteed by the Bill of Rights. *See Bruen*, 597 U.S. at 70. It should be clear that in such a situation, the hypothetical defendant's prosecution under Section 922(g)(3) would be constitutional. Should this Court uphold Alston's facial constitutional challenge, it would be deciding otherwise.

43

In addition to unlawful drug users, Section 922(g)(3) covers individuals who are "addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act)." 18 U.S.C. § 922(g)(3).[15] That statute defines an "addict" as "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction." 21 U.S.C. § 802(1). That definition incorporates public endangerment and loss of self-control, thus describing an individual who would "pose a risk to society if permitted to bear arms." *Patterson*, 431 F.3d at 836. Such a person, who by definition is a danger to society, has no Second Amendment right to possess a firearm and this Court should so find, by upholding the facial constitutionality of Section 922(g)(3).

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the judgment of the district court dismissing Count Two of the Indictment should be reversed.

---

[15] Alston is charged under this alternative theory of criminal liability. J.A. 8.

Respectfully submitted, this 7th day of March, 2024.

MICHAEL F. EASLEY, JR.
*United States Attorney*


BY:    */s/ Sarah E. Nokes*
         SARAH E. NOKES
         *Assistant United States Attorney*
         150 Fayetteville Street, Suite 2100
         Raleigh, North Carolina 27601
         Telephone: 919-856-4530



DAVID A. BRAGDON
*Assistant United States Attorney*

*Of Counsel*

# <u>CERTIFICATE OF COMPLIANCE</u>

1.  Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief meets the page or type-volume limits of Rule 32(a) because, exclusive of the portions of the document exempted by Rule 32(f), this brief contains:

    ☐ _____ Pages *(may not exceed 30 pages for a principal brief or 15 pages for reply brief, pursuant to Rule 32(a)(7)(A))*; or

    ☒  11,455  Words *(may not exceed 13,000 words for a principal brief or 6,500 words for reply brief, pursuant to Rule 32(a)(7)(B))*.

2.  Further, this document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in Microsoft Word 2016 using fourteen-point *Calisto MT*, a proportional-width typeface.

                    */s/ Sarah E. Nokes*
                    SARAH E. NOKES
                    *Assistant United States Attorney*