No. 23-4705

# United States Court of Appeals
# for the Fourth Circuit

―――――

**UNITED STATES OF AMERICA,**
*Appellant,*

***v.***

**CARLOS ALSTON,**
*Appellee.*

―――――

*On Appeal from the United States District Court
for the Eastern District of North Carolina*

═══════════

## CORRECTED JOINT APPENDIX
### PAGES 1 TO 267

═══════════

MICHAEL F. EASLEY, JR.
*United States Attorney*

ALAN DUBOIS
*Federal Public Defender*

DAVID A. BRAGDON
SARAH E. NOKES
*Assistant United States Attorneys*
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina  27601
Telephone: (919) 856-4530

ANDREW DESIMONE
*Assistant Federal Public Defender*
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: (919) 856-4236

*Attorneys for Appellant*

*Attorney for Appellee*

## CONTENTS OF CORRECTED JOINT APPENDIX

PAGE NO.

District Court Docket Sheet............................................................................ 1

Defendant's Criminal Complaint
    Filed January 6, 2023................................................................ 8

Indictment
    Filed January 24, 2023............................................................ 15

Defendant's Motion to Dismiss Indictment
    Filed February 28, 2023 .......................................................... 18

Government's Response to Defendant's
    Motion to Dismiss
    Filed March 28, 2023............................................................... 51

Court Order for Supplemental Briefing
    Filed May 12, 2023.................................................................. 83

Defendant's Supplemental Brief
    Filed May 25, 2023.................................................................. 85

Government's Supplemental Brief
    Filed May 26, 2023.................................................................. 90

Transcript of Hearing on Motion to Dismiss Indictment
    Heard on May 31, 2023 .......................................................... 101

Memorandum and Recommendation
    Filed July 18, 2023 ................................................................. 177

Government's Objections to
    Memorandum and Recommendation
    Filed August 15, 2023............................................................. 219

Defendant's Objections to
 Memorandum and Recommendation
   Filed August 15, 2023 ............................................................... 246

Court Order on Motion to Dismiss
   Filed October 24, 2023 ............................................................. 255

Notice of Appeal
   Filed November 20, 2023 ......................................................... 266

Query   Reports     Utilities     Help   Log Out

APPEAL,STAYED

# U.S. District Court
## EASTERN DISTRICT OF NORTH CAROLINA (Western Division)
## CRIMINAL DOCKET FOR CASE #: 5:23-cr-00021-FL-RN-1

Case title: USA v. Alston                           Date Filed: 01/24/2023

Magistrate judge case number: 5:23-mj-01028-BM

---

Assigned to: District Judge Louise Wood
Flanagan
Referred to: Magistrate Judge Robert T.
Numbers, II

Appeals court case number: 23-4705 USCA

**Defendant (1)**

**Carlos Alston**                    represented by   **Edward D. Gray**
                                                      Federal Public Defender's Office
                                                      150 Fayetteville Street, Suite 450
                                                      Raleigh, NC 27601
                                                      919-856-4236
                                                      Fax: 919-856-4477
                                                      Email: edward_gray@fd.org
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      *Designation: Public Defender or*
                                                      *Community Defender Appointment*

**Pending Counts**                                    **Disposition**

Receipt of firearm by person under felony
indictment
(1)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                 **Disposition**

Possession of a firearm by unlawful user of
or person addicted to any controlled                  Dismissed per Order by Court on
substance                                             10/24/2023 (see DE 32)
(2)

**Highest Offense Level (Terminated)**

USCA4 Appeal: 23-4705        Doc: 27        Filed: 03/12/2024        Pg: 5 of 270

Felony

**Complaints**                                                    **Disposition**

18 U.S.C. § 922(g)(3) - Possession of a
Firearm by Unlawful User of or Person
Addicted to Any Controlled Substance

---

**Plaintiff**

**USA**                                    represented by   **Sarah E Nokes**
United States Attorney's Office - EDNC
150 Fayetteville Street
Ste 2100
Raleigh, NC 27601
919-856-4530
Fax: 919-856-4530
Email: sarah.nokes@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2023 | 1 | COMPLAINT as to Carlos Alston (1). (Horton, B.) [5:23-mj-01028-BM] (Entered: 01/06/2023) |
| 01/06/2023 | 2 | Arrest Warrant Issued by Magistrate Judge Brian S. Meyers in case as to Carlos Alston. Original to US Marshal's Office for service. (Horton, B.) [5:23-mj-01028-BM] (Entered: 01/06/2023) |
| 01/18/2023 | | Arrest of Carlos Alston. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/19/2023 | | Set hearing as to Carlos Alston: Initial Appearance set for 1/20/2023 at 10:00 AM in Raleigh - 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/19/2023) |
| 01/20/2023 | 3 | CJA 23 Financial Affidavit by Carlos Alston (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/20/2023 | 4 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Carlos Alston. Signed by Magistrate Judge Robert T. Numbers, II on 1/20/2023. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/20/2023 | | ORAL MOTION for Detention filed by USA as to Carlos Alston. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/20/2023 | | TEXT ORDER as to Carlos Alston - As required by Rule 5(f)(1) of the Federal Rules of Criminal Procedure, the court reminds counsel that under Brady v. Maryland and its progeny the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. 83, 87 (1963). Failure by the government to comply with its disclosure obligation could result in the exclusion of evidence, an adverse jury instruction, dismissal of charges, reversal of a conviction, vacation of a sentence, and imposition of sanctions against the individuals responsible for the violation, among other consequences.. Entered by Magistrate Judge |

| | | |
|---|---|---|
| | | Robert T. Numbers, II on 1/20/2023. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/20/2023 | 5 | Minute Entry for proceedings held before Magistrate Judge Robert T. Numbers, II in Raleigh - Initial Appearance as to Carlos Alston held on 1/20/2023. Assistant US Attorney present for the Government. Defendant requests counsel. The Court appoints a Federal Public Defender. Defendant advised of rights, charges and maximum punishments. The Government moves for detention. Probable Cause and Detention Hearings set for 1/25/2023 at 10:00 AM in Raleigh - 6th Floor Courtroom before Magistrate Judge James E. Gates. Defendant remanded to custody of the US Marshal. (Court Reporter - FTR) (Brewer, C) Modified on 1/20/2023 to add probable cause hearing (Brewer, C). [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/20/2023 | 6 | ORDER OF TEMPORARY DETENTION as to Carlos Alston - Probable Cause and Detention Hearings set for 1/25/2023 at 10:00 AM in Raleigh - 6th Floor Courtroom before Magistrate Judge James E. Gates. Signed by Magistrate Judge Robert T. Numbers, II on 1/20/2023. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/20/2023 | | Set Hearings as to Carlos Alston: Probable Cause and Detention Hearings set for 1/25/2023 at 10:00 AM in Raleigh - 6th Floor Courtroom before Magistrate Judge James E. Gates. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/20/2023) |
| 01/23/2023 | 7 | Notice of Attorney Appearance: Edward D. Gray appearing for Carlos Alston . (Gray, Edward) [5:23-mj-01028-BM] (Entered: 01/23/2023) |
| 01/23/2023 | 8 | Request for discovery filed by Carlos Alston . (Gray, Edward) [5:23-mj-01028-BM] (Entered: 01/23/2023) |
| 01/24/2023 | 9 | Arrest Warrant Returned Executed on 1/18/2023 as to Carlos Alston. (Brewer, C) [5:23-mj-01028-BM] (Entered: 01/24/2023) |
| 01/24/2023 | 11 | INDICTMENT as to Carlos Alston (1) counts 1, 2. The foreperson's signature has been redacted pursuant to the E-Government Act. The unredacted version of this document has been filed under seal. (Herrmann, L.) (Entered: 01/25/2023) |
| 01/24/2023 | 12 | Unredacted Document - 11 Indictment. (Herrmann, L.) (Entered: 01/25/2023) |
| 01/24/2023 | 13 | Penalty Sheet *(Selected Participants Only)* as to Carlos Alston. (Herrmann, L.) (Entered: 01/25/2023) |
| 01/25/2023 | 10 | Pretrial Services Report filed by Anais Perez as to Carlos Alston. (Durr, Alexandra) [5:23-mj-01028-BM] (Entered: 01/25/2023) |
| 01/25/2023 | 14 | Minute Entry for proceedings held before Magistrate Judge James E. Gates in Raleigh.Detention Hearing and Initial Appearance on Indictment as to Carlos Alston held on 1/25/2023. Assistant U.S. Attorney present for government. Defendant present with counsel. The court conducts an initial appearance on the Indictment. Defendant advised of rights, charges and maximum punishments. Evidence presented by oral testimony. The governments motion for detention is allowed. The court finds that the government has shown by clear and convincing evidence that there is no condition or set of conditions to reasonably assure the safety of the community and by a preponderance of the evidence that there is no condition or set of conditions to reasonably assure the defendants appearance as required if the defendant were to be released before trial. Defendant ordered detained and remanded to the custody of the U.S. Marshal. (Court Reporter - FTR) (Horton, B.) (Entered: 01/25/2023) |
| 01/25/2023 | | **ORAL ORDER granting Oral Motion for Detention Pending Trial as to Carlos Alston (1). Entered by Magistrate Judge James E. Gates on 1/25/2023. (Horton, B.) (Entered:** |

| | | |
|---|---|---|
| | | 01/25/2023) |
| 01/26/2023 | 15 | **ORDER OF DETENTION PENDING TRIAL as to Carlos Alston. Follows oral order of 1/25/23. Signed by Magistrate Judge James E. Gates on 1/25/2023. (Horton, B.) (Entered: 01/26/2023)** |
| 01/27/2023 | 16 | **SCHEDULING ORDER as to Carlos Alston - The attorneys are ORDERED to conduct a pre-trial conference on or before** <u>February 14, 2023.</u> **Arraignment set for** <u>3/14/2023</u> **term of court in New Bern. Motions due by** <u>2/28/2023</u>**. Response to Motion due by** <u>3/13/2023</u>**. Signed by District Judge Louise Wood Flanagan on 1/27/2023.** *Counsel should read this order in its entirety for significant deadlines and procedures.* (Rudd, D.) (Entered: 01/27/2023) |
| 02/22/2023 | | **Notice of Hearing as to Carlos Alston: Arraignment set for 3/9/2023 at 1:30 PM in Wilmington Courtroom 100 before Magistrate Judge Robert B. Jones Jr.**<br><br>*Any request for a continuance of arraignment and trial must recite a basis for good cause to enable the court to make Speedy Trial Act findings pursuant to 18 U.S.C. § 3161(h), and it must be filed not later than seven days prior to arraignment.* (Lee, L.) (Entered: 02/22/2023) |
| 02/28/2023 | 17 | First MOTION to Dismiss *Indictment* filed by Carlos Alston. (Gray, Edward) (Entered: 02/28/2023) |
| 03/01/2023 | | **TEXT ORDER as to Carlos Alston - It is ordered that arraignment, currently scheduled for March 9, 2023, at 1:30 p.m. in Wilmington, is continued and will be reset to occur no sooner than 45 days after the court's ruling on the now pending motion to dismiss indictment. Counsel should refer to** 16 **SCHEDULING ORDER for additional directives.**<br><br>**It is further ordered that any delay that results from this continuance is excluded from the Speedy Trial Act computation pursuant to 18 U.S.C. § 3161(h)(7)(A) for the reason that the ends of justice served by granting this continuance outweigh the best interest of the public and the defendant in a speedy trial. Signed by District Judge Louise Wood Flanagan on 3/1/2023. (Castania, M) (Entered: 03/01/2023)** |
| 03/10/2023 | 18 | First MOTION for Extension of Time to File Response/Reply as to 17 First MOTION to Dismiss *Indictment* filed by USA as to Carlos Alston. (Attachments: # 1 Text of Proposed Order) (Nokes, Sarah) (Entered: 03/10/2023) |
| 03/13/2023 | 19 | **ORDER granting 18 Motion for Extension of Time to File Response to Motion to Dismiss Indictment as to Carlos Alston. Signed by District Judge Louise Wood Flanagan on 3/13/2023. (Castania, M) (Entered: 03/13/2023)** |
| 03/28/2023 | 20 | RESPONSE to Motion by USA as to Carlos Alston regarding 17 First MOTION to Dismiss *Indictment* filed by USA as to Carlos Alston. (Nokes, Sarah) (Entered: 03/28/2023) |
| 03/31/2023 | | Motion Referred to US Magistrate Judge Robert T. Numbers, II as to Carlos Alston regarding 17 First MOTION to Dismiss *Indictment*. (Castania, M) (Entered: 03/31/2023) |
| 04/27/2023 | 21 | **Order Setting Hearing as to Carlos Alston. Motion Hearing regarding 17 motion to dismiss set for 5/31/2023 at 11:00 AM in Raleigh, 5th Floor Courtroom. Signed by Magistrate Judge Robert T. Numbers, II on 4/26/2023. (Castania, M) (Entered: 04/27/2023)** |
| 05/12/2023 | 22 | **ORDER as to Carlos Alston regarding 17 First MOTION to Dismiss *Indictment* - The court orders the parties to submit supplemental briefs, not to exceed 20 pages, by** |

| | | |
|---|---|---|
| | | **May 26, 2023. Signed by Magistrate Judge Robert T. Numbers, II on 5/12/2023.** (Castania, M) (Entered: 05/12/2023) |
| 05/16/2023 | | ***CHANGE IN HEARING TIME*** Reset Hearing as to Carlos Alston: Motion Hearing set for 5/31/2023 at 01:30 PM in Raleigh - 5th Floor Courtroom before Magistrate Judge Robert T. Numbers II. (Pendergrass, Carson) (Entered: 05/16/2023) |
| 05/25/2023 | 23 | SUPPLEMENTAL BRIEFING / RESPONSE TO ORDER by Carlos Alston (Gray, Edward) Modified on 5/26/2023 for clarity (Castania, M). (Entered: 05/25/2023) |
| 05/26/2023 | 24 | SUPPLEMENTAL BRIEFING / RESPONSE TO ORDER by USA as to Carlos Alston (Nokes, Sarah) Modified on 5/26/2023 for clarity (Castania, M). (Entered: 05/26/2023) |
| 05/31/2023 | 25 | Minute Entry for proceedings held before Magistrate Judge Robert T. Numbers, II in Raleigh - Motion Hearing as to Carlos Alston held on 5/31/2023 regarding 17 First MOTION to Dismiss *Indictment* filed by Carlos Alston. Assistant US Attorney present for the Government. Defendant present with counsel. The Court makes opening remarks. The parties make arguments. The Court takes this matter under advisement. Written order to follow. (Court Reporter - FTR) (Pendergrass, Carson) (Entered: 05/31/2023) |
| 06/29/2023 | 26 | OFFICIAL TRANSCRIPT of Proceedings as to Carlos Alston held on 5/31/2023, Motion Hearing, before Judge Robert T. Numbers, II. Court Transcriber/ eScribers, Telephone number 973-406-2250, www.escribers.net. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Please review Attorney obligations regarding the redaction of electronic transcripts of court proceedings available on the court's website. Redaction Request due 7/23/2023. Redacted Transcript Deadline set for 8/2/2023. Release of Transcript Restriction set for 9/30/2023. (Foell, S.) (Entered: 06/29/2023) |
| 06/29/2023 | | Notice of Filing of Official Transcript 26 Transcript. The parties have seven calendar days from the filing of the transcript to file a Notice of Intent to Request Redaction. The parties must also serve a copy on the court reporter or transcriber. After filing the Notice of Intent to Request Redaction, a party must submit to the court reporter or transcriber, within 21 calendar days of the filing of the transcript, a written statement indicating where the personal data identifiers to be redacted appear in the transcript. (Foell, S.) (Entered: 06/29/2023) |
| 07/18/2023 | 27 | **MEMORANDUM AND RECOMMENDATIONS as to Carlos Alston regarding 17 First MOTION to Dismiss Indictment. It is recommended that the Court grant in part the Motion to Dismiss. Objections to Memorandum and Recommendations due by 8/1/2023. Signed by Magistrate Judge Robert T. Numbers, II on 7/18/2023.** (Akerly, J) (Entered: 07/18/2023) |
| 07/31/2023 | 28 | MOTION for Extension of Time to file objections to 27 MEMORANDUM AND RECOMMENDATIONS as to Carlos Alston regarding 17 First MOTION to Dismiss *Indictment* until 8/15/2023filed by USA as to Carlos Alston. (Attachments: # 1 Text of Proposed Order) (Nokes, Sarah) (Entered: 07/31/2023) |
| 07/31/2023 | 29 | **ORDER granting 28 Motion for Extension of Time to File Objections to Memorandum and Recommendations as to Carlos Alston (1). Objections due on or before 8/15/2023. Signed by District Judge Louise Wood Flanagan on 7/31/2023.** (Akerly, J) (Entered: 07/31/2023) |
| 08/15/2023 | 30 | OBJECTION TO MEMORANDUM AND RECOMMENDATIONS 27 by USA as to Carlos Alston (Nokes, Sarah) (Entered: 08/15/2023) |

| | | |
|---|---|---|
| 08/15/2023 | 31 | OBJECTION TO MEMORANDUM AND RECOMMENDATIONS 27 by Carlos Alston (Gray, Edward) (Entered: 08/15/2023) |
| 09/05/2023 | | Motion Submitted to District Judge Louise Wood Flanagan as to Carlos Alston regarding 27 MEMORANDUM AND RECOMMENDATION as to Carlos Alston regarding 17 First MOTION to Dismiss *Indictment*. (Castania, M) (Entered: 09/05/2023) |
| 10/02/2023 | | Terminate transcript deadlines as to Carlos Alston (Foell, S.) (Entered: 10/02/2023) |
| 10/24/2023 | 32 | **The Court hereby ADOPTS the recommendation of the Magistrate Judge, re 27 , as its own, and for the reasons therein, defendant's Motion to Dismiss Indictment DE 17 is GRANTED IN PART and DENIED IN PART. Count two of the indictment is DISMISSED. Signed by District Judge Louise Wood Flanagan on 10/24/2023.** (Akerly, J) (Entered: 10/24/2023) |
| 10/24/2023 | | Notice of Hearing as to Carlos Alston: Arraignment set for term of court commencing on 12/12/2023. A specific date and time will be noticed approximately three weeks before the start of the term. (Akerly, J) (Entered: 10/24/2023) |
| 11/20/2023 | 33 | Notice of Appeal filed by USA as to Carlos Alston. (Nokes, Sarah) (Entered: 11/20/2023) |
| 11/21/2023 | 34 | Transmission of Notice of Appeal and Docket Sheet as to Carlos Alston to US Court of Appeals regarding 33 Notice of Appeal -*Interlocutory Appeal.* NOTE: The Docketing Statement and Transcript Order Form, if you are court appointed counsel, are available on our website at website. (Foell, S.) (Entered: 11/21/2023) |
| 11/21/2023 | | **Notice of Hearing as to Carlos Alston: Arraignment set for 12/4/2023 at 1:30 PM in Wilmington - Courtroom 3 before US Magistrate Judge Robert B. Jones, Jr.** *Any request for a continuance of arraignment and trial must recite a basis for good cause to enable the court to make Speedy Trial Act findings pursuant to 18 U.S.C. § 3161(h), and it must be filed not later than seven days prior to arraignment.* (Akerly, J) (Entered: 11/21/2023) |
| 11/27/2023 | 35 | US Court of Appeals Case Number 23-4705 (Anisha Walker, Case Manager) for defendant Carlos Alston as to 33 Notice of Appeal - Final Judgment filed by USA. (Foell, S.) (Entered: 11/28/2023) |
| 11/27/2023 | 36 | ORDER of US Court of Appeals appointing the Public Defender as to Carlos Alston regarding 33 Notice of Appeal - Final Judgment. (Foell, S.) (Entered: 11/28/2023) |
| 12/01/2023 | 37 | MOTION to Stay *pending Interlocutory Appeal* filed by USA as to Carlos Alston. (Attachments: # 1 Text of Proposed Order) (Nokes, Sarah) (Entered: 12/01/2023) |
| 12/01/2023 | | Motion Submitted to District Judge Louise Wood Flanagan regarding 37 MOTION to Stay *pending Interlocutory Appeal* as to Carlos Alston. (Akerly, J) (Entered: 12/01/2023) |
| 12/01/2023 | 38 | **ORDER granting 37 Motion to Stay as to Carlos Alston. It is further ORDERED that the arraignment, currently scheduled for December 4, 2023, is CANCELLED, to be reset upon resolution of the pending interlocutory appeal. Signed by District Judge Louise Wood Flanagan on 12/1/2023.** (Akerly, J) (Entered: 12/01/2023) |
| 12/01/2023 | | Terminate Arraignment Hearing until disposition of appeal as to Carlos Alston. (Akerly, J) (Entered: 12/01/2023) |

---

| PACER Service Center |
|---|
| **Transaction Receipt** |

12/19/23, 10:07 AM

CM/ECF - NCED

| 12/19/2023 10:06:56 | | | |
|---|---|---|---|
| **PACER Login:** | Brendab001 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:23-cr-00021-FL-RN |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

AO 91 (Rev. 11/11)  Criminal Complaint

**FILED**

# UNITED STATES DISTRICT COURT
### for the
#### Eastern District of North Carolina

JAN 06 2023

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY ___ DEP ___ DEP CLK

United States of America
v.

Carlos Alston

)
)
)
)
)
)
)

Case No. 5:23-mj-1028-Bm

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 4, 2023 _____ in the county of _____ Vance _____ in the

_____ Eastern _____ District of _____ ,North Carolina _____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| Title 18 U.S.C. 922(g)(3) | Possession of a Firearm by Unlawful User of or Person Addicted to Any Controlled Substance |

This criminal complaint is based on these facts:

See attached

☑ Continued on the attached sheet.

On this day, Special Agent Tanisha Jeter, appeared before me via reliable electronic means, was placed under oath and attested to the contents of this complain via telephone at 4:57 pm.

_Complainant's signature_

Tanisha Jeter, ATF Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: January 6, 2023; 4:57 pm

_Judge's signature_

City and state: _____ Raleigh, NC _____

United States Magistrate Judge, Brian. S. Meyers
_Printed name and title_

SEM

J.A. 8

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR CRIMINAL COMPLAINT

Tanisha M. Jeter, hereinafter designated as affiant, having been duly sworn according to law, deposes and states that:

### Affiant Background

1.  Affiant is employed as a Special Agent (S/A) for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and has been since 2015. I have been a sworn law enforcement officer since 2012 working in a criminal investigator capacity the length of my career. I have received extensive training at the ATF National Academy in the areas of firearms, explosive and arson investigations.

2.  Affiant's duties include, but are not limited to, enforcing the federal firearms laws as well as other offenses committed in violation of federal statutes. During your affiant's employment with ATF, affiant has conducted and assisted in several investigations related to federal firearms and narcotics violations. Prior to becoming employed by ATF, affiant was employed by the North Carolina State Bureau of Investigations.

### Purpose of Affidavit

3.  Affiant makes this affidavit in support of an application for the issuance of a criminal complaint in the matter of United States v. CARLOS ALSTON for the following violation:

> Possession of Firearm by a Person who is an Unlawful User of or
> Addicted to a Controlled Substance in violation of Title 18 United
> States Code, Section 922(g)(3).

1

SEN

4.  The facts contained in this affidavit are the product of my investigation and the investigation of other law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

### Facts Establishing Probable Cause

5.  On January 4, 2023, at approximately 8:00PM, a Henderson Police Department officer observed a subject (CARLOS ALSTON), known to have outstanding warrants, in the drive-thru line of a restaurant located in the 1400 block of East Andrews Avenue, Henderson, Vance County, North Carolina, which is in the Eastern District of North Carolina. The officer approached the vehicle being operated by CARLOS ALSTON, on the passenger side, and spoke to CARLOS ALSTON via the open window. CARLOS ALSTON was the sole occupant of the vehicle. The officer explained to CARLOS ALSTON that there were active warrants for his arrest and gave verbal commands for CARLOS ALSTON to show his hands. CARLOS ALSTON refused to comply with the commands and reached for an item inside of the vehicle. He then brandished the item, which was a firearm, at the officer. The officer, recognizing the item as a firearm, drew his duty weapon and fired one (1) shot at CARLOS ALSTON, striking him in the lower body.

6.  CARLOS ALSTON ran from the vehicle, across the street and between two homes, where he discarded the firearm before he collapsed from his injuries.

2

SEN

CARLOS ALSTON was then apprehended and taken into custody by Henderson Police Department officers.

7.    A Smith & Wesson, SD9VE 9mm pistol bearing serial number FZL8687, containing a magazine loaded with six rounds of 9mm ammunition, and one additional chambered round, was discovered by a Henderson Police Department article search K9 a few minutes later along CARLOS ALSTON's flightpath from law enforcement.

8.    Henderson Police Department officers identified the odor of marijuana emitting from the vehicle CARLOS ALSTON was operating based on their training and experience. Officers collected a cigarette containing what they recognized, through their training and experience, to be marijuana from the passenger seat of the vehicle. The marijuana cigarette weighed approximately 1.1 grams. Additionally, a plastic baggie containing approximately twenty-six (26) grams of a substance officers recognized as marijuana was collected from the driver-side door pocket. Drug paraphernalia, also recognizable to officers from their training and experience, including a digital scale, was recovered from the center console cup holder, along with an open box of sandwich baggies from the back seat.

9.    An examination of CARLOS ALSTON's criminal history revealed a state probation revocation in 2021, resulting from a positive drug screen indicating the presence of marijuana, failure to register for drug treatment classes, and

3

SEN

multiple new criminal allegations in Vance County, North Carolina involving stolen firearms and an assault involving a firearm.

10. Regarding CARLOS ALSTON's recent criminal history, on April 19, 2019, CARLOS ASLTON was arrested by Henderson Police Department after being found in possession of a stolen firearm and 33 grams of marijuana following a traffic stop in which CARLOS ALSTON was operating a vehicle which was emitting a strong odor of marijuana. CARLOS ALSTON handed the officer a baggie containing the 33 grams of marijuana and the stolen firearm was located beneath the driver's seat.

11. In September 2021, CARLOS ALSTON was the passenger in a vehicle which failed to yield to a Henderson Police officer's blue lights and sirens as they were attempting to stop the vehicle for a traffic violation. An object, later identified as a stolen firearm wrapped in a t-shirt, was thrown from the passenger window just before the vehicle yielded to police. CARLOS ALSTON ran from the vehicle as the Henderson Police Department officer was securing the driver in his patrol vehicle. The officer found a small blue baggie containing approximately 1.8 grams of marijuana on the passenger seat of the vehicle, where CARLOS ALSTON had been sitting prior to the stop. CARLOS ALSTON was arrested on a later date.

12. Based on CARLOS ALSTON's recent positive drug screen for marijuana, recent law enforcement contacts during which he was found with marijuana and the evidence of items found in the vehicle of which he was the sole occupant

4

on January 4, 2023, including a marijuana cigarette, odor of marijuana and baggie of marijuana, your affiant believes that CARLOS ALSTON is an unlawful user of marijuana and/or is addicted to marijuana.

13. A description of the Smith & Wesson SD9VE 9mm pistol bearing serial number FZL8687 was provided to ATF Nexus examiner, Special Agent John Griffin, who has training and expertise in firearms nexus examinations. S/A Griffin determined that the Smith & Wesson SD9VE 9mm pistol bearing serial number FZL8687 is a firearm as that term is defined in 18 U.S.C. § 921(a)(3). He further determined that the firearm was manufactured outside of the state of North Carolina, meaning that it traveled in interstate and/or international commerce before being possessed in North Carolina by CARLOS ALSTON.

## Conclusion

14. Based on the forgoing facts, I respectfully submit that probable cause exists to believe that on or about January 4, 2023, in Vance County, North Carolina, CARLOS ALSTON did possess a firearm while knowing that he was an

unlawful user of, or addicted to, controlled substances, in violation of Title 18 United States Code, Section 922(g)(3).

Respectfully submitted,

Tanisha M. Jeter
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

USMJ signature on next page - Page 6. BSM 01/06/2023

5

On this ___6ᵗʰ___ day of January 2023, pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, Special Agent Tanisha Jeter of the Bureau of Alcohol, Tobacco, Firearms and Explosives appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this Affidavit ɑᴛ 4:57 ᴘᴍ

Honorable Brian S. Meyers
United States Magistrate Judge
Eastern District of North Carolina

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

6

FILED IN OPEN COURT
ON _1-24-2023_ BG
Peter A. Moore, Jr., Clerk
US District Court
Eastern District of NC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:23-CR-21-1FL-RN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | INDICTMENT |
| | ) | |
| CARLOS ALSTON | ) | |

The Grand Jury charges that:

## COUNT ONE

On a date unknown to the Grand Jury, but in or about December 2022, in the Eastern District of North Carolina, the defendant, CARLOS ALSTON, knowing he was then under indictment by the State of North Carolina for a crime punishable by imprisonment for a term exceeding one year, that being: assault with a deadly weapon with intent to kill and inflicting serious injury, did willfully receive a firearm, said firearm having been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Sections 922(n) and 924.

## COUNT TWO

On or about January 4, 2023, in the Eastern District of North Carolina, the defendant, CARLOS ALSTON, knowing he was an unlawful user of and addicted to any controlled substance, including marijuana, a Schedule I Controlled Substance, did knowingly possess in and affecting commerce, a firearm, in violation of Title 18, United States Code, Sections 922(g)(3) and 924.

## FORFEITURE NOTICE

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any violation of the Gun Control Act, the National Firearms Act, or any other offense charged herein that involved or was perpetrated in whole or in part by the use of firearms or ammunition, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and/or 26 U.S.C. § 5872, as made applicable by 28 U.S.C. § 2461(c), any and all firearms and ammunition that were involved in or used in a knowing or willful commission of the offense, or that were intended to be used in any offense identified in 18 U.S.C. § 924(d)(3), or, pursuant to 18 U.S.C. § 3665, that were found in the possession or under the immediate control of the defendant at the time of arrest.

The forfeitable property includes, but is not limited to, the following:

Personal Property:

a) One Smith & Wesson SD9VE 9mm pistol, bearing serial number FZL8687, seized on January 4, 2023, from CARLOS ALSTON and any and all associated ammunition.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the

me

intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

A TRUE BILL:

**REDACTED VERSION**
Pursuant to the E-Government Act and the federal rules, the unredacted version of this document has been filed under seal.

FOREPERSON

1/24/2023
DATE

MICHAEL F. EASLEY, JR.
United States Attorney

BY: SARAH E. NOKES
Assistant United States Attorney

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | |
|---|---|
| UNITED STATES OF AMERICA | MOTION TO DISMISS INDICTMENT AND INCORPORATED MEMORANDUM OF LAW |
| v. | |
| CARLOS ALSTON | |

Defendant Carlos Alston, through undersigned counsel, respectfully asks this Court to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) because 18 U.S.C. § 922(g)(3) and 18 U.S.C. § 922(n) violate Mr. Alston's Second Amendment right to keep and bear arms.

## I.    BACKGROUND

### A.  Procedural History

On January 24, 2023, Mr. Alston was charged in a two-count indictment with one count of being a person in receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n), and one count of being a person in possession of a firearm while a drug user, in violation of 18 U.S.C. § 922(g)(3). [DE 11]. Arraignment is set for March 9, 2023.

### B.  Factual Background

Mr. Alston was waiting in the drive-thru line of a restaurant located in Henderson, North Carolina, when police approached his car. [DE 1]. Mr. Alston anticipates that the government will argue Mr. Alston brandished a weapon at the approaching police officer after the officer gave verbal commands for Mr. Alston to show his hands and notified him of outstanding warrants. [DE 1]. The officer then shot Mr. Alston once, striking him in the lower body. [DE 1]. After a foot chase, Mr. Alston collapsed from his injuries and was taken into

J.A. 18

custody. [DE 1]. Police recovered a Smith & Wesson, SD9VE 9mm pistol near Mr. Alston's flight path, and they discovered marijuana in his car. Mr. Alston has a prior criminal conviction related to marijuana. [DE 1]. At the time of the shooting, Mr. Alston did not have any felony convictions.

## II.    LAW REGARDING SECOND AMENDMENT ANALYSIS UNDER *BRUEN*

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), issued on June 23, 2022, marked a dramatic shift in Second Amendment law. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen,* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era. *Id.*

### A.  Before *Bruen*, lower courts evaluated Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court therefore struck down District of Columbia statutes prohibiting the possession of handguns in the home and requiring that other guns in the home be kept inoperable. *Id.* at 628-34. Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010).

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny" whether strict or intermediate. *Id.*

### B. *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."

The Supreme Court's recent opinion in *Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If so, "the Constitution presumptively protects that conduct." *Id*. At issue in *Bruen* was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause". *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects . . . carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public. *Id.* at 2135.

To rebut the presumption of unconstitutionality, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. Only if [the government demonstrates that] a firearm regulation is consistent with this Nation's historical tradition

may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, the Court indicated it would "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791. *Id.* at 2136.[1] The farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.").

The Court in *Bruen* held that, because New York could not point to a robust tradition of regulations distinctly similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. The Court did not provide a comprehensive scheme for evaluating historical evidence, but it did provide guideposts.

---

[1] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

1.  **Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new. In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 2131. The government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.*

In "other cases," a challenged statute will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into such statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar.*" *Id.* (emphasis added).

2.  **The government must identify a "well-established and representative" tradition of comparable regulations.**

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a

governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" if that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. Moreover, even if certain statutes were widespread in the founding era, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws, in part, because "respondents offer little evidence that authorities ever enforced [those] laws").

### 3. The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also id.* at 2127, 2130, 2141 n.11. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

### ARGUMENT

Under the framework announced in *Bruen*, § 922(g)(3) and § 922(n) violate Mr. Alston's Second Amendment right to keep and bear arms. Because possession of firearm comes within the Second Amendment's "plain text," Mr. Alston's conduct of possessing a firearm is presumptively protected. *Bruen* forecloses any argument, whether derived from *Heller* or elsewhere, that Mr. Alston's fundamental Second Amendment rights disappear

J.A. 23

merely because of his drug use or his indictment. Instead, taking the *Bruen* court seriously demands that the Second Amendment right to bear arms be presumptively available to all of "the people," not meted out variably to different "subsets" of the people. The government can upset this presumption only by identifying a robust historical tradition of firearm regulation that disarmed citizens based on drug use or being under indictment, but it fails to do so. Therefore, the Court should dismiss Mr. Alston's indictment under § 922(g)(3) and § 922(n) as unconstitutional.

**III. MR. ALSTON'S INDICTMENT UNDER § 922(g)(3) FOR POSSESSION OF A FIREARM BY A DRUG USER VIOLATES HIS SECOND AMENDMENT RIGHT TO BEAR ARMS AND MUST BE SET ASIDE.**

Section 922(g)(3) provides that it is unlawful for any person "who is an unlawful user of or addicted to any controlled substance" (as defined in Section 102 of the Controlled Substances Act (21 U.S.C. 802)) to "*possess* in or affecting commerce, any firearm . . . which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(3) (emphasis added). Mr. Alston's indictment under § 922(g)(3) criminalizes his possession of a firearm, based merely on his use of marijuana, which presumptively violates his right to bear arms under the Second Amendment. Users of illicit substances possessing firearms is not a historically "unprecedented" challenge, and thus to rebut this presumption, the government is required to identify a "distinctly similar" regulation from the founding era that purported to address the societal challenge of intoxicated persons possessing firearms. The government fails this showing, and Mr. Alston's indictment under § 922(g)(3) should be set aside.

**A. Mr. Alston's conduct, prohibited by § 922(g)(3), is covered by the "plain text" of the Second Amendment.**

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. The Second Amendment's operative clause contains three textual elements: it protects the

right of (1) "the people" to (2) "keep and bear" (3) "Arms." Here, Mr. Alston satisfies all three elements.

> **1. Mr. Alston's possession of a handgun is covered by the Second Amendment's protection of the right to "keep and bear Arms."**

"The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2111, 2156. Mr. Alston's possession of a firearm, the conduct prohibited by § 922(g)(3), categorically falls within the scope of the right to "bear arms." Furthermore, Mr. Alston's firearm was a handgun, which is a weapon "in 'common use' for self-defense today." *Id.* at 2143. Thus, his conduct is covered by the "plain text" of the Second Amendment.

> **2. Mr. Alston, as a substance user, is a member of "the people" entitled to Second Amendment rights.**

>> **a. *Heller* does not make the Second Amendment only available to the "law-abiding."**

*Heller*, in its analysis of the Second Amendment's phrase the "right of the people," concluded that "the people" meant the same thing in the Second Amendment as in other parts of the Constitution. *Heller*, 544 U.S. at 580-81. In the other six Constitutional provisions "that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 544 U.S. at 580-81 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). The *Heller* Court characterized "the people" as a "term of art" referring to "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580. *Heller* concluded that the Second Amendment belongs to "all Americans." *Id.* at 581.

Mr. Alston anticipates that the government will seize upon the following sentence in *Heller* to argue that certain subsets of people fall outside the protection of the Second

Amendment: "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 544 U.S. at 635. But while *Heller* made passing reference to "law-abiding, responsible citizens," it was not in the context of defining the term "the people." Only Justice Stevens' dissent described it as such. *Id*. at 644. Rather, *Heller* provides that, at the very least, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. *See id.* at 635. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too. In fact, Heller expressly left that question "to future evaluation." *Id*

Indeed, to insist that the Second Amendment protects only the rights of the law-abiding is inconsistent with *Heller's* decision to give the phrase "the people" in the Second Amendment the same meaning it carries in other amendments passed at the same time. For "even felons (and presumably irresponsible citizens as well) may invoke the protections" of the First and Fourth Amendments. *Heller*, 554 U.S. at 644 (Stevens, J., dissenting). Various courts and judges agree. According to then-Judge Barrett, *Heller* "interpreted the word 'people' as referring to 'all Americans.'" *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting). So too Judge Bibas: "The text does not define 'the people' as 'the virtuous' or 'non-felons.'" *Folajtar v. Att'y Gen.*, 980 F.3d 897, 923 (3d Cir. 2020) (Bibas, J., dissenting). Discussing § 922(g)(1), the felon disarmament provision, Judge Bibas elaborated, "[f]elons are more than the wrongs they have done. They are people and citizens who are part of 'We the People of the United States.' U.S. CONST. pmbl. So, they too share in the Second

Amendment 'right of the people to keep and bear Arms,' subject only to the historical limits

on that right." *Id*. at 912.

Rejecting the view that those with a criminal record or who engaged in criminal

conduct (failing to pay taxes) are not among "the people" falling within the Second

Amendment, the Seventh Circuit similarly explained:

> Many people, citizens and noncitizens alike, raising Fourth
> Amendment claims are likely to have a criminal record, but we see
> no hint in [Supreme Court precedent] that this is a relevant
> consideration . . . . Not only would this test be difficult to
> implement; it would also create the potential for a noncitizen to
> lose constitutional rights she previously possessed simply because
> she began to behave in a criminal or immoral way. The Second
> Amendment is not limited to such on-again, off-again protection.

*Meza- Rodriguez*, 798 F.3d at 671. Judge Barrett similarly observed, "[t]o say that certain

people fall outside the Amendment's scope" means that "a person could be in one day and out

the next…." *Kanter*, 919 F.3d at 452. Thus, that someone is a felon, or otherwise non-law-

abiding, does not make him "categorically excluded from our national community," i.e., "the

people." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting).

### b. Nor does *Bruen* make the Second Amendment only available to the "law-abiding."

*Bruen* only buttresses the conclusion that the Second Amendment is not a switchboard

of rights to be turned on and off. In *Bruen*, the Court held that the right to bear arms extends

outside the home, in part, because "nothing in the Second Amendment's text draws a

home/public distinction with respect to the right to keep and bear arms." 142 S. Ct. at 2134.

Just as the text of the Second Amendment does not "draw[] a home/public distinction with

respect to the right to keep and bear arms," *id.*, it does not draw a drug-user/non-drug-user

distinction. "[N]othing in the Second Amendment's text" suggests drug users are not among

"the people" entitled to the amendment's protection. *See id*; *see also United States v.*

*Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022) (citing founding-era dictionaries and recognizing that felons and the mentally ill "are indisputably part of 'the people'").

Furthermore, whether "the people" refers only to "ordinary, law-abiding, adult citizens," was not at issue in *Bruen*, making any passing statement to that effect dicta. *Bruen*, 142 S. Ct. at 2134. Before addressing the question presented, *Bruen* simply explained that there was no dispute that petitioners—who alleged in "pleadings below" that they were "ordinary, law-abiding, adult citizens"—are part of "the people" whom the Second Amendment protects. *Id*. at 2124, 2134 (citing *Heller*, 544 U.S. at 580). It did not hold that non-law-abiding people are unprotected. That question was not presented. Instead, the court's resounding message was that "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* at 2156 (emphasis added).

Indeed, the context and briefs contributing to *Bruen* suggest that the Court's reasoning was at least informed by the extent to which the New York gun licensing scheme improperly divvied up Second Amendment rights for different groups. Most responsible for this contribution was the Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae*, which revealed how New York's gun licensing scheme was in part motivated by racial fears. Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae,* at 8-11. As the amici argued, the New York Police Department long lamented gun ownership as "a strong habit with both negroes and Italians," disproportionately prosecuted firearm possession in communities of color, and simultaneously granted police officers a permit upon leaving the force and accepting bribes from white business people to obtain firearm permits. *Id*. at 10, 11-12. Though only Justice Alito's concurrence cites the Black Attorneys' brief, acknowledging that fear of racial victimization understandably leads non-white Americans to possess a firearm,

*Bruen*, 142 S.Ct. at 2156 (Alito, J., concurring), the Black Attorneys' brief appropriately calls out the underlying context of the issue in *Bruen*: New York's law was essentially making the Second Amendment available only to "subsets" of the American people.

Acknowledging this context, the *Bruen* majority noted how Black Americans' exercise of the Second Amendment "was systematically thwarted" after the Civil War. *Bruen*, 142 S.Ct. at 2151; *see also McDonald*, 561 U.S. at 771, 130 S.Ct. 3020 (noting the "systematic efforts" made to disarm Blacks); *id.*, at 845–847, 130 S.Ct. 3020 (THOMAS, J., concurring in part and concurring in judgment); *see also* S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics"). Thus, *Bruen* should be understood not only to eschew a law-abiding versus non-law-abiding distinction but also to broadly respond to legal paradigms which condition access to Second Amendment rights.

In the wake of *Bruen*, at least one court facing a Second Amendment challenge to § 922(g)(3) had no trouble concluding that drug users, like Mr. Alston, are part of "the people" to whom Second Amendment rights are guaranteed. *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *4 (W.D. Okla. Feb. 3, 2023). The *Harrison* court noted that excluding drug users from the Second Amendment, as the government urged, represented "precisely the sort of carving out of a subset from 'all Americans' that the *Heller* Court rejected." *Id.* at 4. Indeed, in response to the government's insistence that drug users had traditionally been excluded from "the people," the court noted the government was jumping the gun by "shoehorn[ing]" the history and tradition inquiry of *Bruen*'s second step onto the first, which merely asks whether "the text of the Second Amendment" protects an individual's conduct. *Id.*; *see also United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (holding, post-*Bruen*, that felons are among "the

people" protected by the Second Amendment); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) (same).

Here, Mr. Alston is a member of "the people" to whom the Constitution extends Second Amendment rights. Following the lead of *Bruen*, *Heller*, *Harrison*, and others, Second Amendment rights are not unqualified, but nor are they turned on and off by an individual's conduct, especially at *Bruen*'s first step. Mr. Alston does not lose membership in our political community merely by way of using marijuana; such conduct does not carve him out from constitutional protection. To find otherwise would perpetuate the race- and class-based access to the Second Amendment that prompted *Bruen*'s landmark decision in the first place.

In sum, the Second Amendment presumptively protects Mr. Alston's possession of a firearm. The question becomes whether the government can identify a historical tradition of firearm regulation supports disarming drug users. See *Bruen*, 142 S. Ct. at 2135. It cannot.

### B. The government cannot identify a historical tradition of firearm regulation that supports disarming citizens based on using marijuana.

Because "the Second Amendment's plain text covers Mr. Alston's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(3) is "consistent with this Nation's historical tradition of firearm regulation." *Id.* Furthermore, because § 922(g)(3) addresses a problem that existed in 1791 and is not historically "unprecedented," the government must point to a robust tradition of "*distinctly similar* historical regulation[s]" as of 1791. *Id.* at 2131 (emphasis added). The government is unable to make that showing.

#### 1. Firearm possession by users of illicit substance is not a new problem.

"[T]he societal problem addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse, is not new." *Harrison*, 2023 WL 1771138, at *6.

"[T]he colonists brought with them from Europe a high regard for alcoholic beverages. Distilled and fermented liquors were considered important and invigorating foods, whose restorative powers were a natural blessing. People in all regions and of all classes drank heavily," from morning into the evening.[2]

Meanwhile, drugs such as opium, morphine, heroin, cocaine, and marijuana were considered effective pain killers, cures for ailments, and mood inhibitors.[3] The use of opium to treat various sicknesses was introduced by British settlers in the early 18th century but continued for most of America's early history. *See DEA History* at 12; Juan Joel Tovanche, *Dying to Wait: How the Abigail Court Got It Wrong*, 22 J.L. & HEALTH 53 (2009) (noting that Benjamin Franklin was a major proponent of drug use, and explaining that opium was used to treat soldiers during the American Revolution). Indeed, Southern Whites had the highest addiction rate of any regional racial group in the country according to documents from addiction centers and pharmacy records. David T. Courtwright, *The Hidden Epidemic: Opiate Addiction and Cocaine Use in the South*, 1860-1920, 49 THE JOURNAL OF SOUTHERN HISTORY, 57-72 (1983).

Such widespread use of intoxicating or addictive substances suggests that the problem of mixing guns and substances was present for policymakers and citizens at the time of the founding. But, importantly, they chose not to pass regulations disarming "the people" based on substance use. As is demonstrated below, state and federal regulations attempting to disarm drug users did not appear until many generations after 1791.

---

[2] Paul Aaron and David Musto, *Temperance and Prohibition in America: A Historical Overview*, 131 (1981) (last accessed Feb. 27, 2023), available at https://www.ncbi.nlm.nih.gov/books/NBK216421/pdf/Bookshelf_NBK216421.pdf.

[3] Drug Enforcement Administration, DEA History: The Early Years at 12, (last accessed Feb. 27, 2023), available at https://www.dea.gov/documents/1919/1919-12/1919-12-17/dea-history-early-years.

2. **The government cannot identify a "distinctly similar" historical tradition of firearm regulation that supports disarming citizens based on purported drug use.**

Mr. Alston is unable to identify a single historical source from the time of the American Colonies and the early Republic which disarmed citizens, in the home or elsewhere, based on being a user of intoxicants. *See Bruen*, 142 S. Ct. at 2135. Indeed, in *Harris*, which faced this exact question, the government's brief acknowledged that "no similar provision" to § 922(g)(3)'s prohibition on firearm possession by an "unlawful user" of any controlled substance or addict "existed at the time of ratification." *Harris*, 2023 WL 1771138, Government's Brief, at 17-18. Here, the lack of a "distinctly similar" historical regulation prohibiting users of intoxicants from possessing firearms establishes that § 922(g)(3) is inconsistent with the Second Amendment. Though some statutes related to drug or alcohol use did exist, they all fail to represent a sufficiently robust historical tradition under the *Bruen* framework.

a. **No state or federal law from the time of the American Colonies and the early Republic supports disarming users of intoxicants.**

Based on independent research, state regulations regarding the possession or use of guns by people under the influence of drugs or alcohol only arose in the late 19th century. Where they did arise, they overwhelmingly prohibited firearm use or possession while intoxicated. They did not disarm American's merely based on their status as a substance user. Mr. Alston is aware of the following 19th century statutes that prohibited *carrying* or *using* firearms *while* under the influence, some applicable only to public or peace officers:

> **General Statutes of Kansas 1868**: Prohibiting "any person under the influence of intoxicating drink" from "carrying… [a] deadly weapon."

> **Ordinance No. 1, Jul. 2, 1877, reprinted in THE MINING ECHO, Jul. 7, 1877, at 1 (Empire City, Kansas):** "Any person

who shall, while exercising the right to carry firearms, not concealed, be intoxicated…shall be deemed guilty of a misdemeanor….”

**1883 Mo. Laws 76, An Act to Amend Section 1274, Art. 2, Ch. 24, §1**: Prohibiting persons from “carry[ing] certain weapons “upon or about his person when intoxicated or under the influence….”

**1890 Okla. Laws 495, art. 47**: “Public officers while in the discharge of their duties…shall be permitted to carry arms…Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.”

**1907 Ariz. Sess. Laws 15, ch. 16, §1**: “It shall be unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor…to carry or have on his person a…firearm….”

**1909 Id. Sess. Laws 6, §1**: Prohibiting persons from carrying certain weapons “when intoxicated, or under the influence….”

**1916 N.J. Laws 275-76, ch.130, §§1-2**: “It shall be unlawful for any person to go into the woods…with a gun…when intoxicated or under the influence of any drug….”

**1931 Mich. Pub. Act 671, Michigan Penal Code, ch. 36, §237**: “Any person under the influence of intoxicating liquor or any exhilarating or stupefying drug who shall carry, have in possession or under control, or use… any firearm within this state, shall be guilty of a misdemeanor.”

Meanwhile, the federal government did not explicitly proscribe “drug users” from possessing guns until the Gun Control Act of 1968, the predecessor of 18 U.S.C. § 922. At the time of enactment, this law prohibited people under indictment for, or who were convicted of a crime punishable by imprisonment of at least one year from receiving, shipping, or transporting a firearm. 82 Stat. §§ 922(d)(1), (g)(1). This same section also prohibited the sale or receipt of firearms to “unlawful user[s] of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug” and those who “ha[d] been adjudicated

as a mental defective or ha[d] been committed to any mental institution." 82 Stat §§ 922(d)(3)-(4), (g)(3)-(4). Most importantly, the Gun Control Act of 1968, as written in 1968, did not prohibit firearm *possession*. Instead, the Act prohibited the transfer, sale, shipping, and receipt of firearms by these populations of people. See 82 Stat. §§ 922(d), (g)-(h). Later, it prohibited the possession of guns by felons and "drug users."[4]

Though related to substance use, these laws fail on a number of fronts: (1) They address the societal problem in a materially different manner as they prohibit carrying or using a firearm publicly while intoxicated, instead of possessing a firearm while having the status of a user, *see Bruen*, 142 S. Ct. at 2131; (2) they "come too late" to establish a historical tradition, *see id.* at 2137; and (3) the regulations are not enough to satisfy the government's significant burden to identify a "well-established and representative historical analogue," *id.* at 2133.

### i.  The cited regulations are materially different.

The cited 19th and 20th century statutes do not evince a "comparable" burden to that of § 922(g)(3). *Bruen*, 142 S. Ct. at 2131-32. Section 922(g)(3) denies the right to possess any gun at all, in any setting, and for any purpose. It thus represents a total infringement of the core right to possess guns in the home for self-defense. By contrast, the burden imposed by the older statutes is much more modest. The older statutes only apply outside the home, and only when someone is carrying or using a firearm while actively intoxicated. It therefore leaves intact the core right recognized by *Heller*. That post-ratification generations addressed

---

[4] United States Department of Justice, *History of Federal Firearms Laws in the United States*, (last accessed Feb. 27, 2023), available at https://www.justice.gov/archive/opd/AppendixC.htm.

the societal problem "through materially different means" is further evidence the modern regulation in § 922(g)(3) is unconstitutional. *Bruen*, 142 S. Ct. at 2131.

### ii. The cited regulations "come too late."

Even if they imposed comparable burdens, state regulations from the 1860s-1880s, and certainly federal regulations from the 1960s, "come too late" to establish a historical tradition of disarming users of intoxicants. *Id*. at 2137. Justice Barrett's Bruen concurrence, like the opinion itself, suggests that 1791 (when the Bill of Rights was ratified) is the correct date for assessing the scope of permissible federal regulation of an individual right. *Bruen*, 142 S. Ct. at 2137-39, 2163 (Barrett, J., concurring). Sources from "75 years after the ratification of the Second Amendment" provide little insight into original meaning. *Id*. The Court viewed 19th-century evidence as relevant only insofar as it provided "confirmation" of earlier sources. *Id*. Here, Mr. Alston is not aware of any earlier sources.

### iii. The cited regulations do not constitute a "well-established and representative historical analogue."

Even if the cited regulations are considered, they are not enough to satisfy the government's significant burden to identify a "well-established and representative historical analogue." *Id*. at 2133. The *Bruen* majority "doubt[ed]" that "*three* colonial regulations" proffered by respondents were sufficient to show a tradition of public carry regulation. *Id*. at 2142. Here, Mr. Alston cannot identify *any* colonial regulations prohibiting users of intoxicants from possessing guns. As for the few 19th- and 20th-century restrictions, none restricts firearm possession by users of intoxicants comparable to § 922(g)(3). These statutes are exactly the kinds of "outliers" on which the *Bruen* Court refused to rely. *Id*. at 2153.

**3. Even if substance users' possession of a firearm was an "unprecedented" challenge "unimaginable" to the Founders, § 922(g)(3) is not sufficiently analogous—or "relevantly similar"—to any purported historical regulations to pass Constitutional muster.**

Given the widespread use of substances at the time of the founding—from alcohol to opium, from the battlefield to the pharmacy—it is doubtful that mixing firearms and substances was a societal challenge "unimaginable" to the Founders. But even if it were, the government cannot identify a "relevantly similar" tradition of firearm regulation to justify § 922(g)(3). Mr. Alston anticipates the government will project a historical tradition of disarming the "unvirtuous" or the "dangerous," but both claims should fail as they lack historical pedigree.

**a. No "relevantly similar" tradition existed.**

The founding generation did not view virtuousness as limiting the right to keep and bear arms. To the extent that some courts concluded prior to *Bruen* that the right to bear arms was tied to the concept of a virtuous citizenry, *but see Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020) 980 F.3d at 913, 915 (Bibas, J., dissenting) (explaining it was the *Binderup* plurality that espoused the virtue theory); *Boyd*, 999 F.3d at 185-86 (discussing historical limitations tied to dangerousness without referencing virtue), others acknowledged that the "relevance of virtue" remained an "ongoing debate." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 436 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom. *Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 212 L. Ed. 2d 540 (Apr. 4, 2022).

*Bruen* demands a new answer. *Bruen*, 142 S. Ct. at 2126-28 ("the government must affirmatively prove that its firearms regulation" is consistent with the historical tradition of firearms regulation by pointing to analogous regulations that preceded and immediately followed ratification). As Judge Bibas explains in his *Folajtar* dissent, the virtue theory of disarmament "is

not supported by history." *Folajtar*, 980 F.3d at 915; *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 371-73 (3d Cir. 2016) (Hardiman, J., concurring) ("We have found no historical evidence" "indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*."). It derives from the *Binderup* plurality, which itself relied on "academic sources" lacking any historical foundation. *Folajtar,* 980 F.3d at 915-20 (Bibas, dissenting). "The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses. The only piece of historical evidence that comes close to endorsing a ban of all former felons is a Pennsylvania *minority* proposal that was rejected. None of this proves that the Founders limited the Second Amendment right to virtuous citizens . . . ." *Id*. (explaining that although a *minority* of the Pennsylvania ratifying convention proposed to guarantee the right of arms "unless for crimes committed," the minority "failed to persuade its own state, let alone others"; a "single failed proposal is too dim a candle to illuminate the Second Amendment's scope."); *see also* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1375 (2009) (the strongest support offered for felon-dispossession is the minority report by Pennsylvania Anti-Federalists, "opponents of the Constitution, and its text is not reflected in the Second Amendment").

Drawing on then-Judge Barrett's *Kanter* dissent and Judge Hardiman's *Binderup* concurrence, Judge Bibas marshaled historical evidence showing that English and early American restrictions on firearm possession were tied to dangerousness, "not some vague notion of 'virtue.'" *Folajtar*, 980 F.3d at 914-20. The few colonial and early American regulations cited as support disarmed (at least temporarily) those who refused to swear a loyalty oath (while at times exempting weapons for defense of house and self). *See Kanter*, 919 F.3d at 457-58 (Barrett, J.,

dissenting). People loyal to another sovereign were disarmed because they posed a danger to the government in power. In short, dangerousness throughout English and early American history was tied to disloyalty, *e.g.*, those sympathetic to the Crown during the Revolution. *Folajtar*, 980 F.3d at 913 (Bibas, dissenting); *ibid*, 914-15. *See Kanter*, 919 F.3d at 455-56 (Barrett, dissenting). *See also* Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 263-65 (2020). Section 922(g)(3)'s burden on drug users is not "comparably justified" by a threat to sovereignty or nationhood, and thus is not "relevantly similar" to those regulations. *See Bruen,* 142 S. Ct. at 2133.

Mr. Alston expects the government to take the position that if there is a tradition of disarming the dangerous, that tradition included those who pose a threat to public safety. But the historical record does not reveal that statutes disarming those posing a threat to public safety were widespread. And even assuming for sake of argument that "dangerousness" sweeps in persons who commit non-political acts of violence, users of intoxicants do not fall within that category.

Furthermore, the government's anticipated assertion regarding the potential danger arising from carrying a firearm while impaired is inapposite, as § 922(g)(3) does not require that the person possessing the firearm actually be under the influence. Rather, the challenged regulation prohibits "unlawful users" of any controlled substance from possessing firearms even in the home for self-defense and does not require users be actively under the influence of a controlled substance or actively possessing of a firearm. *See United States v. Augustin*, 376 F.3d 135, 139 (3d Cir. 2004) (explaining that § 922(g)(3) outright forbids possession based on *status* as an "unlawful user" at or about the time he or she possessed the firearm).

> **b. The government's anticipated focus on "virtue" and "dangerousness" is misplaced and merely replicates the means-ends scrutiny that *Bruen* rejected.**

*Bruen* established, in discussing firearm regulations in sensitive places, that any exceptions to "the Second Amendment's unqualified command" must be defined narrowly. *Bruen*, 142 S. Ct. at 2130. As noted, Mr. Alston anticipates that the government will argue that unlawful drug users are unvirtuous or dangerous and are not entitled to Second Amendment protections. But the Second Amendment exceptions that the government's approach would produce are grossly overbroad and in direct conflict with *Bruen*.

The category of "dangerous" persons, for example, is neither "well-defined," *Bruen*, 142 S. Ct. at 2156, nor "narrowly limited," *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 791 (2011). "Dangerous" is an elastic, malleable term that, in the wrong hands, could be applied to virtually any group of people—and therefore one that the government could use to "shoehorn" historically protected groups into unprotected status. *Brown*, 564 U.S. at 793. The term "dangerous," in other words, is the kind of "highly manipulable" metric that the Supreme Court has said governments may not use to limit citizens' fundamental constitutional rights. *United States v. Stevens*, 559 U.S. 460, 472 (2010). The "unvirtuous" label is even less "well-defined" and "narrowly limited."

More importantly, applying the "dangerous" and "unvirtuous" labels would require precisely the "judge-empowering interest-balancing inquiry" that *Bruen* forbids. 142 S. Ct. at 2129. After explaining its metrics for "relevantly similar," *Bruen* cautioned, "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 2133 n.7. But that is what is happening here. When the government defines "dangerous" or "virtuous" at a high level of generality, as it does here,

it is attempting to embroil courts in exactly the kind of means-ends balancing *Bruen* rejected. That approach cannot be right.

Section 922(g)(3) violates the Second Amendment as it was understood at the time of its adoption. The Court should therefore dismiss the indictment against Mr. Alston.

## IV.   MR. ALSTON'S INDICTMENT UNDER § 922(n) FOR POSSESSION OF A FIREARM WHILE UNDER INDICTMENT VIOLATES HIS SECOND AMENDMENT RIGHT TO BEAR ARMS AND MUST BE SET ASIDE.

Section § 922(n) provides that it is unlawful for any person "who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n). Mr. Alston's indictment under § 922(n) criminalizes his receiving a firearm based merely on his status as a person under indictment, which presumptively violates his right to bear arms under the Second Amendment. Receipt or possession of a firearm by a person under indictment is not a historically "unprecedented" challenge, and thus to rebut this presumption, the government is required to identify a "distinctly similar" regulation from the founding era that purported to address the societal challenge of indictees possessing firearms. As the government fails this showing, Mr. Alston's indictment under § 922(n) should be set aside.

### A.   Mr. Alston's conduct, prohibited by § 922(n), is covered by the "plain text" of the Second Amendment.

The question of whether Mr. Alston's conduct—possession of a firearm by an indictee—is covered by the "plain text" of the Second Amendment largely repeats the analysis set forth above with respect to § 922(g)(3). Those arguments are incorporated herein for reference.

### 1. Mr. Alston's receipt of a handgun is covered by the Second Amendment's right to "keep and bear Arms."

"The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Bruen*, 142 S. Ct. at 2111, 2156. Mr. Alston's receipt of a firearm, the conduct prohibited by § 922(n), categorically falls within the scope of the right to "bear arms." To suggest otherwise would be absurd, because how could one bear arms without first receiving them? Mr. Alston's firearm was a handgun, which is a weapon "in 'common use' for self-defense today." *Id.* at 2143. Thus, his conduct is covered by the "plain text" of the Second Amendment.

### 2. Mr. Alston, as an indictee, is a member of "the people" entitled to Second Amendment rights.

As argued above, the Second Amendment is not a switchboard of rights to be turned on and off. It is presumptively available to all. And just as drug user is a member of the people, so too is an indictee—who has not even been convicted of unlawful conduct.

Indeed, the issue seems even clearer for indictees, as several courts interpreting *Bruen* have held that felony indictees are members of "the people" entitled to Second Amendment rights. *See United States v. Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *2 (S.D. Ohio Feb. 21, 2023) (felony indictees are covered by plain text of Second Amendment); *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *2–3 (M.D. Tenn. Nov. 16, 2022) (same); *United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) (same); *United States v. Kays*, No. CR-22-40-D, --- F.Supp.3d ----, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) (same); *United States v. Quiroz*, No. PE:22-CR-00104-DC, --- F.Supp.3d ----, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) (same); *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, --- F.Supp.3d ----,

2022 WL 17103509 (N.D. Ind. Oct. 31, 2022) (same); *United States v. Hicks*, No. W:21-CR-00060-ADA, --- F.Supp.3d ----, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (same).

Finally, as emphasized in Subsection III(A)(2) of this Motion, *Heller* and *Bruen* do not make the Second Amendment only available to the "law-abiding" by excluding subsets of "the people," such as indictees. The words "the people" in the Second Amendment and throughout the Constitution "unambiguously refer[] to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Mr. Alston is a member of that community and is entitled to Second Amendment rights.

### B. The government cannot identify a historical tradition of firearm regulation that supports disarming citizens based on indictee status.

Because the plain text of the Second Amendment protects receipt and possession of a firearm, the Government bears the burden to show that the restriction in § 922(n) is "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S.Ct. at 2130. Specifically, the government must point to a robust tradition of "*distinctly similar* historical regulation[s]" as of 1791, because § 922(n) addresses a problem that existed in 1791 and is not historically "unprecedented." *Bruen*, 142 S.Ct. at 2131 (emphasis added).

The government cannot meet this burden. There is no such historical tradition of depriving an individual of their Second Amendment right, based solely on an indictment. After all, to deprive a subset of "the people" of their right to bear arms without consideration of the nature of the underlying offense, a particularized assessment of an individual's dangerousness, or any other process bearing on the person's guilt would constitute a remarkable limit on a person's Second Amendment liberties, inconsistent with the Nation's history or its jurisprudence as announced in *Heller* and *Bruen*. *See also Estelle*

*v. Williams*, 425 U.S. 501, 503 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice").

> **1. The government fails its burden to identify a "distinctly similar" historical tradition of firearm regulation that supports disarming citizens based on indictee status.**

As in *Heller* and *Bruen*, historical examples of regulations proffered by the Government must be "distinctly similar" to § 922(n) because the restriction does not address "unprecedented societal concerns or dramatic technological changes[.]" *Bruen*, 142 S.Ct. at 2132–33. Section 922(n) creates a total ban on firearm receipt based on an individual's indictment—a criminal legal process older than and expressly discussed in the Fifth Amendment of the Constitution. *See* U.S. CONST. amend. V. Given the existence of indictments at the time of the founding, as well as the Framers' profound concern for the criminal legal process in general, the receipt of a firearm by a person indicted under such criminal legal processes was not an "unprecedented" or "unimaginable" challenge at the time of the Founding.

The Government cannot meet its burden to show that the Nation's history, particularly in the late 18th century, supports firearm restrictions for individuals under indictment or "distinctly similar" restrictions. "Indictment has historically had a limited effect on an individual's constitutional rights." *United States v. Laurent*, 861 F.Supp.2d 71, 91 (E.D.N.Y 2011). And the impact on an indicted person's rights has generally been limited to detention or certain pre-trial conditions only after a judicial determination that such conditions are necessary. *Id.* at 90–93 (citing *United States v. Salerno*, 481 U.S 739, 764 (1987); 18 U.S.C. § 3142).

### a. Federal prohibitions of indictees' firearm possession "come too late" under the *Bruen* framework to be "distinctly similar."

Only centuries after the Founding did Congress begin barring indicted individuals from receiving firearms. Congress first passed a law prohibiting transporting firearms for individuals under indictment for a crime of violence in 1938. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It was not until 1961 that Congress expanded the prohibition to include all individuals under indictment. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed). The statute was again clarified in 1968, to include indictments in state and federal court, but only for those felonies punishable by more than one year in prison. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

The Government cannot rely on the passage of § 922(n) in the mid-20th century to establish a long-standing historical tradition back to the enactment of the Second Amendment, particularly where it contradicts the plain language of the Constitution's text. *See Bruen*, 142 S. Ct. at 2136–37. The Supreme Court specifically declined to consider any 20th century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

### b. No state laws from the founding era are "distinctly similar."

Mr. Alston anticipates the government will point to state felon-in-possession laws or surety laws as "distinctly similar" historical traditions, but both fall short.

*Felon-in-possession laws*

Though English law had a "long history of disarming citizens for any reason or no reason at all," the colonies' attitude toward disarming individuals diverged from its English

roots. *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *6 (W.D. Tex. Sept. 19, 2022) (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 155 (2007)). "Indeed, when Virginia disarmed all citizens who refused to take an allegiance test, it did so only partially, allowing citizens to keep "such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the defense of his house and person." *Id.* (citing 1 George I, stat. 2, c. 13 (1714); "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," (1756), Hening, STATUTES AT LARGE, 7:35). By the time the Second Amendment was up for adoption, the colonies had "consistently refrained from exercising such a power over citizens." *Id.* (citing Churchill, *Gun Regulation* at 157).

Not until 1886 did a state court even rule on a firearm regulation that regulated "the condition of a person"—such as his status as an indictee—rather than "directly regulating his manner of carrying." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 711 (2009). That case, *Missouri v. Shelby*, upheld a ban on carrying a deadly weapon while intoxicated. 90 Mo. 302, 2 S.W. 468 (1886). "And even though other state courts eventually ruled on laws regulating the condition of a person, very few states prohibited felons—or any other type of person for that matter—from possessing a firearm." *Quiroz*, 2022 WL 4352482, at *7. In fact, "by the mid-1920s, only six states had laws banning concealed carry by someone convicted of a crime involving a concealed weapon. And zero states banned possession of long guns based on a prior conviction." *Id.* (citing Marshall, *Why Can't Martha Stewart Have A Gun?*, at 708). These findings suggest that the colonies and the early Republic, though not monolithic, did not

have a "longstanding" tradition of disarming even convicted felons, much less those merely indicted.

### *Surety statutes*

Several states adopted surety laws in the mid-19th century as a way of limiting certain persons' access to weapons. *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509, at *4 (N.D. Ind. Oct. 31, 2022). The statutes required a person "reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Quiroz*, 2022 WL 4352482, at *7. In other words, an accused person could overcome the prohibition if he showed an individualized need to carry a weapon for self-defense, or if he posted a bond. *Holden*, 2022 WL 17103509, at *4.

These surety statutes, raised in *Bruen*, are not "distinctly similar" to § 922(n). Whereas § 922(n) amounts to a total deprivation of the right to bear arms for those under certain forms of indictment, there is "little support in the historical record" to suggest that surety statutes even came close to a "severe restraint." *Holden*, 2022 WL 17103509, at *4 (citing *Bruen*, 142 S. Ct. at 2149). Justice Thomas, writing for the *Bruen* majority, frankly doubted that the surety statutes were regularly enforced or even meant as "punishment" at all. *Bruen*, 142 S. Ct. at 2149. Thus, compared to § 922(n), the surety statutes fall far short of "distinctly similar."

The lack of a "distinctly similar historical regulation" restricting firearm receipt for individuals under indictment demonstrates that § 922(n) is inconsistent with the Second Amendment. *See Bruen*, 142 S. Ct. at 2131.

  **2. Even if indictees' possession of a firearm was an "unprecedented" challenge "unimaginable" to the Founders, § 922(n) is not sufficiently**

**analogous—or "relevantly similar"—to any purported historical regulations to pass Constitutional muster.**

Even if § 922(n) were construed to be addressing a uniquely modern social problem, such that the Court could expand its historical analysis to include "relevantly similar" historical analogues, the Government still cannot prove § 922(n)'s consistency with historical tradition. *See Bruen*, 142 S. Ct. at 2132–33.

As noted, several district courts have faced this question, and several have held § 922(n) to be unconstitutional under *Bruen*. *United States v. Hicks*, No. W:21-CR-00060-ADA, 2023 WL 164170, (W.D. Tex. Jan. 9, 2023); *United States v. Quiroz*, No. PE:22-CR-00104-DC, ––– F.Supp.3d ––––, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, ––– F.Supp.3d ––––, 2022 WL 17103509 (N.D. Ind. Oct. 31, 2022); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, ––– F.Supp.3d ––––, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022). Each found that no "relevantly similar" tradition existed to support § 922(n).

In particular, each condemned the government's assertion that surety laws, mentioned above, amounted to a "relevantly similar" tradition. *See, e.g.*, *Holden*, 2022 WL 17103509, at *4 (holding that § 922(n) is "meaningfully different than surety laws, so surety laws don't provide the historical support needed" to sustain § 922(n)). Surety laws restricted firearm possession, but their prohibition was surmountable: the regulated person could bear a firearm if he had an individualized need for self-defense or if he posted a bond. *Id.* Section 922(n), on the other hand, imposes an absolute prohibition. Anyone under indictment is prohibited from receiving a firearm no matter how grave their need for armed self-defense and no matter their willingness and ability to pay a bond. *Id.* "Although an analogy needn't be a 'historical twin' and the government's burden isn't a 'regulatory

straightjacket,' the difference between surety laws and § 922(n) is substantial because the laws address the same societal problem . . . through materially different means." *Id.*

Also condemned was the government's pointing to *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010), to argue that legislatures have long had the right to disarm "unvirtuous citizens." *Yancey*'s reasoning on "unvirtuous citizens" quotes an influential 1868 constitutional treatise, which stated constitutional rights did not apply to "the idiot, the lunatic, and the felon." *Yancey*, 621 F.3d at 685 (citing Thomas M. Cooley, *A Treatise on Constitutional Limitations* 29 (BOSTON, LITTLE BROWN & CO. 1868). But omitted is how blacks were treated the same as lunatics: "Pistols old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics." Justice Thomas included the same omission in *Bruen*. 142 S. Ct. at 2151.

Suffice it to say that laws based on disarming unvirtuous citizens—wherein the term unvirtuous meant blacks as much as lunatics—is not a "relevantly similar" historical analog to § 922(n). And if it is, the government arguably has other problems. *See Quiroz*, 2022 WL 4352482, at *11 ("Another reason that § 922(n) warrants skepticism is the historical misappropriation of law to pretextually and unlawfully disarm unfavored groups.").

The government cannot meet its burden to identify a "relevantly similar" historical tradition of firearm regulation that supports disarming individuals who have been merely indicted.

## V.    CONCLUSION

The government has failed to demonstrate that § 922(g)(3) and § 922(n) are supportable by any historic tradition of firearm regulation in the United States, rendering

them unconstitutional under *Bruen* and the Second Amendment. This Court should dismiss both counts of the indictment against Mr. Alston.

Respectfully requested this 28th day of February, 2023.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

> Sarah E Nokes
> Assistant United States Attorney
> United States Attorney's Office
> Eastern District of North Carolina
> 150 Fayetteville Street, Suite 2100
> Raleigh, NC 27601

by electronically filing the foregoing with the Clerk of Court on February 28, 2023, using the

CM/ECF system which will send notification of such filing to the above.

This the 28th day of February, 2023.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

J.A. 50

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S RESPONSE IN |
| v. | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION TO DISMISS THE |
| CARLOS ALSTON | ) | INDICTMENT |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to Defendant's motion to dismiss the Indictment (D.E. 17). The Indictment charges the defendant with possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3) and receipt of a firearm by a person under felony indictment, in violation of 18 U.S.C. § 922(n). D.E. 11. The defendant has moved to dismiss the Indictment, arguing that 18 U.S.C. §§ 922(g)(3) and (n) are unconstitutional under the Supreme Court's recent decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022). For the reasons that follow, the motion should be denied.

## **FACTS AND PROCEDUARAL SUMMARY**

On the evening of January 4, 2023, a Henderson Police Department (HPD) officer approached the defendant as he waited in a restaurant drive-thru lane in Henderson, North Carolina. The officer told the defendant that there were active warrants for his arrest and commanded the defendant to show his hands. The

defendant did not comply with the officer's commands, and instead reached for an item inside of the vehicle. Defendant then brandished the item, which was a firearm, at the officer. The officer, recognizing that the defendant was brandishing a firearm at him, drew his duty weapon and fired a shot at the defendant, striking him in the lower body. The defendant then ran from the officer but was apprehended a short time later. The firearm possessed by the defendant was recovered from his route of flight and found to be a loaded, 9mm Smith and Wesson handgun. The firearm was later examined by an interstate nexus expert, who opined that it was not manufactured in North Carolina.

Officers investigated the vehicle the defendant had left behind when he fled from HPD. The vehicle emitted an odor of marijuana, and they found a marijuana cigarette on the passenger seat of the vehicle. A plastic baggie containing approximately 26 grams of marijuana was collected from the driver-side door pocket. Officers also recovered digital scales and plastic baggies, both items commonly used in the drug trade.

The defendant's criminal history revealed a state probation revocation in 2021, resulting from a positive drug screen indicating the presence of marijuana and failure to register for drug treatment classes, among other violations. The defendant's criminal record also revealed that he was then under state indictment – and had been since December 2021 – for assault with a deadly weapon with intent to kill inflicting serious injury (AWDWIKISI).

On January 6, 2023, Defendant was charged by Criminal Complaint with being an unlawful drug user in possession of a firearm, in violation of 18 U.S.C. § 922(g)(3). (5:23-MJ-1028-BM). On January 18, 2023, the defendant was taken into custody and interviewed by Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agents after provision of *Miranda* warnings. During the interview, Defendant admitted to using marijuana daily. He also admitted to obtaining the firearm at issue in this case in December 2022, roughly a year after he was indicted by the state court for AWDWIKISI. Defendant admitted knowledge of the pending state indictment.

On January 24, 2023, a federal grand jury returned an Indictment against Alston charging him with possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3) and receipt of a firearm by a person under indictment, in violation of 18 U.S.C. § 922(n). D.E. 11. On February 28, 2023, the defendant filed a motion to dismiss the Indictment (D.E. 17), to which the government now responds.

## **ARGUMENT**

## I.    **TITLE 18 UNITED STATES CODE SECTION 922(g)(3) IS CONSTITUTIONAL.**

Defendant argues 18 U.S.C. § 922(g)(3) is facially unconstitutional because its prohibition of unlawful drug users' possession of firearms is not deeply rooted in this nation's history and tradition. In making this argument, the defendant faces a heavy burden, because "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish

that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Section 922(g)(3) proscribes conduct outside the scope of Second Amendment protections because it prohibits firearm possession by non-law-abiding individuals. The law is also sufficiently analogous to historical regulations to be deemed "longstanding."

### A.  The Second Amendment, *Heller* and *Bruen*

The Second Amendment to the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Amendment protects an individual right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms within homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34. In *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that this right is incorporated against the states through the Fourteenth Amendment.

"Like most rights," however, *Heller* emphasized that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. Heller* made clear that the opinion should not "be taken to cast doubt on

longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald*, 561 U.S. at 786. *Heller* described these regulations as "presumptively lawful" measures. 554 U.S. at 627 n.26. Over the next decade, courts of appeals applied a two-step test to determine the constitutionality of firearms regulations, which required both an examination of whether such statutes were consistent with the history of firearm regulation and application of intermediate, means-end scrutiny. *Bruen*, 142 S.Ct. at 2125-26.

In *Bruen*, the Court "made the constitutional standard endorsed in *Heller* more explicit," holding that the two-step test applied by the courts of appeals was inconsistent with *Heller*'s holding, which only provided for analysis of the historical question, not means-end scrutiny. 142 S.Ct. at 2125-27, 2134. It elaborated on the test *Heller* and *McDonald* set forth to determine whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. Applying that standard, the Court held unconstitutional a New York licensing law that allowed an applicant to obtain a license to carry a gun outside his home only upon proving existence of

"proper cause." *Id.* at 2123. First, the Court held the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners were "ordinary, law-abiding, adult citizens" who sought to carry handguns publicly for self-defense. *Id.* at 2134. This conduct, the Court concluded, fell within "the right to keep and bear arms" guaranteed by the Second Amendment. *Id.*

The Court then surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether the New York licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th-century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need to do so. *Id.*

## 1.    The Second Amendment does not protect an unlawful drug user in possession of firearms.

Just as *Heller* defined the right to bear arms as belonging to "law-abiding, responsible citizens" (554 U.S. at 635), *Bruen* focuses exclusively on the rights of law-abiding citizens. The *Bruen* court stated no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens. *See, e.g.*, *Bruen*, 142 S.Ct. at 2122 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense.");

*id.* ("[O]rdinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense."); *id.* at 2124-25 ("[P]etitioners . . . are law-abiding . . . citizens."); *id.* at 2131 ("The Second Amendment . . . elevates . . . the right of law-abiding, responsible citizens to use arms for self-defense." (internal citations omitted)); *id.* at 2132-33 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."); *id.* at 2134 ("[O]rdinary, law-abiding, adult citizens . . . are part of 'the people' whom the Second Amendment protects."); *id.* at 2135 n.8 ("State[s] may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense."); *id.* at 2138 n.9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes . . . designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"); *id.* at 2150 ("None of these historical limitations . . . operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."); *id.* at 2156 ("American governments [have generally not] required law-abiding, responsible citizens to demonstrate a special need for self-protection." (internal citations omitted)); and *id.* ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). The majority opinion says nothing about non-law-abiding citizens like Defendant, or about the

scope of the Second Amendment as it might pertain to any of them.

The *Heller* court referred to at least some restrictions upon firearm possession by certain individuals with approbation. 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings...."). In a concurring opinion joined by the Chief Justice, Justice Kavanaugh explained that "the Second Amendment allows a variety of gun regulations" and reiterated the *Heller* court's reassurances that the decisions did not "cast doubt on" numerous such regulations, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162 (Kavanaugh, J., concurring) (internal quotation marks and citation omitted). Unlawful users of controlled substances are per se not law-abiding citizens and are thus not the type of persons repeatedly referred to throughout the *Bruen* opinion as individuals who enjoy unburdened Second Amendment rights.

A person like Defendant, who violates Section 922(g)(3) is, by definition, not a law-abiding, responsible citizen. The statute applies only to a person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." 18 U.S.C. § 922(g)(3). For Section 922(g)(3)'s prohibition to apply, a defendant's illegal drug use must occur sufficiently consistently, be prolonged and close in time to his gun possession. *United States v. Edwards*, 38 Fed.Appx. 134, 138 (4th Cir. 2002) (unpublished); *see United States v.*

*Jackson*, 280 F.3d 403, 406 (4th Cir. 2002) (finding district court did not err in requiring the government to prove a pattern of drug use and recency of drug use). An unlawful, current, and regular user of a federally controlled substance can hardly be termed "law-abiding" or "responsible." *Bruen*, 142 S.Ct. at 2131.

"Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo–American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous." *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012). Unlawful users of intoxicating substances known to cause impairment of the ability to safely handle firearms are dangerous. *United States v. Yancey*, 621 F.3d 681, 686-87 (7th Cir. 2010) (discussing studies which demonstrate the connection between chronic drug abuse and violent crime). Chronic drug users are neither law-abiding nor responsible and they are not afforded the Second Amendment protections enjoyed by responsible, law-abiding individuals.[1]

Indeed, *Bruen* endorsed the "shall issue" license-to-carry provisions of 43 states, a number of which specifically exclude those who unlawfully use or are addicted to controlled substances. *See, e.g.*, MISS. CODE ANN. § 45- 9-101(e); TEX.

---

[1] In a post-*Heller* decision examining the constitutionality of 18 U.S.C. § 922(g)(3), the Fourth Circuit assumed, without deciding, that a drug user's possession of a firearm implicates the Second Amendment. *Carter*, 669 F.3d at 416. However, the court also noted that, "[t]he weight of the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right." *Id.* at 415. Consistent with that holding, in a decision issued later the same year, the Fourth Circuit found that the Second Amendment's protections did not extend to illegal aliens because they are not "law-abiding members of the political community." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012).

GOV'T CODE ANN. § 411.172(a)(6); OHIO REV. CODE § 2923.125(o); ARK. CODE § 5-73-309(7)(A). *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S.Ct. at 2138 n.9. The Court said those regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* And Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id.* at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little sense if the Second Amendment in fact prevented states from disarming unlawful users of controlled substances.

> 2. **Even if the Court finds that the Second Amendment applies to unlawful drug users, Section 922(g)(3) is consistent with historical tradition.**

Defendant's claim that disarming unlawful drug users is not deeply rooted in this country's history is incorrect. There exists a long history and tradition of disarming dangerous individuals, including intoxicated persons, the mentally ill and those considered dangerous. While 18 U.S.C. § 922(g)(3) was passed in the mid-20th century, it rests on a history and tradition of analogous legislation stretching back to the time of the founding and is thus constitutional.

Even if Section 922(g)(3) is deemed to burden the rights of "law-abiding, responsible citizens," it should pass constitutional muster because it is consistent

with the Nation's historical tradition of firearm regulation. Courts have overwhelmingly rejected Second Amendment challenges to Section 922(g)(3), both before and after *Bruen*. No circuit has ruled otherwise. And although some circuit decisions applied the means-ends test *Bruen* eschewed, *see, e.g., Carter*, 669 F.3d at 414, others rest on the analogy between Section 922(g)(3) and the "longstanding prohibitions" that *Heller* endorsed, 554 U.S. at 626, and upon which *Bruen* does not cast doubt. *See, e.g.,* 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *see United States v. Dugan*, 637 F.3d 998, 999 (9th Cir. 2011); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010).

Consistent with these authorities, ten of eleven district courts to confront facial challenges to Section 922(g)(3) after *Bruen* have repudiated them.[2] The lone outlier proceeded primarily not by distinguishing Section 922(g)(3) from the longstanding prohibition disqualifying felons, but by questioning the constitutionality of that prohibition as well, *see United States v. Harrison*, 2023 WL 1771138 (W.D. Ok. Feb. 3, 2023)—a result which no other federal court has embraced, *see United States v. Posey*, 2023 WL 1869095, at *9 n.9 (N.D. Ind. Feb. 9, 2023) (recognizing that *Harrison* represents a "dramatic departure from existing

---

[2] *See United States v. Beverly*, No. 2:21cr36 (N.D.W.Va. Jan. 3, 2003); *United States v. Black*, —F.Supp.3d—2023 WL 122920 (W.D. La. Jan. 6, 2023); *United States v. Connelly*, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022); *United States v. Kelley*, No. 5:22cr395 (W.D. Okla. Jan. 13, 2023); *United States v. Lewis*, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Posey*, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Stennerson*, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Veasley*, No. 4:20cr209 (S.D. Iowa Sept. 22, 2022).

precedent").

Section 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is analogous to "longstanding prohibitions on the possession of firearms by … the mentally ill" and the intoxicated. *Heller*, 554 U.S. at 626. In England, justices of the peace could lock up dangerous lunatics and seize their property. *See The Origin of Insanity as A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487 (1985). Similarly, "in eighteenth-century America, justices of the peace were authorized to lock up lunatics who were dangerous to be permitted to go abroad." *Yancey*, 621 F.3d at 685 (internal quotations and citation omitted). As the Third Circuit reasoned in a decision vacated on other grounds, these severe restrictions on the liberty of the mentally ill made any specific restrictions on firearm possession unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated*, 140 S.Ct. 2758 (2020). But, as *Heller* recognized, it was beyond dispute that the mentally ill could be disarmed. 554 U.S. at 626.

Although being under the influence of a controlled substance is not tantamount to mental illness, both conditions can render a person incapable of safely and responsibly possessing a firearm. The founders placed intoxicated individuals in the same category as the mentally ill, criminals, and others subject to disarmament. Benjamin Rush, a signer of the Declaration of Independence and a prominent physician, equated drunkenness with a "temporary fit of madness."

BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS ON THE MIND AND BODY, 2 (1784). And other eighteenth-century observers likewise designated "habitual drinking" as a form of "insanity." CARL ERIK FISHER, URGE: OUR HISTORY OF ADDICTION 47 (2022) (citing Roy Porter, *The Drinking Man's Disease: The Prehistory of Alcoholism in Georgian Britain*, 80 BRITISH J. OF ADDICTION 385, 390 (1985)). As the Seventh Circuit observed, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685; *and see United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) (observing that "unlawful users of controlled substances pose a risk to society if permitted to bear arms").

Section 922(g)(3) is also analogous to historical laws that prohibited carrying a firearm while under the influence of alcohol. For example, in 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." 1 Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 401-02 (1823). In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)). And a 1746 New Jersey statute authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in Liquor." Acts of the General Assembly of the Province of New-Jersey 303 (1752).

Similarly, in the era following ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald*, 561 U.S. at 749-50, many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868); 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws 76, § 1; 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 47, § 4; 1899 S.C. Acts 97, No. 67, § 1; *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). As a Missouri Supreme Court decision explained, these laws comport with the right to bear arms because they mitigate the "mischief" that may result "from an intoxicated person going abroad with fire-arms." *Shelby*, 2 S.W. at 469.

Drugs other than alcohol were not widely used as intoxicants in the United States until the late nineteenth and early twentieth centuries. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSP. ON CRIME & JUST. 51, 63 (1997-98). Prohibitions on controlled substances accordingly did not emerge until around the 1880s and the early twentieth century. *See* U.S. Treasury Dep't, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (1931) 1-9 (describing development of state-level laws); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985, 1010 (1970).

As new and often more potent substances proliferated, so too did associated firearms regulations. For example, a Pennsylvania statute established that "[n]o person shall deliver a firearm . . . to one who he has reasonable cause to believe … is a drug addict." 1931 PA. LAWS 499, no. 158, § 8. Following Pennsylvania's lead, jurisdictions across the country—including the District of Columbia, Alabama, California, South Dakota, and Washington—all passed laws barring the sale of firearms or pistols to "drug addict[s]." 47 Stat. 652, § 7 (1932) (D.C.); *see* 1936 Ala. Laws 52, no. 82, § 8; 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8.

In a testament to the strength of this historical tradition, prohibitions on firearms possession by drug users remain prevalent today. In recent times, at least twenty-six states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting examples). Section 922(g)(3) thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 142 S.Ct. at 2156; see *id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Unlike those exceptional laws, Section 922(g)(3) reflects a historical tradition that stretches from the founding to the present, and it therefore comports with the Second

Amendment. Although none of the pre-twentieth century historical analogues are a "dead ringer" or "historical twin" for 18 U.S.C. § 922(g)(3), *Bruen*, 142 S.Ct. at 2133, they nevertheless show that § 922(g)(3) is "analogous enough" to historical laws "to pass constitutional muster." *Id.*

The "historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). This historical disarmament of individuals deemed to be dangerous or risky was implicitly recognized by *Bruen*. *See Bruen*, 142 S.Ct. at 2152 & n.26 (citing General D.E. Sickles's 1886 decree barring any "disorderly person, vagrant, or disturber of peace" from bearing arms). Here, § 922(g)(3)'s prohibition on firearm possession applies only to persons in present or very recent violation of federal drug laws. Societal risk was a key consideration in Congress's adoption of the statute which was aimed at keeping guns out of the hands of illegal drug users. *See Yancey*, 621 F.3d at 683-84 (Congress's goal in passing § 922(g) was "to keep guns out of the hands of presumptively risky people" and to "suppress[ ] armed violence."). Accordingly, the burdens imposed by Section 922(g)(3) and the referenced historical analogues are "comparably justified." *Bruen*, 142 S.Ct. at 2133. As a result, Defendant's claim that § 922(g)(3) unconstitutionally infringes on a Second Amendment right should be denied.

## II.    TITLE 18 UNITED STATES CODE SECTION 922(n) IS CONSTITUTIONAL.

The defendant also challenges the constitutionality of 18 U.S.C. § 922(n), arguing that its prohibition of firearms receipt by indictees is not deeply rooted in this nation's history and tradition. Again, this facial challenge faces a steep burden, because to prevail, the defendant "must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745. Because Defendant's conduct in possessing a firearm as an indicted person falls outside the protections of the Second Amendment and because the prohibition against receipt of firearms by those under indictment is consistent with this nation's history and tradition of firearms regulation, this Court should deny Defendant's motion.

### A. The Second Amendment Does Not Protect Receipt of a Firearm by a Person Under Felony Indictment

As discussed in parts (I.A.) and (I.A.1), supra, Second Amendment rights are "not unlimited." *Heller*, 554 U.S. at 626. The Second Amendment "'elevates above all other interests the right of *law-abiding, responsible citizens* to use arms for self-defense." *Bruen*, 142 S. Ct. at 2131, quoting *Heller*, 554 U.S. at 635 (emphasis added). That interest and the Second Amendment generally, however, do not restrict "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626-627 & n.26; see also *McDonald*, 461 U.S. at 786 (repeating *Heller*'s "assurances" that governments may, consistent with the Second Amendment, prohibit felons and the mentally ill from possessing arms). These groups of people are excluded

from the Second Amendment's protection because the Amendment codified a "right," belonging to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635; *see also Bruen*, 142 S. Ct. at 2111 (describing the "right of an ordinary law-abiding citizen to possess a handgun" both publicly and in the home "for self-defense"). As previously discussed above, throughout *Bruen*, including in its concurring opinions, the Supreme Court repeatedly described the Second Amendment right as belonging only to "law-abiding citizens." See *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156; see also *Id.* at 2157, 2158, 2159, 2161 (Alito, J., concurring); *Id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring).

In applying the framework it announced in *Bruen*, the Supreme Court addressed whether petitioners were "ordinary, law-abiding adult citizens" in the section of its opinion addressing the Second Amendment's textual scope. *See Bruen*, 142 S. Ct. at 2134-2135; It further noted that the two key metrics for assessing whether firearms regulations comply with the Second Amendment are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133; see also *Wrenn v. District of Columbia*, 864 F.3d 650, 663 (D.C. Cir. 2017) (suggesting laws comply with *Heller* if they "leave responsible, law-abiding citizens some reasonable means of exercising" the right to keep and bear arms); *but see United States v. Rahimi*, ___ F.4th ___, 2023 WL 1459240, *3-*4 (5th Cir. Feb. 2, 2023) (concluding the phrase "law-abiding, responsible citizens" was mere "shorthand," and that all members of the "political community," including lawbreakers, have a presumptive right to bear arms).

*Bruen* took specific care to clarify that nothing in the opinion was meant to cast doubt on the legality of the "shall-issue" licensing regimes then in place in 43 states that included background checks and other "narrow, objective and definite" requirements "designed to ensure only that those bearing arms in the jurisdiction are in fact 'law-abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see also Id.* at 2161 (Kavanaugh, J., concurring). Many of these state regimes expressly disqualify those under indictment or information. *See, e.g.,* Ariz. Rev. Stat. § 13-311(E)(3); Ill. Comp. Stat. 66/25(4); Ind. Code § 35-47-2-3(i)(5); Ky. Rev. Stat. § 237.110(4)(a); La. Stat. § 40:1379.3(C)(1); Tenn. Code § 39-17-1351(c)(7). By indicating that these regimes remain broadly constitutional (unless abused through "lengthy wait times .. or exorbitant fees [that] deny ordinary citizens their right to public carry," see *Bruen*, 142 S. Ct. at 2138 n.9), the Court reinforced that the Second Amendment's protections do not extend to people who are not law-abiding. Otherwise, each of the 43 "shall-issue" regimes could survive only if all of their many objective disqualifying criteria survive a case-by-case, historical inquiry. Such exacting scrutiny is flatly contrary to the Supreme Court's express declaration that it was casting no doubt on these regimes.

The conclusion that the Second Amendment's text covers only law-abiding citizens is also consistent with a host of pre-*Bruen* appellate court decisions. For example, *Medina v. Whitaker*, 913 F.3d 152, 157-158 (D.C. Cir. 2019), rejected a nonviolent felon's "as applied" challenge to the federal felon in possession statute. To

determine the "public understanding" of the Second Amendment at the time of ratification, the D.C. Circuit considered evidence that the founders understood the right to bear arms to exclude "those who were not (or could not be) virtuous members of the community." *Id.* at 158-159. The court of appeals held that felons—violent or not—"are not among the law-abiding, responsible citizens entitled to the protections of the Second Amendment." *Id.* at 154; *accord United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (holding that "felons are categorically different from the individuals who have a fundamental right to bear arms").

Courts have reasoned similarly for other groups classified as irresponsible or non-law-abiding. For instance, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011), rejected a challenge to 18 U.S.C. § 922(g)(8), which prohibits gun possession by people subject to domestic violence restraining orders. Relying on *Heller*'s description of the right to bear arms as protecting law-abiding citizens, the Eighth Circuit observed that the Supreme Court most likely viewed restrictions on gun possession by felons and the mentally ill "as presumptively lawful because they do not infringe the Second Amendment right." *Id.* at 1183. This rendered Section 922(g)(8) "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *Id.* at 1184. Consistent with this interpretation, in *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) the Fourth Circuit refused to apply Second Amendment protections to illegal aliens "because illegal aliens are not law-abiding members of the political community". Like the above prohibitions, Section 922(n) does

not contravene the Second Amendment because it places no burden on the rights of an "ordinary, law-abiding citizen."

A citizen cannot be arrested on felony charges absent a showing of probable cause to believe he has not abided by the law. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Watson*, 423 U.S. 411, 415-416 (1976). Once probable cause is established, however, the suspected lawbreaker "may face substantial liberty restrictions." Salerno, 481 U.S. at 749. He may be searched incident to arrest. *United States v. Robinson*, 414 U.S. 218, 224-226 (1973). He may be strip-searched once taken to jail. *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 322-323 (2012). He may be temporarily jailed pending arraignment based upon the government's "strong interest" in protecting the public from those "reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial adjudication." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). In some circumstances, a person charged with a crime can be denied bail and detained pending trial with his assets frozen, precluded from hiring Sixth Amendment counsel of choice. *Salerno*, 481 U.S. at 739; *Kaley v. United States*, 571 U.S. 320 (2014). Despite the First Amendment freedoms of speech and the press, those detained can be prohibited from receiving books and magazines from private parties. *Bell v. Wolfish*, 441 U.S. 540, 549-552 (1979).

Given that the needs of the criminal justice system can justify all these substantial restrictions and outweigh a criminal defendant's First, Fourth, Fifth, and

Sixth Amendment rights, they can likewise outweigh a criminal defendant's Second Amendment rights. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 2156 (emphasizing the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees"). Thus, if an indictment found to be supported by probable cause is sufficient to trigger detention, *see Salerno*, 481 U.S. at 739; a seizure of assets, *see Kaley*, 571 U.S. at 327-328; and First Amendment restrictions, *see Bell*, 441 U.S. at 550; it is also sufficient to temporarily restrict the right to acquire firearms.

One district court applying *Bruen* to a charged defendant reached just that conclusion. *See United States v. Fencl*, No. 21-CR-3101, JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec. 7, 2022), *aff'd*, No. 22-50316 (9th Cir. Jan. 26, 2023) (opinion to follow). *Fencl* held that a pretrial release condition barring gun possession, 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment. *Id.* The court reasoned the defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause." *Id.* It rejected an appeal to the presumption of innocence, explaining this presumption "does not deprive the government of the ability to place significant, but temporary, restrictions on an accused's constitutional rights in order to further its interest in community safety." *Id.* (citing *Salerno*, 481 U.S. at 748). This Court should hold the same. Because Alston and others facing pending felony charges are not ordinary, law-abiding citizens,

the Second Amendment does not preclude the government from imposing firearms restrictions on that class of individuals.

## B. Section 922(n) is Consistent with the Nation's Historical Tradition of Gun Regulation

Even if the Second Amendment's text were thought to cover defendants charged with felonies, 18 U.S.C. § 922(n) would still survive constitutional challenge under *Bruen* because it squares with historical tradition. When comparing modern and historical gun laws, courts often must "reason[ ] by analogy," which "requires a determination of whether the two regulations are relevantly similar." *Bruen*, 142 S.Ct. at 2131 (quotation marks omitted). *Bruen* offered no "exhaustive survey of the features that render regulations relevantly similar," but it established as the central inquiry: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In conducting this historical inquiry, the Court must give greatest weight to the laws of "the Colonies and early Republic," as well as to the period of English law between 1660 and 1688. *Bruen*, 142 S. Ct. at 2140-2142. "[A]nalogical reasoning" is not "a regulatory straightjacket." *Id.* It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* (emphasis in original); *see also National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated in part on other grounds by Bruen*, 142 S. Ct. at 2111 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era

analogue.”). “So, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.” *Bruen*, 142 S. Ct. at 2133.

*Bruen*'s guidance forecloses simply “comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application.” *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, *2 (M.D. Tenn. Nov. 16, 2022) (upholding § 922(n)). This is “because a list of laws that *happened to exist* in the founding era, as a matter of basic logic, is not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution.” *Id.* (emphasis in original). Multiple historical analogues to Section 922(n)'s prohibition exist. In *Bruen*'s wake, several district courts have held historical laws sufficiently analogous to establish a tradition supporting the imposition of modern gun restrictions on indicted defendants. *See United States v. Rowson*, 2023 WL 431037, at *21-*24 (S.D.N.Y. Jan. 26, 2023); *Fencl*, 2022 WL 17486363, at *3; *United States v. Perez-Garcia*, No. 22-CR-158-GPC, 2022 WL 17477918, at *4-5 (S.D. Cal. Dec. 6, 2022); *Kelly*, 2022 WL 17336578, at *5; *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2-3 (W.D. Pa. Oct. 6, 2022); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519, at *4-5 (W.D. Okla. Aug. 29, 2022).

1.     **Section 922(n) is analogous to historical laws detaining indicted defendants prior to trial.**

Consistent with the Constitution, legislatures can deprive indicted defendants of their liberty. A "fundamental right to bail was not universal among the colonies or among the early states." *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981). While the Eighth Amendment forbids excessive bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Id.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed." *Id.* Indeed if it chose, "Congress may ban bail in an entire class of cases." *United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010).

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"— and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 YALE L.J. 490, 502 (2018); *Slye*, 2022 WL 9728732, at *2 ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law."). The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail

was allowed "except where the punishment may be death, in which case it shall not be admitted but by [a court or judge] who shall exercise his discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the founding, capital cases encompassed a broad swath of criminal conduct. Capital crimes "included nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *Furman v. Georgia*, 408 U.S. 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion"). "Capital punishment for felonies was 'ubiquit[ous]' in the late Eighteenth century and was 'the standard penalty for all serious crimes.'" *Medina*, 913 F.3d at 158, quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring).

The historical tradition of detaining those charged with serious crimes supports Section 922(n)'s restriction on those individuals' right to receive guns. The power to detain necessarily encompasses the power to impose some lesser liberty restrictions. Thus, for example, the Supreme Court has reasoned that "'it would be odd to conclude'" that the government cannot seize forfeitable assets on a grand jury's probable cause finding when that showing is "often sufficient to 'restrain *persons*.'" *Kaley*, 571 U.S. at 330 (quoting *United States v. Monsanto*, 491 U.S. 600, 615 (1989)) (emphasis in original); *see also Stephens*, 594 F.3d at 1039 (reasoning that Congress's

power to ban bail implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" of a curfew and electronic monitoring). In the same way, it would be odd to conclude that being charged with a crime can justify pretrial detention and the freezing of forfeitable assets but cannot justify a temporary restriction on receipt of a firearm.

Thus, applying *Bruen*, some district courts have upheld gun restrictions placed on charged felony defendants based on the nation's historical tradition of pretrial detention. In *Slye*, the district court rejected a Second Amendment challenge to a "standard condition" prohibiting a pretrial releasee from possessing a gun. *Slye*, 2022 WL 9728732, at *2-3. The court explained that "[i]t would be illogical to conclude" that it had authority to detain the defendant "but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* at *2; *see also Fencl*, 2022 WL 17486363, at *3 (upholding 18 U.S.C. § 3142(c)(1)(B)(viii) based partly on "this Nation's historical tradition of pretrial detention (and its attendant restrictions on an individual's Second Amendment rights)").

As a constitutional matter, Defendant could have been held without bail pending trial on his state AWDWIKISI offense. Under many colonial statutes, his breach of the peace would have justified disarming him as dangerous, untrustworthy, or a threat to the public. Nothing in the Second Amendment suggests that Section 922(n) cannot be applied to defendants who have been charged with violent felonies

but granted bail pending trial. *See Kanter,* 919 F.3d at 454 (Barrett, J. dissenting) ("Legislature[s] may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety). It would make little sense if a complete deprivation of an indictee's liberty (which would naturally include deprivation of arms while in custody) is constitutional, but the less-restrictive, temporary prohibition of receipt of firearms by a person, like Alston, who is at liberty pending trial, is unconstitutional. This Court should deem Section 922(n) sufficiently analogous to historical laws allowing pretrial detention and uphold its constitutionality.

> ## 2. Section 922(n) is analogous to historical laws disarming dangerous or untrustworthy people.

Both England and early America restricted the gun rights of some to protect the safety of all. In 1662, England empowered officers to "seize all Arms in the custody and possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3 § 13 (1662). "[B]y the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 WYO. L. REV. 249, 261 (2020); *see also id.* at 259-261 (detailing this history). Early America inherited the English tradition. "The historical record shows that gun safety regulation was commonplace in the colonies." *National Rifle Ass'n*, 700 F.3d at 200.

Noteworthy among "revolutionary and founding era gun regulations are those that targeted particular groups for public safety reasons." *National Rifle Ass'n*, 700 F.3d at 200. During the Revolutionary War, at least six "jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance." *Id*; *see* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

Accounts of the ratification debates confirm the founders' belief that "disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally." *National Rifle*, 700 F.3d at 200. "*Heller* identified ... as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting *Heller*, 554 U.S. at 604). That report recognized the government could disarm the potentially dangerous, stating that "citizens have a personal right to bear arms 'unless for crimes committed, or real

J.A. 79

danger of public injury.'" *Skoien*, 614 F.3d at 640 (quoting 2 Bernard Schwarz, *The Bill of Rights: A Documentary History*, 662, 665 (1971)).

Similarly, Samuel Adams offered an amendment at the Massachusetts ratification convention recommending "that the said Constitution be never construed to authorize Congress to … prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, *The Bill of Rights*, 674-675, 681 (emphasis added). Some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley*, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868). The tradition of disarming dangerous or untrustworthy persons supports Section 922(n)'s ban on indicted defendants' receipt of firearms.

Section 922(n) is "relevantly similar" to these historical precursors under the "two metrics" *Bruen* offered: "how and why the regulations burden" Second Amendment rights. *Bruen*, 142 S. Ct. at 2132-2133. As to "how" the statute operates, Section 922(n), like those precursors, uses an objective criterion to categorically restrict a specific group's gun rights. As to "why," Section 922(n) seeks "to combat violence and promote public safety" by "keeping firearms out of the hands of categories of potentially irresponsible persons." *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011) (ellipses omitted). Section 922(n) thus represents a

permissible legislative judgment that a person's status as an indicted felon warrants temporarily precluding the person from acquiring new firearms. Because Section 922(n) is analogous to historical restrictions on other classes of individuals deemed dangerous or untrustworthy, it is a constitutional exercise of Congressional power.

## III.    CONCLUSION

*Heller* and *Bruen* are clear that the Second Amendment protects possession and use of firearms and ammunition for lawful purposes by law-abiding, responsible citizens. The Constitution does not protect the conduct prohibited by 18 U.S.C. §§ 922(g)(3) and (n). Moreover, even if such conduct were covered, the statutes are consistent with the nation's historical tradition of firearm regulation. Sections 922(g)(3) and 922(n) are thus facially constitutional, and Defendant's motion to dismiss should be denied.

Respectfully submitted this 28th day of March, 2023.

MICHAEL F. EASLEY, JR.
United States Attorney

BY:   /s/ Sarah E. Nokes
SARAH E. NOKES
Assistant United States Attorney
Criminal Division
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone:   (919) 856-4054
Facsimile:   (919) 856-4487
E-mail:   sarah.nokes@usdoj.gov
VA Bar No. 82472

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 47.2(f)</u>

This is to certify that this Response to Defendant's Motion to Dismiss complies with Local Criminal Rule 47.2(f) and the applicable word limit. Based upon a word count generated by word processing software, this brief is 7,899 words.

/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this 28th day of March, 2023, served a copy of the foregoing response upon the defendant in this action by CM/ECF to:

Edward D. Gray
Attorney for Defendant

/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CR-00021-FL-RN-1

|  |  |
|---|---|
| **United States of America**, |  |
| v. |  |
| **Carlos Alston**, | **Order** |
| Defendant. |  |

Defendant Carlos Alston has challenged the constitutionality of 18 U.S.C. §§ 922(g)(3) and 922(n), the federal statutes under which he was indicted. *See* Mot. Dismiss, D.E. 17. In short, Alston contends that the statutes fail to satisfy the test laid out in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The court has scheduled a hearing to discuss Alston's motion for later this month. *See* Order Setting Hr'g, D.E. 21.

Federal law—at least in theory—allows someone barred from possessing or receiving a firearm under § 922 to apply to the Attorney General to restore his rights. 18 U.S.C. § 925(c). And if the Attorney General denies an individual's application, § 925(c) allows him to petition the courts for relief. *Id.*

But since 1992 Congress has prohibited the Executive Branch from using appropriated funds "to investigate or act upon applications for relief from [f]ederal firearms disabilities under" 18 U.S.C. § 925(c). Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, 136 Stat. 49; *United States v. Bean*, 537 U.S. 71, 74–76 (2002). And absent an actual denial of a request for relief, federal courts lack jurisdiction to conduct the review provided by § 925(c). *Bean*, 537 U.S. at 75–76.

J.A. 83

The court would like to know the parties' positions on how—if at all—the existence of this rights-restoration provision and, separately, Congress's denial of funds to the Attorney General to implement the provision impact the questions before the court. Thus, the court orders the parties to submit supplemental briefs, not to exceed 20 pages, on this issue by May 26, 2023.

Dated:  May 12, 2023

_____
Robert T. Numbers, II
United States Magistrate Judge

J.A. 84

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | |
|---|---|
| UNITED STATES OF AMERICA | SUPPLEMENTAL BRIEFINF AND INCORPORATED MEMORANDUM OF LAW |
| v. | |
| CARLOS ALSTON | |

Defendant Carlos Alston, through undersigned counsel, respectfully provides this brief in response to the Court's request for Mr. Alston's position as to whether the existence of a rights-restoration provision and whether Congress's denial of funds to the Attorney General to implement the restoration provision impacts the questions before the court as to whether the Indictment violates Mr. Alston's Second Amendment right to keep and bear arms.

## I.    BACKGROUND

### A.  Procedural History

On January 24, 2023, Mr. Alston was charged in a two-count indictment with one count of being a person in receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n), and one count of being a person in possession of a firearm while a drug user, in violation of 18 U.S.C. § 922(g)(3). [DE 11]. Arraignment is set for March 9, 2023.

### B.  Factual Background

Mr. Alston was waiting in the drive-thru line of a restaurant located in Henderson, North Carolina, when police approached his car. [DE 1]. Mr. Alston anticipates that the government will argue Mr. Alston brandished a weapon at the approaching police officer after the officer gave verbal commands for Mr. Alston to show his hands and notified him of

outstanding warrants. [DE 1]. The officer then shot Mr. Alston once, striking him in the lower body. [DE 1]. After a foot chase, Mr. Alston collapsed from his injuries and was taken into custody. [DE 1]. Police recovered a Smith & Wesson, SD9VE 9mm pistol near Mr. Alston's flight path, and they discovered marijuana in his car. Mr. Alston has a prior criminal conviction related to marijuana. [DE 1]. At the time of the shooting, Mr. Alston did not have any felony convictions.

## II.    LAW REGARDING FEDERAL RESTORATION OF RIGHTS

### A.  *No application for restoration can be made in this case.*

Under federal law, a person who is convicted of a felony is prohibited from possessing firearms. *See* § 922(g)(1). The Secretary [of the Treasury] was authorized to grant relief from that prohibition if it is established to his satisfaction that certain preconditions are met. *See* § 925(c). An applicant may seek judicial review from a "United States district court" if his application "is denied by the Secretary." *Id. See United States v. Bean,* 537 U.S. 71, 74, 123 S.Ct. 584, 586 (2002). However, there is no practical process for restoration as the Bureau of Alcohol Tobacco and Firearms (ATF) has been barred from acting on this due to an appropriations ban that has been in place since 1992. Accordingly, the ATF is prohibited to act on § 925(c) applications. Specifically, the Secretary is barred from using "funds appropriated herein ... to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. [§ ]925(c)." Treasury, Postal Service, and General Government Appropriations Act,  Pub. L. 102-393, 106 Stat. 1732.

As there is a bar which effectively prevents Mr. Alston from applying for restoration of rights under any circumstances.  However, under the *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111

(2022) decisions, Mr. Alston should not have to apply for restoration as the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. *Heller*, 554 U.S. 570, 592, 624 (2008). Under *Bruen*, the government cannot meet its burden to identify a "relevantly similar" historical tradition of firearm regulation that supports disarming individuals who have been merely indicted.   Accordingly, Mr. Alston should not be required to ask for restoration of his rights.

### B.  The remote chance of "restoration" does not cure the unconstitutionality of the statute.

The fact that Congress disabled the program means 925(c) is a dead letter. There is, in effect, no possibility of getting firearms rights restored under any circumstances under the current legislative regime. Further, the remote possibility that 925(c) might someday be revived AND that someone might prevail under it cannot cure the unconstitutionality of the prohibitions.

The fact that, in theory, someone could regain his arms right through a discretionary, long-shot process just doesn't mean that his right isn't being infringed right now. *Bruen* makes clear that the right to keep and bear arms can be infringed by deprivations short of total disarmament. The New York statute's proper-cause requirement stuck down by the Supreme Court in *Bruen* was discretionary and difficult to satisfy in the same way that 925(c) is.  Once again, a very speculative avenue for relief does not meaningfully prevent deprivation of a constitutional right.

Further, consistent with *Bruen's* focus on history, there is no evidence showing that any founding-era examples indicating that people who were entitled to bear arms could be disarmed if the government left open a very small, highly discretionary avenue for those people to regain their rights.  As the holding of Bruen clearly articulates, the government can't take away a person's Second Amendment rights, contingent on their proving that they meet some highly subjective and demanding criteria, unless the government can show there was evidence of such a scheme in the

J.A. 87

founding era.  Once again, the government cannot meet its burden to identify a "relevantly similar" historical tradition of firearm regulation that supports disarming individuals who have been merely indicted.   Accordingly, Mr. Alston does not have to ask for restoration of his rights to lawfully possess firearms.

## III.    CONCLUSION

The government has failed to demonstrate that § 922(g)(3) and § 922(n) are supportable by any historic tradition of firearm regulation in the United States, rendering them unconstitutional under *Bruen* and the Second Amendment. Mr. Alston continues to argue that this Court should dismiss both counts of the indictment against Mr. Alston.

Respectfully requested this 25th day of May, 2023.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served upon:

> Sarah E Nokes
> Assistant United States Attorney
> United States Attorney's Office
> Eastern District of North Carolina
> 150 Fayetteville Street, Suite 2100
> Raleigh, NC 27601

by electronically filing the foregoing with the Clerk of Court on May 25, 2023, using the

CM/ECF system which will send notification of such filing to the above.

This the 25th day of May, 2023.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S SUPPLEMENTAL |
| v. | ) | BRIEF REGARDING APPLICABILITY |
| | ) | OF 18 U.S.C. § 925(c) TO ALSTON'S |
| CARLOS ALSTON | ) | MOTION TO DISMISS |

Defendant Carlos Alston moved to dismiss the Indictment pending against him, arguing that the charged statutes, 18 U.S.C. §§ 922(g)(3) and (n), are unconstitutional in the wake of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). DE 17. The government responded, arguing that the statutes are constitutional. DE 20. On May 12, 2023, the Court ordered the parties to submit supplemental briefing regarding the effect of the rights-restoration provision of 18 U.S.C. § 925(c) on the parties' arguments. DE 22. As further discussed below, 18 U.S.C. § 925(c) has no effect on the issues now before the Court.

## I.    Background

Since 1986, federal law has included a rights-restoration provision at 18 U.S.C. § 925(c)[1] which ostensibly allows individuals who are federally prohibited from

---

1 Congress promulgated an earlier version of the rights restoration statute in 1965. Ryan Laurence Nelson, *Rearming Felons: Federal Jurisdiction Under 18 U.S.C. § 925(c)*, 2001 Univ. of Chi. L. Forum 554, *available at* https://perma.cc/EM73-HWK5. While intended to provide relief to corporations which had incurred prohibitions

possessing, shipping, transporting or receiving firearms to petition the Secretary of

the Treasury (and later, the Attorney General) for restoration of their firearms

privileges. *See* Pub. L. No. 99-308, 100 Stat. 449 (1986); 18 U.S.C. § 925(c). The statute

provides, in pertinent part:

> A person who is prohibited from possessing, shipping, transporting, or
> receiving firearms or ammunition may make application to the Attorney
> General for relief from the disabilities imposed by Federal laws with
> respect to the acquisition, receipt, transfer, shipment, transportation, or
> possession of firearms, and the Attorney General may grant such relief
> if it is established to his satisfaction that the circumstances regarding
> the disability, and the applicant's record and reputation, are such that
> the applicant will not be likely to act in a manner dangerous to public
> safety and that the granting of the relief would not be contrary to the
> public interest.

18 U.S.C. § 925(c). The statute further allows for unsuccessful applicants to petition

the district court in the district in which they reside for review of the denial of their

restoration of firearms rights. 18 U.S.C. § 925(c). The Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF) was tasked with reviewing rights restoration

applications and conducting "a broad-based field investigation of the convicted

applicant's record and reputation before ruling on the application" according to

detailed regulations. *United States v. McGill*, 74 F.3d 64, 66 (5th Cir. 1996).

In 1992, Congress prohibited executive branch agencies from using federal

funding to investigate or act upon petitions for relief under 18 U.S.C. § 925(c). *United*

*States v. Bean,* 537 U.S. 71, 74-75 (2002) (citing Treasury, Postal Service and General

against participation in the firearms trade, individual persons also took advantage of the program. *Id.*

Government Appropriations Act, 1993, Pub. L. 102-393, 106 Stat. 1732). Congress explained that the task of reviewing, investigating and deciding upon rights restoration applications was "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made" and that the time spent reviewing and investigating the applications would be better spent in "crack[ing] down on violent crime." S. Rep. No. 353, 102nd Cong. 2d Sess. 77 (1992). Congress has continued to withhold funding for review of rights restoration applications. *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, 136 Stat. 49.

The withdrawal (and continued withholding) of funding effectively eliminated the ability of individuals to obtain relief under 18 U.S.C. § 925(c), because the ATF cannot issue a final decision on any individual's restoration application and the district courts lack jurisdiction to consider an individual's petition without such a final decision. *Bean*, 537 U.S. at 75-78; *Saccacio v. Bureau of Alcohol, Tobacco & Firearms*, 211 F.3d 102, 104 (4th Cir. 2000). This outcome aligned with Congressional intent, as Congress intended its withdrawal of funds "to suspend the relief provided by [18 U.S.C.] § 925(c)." *McGill*, 74 F.3d at 67. Since 1993 then, 18 U.S.C. § 925(c) "has been rendered inoperative." *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

## II.    Argument

Neither the existence of 18 U.S.C. §925(c)'s rights-restoration provision nor Congress's denial of funds to implement that provision impacts the analysis in this

case for two reasons. First, Section 925(c)'s rights-restoration provision would be relevant, if operational, to the propriety of as-applied challenges to federal firearms statutes, and Defendant makes only a facial challenge to Sections 922(g)(3) and (n). Second, Section 925(c)'s rights-restoration process is not constitutionally required, and Defendant could not satisfy its requirements even if it were operational.

### A. Section 925(c)'s operation may be relevant to an as-applied challenge, but Defendant makes only facial challenges to the constitutionality of 18 U.S.C. §§ 922(g)(3) and (n)

The unavailability of judicial review under 18 U.S.C. § 925(c) does not prevent a criminal defendant from raising a Second Amendment challenge to a charge of illegal possession of a firearm under 18 U.S.C. § 922. If the relief process under Section 925(c) were operational, it would significantly weaken or perhaps entirely foreclose a defendant's claim that a federal ban on firearm possession was unconstitutional as applied to him. *See Lewis v. United States*, 445 U.S. 55, 64 (1980) (stating that "Congress clearly intended that the defendant clear his status *before* obtaining a firearm" and pointing to § 925(c) as a possible means of doing so). But in the years following Congress's withdrawal of funds from the program, courts, including the Fourth Circuit, have entertained as-applied challenges to various provisions of 18 U.S.C. § 922. *See, e.g., Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021); *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019); *Binderup v. Att'y Gen. United States of Am.,* 836 F.3d 336 (3d Cir. 2016).

Some judges have expressed the view that such as-applied challenges are improper given Congress's decision to de-fund Section 925(c). *See Harley*, 988 F.3d 766, 774 (4th Cir. 2021) (Wynn, J., concurring) (observing that the defendant "seeks to avoid the limitations of § 925(c) by pursuing an as-applied challenge directly in federal court" and expressing the view that "relief, if any, lies in obtaining a pardon in Virginia or receiving relief from the Attorney General" under Section 925(c)); *Binderup*, 836 F.3d at 403 (Fuentes, J., dissenting) ("Notwithstanding Congress's experience with § 925(c), [petitioners] seem to believe that by shoehorning their complaints about § 922(g)(1)'s scope into the rubric of 'as-applied challenges,' they necessarily force us to assess their individual characteristics rather than rely on Congress's categorical rule."). But the Fourth Circuit has routinely considered as-applied Second Amendment challenges in the context of federal firearms prosecutions, despite the existence of § 925(c). *See, e.g., Harley*, 988 F.3d at 768-71; *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020); *United States v. Hosford*, 843 F.3d 161, 167-70 (4th Cir. 2016). And nothing in *Bruen* indicates that such as-applied challenges are impermissible. *See Range v. Attorney General*, 53 F.4th 262, 270 n.9 (3d Cir. 2022) ("[T]here is still room for 'as-applied' challenges even after *Bruen*."), vacated on rehearing *en banc*, 56 F.4th 992 (2023); *but see United States v. Wagoner*, No. 4:20-CR-00018, 2022 WL 17418000, at *4 (W.D. Va. Dec. 5, 2022) (calling into question whether as-applied challenges may be made post-*Bruen* because the only question for the court is "whether the challenged law is facially consistent

with the Nation's historical tradition of firearm regulation.").

In any event, Defendant raises a facial challenge that would not be affected even if Section 925(c) were operational. Defendant's Motion does not explicitly claim to be either a facial challenge or an as-applied challenge. But because Defendant neither included "a developed factual record" nor challenged "the application of a statute to a *specific person*," his challenge is not an as-applied challenge. *Educ. Media Co. at Va. Tech v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (emphasis added) (*quoting Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (*en banc*)). Defendant's Motion does not argue specific facts about his own characteristics, history or circumstances that would lead the Court to conclude that the prohibitions in 18 U.S.C. §§ 922(g)(3) and (n) are unconstitutional as they have been *specifically applied to him*. Rather, Defendant makes a broader argument: that 18 U.S.C. §§ 922(g)(3) and (n) are unconstitutional in any application, because they are not consistent with the nation's history and tradition of firearms regulation. This is a quintessential facial challenge.

Section 925(c) is a provision which, when in use, was focused solely on the specific characteristics of the petitioner. 18 U.S.C. § 925(c) (directing inquiry into "the applicant's record and reputation."). When funding existed for such individual inquiries, ATF considered information about each specific petitioner, including, *inter alia*, statements from personal references, employment history, medical history, military service and the applicant's criminal record, in order to make necessary

findings about whether that particular petitioner would be a danger to the public. 27 C.F.R. § 478.144(c). The Court has no such information about the defendant, and thus Defendant's Motion is not analogous to a petition under § 925(c). Because Defendant has not made the kind of showing contemplated by § 925(c) or the types of as-applied challenges considered in *Harley, Kanter* or *Binderup*, the existence and inoperability of § 925(c) are not relevant to his Motion.

### B. Section 925(c)'s rights-restoration provision is not constitutionally required, and Defendant could not satisfy its requirements in any event.

The existence of Section 925(c) does not prevent Defendant from bringing an as-applied challenges to Sections 922(g)(3) and (n). But neither does Section 925(c)'s inoperability help Defendant prevail on those challenges. Section 925(c)'s rights-restoration scheme is not constitutionally required. The government is not aware of any decision holding that defendants must be able to seek relief from the prohibitions in Section 922, nor any decision holding that Congress's failure to fund Section 925(c) creates constitutional concerns. Defendant has not alleged—and cannot show—that a funded rights-restoration process is necessary to a constitutional firearms regulation scheme.

This is particularly true in the context of the temporary prohibitions on firearm possession and receipt that Defendant challenges. Several of Section 922's prohibitions are permanent. *See, e.g.,* 18 U.S.C. §§ 922(g)(1) and (g)(9) (permanently depriving felons and domestic violence misdemeanants from firearm possession). The

*Heller* and *Bruen* courts cited at least some permanent disposition statutes as constitutionally sound. *See, e.g., District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons...."); *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) (same). But the permanent nature of these prohibitions has been the crux of many as-applied challenges in the wake of Section 925(c)'s defunding. *See, e.g., Kanter*, 919 F.3d at 468-69 (Barret, J., dissenting); *Harley*, 988 F.3d at 771.

However, the statutory provisions currently before the Court for constitutional review are *not* permanent in nature. In order to receive relief from the prohibition on firearm possession in Section 922(g)(3), an individual need only cease use of illegal controlled substances. A person who has not engaged in illegal controlled substance use with recency and regularity is not subject to the prohibition in 18 U.S.C. § 922(g)(3). *See United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002). Similarly, a person who is subject to the prohibition on his receipt of firearms under Section 922(n) because he is under felony indictment will be relieved of the restriction if he is found not guilty of his crime[s] or the indictment is dismissed. Even if he is found guilty of the felony offense[s] for which he was under indictment, the prohibition in Section 922(n) no longer applies, though he would face prohibition under 18 U.S.C. § 922(g)(1). In short, both challenged statutes impose only temporary burdens on an individual's rights to receive or possess firearms and such person would not need a

formal rights-restoration scheme in order to be relieved of either statute's prohibitions.

Moreover, even if Section 925(c) were operational, Defendant could not meet that provision's requirements. Defendant, as a daily user of marijuana and person under indictment for a serious, violent felony is not someone who could show that he would "not be likely to act in a manner dangerous to public safety" and whose rearmament "would not be contrary to the public interest." 18 U.S.C. § 925(c); *see, e.g., Kanter,* 919 F.3d at 440 (considering and denying an as-applied challenge from a plaintiff who had been convicted of a non-violent felony, completed his sentence and paid his monetary penalties). Defendant showed that he was, in fact, dangerous when he brandished a loaded handgun at an officer who approached him to effectuate a lawful arrest. *See* DE 15 (finding, by clear and convincing evidence, that no release condition which could be imposed upon the defendant could reasonably assure the safety of any person or the community). Because Defendant could not hope to satisfy the requirements of 18 U.S.C. § 925(c) (or an as-applied challenge in which the court applied similar criteria), that section's inoperability has no effect on his Motion.

## III. Conclusion

The existence and inoperability of Section 925(c) has no effect on the issues before the court. Sections 922(g)(3) and 922(n) are constitutional both facially and

as applied to Defendant, and Defendant's motion to dismiss should be denied.

Respectfully submitted this 26th day of May, 2023.

> MICHAEL F. EASLEY, JR.
> United States Attorney
>
> BY:   <u>/s/ Sarah E. Nokes</u>
> SARAH E. NOKES
> Assistant United States Attorney
> Criminal Division
> 150 Fayetteville Street, Suite 2100
> Raleigh, North Carolina 27601
> Telephone:   (919) 856-4054
> Facsimile:    (919) 856-4487
> E-mail:   sarah.nokes@usdoj.gov
> VA Bar No. 82472

## CERTIFICATE OF SERVICE

This is to certify that I have this 26th day of May, 2023, served a copy of the

foregoing response upon the defendant in this action by CM/ECF to:

Edward D. Gray
Attorney for Defendant


/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division

J.A. 100

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NORTH CAROLINA**

```
                              )
UNITED STATES OF AMERICA,     )
                              )   DOCKET NO. 5:23-CR-21-FL-RN
               Plaintiff,     )
                              )
vs.                           )
                              )
CARLOS ALSTON,                )
                              )
               Defendant.     )
```
_____

**TRANSCRIPT OF HEARING ON MOTION TO DISMISS INDICTMENT
BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II
WEDNESDAY, MAY 31, 2023; 1:37 PM
RALEIGH, NORTH CAROLINA**


**FOR THE PLAINTIFF:**
     United States Attorney's Office - EDNC
     By:  Sarah E. Nokes, AUSA
     150 Fayetteville Street
     Suite 2100
     Raleigh, NC 27601


**FOR THE DEFENDANT:**
     Federal Public Defender's Office
     By:  Edward D. Gray, Esq.
     150 Fayetteville Street
     Suite 450
     Raleigh, NC 27601

  Audio Operator:           Clerk's Office Personnel

eScribers, LLC
7227 N. 16th Street
Suite 207
Phoenix, AZ 85020
973-406-2250
www.escribers.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

P R O C E E D I N G S

THE CLERK:  All rise.  This Court is now in session.
Honorable Judge Robert T. Numbers, II presiding.  Be seated
and come to order.

THE COURT:  Good afternoon, everyone.

THE CLERK:  Good afternoon, Judge.

MR. GRAY:  Afternoon, Your Honor.

MS. NOKES:  Good afternoon.

THE COURT:  We're here in the United States District
Court for the Eastern District of North Carolina sitting in
Raleigh for a hearing in the case of United States v, Carlos
Alston, case 523-CR-21.

I'd like to begin by asking counsel to identify
themselves for the record, beginning with counsel for the
United States.

MR. GRAY:  Sarah Nokes, Your Honor, on behalf of the
United States.  This is John Gibbons.  He is in our appellate
division, also on behalf of the United States.

THE COURT:  Good afternoon.

MR. GRAY:  Edward Gray, Assistant Federal Public
Defender on behalf of Mr. Alston.

THE COURT:  Good afternoon, Counsel.

UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

THE COURT:  And I'll note for the record Mr. Alston
is present as well.  So Mr. Alston has filed a motion seeking

to dismiss his indictment on the argument, more or less that if the Supreme Court's Bruen decision last term the Second Amendment to the Constitution prohibits the United States from pursuing these charges against him. I appreciate the briefing from the parties on the issue of fraud. I appreciate the briefing on the 925 issue as well.

This is obviously Mr. Alston's motion, but under Bruen the government has the burden here. So Ms. Nokes, I'm happy to hear from you first.

MS. NOKES: Thank Your Honor. The government has its agent here if the Court needs to hear the facts that underlie the indictment. Otherwise, I think both parties' briefs set forth the facts pretty similarly. If the Court is satisfied with that, then we'll just move to the substance of the Bruen argument.

THE COURT: I think moving to the substance is fine.

MS. NOKES: Okay. Thank you. Your Honor, before we embark on the historical analysis that is contemplated by Bruen, that sort of sea change that came about by Bruen, the Court has to answer a threshold question, which is, is this defendant and his conduct covered by the Second Amendment. So in Heller, the Supreme Court held that the Second Amendment protects the right of law-abiding, responsible citizens to use arms in defense of hearth and home. And this question -- this threshold question of whether the defendant and his conduct

J.A. 103

are covered by the Second Amendment is still part of the
analysis post-Bruen.  So --

        THE COURT:  You said -- you mentioned that there are
two things, whether the defendant's covered and whether his
conduct is covered.  I think those are two separate questions
that I hope you address individually.

        MS. NOKES:  Sure.  Certainly, Your Honor.  So let's
turn first to the question of person.  Is Mr. Alston a person
who is protected by the Second Amendment?  The Bruen court
addressed that question in the Bruen decision, talked about
the fact that the petitioners in that case were ordinary, law-
abiding citizens, and moved on pretty quickly to the
historical analysis.  So the language stressing that the
Second Amendment is enjoyed by a law-abiding citizen is in the
majority opinion.  It's also stressed in Justice Alito and
Justice Kavanaugh.  It's a -- which was joined by Justice
Roberts' concurrences that the point is that the Second
Amendment applies to law-abiding, responsible citizens.  There
would be no majority without that language.

        THE COURT:  Well, so is the position here -- well,
your position is that the defendant is excluded from the
Second Amendment because he is not a law-abiding individual.
I'll accept that for the sake of argument that -- the nonlaw-
abiding portion of this.  I guess my question is in Heller and
Bruen -- I mean, I certainly do say that the Second Amendment

applies to law-abiding individuals.  And what I'm trying to figure out is at any point did they say that it does not apply to anyone other than law-abiding individuals?

MS. NOKES:  Your Honor, in both Heller and Bruen, the Court cites with approbation restrictions on felons, for example, and the mentally ill.  And the Court does not -- of course, in Bruen, the Court said that the means end scrutiny that the circuits had been applying post-Heller was bunk, that they weren't going to do that anymore.  But the Court did not say that we were not to consider this threshold question of whether this individual before the Court is someone who was covered by the Second Amendment.  And in fact, the Court in Bruen specifically addresses that before moving on, like I said, pretty quickly to the historical analysis, because in the Bruen decision, there's no question that the two petitioners before the Court were just ordinary, law-abiding folks.

THE COURT:  Well, right.  So I guess that's kind of the point.  And interestingly, as you get into more of the nuance of the Second Amendment questions, you see that Bruen and Heller perhaps weren't the most complicated cases from a historical standpoint.  These are much stickier issues.  My concern is that the government in this case, and in others, puts a lot of weight on the recitation of the fact that the Second Amendement applies to law-abiding citizens.  And I

don't quibble with that point.  What I'm trying to figure out
is, is that where it stops?  And if so, what is the
justification for saying it stops with law-abiding citizens?

        MS. NOKES:  Your Honor, so in post-Heller decisions,
the Fourth Circuit actually addressed this question, right?
So applying the Chester framework post-Heller, the Fourth
Circuit said that the first question that needed to be
answered was, was the defendant or petitioner a part of "the
people" that is covered by the Second Amendment?  And
defendant has made an impassioned argument in the motion to
dismiss that's supported largely by dissenting opinions from
Judge, now Justice, Barrett and Cantor (ph.) and Judge Bevis
(ph.) and Fullytar (ph.) and some case law from other circuits
talking about how the Court shouldn't carve out individuals
from the Second Amendment's guarantee.  But in this circuit --
in the Fourth Circuit and precedent that is binding on this
Court, that is what the Fourth Circuit has done.

        THE COURT:  Hasn't the Fourth Circuit just punted on
the question each time and assumed for the sake of argument
that the person is subject to Second Amendment?

        MS. NOKES:  I assume you're talking about Carter.

        THE COURT:  Every case that I've read, and maybe you
can point me to it, where they've said that -- made the point
that you're making.

        MS. NOKES:  Right.  So in Carter, they did punt on

this question. Carter was a case looking at 18 U.S.C. 922(g)(3), the drug user and possession statute that is before the Court today. And they did punt on the issue there. They talk about how Carter was not a law-abiding citizen. In fact, they said that Carter or drug users like him flunk that test. But what the Court said in Carter was, listen, we don't actually have to decide that the Second Amendment doesn't apply to this drug user because we're going to apply a means and scrutiny test. And every circuit who has applied a means and scrutiny test has decided that this statute is a-okay.

So in the first Carter decision, they sent the case back to the district courts for some additional findings so that then they could apply that means and scrutiny and do what their sister circuits had done and find that based on that scrutiny, the statute was okay. But the Fourth Circuit distinctly said that a drug user is not someone who is law-abiding and that that person flunks that test. But in --

THE COURT: So hold on -- okay.

MS. NOKES: Go ahead.

THE COURT: Sorry. Go ahead.

MS. NOKES: Carpio-Leon, the Fourth Circuit found that the Second Amendment's protections do not extend to illegal aliens because they're not law-abiding members of the political community.

THE COURT: But I think that's an important

distinction, right?  Because this -- there's this question
that "the people" who are subject to the Second Amendment are
the political community, and that's not been fleshed out.  But
it's a -- you have a harder argument if you're not a citizen
that you're part of the political community than if you're a
citizen who happens to have committed crimes.

        MS. NOKES:  See, I don't think we pull noncitizens
out of other Bill of Rights guarantees, right?  Like, a
noncitizen driving down the road does not have no Fourth
Amendment right a reasonable stop or an -- right, against an
unreasonable stop just because they're a noncitizen.  I don't
think that the fact that that person's not a citizen is the
deciding factor here.  I mean, the courts could have said that
as a non-citizen, he's not a part of the political community,
he's not part of "the people" that are covered by the Second
Amendment, but the Court specifically pressed on the law-
abiding issue, says he's not -- a noncitizen is not a law-
abiding member of the political community.

        THE COURT:  All right.

        MS. NOKES:  The Court --

        THE COURT:  I mean, that's also, I think, factually
correct, right?  I mean, if you're not -- if you are
illegal -- if it's illegal for you to be present in this
country, then you're not law-abiding.  So you would by -- yes,
you would not be a law-abiding member of the political

community.  But I don't know how that answers this question.

MS. NOKES:  Right.  Well, because someone who's a chronic drug user is not a law-abiding member of our political community.

THE COURT:  Okay.

MS. NOKES:  So --

THE COURT:  Let's assume I accept that.

MS. NOKES:  Okay.

THE COURT:  Okay?  Where do you draw the line?  If I drive seventy-five miles per hour on 540 on my way home today, I'm not a law-abiding individual.  So do I then lose my Second Amendment rights?

MS. NOKES:  There is no statute that would take your Second Amendment rights away in that circumstance.

THE COURT:  Could Congress -- does Congress have the power to take away my Second Amendment rights if I speed on my way home from work?

MS. NOKES:  Your Honor, there is no similar situation to that.  I mean, the statutes that we have that take away Second Amendment rights take them away for very serious reasons.  I mean --

THE COURT:  But --

MS. NOKES:  -- a drug user who uses drugs just once, someone who smokes one blunt, is not subject to (g)(3)'s prohibitions.  The statute requires the kind of regular,

chronic drug use, recency of drug use, that sort of thing.

THE COURT:  Okay.  I speed home on 540 and I crash my car and kill some innocent individuals.  Does Congress then have the power to take away my Second Amendment rights?

MS. NOKES:  Once you're indicted for, I guess, involuntary manslaughter, at that point, then yes.

THE COURT:  So any person charged with -- Congress has the authority to make it a federal crime to have every person charged with involuntary manslaughter barred from possession a firearm?

MS. NOKES:  Yes.

THE COURT:  Okay.  Well, we're getting a better feel, but I don't know if it's historical basis for that, but -- there weren't cars back then, either.  But I guess I'm trying -- what's the line that is drawn?  Anyone who breaks any law, Congress can prohibit them from possessing a firearm?

MS. NOKES:  Your Honor, the statutes as it's written are that somebody who's under indictment for a felony is not a law-abiding citizen or someone who has been convicted of a felony previously, not a law-abiding citizen.  They are not covered by, as the Fourth Circuit said in Moore and Pruiss (ph.), the core Second Amendment right.  So if you've been convicted of a felony, if you've been convicted of manslaughter, no, you are not covered by the Second Amendment.

THE COURT:  What if I'm convicted of DWI?

MS. NOKES:  That's a misdemeanor offense, and you wouldn't have the indictment prohibition.  You wouldn't have the felon in possession prohibition.  You'd still have your right to possess a firearm.

THE COURT:  What we're looking at here is governmental power, right?  The Second Amendment restricts governmental power.  Does the government have the power to bar everyone who is charged with DWI from possessing a firearm?  I mean, that's -- I'm trying to find a line drawn here what makes someone -- to exclude them from the Second Amendment, right?  Because you're saying by being nonlaw-abiding, you are not entitled to the Second Amendment's protection at all.  So how do we draw the line between where someone loses those protections and where they don't?

MS. NOKES:  Well, I think Congress has reasonably drawn that line at the commission of a felony or pending indictment for an alleged commission of a felony.

THE COURT:  Okay.  But how -- I mean, the Second Amendment takes certain policy choices away from Congress.  How do we draw the Constitutional line of where the Second Amendment allows it and where the Second Amendment doesn't allow it?

MS. NOKES:  Your Honor, that seems like a pretty bright line rule to me, misdemeanor conduct versus felony conduct.  For a felony, you can be imprisoned for a term

exceeding one year.  For a misdemeanor that's not the case.

You could be jailed for a term up to twelve months, right?

The Congress has decided that people who are not law-abiding

include those who have committed these serious crimes, who

have alleged to have committed these serious crimes.  And I

think that the fact that nonlaw-abiding citizens are not

covered by the Second Amendment is pretty clear throughout

both Heller's and Bruen's opinions.

          THE COURT:  So Congress has the ability to determine

who is entitled to Second Amendment rights is what you're

telling me?

          MS. NOKES:  So Congress has the ability to make

statutes that reflect who is covered by the Second Amendment,

and the court has told us that the Second Amendment covers

those who are law-abiding.

          THE COURT:  Because I mean, if you look back at the

debates on the Second Amendment, even Elbridge Gerry was

opposed to some of the proposed language of the Second

Amendment because it allowed Congress to exclude religious

objectors, and there was a lot of upset because the feeling

was Congress may then say, well, everyone's a conscientious

objector and therefore no one has a right to the gun.  So

there are concerns here over the power of government to, by

passing a law exclude a giant portion of the population, or a

substantial portion of population, from the Second Amendment's

protections just writ large. But I hear your point on this, so you can move on, if you like, or if it's anything else on this point you'd like to --

MS. NOKES: Well, like, Your Honor, I'd just like to, again, push on the fact that in in both Heller and Bruen, the majority opinions and concurrences talk about how the Court is not casting doubt on the fact that felons are constitutionally prohibited from possessing firearms. So the Court is saying that these folks who are not law-abiding, who have been convicted of felonies, it's absolutely okay to constitutionally prohibit them from possessing firearms.

THE COURT: Mr. Alston's not charged with being a felon in possession of a firearm, is he?

MS. NOKES: Right. You're absolutely right. I'm just pressing on your law-abiding issue and saying what the Court has said, that at least as to felons, that's perfectly okay.

THE COURT: And if we're looking at historical tradition on this point, were there exclusions from the right to -- from bear arms -- kind of a complete exclusion from the political community or from the Second Amendment's protections on this sort of basis that you've identified?

MS. NOKES: Your Honor, I would argue that statutes that precluded people from possessing firearms because they would not swear a loyalty oath to the country, they were

disloyal people, they could be dispossessed of their guns, and
that that is similar. They're not -- I mean, that's even --
that's sort of less onerous than a restriction on -- or less
serious than a restriction on someone who's got a felony
conviction or is under felony indictment or is a chronic,
absolute person who dismisses the law regarding controlled
substances. I mean, this is just somebody who won't swear an
oath of loyalty to the country and they dispossess them of
their gun rights.

THE COURT: So this is a bit of a nuanced point, and
it came up in then Judge Barrett's concurrence. What we're
talking about there is those people still have Second
Amendment rights, the -- I mean, it was all the grounds we
find abhorrent today, right? It was Indians and -- or Native
Americans and they referred to them as Indians, Catholics, and
enslaved people, right? Those are the folks who weren't
allowed to have guns because they were considered dangerous or
whatever. But as you noted, there are exemptions to that
disqualification for many of those groups by swearing a
loyalty oath and other disqualifications over time had -- the
disqualification ran out or could be cured.

So -- and this was Judge Barrett's point that she
made in her dissent was that, one, we're talking people who
don't -- who lose their Second Amendment rights entirely and
have none of them. The other one -- the other thing we're

talking about is whether folks have these rights, but Congress has the ability to restrict them in a certain way. And those are two slightly different things. And so I just want to make sure we're kind of focusing on the right things here.

MS. NOKES: Right. Your Honor, I would agree with that. I would say that we still have to answer this threshold question of whether the defendant is someone who's covered by the Second Amendment. And the government's position is that he is not so long as he's a chronic drug user, so long as that recency of drug use, that regularity of drug use apply. And he's not as long as he's under felony indictment. Now, this pushes on an interesting point with respect to these two statutes, which is that both of them are temporary restrictions, right, and that the defendant has at least some of the ability to gain his rights back, because as soon as a defendant stops using drugs regularly, as soon as the government couldn't prove that he was a regular user of drugs, that that recency of drug use applied, he has his rights under (g)(3) back. It's a temporary restriction for as long as the defendant could be considered a chronic drug user.

Similarly, the prohibition on possession -- or receipt, excuse me, of firearms by a person under indictment is only temporary to the time that that indictment is outstanding. Now, it may result in a longer-standing prohibition of a felon in possession prohibition. But the

922(n) prohibition is, by its very nature, temporary.  That
indictment will be resolved in some way at some point.

THE COURT:  I agree with you.

MS. NOKES:  Okay.  Your Honor, the other issue that
the Court addressed as a threshold question was whether
defendant's conduct in carrying the gun or using the gun for
whatever purpose the defendant used it for was covered by the
Second Amendment.  And the government would argue the
defendant's purpose here carrying the gun while he's got a
bunch of drugs on him, pointing that gun at a police officer,
that's not conduct protected by the Second Amendment.

THE COURT:  Oh, but -- so I guess the two statutes at
issue here deal with different types of conduct, right?

MS. NOKES:  Um-hum.

THE COURT:  Possession under the (g)(3).  And
possession -- I mean, can you argue that under current
precedent that the possession of a firearm is not an activity
that falls within the Second Amendment?

MS. NOKES:  Possession of firearm generally no, but
possession of a firearm by someone who's a chronic drug user,
who has drugs on them, who is then committing other crimes by
dint of the fact that he's a chronic drug user, yes.

THE COURT:  But the crime he's charged with here --
and I mean, I don't countenance pointing firearms to anybody,
particularly a law enforcement officer, but what he's charged

with here is being a chronic -- among other things, being a chronic drug user or a drug user in possession of a firearm. He's not charged with what we see on other cases brandishing or use of a firearm in connection with a certain crime. So I mean, isn't the activity we're looking at here just the simple possession of the firearm?

MS. NOKES: I don't think we can divorce the possession from the prohibition, from the fact of the chronic drug use. So we're talking about conduct that is by statute connected, that that person is a chronic drug user, that person is possessing a firearm. So I agree with you to the extent that the Second Amendment covers someone's ability to possess a firearm. Obviously, Heller told us that the Second Amendment gives an individual an individual right to possess a firearm.

However, here we're discussing not just someone who possessed a firearm, but a chronic drug user who possessed a firearm, and that shouldn't be divorced in this context.

THE COURT: I mean, does the precedent bear out that nuanced analysis? I mean, it certainly sounds like a very helpful argument to the government. But I mean -- and again, the defendants -- or I'm sorry, the plaintiffs in Heller and McDonald and Bruen are not by accident they're there, right? They're chosen in part because they're law-abiding nature and all that. But is there anything in the cases that supports

the idea that you're putting forward that we're supposed to get that granular about the particular activity at play?

MS. NOKES:  Your Honor, I think this is all part of that threshold question analysis.  So the questions about what makes the person prohibited from possessing that firearm are integral to the question of whether the Second Amendment's going to apply to them.  And I agree with the Court that the Fourth Circuit has punted on that some, has given some essentially dicta on issues related to whether a person or the conduct is covered by the Second Amendment and then said, yeah, okay, but we're going to apply the means on scrutiny and find that this is okay anyway.  But I can't point the Court to a specific case that says the threshold question for a drug user in possession, those two things cannot be divorced.  And so we ask not only is the person covered by the Second Amendment, but is the conduct of possessing a firearm while being a drug user covered under the Second Amendment.

THE COURT:  I think the more puzzling question, perhaps, is the question about 922(n), right?  That doesn't criminalize possession of a firearm by someone under indictment.  If Mr. Alston had a house full of firearms prior to being indicted, he could possess them as much as he wanted.  It makes it illegal, among other things, to receive firearms, what he's charged with here.  And what's your argument as to why receipt of a firearm under indictment is or is not Second

Amendment-protected conduct?

MS. NOKES:  Your Honor, at the point when someone is under indictment, they know that they're under indictment, I think that the statute reflects that they pose an extra danger not just because of the fact that a grand jury has found probable cause to believe that they've committed some serious crime, but also because there may then be a motivation to go after a witness, go after maybe a victim, or a prosecutor, a judge, somebody like that.

THE COURT:  Well, what I want to focus on Second Amendment's protections.  I mean, setting aside this law, the Second Amendment protects that right to self-defense and, to some extent, the militia aspects of it, too.  And the Supreme Court said possession is part of that right, the right to possess those firearm, to keep and bear arms, right?  That's the text of the amendment.  So is receipt part of that?  Is receipt of a firearm by anyone part of the Second Amendment's protections?

MS. NOKES:  Yes, Your Honor.  I think that the Second Amendment does cover receipt generally, yes.

THE COURT:  Okay.  And so would you say that in this case the Second Amendment protects Mr. Alston's receipt of the firearm or why not?

MS. NOKES:  Your Honor, I don't think the Second Amendment protects Mr. Alston's receipt of the firearm because

he is a person who has been charged with a serious felony

crime and is under indictment.  Because he has that indictment

pending, he doesn't have the protection of the Second

Amendment that law-abiding citizens would.

THE COURT:  Right.  Okay.  So -- and again, hate to

belabor this, but I think it goes back to what I mentioned

earlier, "the people", right, "the people" as a whole have a

Second Amendment right to receive firearms; do you agree with

that?

MS. NOKES:  Yes.

THE COURT:  Okay.  And there are some people, perhaps

Mr. Alston, perhaps not, Congress has said you, because of

your conduct or the fact you've been indicted, are excluded

from that portion of the right.  And you're saying he falls

into that --

MS. NOKES:  Yes.

THE COURT:  -- that category?

MS. NOKES:  Yes.  Yes, sir.

THE COURT:  Okay.

MS. NOKES:  So in sum the government would say, at

least as to this threshold question, that defendant, not a

law-abiding citizen.  As Helen said and Bruen reiterated, the

Second Amendment protects the right of law-abiding,

responsible citizens to use arms in defense.  It doesn't

protect the nonlaw-abiding.  And then I just cite that Heller

and Broun both cite with approbation these prohibitions on felons and the mentally ill.

THE COURT:  When they say they're presumptively lawful, but again, Mr. Altman isn't really charged with those particular items, so I question how much that language is worth here, given that he's not charged with those.  And they're saying that a challenge against those would have a harder time, right, is what they're saying.  So I don't know what it has to say about the question we have here.

MS. NOKES:  I think what they're saying is that a challenge against, for example, the felon in possession statute is dead in the water.  And the government is aware of no court that has found otherwise.  And at this point, there have been many challenges to 18 U.S.C. 922(g)(1).  That the Court is saying in both Bruen and Heller that this applies to law-abiding citizen.  And if you're -- citizens.  And if you're not a law-abiding citizen, like a felon, it doesn't apply to you.

THE COURT:  I mean, there's some academic debate about this.  But I mean, felons were typically or regularly put to death, right?  And after that, there was no need for a firearm and no ability to get one.  So again, I -- and I have not seen in my research, nor has anyone cited anything to me, showing that folks who use intoxicating substances back around the founding era were subject to the same sort of harsh

penalty for their use.  So again, I don't know that it's an exactly a one-for-one analogy there between the two types of crimes.

MS. NOKES:  And that's fair, Your Honor.  I'm just saying that the Court in making that distinction of law-abiding citizens and saying that felons are not part of that group and thus that there's no problem with dispossessing them of firearms, the court is saying that the Second Amendment applies only to those law-abiding citizens.

THE COURT:  Okay.

MS. NOKES:  Okay.  May I turn to the historical analysis?

THE COURT:  Sure.

MS. NOKES:  Okay.  So the Bruen court recognized that courts can't compare modern statutes to statutes from 100 years ago or 200 years ago or at the time of the founding like, as they say, a red-line comparison in a word processing application.  The court's merely just asking us to analogize our statutes -- our modern statutes against those statutes from a couple hundred years ago.  And I think the Bruen court goes back even further than that.

So as this Court looks at analogous statutes, I think the Court needs to keep in mind that even if the Court does not find a one-to-one comparison between a founding era statute and the modern statute, that does not mean that modern

law is unconstitutional.  It's only, as Bruen said, relevant evidence.  That is because, as other courts have recognized, some restrictions that the founders would have believed to be permissible would fail just because they happened not to exist at the time of the founding era.

So the idea is that there -- you can think about it as like a cloud of permissible laws that the founders understood could be -- were constitutional, could be imposed constitutionally.  Just because that the entirety of everything up in that cloud hadn't been written in the statute book doesn't mean that the law itself or its descendant a couple hundred years later is unconstitutional.

So if we look at 922(g)(3), first of all, the government would note that drug use of the type that's seen in modern life was not present or at least not prevalent at the time of the founding.  And so it's not a question that was directly confronted by the founders.  And there's no statute in the founding era related to the type of controlled substance use that we see today, the marijuana use, the fentanyl use, things like that.

THE COURT:  I guess this is a thread that runs through a lot of this discussion, and that is at what level generality do we approach this analogy?  Because again, I haven't -- nothing's been cited to me nor have I found a statute like you're talking about, but perhaps that's too high

of a level of generality.  But again, that's a difficult

question to answer.

MS. NOKES:  You're right, Your Honor.  And that's why

I cite to the fact that drug use has changed over the course

of the past 200-plus years.  It doesn't look the same as it

did at the time of the writing of the Constitution.  So we

have to look at statutes that are a little bit more general,

that look at things like dispossessing individuals because

they are drunkards or intoxicated by alcohol, and

dispossessing individuals who are mentally ill.  I think those

are the two best historical analogues in this context.  So --

THE COURT:  Well, let's start with -- well, go ahead.

I have a question.  But go ahead.  I want to hear --

MS. NOKES:  Sure.  Okay.  Turning first to statutes

that disarmed drunkards, founders were certainly familiar with

intoxicating drink.  And it was, I think, as defendant pointed

out, important at the time of the founding, liquor in the

United States.  But they also recognized that possession of

guns by drunkards posed a danger to the community.  And they

understood that that danger could be mitigated by taking away

those guns.

THE COURT:  Is that what they did, though?  Didn't

they just prohibit folks from using fire, from shooting off

firearms, excepting weddings and funerals?

MS. NOKES:  Your Honor, I don't think so.  I think

that some of the statutes, and they're cited in the government's brief, talk about not just shooting off firearms but actually taking guns away from intoxicated individuals or drunkards, actually preventing individuals from having guns for certain occasions where people were likely to be intoxicated, because they recognized that danger and did not see it as a problem under the Second Amendment to impose those restrictions.

THE COURT:  We're talking about the founding era restrictions?

MS. NOKES:  Yes, Your Honor, founding era and into the Reconstruction era in the 1800s.  And the government would argue that drunkenness is analogous to drug addiction, obviously not a one-to-one comparison, but analogous.  Both someone who's drunk or a drunkard and the drug user have diminished capacity and are dangerous, especially around firearms.  Founders and Reconstruction-era legislators understood that guns could be taken away from those folks in order to protect the public safety, just as legislators in the mid-20th century understood that guns can and should be taken away from chronic drug users in order to protect the rest of the public.

THE COURT:  So I'm looking at page 13 of your response brief, which I think is the relevant portion of this. And if there's not, feel free to point me to the right

portion.  You talk about the 1655 Virginia law that prohibited shooting any guns at drinking, a 1771 New York law prohibiting firing guns during the New Year's holiday, and then a 1746 New Jersey statute that allowed military officers to disarm soldiers who appeared drunk; is that correct?

MS. NOKES:  Yes, sir, Your Honor, page 13.

THE COURT:  So we've got three cases there.  And assuming I find those cases persuasive, I've still got to confront the language in Bruen on page 2,142 of the Supreme Court Recorder.  It says, "In the colonial era, respondents point to only three restrictions on public carrying.  For starters, we doubt that three colonial regulations could suffice to show a tradition of public carrier regulation".  And so even if I find those three cases to be one hundred percent on point, is that enough under Bruen?

MS. NOKES:  Your Honor, the government would argue that it is because what it shows is that at the time of the founding -- prior to the founding, then at the time of the founding and then into the 1800s, there was this evolution of disarming individuals who were intoxicated, who were drunkards from having firearms because they were considered to be dangerous.  And that evolution just continued.  As intoxicating substances became more potent, became something other than just alcohol, became the marijuana and the cocaine and the fentanyl and the meth that we see today, those

statutes had evolved along with them.  And because the Court
can look at this entire timeline and see statutes from prior
to the founding all the way up until today, following this
evolutionary timeline and following along with the evolution
of use of substances in this country, the government would
argue that that that is absolutely consistent with the
historical tradition of firearm regulation in this country.

THE COURT:  So two of those three colonial era cases
that you cited talked about firing firearms.  And the one
about the military officers seemed to involve disarming
someone.  But it seemed like the historical tradition outside
of the military was more to prohibit use as opposed to
possession of the firearms.  So why should -- I mean, and
that is a distinction that the law recognizes in a bunch of
different contexts.  So why should I not find that, again, if
I accept those cases as sufficient that the historical
tradition was actually one of possessing -- of prohibiting
using a firearm as opposed to merely possessing one?

MS. NOKES:  Your Honor, I think that the Second
Amendment covers both firing firearms, certainly in a
noncriminal context, not firing at somebody, not firing in a
sensitive place, those sorts of things.  Second Amendment
covers firing firearms just as much as it does cover
possession of firearms.  So the fact that those are two
different activities shouldn't matter in the Court's analysis

because we can show this historical tradition.

THE COURT:  The core of the Second Amendment is self-defense, and we're looking at how that's impacted here.  There is self-defense value in an open carrying a firearm and I guess to the carrier's concealed carrying a firearm.  And there's certainly some deterrent value in brandishing a firearm, which are not restricted by two of the three cases that you've cited.  So why is historical tradition one of disarmament as opposed to disallowing use?

MS. NOKES:  Your Honor, I would argue that the historical tradition shows that the Second Amendment right, whether that's firing or possessing the firearm, can be burdened because the person poses a danger, because of the use of substances, and not that it matters necessarily exactly which piece of conduct that is covered by the Second Amendment that person was actually engaged in.

THE COURT:  So Judge Wyrick in Oklahoma wrote a lengthy opinion kind of really diving into these various statutes and found to his satisfaction that they did not -- that the reason, the why, right -- Bruen talks about the how and the why -- the why did not match up with our current-day whys.  One of the no firing firearms drunkenly is because we need to use firearms to alert us when there's -- our enemies are approaching.  And if you're always firing off firearms, we won't be able to distinguish between real threats and drunken

discharges of firearms.  So do I -- do these -- does the why

of these various statutes comport with the why of the ban on

Mr. Alston's possession?

MS. NOKES:  Your Honor, I believe that it does.  In

the government's brief page 12, we cite to a -- and I guess an

article by Benjamin Rush, a signer of the Declaration of

Independence, who talked about habitual drinking being a form

of insanity.  In the Yancey decision from the Seventh Circuit,

Seventh Circuit talks about the danger that persons under

substances pose to the rest of society.  And I think that

thread is present throughout these statutes, not just showing

that they needed to have a Paul Revere moment and alert other

folks when there was some sort of issue, but also that these

statutes were important to protect the public.

THE COURT:  I think Mr. Rush's statements are what

they are.  But I mean, are you -- I'm looking -- you cited

these three colonial-era laws -- I mean, does the why of those

particular laws provide support for your argument here?

MS. NOKES:  Your Honor, I don't have any statements

upon the promulgation of any of those laws that show that in

1655 the legislature of the Colony of Virginia was primarily

or solely concerned with the public safety in passing a law

preventing someone from possessing a firearm while drinking.

But I think the evolution of these statutes, dispossessing

folks who are under the influence of substances, shows that it

is about danger to the community.

Your Honor, we also argue that 922(g)(3) is analogous to disarmament of the mentally ill. Of course, the Bruen and the Heller courts say that their decisions don't cast any doubt on regulations that prohibit firearm possession by felons or persons who are mentally ill. As we know today, drug addiction is actually a mental illness. Substance use disorder is recognized in the DSM-5. And interestingly, in the DSM-5, there are several different categories for substance use disorder. One of them is cannabis use, marijuana use, and another is alcohol use, and then there are several others opioids and things like that.

But habitual drug users, like others with mental illness, are more likely to have difficulty exercising self-control and making it so that it's a dangerous proposition for someone like that to have a weapon. So given that drug addiction is, in fact, a mental illness and that chronic drug use has at least some of the same effects of mental illness, reducing inhibitions, preventing that person from being able to exercise an ordinary level of self-control, making them dangerous to society, the government would argue, as it has in its brief, that drug users are at least analogous to the mentally ill for purposes of restrictions on possession of firearms, which again, the Bruen and Heller courts say are just fine.

THE COURT:  Sorry, point me to the laws about -- that you've cited in here about disarming the mentally ill.

MS. NOKES:  I'm sorry?

THE COURT:  You're talking about that there were laws about disarming the mentally ill and all that.  Where in your brief are those laws?  Just like what -- the -- as we sit here?

MS. NOKES:  Your Honor, the government cited opinions discussing longstanding prohibitions on possession of firearms by the mentally ill; that's from Heller.  We cited Yancy for the proposition that in 18th century America justices of the peace were authorized to lock up lunatics who were dangerous -- too dangerous to be permitted to go abroad.  We didn't, as in the situation with disarming drunk individuals, cite specific statutes from 1600 or 1700s so.

THE COURT:  Well, I mean, the justice of the peace manuals are an interesting thing, right?  They go through -- I was looking at this yesterday -- I mean, they go through and they define mental illness in different ways.  Kind of a short-term episode would not necessarily be considered mental illness, but a longer term one might be.  So again, that sort of nuance may be relevant here.  I mean, if it's -- in determining whether it's -- chronic use of a drug qualifies closely enough as a mental illness so --

MS. NOKES:  Your Honor, I agree, actually, that that

nuance is relevant and that that is why it's important that
for 18 U.S.C. (g)(3) the government has to be able to prove
that that use this chronic, that it is regular, that it is
recent.  It is not someone who smokes a blunt, gets high, and
is off their gourd for a day.  It's not that.  We're talking
about someone who is a chronic user of controlled substances
in the way that someone who has a mental illness has a long-
term issue, which the founders and statutes, legislators
throughout the 1800s did not have a problem dispossessing from
possession of firearms.

   THE COURT:  All right.

   MS. NOKES:  Okay.  So turning, then, to 18 U.S.C.
922(n), the prohibition against receipt of a firearm while a
person is under indictment, the government argues that that
statute is consistent with the nation's history and tradition
of firearms regulation in three ways; two of them are fully
expanded in our brief -- I'll go over them briefly -- but then
also surety statutes.  So we talk about the fact that this
burden on Second Amendment rights, when someone is facing a
felony indictment, is similar to other pre-trial burdens on
rights.  We talk about the fact that 922(n) is analogous to
prohibitions against dangerous individuals possessing
firearms, and then the fact that this is analogous to some of
the surety laws that the Court actually took a look at in
Bruen.

So speaking first about the Second Amendment's burden on -- or excuse me, the 922(n)'s burden on Second Amendment rights being similar to burdens on other pre-trial rights, the Court is, of course, aware that a person can be completely locked up prior to trial. They can have a burden on their liberty that's so extreme that they're sitting in a jail cell. Obviously, they don't have access to guns while sitting in a jail cell. And from the time of the founding, that has been completely constitutionally appropriate. At the time of the founding the founders were familiar with the English Bill of Rights Act, which was not understood to afford bail in all cases. Some people who have been arrested are subject to a search of their person, incidental arrests burdening a Fourth Amendment right. They can even be strip searched, again, burdening a Fourth Amendment right. Someone who's got pending felony indictment, like I said, could be locked up and in being locked up could have restrictions on their First Amendment right, could have restrictions on the kind of materials that they're able to get while in custody. And they can also have restrictions on their Sixth Amendment right as the government can seize potentially for finable assets and prevent that person from hiring counsel of their choosing. So there are there are a slew of rights that are in the Bill of Rights that the government can accurately, adequately, constitutionally burden when someone is facing a felony

indictment.

        And in the Bruen opinion, Justice Thomas talks about
the fact that the Second Amendment is not a second class
right.  But he does not say that the Second Amendment is more
important than every other right in the Bill of Rights.  So if
it is constitutional to burden the Fourth Amendment, the First
Amendment, the Sixth Amendment, it is logical to understand
that it is also constitutional to burden that Second Amendment
right.

        THE COURT:  So a lot of what you say makes sense.
The one kind of question that I have in my mind about -- or
one of them, about this issue is obviously every day here we
go through the exercise of determining whether someone's let
in or out of custody.  And if they're let out, almost always,
we say they can't have a firearm, right?  And that seems to
have been upheld by the courts.  And it makes sense because
the alternative was -- is that you go to prison and are
deprived of all of your liberty pending your trial.  That all
makes sense to me.

        But not every defendant is -- some defendants are
aware they're under indictment before they're arrested, before
they show up in a court.  So does the same argument apply if
they're not facing that burden of I need -- I could be in jail
or -- but I'm not, so I have slightly fewer rights, but at
least I'm not in jail, does that still apply to someone who

hasn't gone through that formal process, hasn't being arrested
and gone through all that?

MS. NOKES:  Your Honor, I'm not familiar with
circumstances in which individuals have been charged with
possessing firearms while under indictment when they haven't
actually been served with their indictment and appeared before
a court.

THE COURT:  We hear -- at least we hear all the time
of defendants or groups who monitor the docket to see if
people have been indicted for either their own knowledge or
for the knowledge of others and -- or maybe someone's aware
that your office calls them and says, we've got you under
indictment, you should turn yourself in or come talk with us
otherwise.  So there are circumstances people can be aware
they're under indictment and thus 922(n) would come into play,
but they're not going through -- they're not yet going through
all the formal steps that occur here in the courthouse.  So is
the same argument apply with the same strength?

MS. NOKES:  So there's two things there.  I guess
what I'm saying is I'm not aware of anyone having been charged
with 922(n) without having first at least been served with the
indictment.  But what I would say there is that, yes, once
that person is under indictment, they are subject to being
arrested.  Once they're arrested, they're subject to a search
and to arrest.  So they don't have the same Fourth Amendment

search protections of their person that you and I have because we're not subject to an indictment. They could be strip searched upon their arrest. All those other prohibitions or burdens, I should say, on Bill of Rights rights could apply even if that person has not yet been served with their indictment. So I don't think it's a problem that that burden could also apply to the Second Amendment.

        THE COURT: Okay.

        MS. NOKES: And Your Honor, I just note that the Ninth Circuit has looked at this issue not as it relates to 922(n), but as it relates to 18 United States Code Section 3142(c)(1)(B)(VIII), the provision that allows for courts to impose a restriction on a defendant's ability to have a firearm while they're on pre-trial release. And the Ninth Circuit said, yeah, that's not a problem because these other burdens on Bill of Rights rights could apply, that we could absolutely lock that person up. Obviously, they wouldn't have access to a firearm. We can also say you can't have a firearm while you're pending indictment. So similar code section and similar analysis, the government believes, to a 922(n) scenario.

        The government also believes that 922(n) is analogous to prohibitions that existed at the time of the founding against dangerous individuals possessing firearms. The court -- the Fifth Circuit in the National Rifle Association

v. the Bureau of Alcohol, Tobacco, and Firearms said that there are historical records of the ratification debates that confirm the founders' belief that disarming select groups for the sake of the public safety was compatible with the right to arms in the Second Amendment. And as we have briefly discussed, there were founding era statutes that disarmed dangerous individuals. Dangerous here at least sometimes equated to disloyalty. And that may seem odd in our today understanding of disloyalty, but at the time, the country had just gone through this Revolutionary War where you had colonists who were loyal to the states and colonists who were loyalists to the crown. And once that war is over, they've got to live next to each other. And the fact that you have someone who's still loyal to the crown or may foment a rebellion would have been seen as a significantly dangerous person. It makes sense that that person posed danger in the context of the time. So we're talking about the founders' understanding that those persons could be dispossessed of their firearms for the sake of the public safety of other loyal colonists.

THE COURT: Well, is it really a question of the public safety in that context? I mean, I don't disagree with what you've laid out about why those laws are there, but it seems to be more of a national security issue, really. And that's what we'd call today, right? We have people who may

invade us and we don't want them having guns, so we're going to take those away from those people.  We have the Catholics they thought would be loyal to the pope as opposed to the government, and we don't want that because they might try to overthrow our country.  And enslaved people, they thought, had reason, rightfully so, to be upset at the current state of affairs and might try to overthrow things, too.  And so it seems to be more national security than these people are going to go out and commit crimes.

MS. NOKES:  At a more granular level, though, they pose a risk to people who are loyal to the new government, their neighbors who are loyal to their new government, the kinds of people that they can affect in their daily lives rather than the entire national security.  We're not talking about today's world where it's easy to hop a flight or get in a car, drive three hours, find like-minded individuals, organize on social media, figure out your cause, do all that kind of thing.  We're talking about people who were mostly confined just by circumstances of transportation and technology to their, like, little spheres of influence.  And those people posed a danger -- an immediate danger to their neighbors who were loyal to the new country.  I would say more than they posed a danger, any one individual posed a danger to the entire national security.

In 922(n), we have a group of dangerous individuals

whom a grand jury has found probable cause to believe have committed some serious crime, some crime for which legislators have determined that the appropriate punishment is prison -- or the maximum punishment is prison, some term of imprisonment exceeding one year.  That's a serious crime.  And so the legislature -- so the statute allows the burden on their Second Amendment right to the extent that they cannot receive new firearms.  It doesn't even say that they can't possess firearms because if they had a shotgun in the closet when they got indicted, they could still have that shotgun in the closet once they get home from court.  But they can't go out and get another gun once they've been indicted.

        And it seems to the government that that is a pretty clever way of threading the needle of making of a burden on the Second Amendment right that is not a full taking away of that right, just burdening the potentially dangerousness of someone arming themselves with a fresh arsenal once they've been indicted for a crime.  So it's an --

        THE COURT:  Isn't that kind of the means to an end argument, though, Bruen told me I can't consider?

        MS. NOKES:  Well, you know, it's interesting because you're right, we can't consider means ends.  But in analogizing, we have to consider that as Bruen talks about the how and the why of why these statutes were promulgated and how modern day statutes are similar to olden days statutes, right?

So some of that analysis is going to look similar, but the Court tells us we have to do that in the historical context.

So the government would submit that this burden on Second Amendment rights for folks who have been found to be nonlaw-abiding, have been found to be dangerous, at least to a probable cause level by a grand jury, is similar to the dispossession of firearms by folks considered to be dangerous at the time of the founding.

We'd also analogize 922(n) to surety laws. As discussed in Bruen, starting in the mid-1800s there were security laws that began to proliferate, which generally provided that an individual's Second Amendment right could be burdened if another person could make out a specific showing of reasonable cause to fear an injury or a breach of peace. They would have to provide some sort of -- essentially like bail money in order to get their right to possess a firearm back because someone else had accused them of being a potential danger, being a potential breacher of the peace.

So 922(n) is somewhat similar there in that it obviously imposed a burden on people considered to be dangerous because they're facing a serious crime. But it's less restrictive than these surety laws. It requires, first of all, legitimate criminal justice process in order to take effect. A prosecutor has had to go to a grand jury, has had to present probable cause, has had to get the issuance of an

indictment, and then only restricts the receipt of the firearm
and is only a temporary restriction, right?  It only lasts so
long as that indictment lasts.

THE COURT:  So I mean, you say it's less onerous, but
from where I sit it seems much harder to make an indictment go
away than to pay a bond to go to prison or satisfy a surety
requirement.  I mean, the fact that it can do that itself,
right?  Let's say we had a surety bond process here, right?
Mr. Alston could have paid that money, found a bondsman, found
some family and paid that.  There's no equivalent process to
make you all dismiss the indictment, right?  It's going to be
there until process completes itself.  So it seems much more
onerous, actually.

MS. NOKES:  Your Honor, I would argue that it's --
the person can pay that surety bond if it is possible for them
to pay.  So first of all, not everyone had means, I assume, to
pay a surety bond once that was required of them.  But second
of all, this is a process that is backed up by the criminal
justice system, that is backed up by the prosecutor presenting
that case to a grand jury, that is backed up by the finding of
probable cause, that is backed up by the issuance of an actual
indictment, not just some random person saying, I think Joe
Schmo is a breacher of the peace and should be required to pay
some surety in order to carry a firearm.  So it is more
onerous in the fact that the defendant does not have complete

control over whether that indictment is dismissed or when that indictment is dismissed. But it is -- requires a lot more from the government than would have been required just by someone saying, I think he's a danger to us, so we got to make him pay.

THE COURT: But the majority of thing in Bruen seems to not find the surety lost to be all that compelling. I mean, I understand they're on the books and they existed, but they didn't seem to feel like the existence of surety laws really provided a meaningful remedy -- whatever the innovation of the Second Amendment rights. So should I afford any weight to this particular argument in light of the Supreme Court's attitude toward them?

MS. NOKES: Your Honor, I absolutely agree with you that the Bruen court seems skeptical of the surety laws being analogous to New York's requirement that folks actually provide some reason why they had to have a gun. But I don't think that the Supreme Court in saying, look, the analogy isn't strong enough here, we're not going to give this a whole lot of weight, it is quite as strong when you look at the fact that it is more factually similar to the circumstance we have before us in 922(n) than New York's scheme for forcing people to provide reasons for why they needed a gun before they could actually go get a gun. So I think that it is more meaningful here than it was in Bruen, though I understand that the Bruen

court kind of looked askance at those surety laws, did not find them to be particularly compelling.

But I will tell the Court that other courts who have looked at 922(n) in the wake of Bruen have found the surety laws to be compelling. To cite just one, United States v. Jackson. This is 2023 Westlaw 2242873. In that the court talks about many of the things that we've already discussed, but does find that in amongst those things that the surety laws are more analogous or that are analogous to 922(n) perhaps in a way that the Supreme Court did not feel the New York statute was in Bruen.

So Your Honor, I'll just say to sum up, defendant as a nonlaw-abiding citizen is not covered by the Second Amendment, which applies to law-abiding citizens. And even if his conduct did fall within the scope of the Second Amendment, the restrictions at issue here, 922(g)(3) and 922(n), are analogous to a historical disarmament of dangerous individuals and the other statutes that we've cited, which makes them consistent with this nation's history and tradition of firearms regulation. We feel that these statutes are thus constitutional.

THE COURT: Thank you. One final question. You've described this in your briefs as a facial challenge, and that seems to be a fair characterization of what's going on here. And I'll hear from Mr. Gray in a moment about that issue. But

Bruen seemed to change the mode of analysis here.  I mean,
it's not the standard facial challenge.  It's the government
must affirmatively prove that this is constitutional, which
seems to be a change.  And so does that matter here?

MS. NOKES:  Your Honor, I don't think we have any law
to say that the standard way of looking at a facial challenge,
which is that no facial challenge can survive if there is any
circumstance which it could be constitutional under the
statute -- we don't have any law to say that that's not how
we're to look at these facial challenges post-Bruen.  I mean,
that would be a huge sea change, I think, that I haven't seen
addressed in by any other court.  And the fact that once the
threshold question is answered about whether the defendant and
his conduct are covered by the Second Amendment, the
government has to come up with some historical analogies, I
don't think changes the entire analysis of how we look at a
facial challenge and says that we basically treat them as
applied challenges now.  I don't think that mixing has
happened.

THE COURT:  Thank you.

MS. NOKES:  Thanks.

THE COURT:  Mr. Gray.

MR. GRAY:  Thank you, Your Honor.  And Your Honor, I
want to say thank you for giving us the opportunity to talk
about this case because when all of us went through law

school, we all had a chance to see a bunch of cases that came out where we had to sit there and wonder, what in the world was the Supreme Court thinking?  How did they get to this reasoning?  How did they get this ending?  What was the analysis?  And I can say very comfortably that in this case with Bruen, this is one of the most clear-cut cases that we've seen the Supreme Court put out because it said very simply this, who does this apply to?  At page 2,156, all Americans.  All Americans.  When is a statute going to be constitutional with regard to regulating the Second Amendment?  If it existed prior to that.

We're talking about -- and I know the government said it was a sea change, but it really is.  We saw a court that ultimately took a line of analysis that was at Heller where we saw the means ends analysis really permeate through how courts were looking at these sort of statutes.  Bruen was the big change where the Court ultimately said, listen, this isn't that complicated.  The right to bear arms for self-defense or other lawful purposes is absolute, period, dot.  We wrote it in the second -- it's written in the Second Amendment.  The next part is pretty simple, who does this apply to?  All Americans.  There is no restriction as to law-abiding, and we discussed in our brief how the government was going to latch on to that idea of law-abiding.  But if you start to go down that rabbit hole of what is law-abiding and what do they mean

by that parsing through all of the various layers of that
onion, not only are we dismantling what the Court was trying
to put across in Bruen, but we ultimately start walking down
this area where we are eventually right back at the means ends
analysis, which was destroyed by Bruen.  And I don't mean just
overlooked, it was destroyed.

        If we use the government's line of analysis, that
circular reasoning, which is that Mr. Alston can't own a
firearm because there's a statute that says that he can't own
a firearm, we really start to walk down a pathway of whether
or not we're interpreting this amendment in the appropriate
way.  As we take a look at what was said in the Bruen court,
let's take a look at Heller, and let's take a look and see
whether or not that analysis was clear enough.  They said no,
the clarity is here.  Did this statute exist before the
founding of the passage of the Second Amendment?  Government
will concede yeah.

        The next question is, using a historical analysis, is
this going to be the same type or similar statute?  And the
government can't say that it is.  When we start looking at
things that are covering "law-abiding persons", we've really
got to ask ourselves two real questions:  What do we mean by
law-abiding in that context?  Well, it seems pretty clear that
the Court said law-abiding means those who have committed and
been convicted of an offense.

In this case but for the fact that he's charged under these two statutes, Mr. Alston wouldn't be here. There is no challenge as to whether or not he could have possessed the firearm, because he's not a felon. He could possess firearms. The only thing that restricts him from possessing a firearm is the statute that says that you can't possess it while under indictment. And when we take a look at that analysis, that portion of the analysis clearly wasn't there and we don't see any citations asked of that existing in our pre-Second Amendment era.

THE COURT: On the law-abiding point, right? The -- and if you -- what's been submitted to me is that the defendant has admitted that he's a regular marijuana user, which under federal law, whatever states it's done, under federal law, that's illegal. So that makes them a nonlaw-abiding person under federal law. And he's been indicted, which doesn't necessarily make him -- I mean, he's got a presumption of innocence, but it's certainly not exactly as -- if law-abiding's on scale, perhaps, it's not -- we're not quite at one hundred percent, but at least the drugs indicates not necessarily law-abiding as far as the federal government is concerned. So isn't there some -- and there is some restriction, and we talked about Heller, talking about these presumptively lawful areas. I mean, there are some people who don't get to enjoy these rights as fully as others. So why is

it not -- and there was lots of emphasis on law-abiding both in the majority and in the concurrences, and so why is it not -- why don't I take into account the fact that there is evidence of nonlaw-abiding conduct here?

MR. GRAY:  And Your Honor, you are walking exactly down the line of analysis that got us to Bruen in the first place, because there's clearly an idea that there are certain types of persons that we feel should not be able to own firearms.  And if we look back historically, you know who those persons were?  If you look at what we've cited in pages 15 and 16 in our brief or in pages 11 and 12 of their brief, you're going to see kind of two types of statutes that govern drug users or people who are intoxicated.  People who are about to go off and shoot that firearm while intoxicated -- we don't have that in this case.  But that's a pro act of saying, you know what, using the mends (sic) -- the ends-means analysis, yeah, we can all think that a person with a gun who's drunk probably shouldn't be around firing.  However, unless it's a wedding or a funeral, somewhere where we need fireworks, it's all good.  But when we take a look at that line of analysis, once again, we've walked ourselves right back into the means-ends analysis.

THE COURT:  Well --

MR. GRAY:  And --

THE COURT:  -- aren't you somewhat running into the

language in Bruen about Second Amendment not being a
regulatory straitjacket, and it doesn't need to be an exact
match?  I mean, it seems like, obviously, as I mentioned,
there are benefits to having a firearm if you're confronted,
even if you can't shoot it for one reason or another.  But the
ultimate power of the firearm is being able to use it.  And if
that's restricted, why is it not analogous, although not a
one-for-one match, with some of the things we're talking about
here?

         MR. GRAY:  No, I completely understand where you're
going at with that, Your Honor.  But once again, that's the
ends-means analysis.  That's where we're -- where it's
sitting.  And the court in Bruen said, all right, we're not
going to do that.  Clearly, the court in Bruen was like, okay,
listen, those who have been felons, that's something that
we're comfortable with saying that may be an area for
regulation.  But then when we look at where the court
ultimately landed, it was take a look and see whether or not
this was a pre-Second Amendment issue.

         THE COURT:  Well, I mean, but Heller -- or Bruen asks
me and all judges to look at the how and why of the
restriction on Second Amendment rights.

         MR. GRAY:  Um-hum.

         THE COURT:  And that's distinct from means end.
Means ends is it's a bad idea for drug users to have guns

because they're going to go -- they're more likely to lose
control and commit crime, right?  That means end, right?  This
is how and why is we take the gun away from someone perhaps
because of the threat they pose to the public.

            MR. GRAY:  Well, Your Honor, I'm going to argue that
how and why is actually embodied in Justice Thomas' statement
that you look and see whether or not this existed before the
enactment of the Second Amendment, because that's your how and
why.  To use as an example, the government's arguing that Mr.
Alston is an addict.  Okay?  But if we use their how and why
analysis, it fails.  What do we know about addiction to
marijuana?  Absolutely nothing.  The reason why we know
nothing about addiction to marijuana is because the federal
government for years didn't allow anybody to go into the study
of this.  The DSM-5 identifies substance abuse disorders.  And
within its commentary, it talks about addictions to various
drugs.  But I think it's also important to note that in 2012
when the American Psychological Association was asked the
question about, hey, how do we feel about the enactment -- and
at this point, we're at thirty-six, and currently in North
Carolina we're arguing whether or not medicinal marijuana use
is appropriate -- where on that scale do we try to figure out
what's the addictive problems of marijuana, what's the
problems of marijuana that make it different than alcohol.
And in that case, the American Psychological Association said,

we'd love to be able to answer that, but there just hasn't
been enough study.

        So if we want to look at this in an analogous sort of
way, which the government wants you to do, it's looking at it
from the standpoint of alcohol.  And here's the real question.
Under the statute, if you had a beer, does that mean that you
can't have a firearm ever again?  I would say that's
ridiculous.  You had ten beers; would that mean that you're no
longer eligible to fall under the Second Amendment
protections?  Once again, everybody else would say that's
ridiculous.

        THE COURT:  Well, I mean, I guess there's ambiguity,
right?  Like, the law prohibits firing guns while drunk.  And
that's going to depend on -- your tolerance might be different
from mine one way or the other, so there is ambiguity and
vagueness there.  But I want to go back.  I'm sorry.  I want
to go back and I want to cover here -- we covered in somewhat
of an ordered way with me take taking a field every once in a
while, but I want to try to do the same thing here.

        As we talk about whether the defendant's entitled to
Second Amendment protections, we've talked a bit about the
law-abiding question, the actions he was taking.  What I hear
from the government is the defendant's actions are not
protected by the Second Amendment because he was pointing the
gun at a law enforcement officer and doing other things we

generally frown on.  Is that the level of analysis I should
take or is it the more generalized he was possessing a firearm
here?

        MR. GRAY:  Your Honor, in this case, the conduct is
possession of a firearm; that's all.  If he had been charged
with assault on a federal law enforcement officer, different
analysis.  If he had been charged with firing on a law
enforcement officer, completely different analysis.  If we had
been charged with any of those sort of similar offenses, the
analysis is different.  But in this case, when we look at the
conduct, the conduct is simple:  Did he possess it and did he
receive it?  Possession while under indictment, receipt while
an addict.  And --

        THE COURT:  The other way.

        MR. GRAY:  -- both of those --

        THE COURT:  The other way.

        MR. GRAY:  Oh, I'm sorry.  Yeah.  Thank you, Your
Honor.  But when we look at that issue, when we look at that
issue, the real question still stops us right back to the
analysis of Bruen, which is, was that a prohibition that
existed prior to the enactment of the Second Amendment?

        THE COURT:  Well, so I mean that is a question.  I
mean, the question is, is the possession and receipt of a
firearm for anyone, are those things the Second Amendment
protects?  Is that part of the keeping and bearing of arms?

And that's I think that's one of those threshold questions. And I think obviously the possession of a firearm is, undoubtedly.  Is the statute dealing with receipt of a firearm, is that implicating the keeping and bearing arms?

MR. GRAY:  I think that is directly bearing on the bearing of arms.  So when we're talking about both of these aspects, the Second Amendment is being directly implicated.

THE COURT:  It seems to implicate it --

MR. GRAY:  I think --

THE COURT:  -- less --

MR. GRAY:  -- it's clear --

THE COURT:  -- less in the context of receiving because, again, if Mr. Alston had all the firearms he ever wanted, there was no -- I mean, unless he came in here and there were conditions put on him, there was no prohibition on him possessing those.  I mean, it's receipt, right, under 922(n).  So does that -- that seems like a lesser limitation, although still a limitation.  And if -- and you can push back on that if you want.  And does that fact impact anything I do down the line with the analysis, meaning is there somewhat of a different standard when the restriction on the Second Amendment right is a lesser one?

MR. GRAY:  I think that argument and that line of analysis would have held prior to Bruen.  That is a classic Heller analysis right there.  That is exactly the sort of

means-ends analysis that was rejected by the court.  And
that's why the arguments get very circular when we start to
listen to the government's argument with regard to why we're
prohibiting this.  Well, is he a law-abiding person?  Well,
the -- the court was pretty clear, the Second Amendment
guaranteed to "all Americans the right to bear commonly used
arms in public, subject to reasonable, well-defined
restrictions".

        THE COURT:  Then why all the ink spilled on law-
abiding citizens?  They say that tons of times in all these
opinions, so why are we spilling all the ink on that if it
doesn't matter?

        MR. GRAY:  You want the real answer, Your Honor?

        THE COURT:  I want your answer.

        MR. GRAY:  Because my answer is going to be the real
answer.  There are certain people that we don't want to have
firearms, and we need to come up with a way to keep them from
having firearms.  So we're going to come up with that
analysis.  However, I do think that's really, really important
to understand when we look at the thread that is consistent
from Heller to Bruen and other similar cases.  It's really
kind of up front when we look at what Justice Thomas was
asking us to do, which is it is not up to the courts to
legislate this issue.  If you want to keep people from having
those firearms, there's a legislative process.  And when we

look at why we get rid of ends -- the means-ends, that really
takes the courts and puts them back into a position where
they're able to make the analysis in a clean way.  Because
it's a simple proposition at that point in time.  Did that law
previously?  If it did, then it holds up.  The Second
Amendment is essentially a filter that filters through
legislation that says, hey, we have the ability to still have
well-reasoned and well-defined restrictions but to determine
the how and the why of what a well-defined and reasonable
restriction is, that's where you look back to the founding
eras.

        THE COURT:  So you've mentioned a couple of times we
need to look at -- we look whether it existed prior to the
Second Amendment.  And obviously it'd be very helpful to the
government if they could point to exact duplicates of the
current laws.  But the Supreme Court didn't freeze us in 1791.
They did say we can look at things going forward.  And the
further you get from the ratification of the Second Amendment,
the less weight to be accorded to those laws.  So what do I
make of the fact that as our -- in the late 18th century,
we're looking at a country that's a nascent country, brand
new, just fought a war, has no money, no form of government,
threats from all around.  They're trying to do certain things.
And perhaps gun regulation wasn't at the top of the list,
right?  As things get more stable and move forward in the

1800s, pre-Civil War, you see more and more regulation. So I don't think Bruen requires me to throw all that in the dust bin, but why should I not consider that in determining what the scope of the Second Amendment is?

MR. GRAY: Well, I think that it should be considered. I mean, when we take a look at the statute under which Mr. Alston is charged, being an addict of marijuana, there's no analogous statute. The government couldn't find one that said that pre-founding era there was a prohibition on folks from possessing firearms while using or being addicted to marijuana. But they cite that, well, we can't really look at marijuana because drug use is different now, things are different, and things have changed. We had opiates back then. We had cocaine back then.

What really is happening here, and I think this is quite frankly the genius of the opinion, is there's a recognition that from your standpoint the decision as to who gets their rights -- I mean, we're talking constitutional rights -- restricted falls on you. So let's make this burden easier. Get rid of the means; get rid of the ends; get back to what's really here. And it doesn't mean that you toss it all to the dustbin. It does mean that those are things that you got to factor within the analysis ultimately to get to the conclusion. But when we start asking ourselves the threshold questions, who does this apply to? Certainly will apply to

Mr. Alston.  Second Amendment applies that.  There's no statement that he has surrendered his Second Amendment rights or has done anything like commit treason or any other felony or any other constitutionally articulated thing that citizens can do to renounce their rights.  He hasn't done any of those things.  So we know this applies to him.

Then the next step is pretty simple.  The two statutes which he's she's been charged with, is there an analogous statute?  Felon in possession?  There's analogous statutes.  We've seen those.  Those are cited not only within this brief by the Department of Justice, but many others.  But when we start asking ourselves as to what's the analogous statute for the possession by a marijuana addict, that's where the how and why analysis from this Court comes into play.  Because then we take a look back and say, all right, under Bruen, the question isn't that complicated; it's quite simple.  Was there an analogous statute?  Was there something that said back then we wanted to restrict certain people from being able to get that right?  Because we've already established it applies to everybody, so we got to figure out who it is that it doesn't apply to.  That's not that difficult of an analysis to make once you start looking at these things from the Bruen analysis, because now it's a question of, all right, what's the pre-Second Amendment discussion and analysis.  This isn't that complicated because Your Honor's already figured it out,

because you asked the question which is always on my mind, which is we talk about law-abiding all day, but if someone has been speeding, whether they've been caught or not, we all would say that that person is not law-abiding.  I feel like that's an argument that even the Supreme Court recognized when it was using the term "law-abiding", which is why they didn't explicitly say law-abiding means X, Y, or Z.  What they were doing was they were saying, yes, we understand that there's going to be restrictions, but those restrictions need to be viewed from the historical lens of what existed in the pre-Second Amendment era.  That's the only distinction.

        And we all have the fear of things going really bad.  But that is a fear that ultimately has been entrusted to Congress, state legislatures to try to address.  Because the one thing that everybody keeps forgetting is that you can amend the Second Amendment.  We did it with alcohol, then we undid it with alcohol.  It can be done.  This isn't a problem without solution.  What we are saying is that the solution is something that's already been written.  And now that we're basically going through the analysis that is as textural as it gets, the question is, did this statute exist prior to the adoption of the Second Amendment?  And the historical record shows that the adoption of marijuana as a drug for the purposes of being an addiction, that's not there.

        THE COURT:  I mean, so what we talked about was the

mental illness prohibitions and some limitations on the ability of those who are intoxicated to use or possess firearms, right? And those get to issues of capacity, right? You don't have the capacity to do this, and so we're not going to let you. And if that's the question, why is Congress not -- if they were regulating people's capacity to possess firearms and use firearms in the early days of our country, then why does Congress today not have the ability to regulate what it views to be people who lack the capacity to appropriately use and possess firearms?

MR. GRAY: I'll take that as kind of a two-step, Your Honor, if you don't mind. So with regard to the issue of the capacity issue, jurisprudence since the common law has come to recognize that there are some folks who, because of their mental status, are not going to be subject to all of the rights that everybody else would get. And it's not because we don't like them. It isn't because they're -- as we had in the late 1700s with Catholics. It is because we have found that based upon their ability to make recent decisions, that person is incompetent. But there's been no argument that what's taking place here is the coverage of someone who is incompetent.

What we have here is we've identified that there's a certain group of people that we don't want to have the right to possess a firearm. So we're going to figure out how to

write the statutory language to get them there.  And I'll be
the first person to tell you -- and I know these words will
come back to haunt me one day -- the idea that the logic that
came out of Bruen when it first struck me was a little jarring
because the first thing I said was, wow, this essentially kind
of scrubs the mat and makes every statue that covers guns or
the regulation of firearms -- it makes it all subject to a
challenge.  But I think what was ultimately said by the court
was what's really at stake here is whether or not a person's
Second Amendment right, which they have, can be infringed
upon, even as the government says, for a little bit.  And the
answer to that was categorically no.  And we've seen this walk
from Heller to Bruen to other cases, and that is where we
stand with this.

        I do this, Your Honor, to say it in a simplistic
manner, because I know that when we are looking at the nuances
of this, it can become quite complicated.  And I think that's
why the means-ends analysis is problematic, because it creates
those nuances that ultimately get us to various areas that
take us further and further and further away from the Bruen
analysis, for example, the government's argument with regard
to an addiction.  One, we have no evidence that there was an
addiction.  Second, we know right now that when it comes to
the issue of lawfulness, North Carolina is debating whether or
not marijuana use as a medical device is lawful.

THE COURT:  Right.

MR. GRAY:  We know thirty-six other states have already said that it's lawful.

THE COURT:  I mean, that's all well and good for those states.  I don't think it's really relevant to the federal question here.  Congress has not seen it appropriate to undo this yet.  And also, I mean, I think we're looking at why did Congress enact this, what was the understanding at the time they enacted this.  And for better or for worse, that may not be today's understanding of it.  But I guess my point was, if Congress has the power -- if the Second Amendment allows Congress the power to regulate capacity -- of whether people of a certain capacity can possess firearms, and it was allowing it to do that in the 1790s, why is that -- why is Congress not able to do that in the modern day?

MR. GRAY:  I think they can, as long as they're looking at it from the standpoint of what was there in the 1790s.  If you want to do it otherwise, amend the Second Amendment.

THE COURT:  Right.  And I -- the point I mentioned is a lot of this is, what is the level of generality at which we look at these practices and the analogy in a logical reasoning we have to engage in.  And so I think that's one of the challenges here, to figure out exactly how analogous something needs to be.  Because again, we could -- you can draw -- you

can have a very broad analogy of the founding era they
regulated anybody they considered dangerous to possess a
firearm, and define that in a broad way, and that would -- if
you accept that, it allows Congress now to regulate people in
a broad way anyone it finds dangerous.  But that's probably an
exception that follows the rule and not one that I think the
Supreme Court would be comfortable with.  So I've got to find
the right level of analogy here to get this straightened out.

        MR. GRAY:  Exactly, Your Honor.  That's the how and
why that's discussed in Bruen.  And what we're arguing is that
the right level of analogy is actually the statutes that we
put forth in pages 16 and 15 of our brief, which is they
restricted the person who was intoxicated from using the
firearm.  That is the how and why right there.  We don't have
that in this case.  So when it comes to the question of
whether it's unconstitutional as applied or just facially,
those two answers -- those two questions are answered when we
take a look at that line of questioning.  The how and why is
where's your analysis, where's your analogy.  It's right
there.

        THE COURT:  So on this point, I mean, Justice
Kavanaugh's concurrence, that the Chief Justice joined, talked
in detail about not questioning the validity of these shall
issue regimes where you have to submit to certain -- answer
certain questions, the stated go -- some training and all

that.  Why does that not give some weight to the argument that there can be these sort of restrictions on who can possess a firearm?

MR. GRAY:  I think, Your Honor, that is much more as -- for lack of a better phrase, that's a narrow application based upon the fact that on Bruen, that's the application of people who were like, hey, I want to be able to apply for this gun.  That's separate and apart and I think factually distinctive from a statute that says simply because you are under indictment, without explanation as to the nature of the danger that occurs with that, you are prohibited from exercising a Second Amendment right.  You are an addict.  Now, we don't know whether or not your addiction is any more akin to being an alcoholic or whether it's been akin to a crack head, but because we've said it, we're taking away your Second Amendment rights.  And I think the real persistent threat from Heller to Bruen is you can't just take away rights that way that are embedded within the Second Amendment.

THE COURT:  Well, that -- is there any other point you want to make on 922(g)(3)?  Okay.

MR. GRAY:  No, Your Honor.  I'll turn my attention now just briefly to covering -- because I don't want to rehash every argument that we've argued within our brief, but I do want to turn our attention to the issue of -- to that historical analysis.  And once again, we've noted that if you

want to take a look at the historical analysis, the provisions
are there.  And those are restrictions on somebody who is
either drunk or intoxicated and that subsequent use of the
firearm or subsequent going into the woods, as one of the
statutes said.  But when we take a look at that from the
historical context, that, I think, is our analogy.  It isn't
the mysterious trying to analogize marijuana to alcohol.  I
think what we have to say is, was there the ability to
legislate for that?  There was.  They didn't.  Your Honor, the
Court asked a great question about the seventy-five-mile-an-
hour question, if you're speeding seventy-five miles an hour
whether or not that would take him outside of law-abiding.
And I do think that when it comes to the question of the law-
abiding principle, the question really comes down to the real
issue of does he fit within the definition of all Americans?
Because that's ultimately the standard that was articulated by
the court in Bruen.

        When it comes to the issue of whether or not his
conduct needs to be evaluated, the conduct is possession of
the firearms.  And even the restrictions that are temporary
have a problem -- are problematic when we look at the
restriction of somebody's Second Amendment rights.

        THE COURT:  But the government talked about, I guess
on both points, but it's perhaps more relevant on 922(n),
which is why I'd like to spend a little time talking about,

but this is a temporary restriction and thus not all that
problematic.  Why is that -- why do you disagree -- I mean, I
understand it's a restriction of his rights, undoubtedly.  Why
is it that sort of temporary restriction akin to a time,
place, and manner restriction of First Amendment -- I mean, I
know there's a difference.  But I mean, you can restrict these
rights in certain ways under certain circumstances.  So why is
that temporary restriction while under indictment of receipt
not permissible?

          MR. GRAY:  To speak specifically with regard to the
while under indictment, Your Honor, the government made a lot
of statement about this is -- we're following a criminal
process where the prosecutor gets up and presents evidence.
But in North Carolina, you don't even have to have a
prosecutor in a room in order to get something through a grand
jury.  Many times what you have is just a cop that shows up,
goes to the grand jury.  There'll be something that will go
forward as an indictment, and you'll have a prosecutor won't
even know it until after the fact, which is why we get a lot
of these dismissals after the fact as well.

          But Your Honor, I tell you -- I use that just to help
illustrate that when we look at the issue of the temporary
restriction.  Under that regime in North Carolina, somebody
can go in, get an indictment, and they don't get into court
for years.  We're not talking about a minor inconvenience.

We're talking about where somebody can be under the guise of an indictment four, five years. That's not a minor or a temporary restriction. That's a deprivation. When we start talking about those sort of things, we're not talking about just the temporal load, because I'm sure most people will say, listen, being deprived of my constitutional rights for even a minute is problematic. But when we look at it in effect, the problem that we have here is under indictment in North Carolina means that you could be effectively waiting for years. And unfortunately, and this is why we responded to the Court's query with 9 -- under 925 -- or 922 why the application for reinstatement is important is he doesn't even get an opportunity to ask for that right back. There's no avenue for him to be able to get a right back that's been suspended for six months or a year or two years. He's just stuck without a constitutional right that applies to all Americans, all on the mere accusation -- it's not a proof. There's been no proof beyond a reasonable doubt -- all based upon a mere accusation. And that is problematic, Your Honor.

        THE COURT: So I mean, that accusation -- I mean, I agree with you that it's black letter basic criminal law, right, an indictment is an accusation supported by probable cause. But that accusation in a lot of ways fundamentally changes the citizen's relationship with their government. And what I've heard the government tell me is that a bunch of our

rights are restricted once we are under indictment.  And
whatever the -- grand jury is there for a reason, and no
system is perfect, but the grand jury makes a decision either
in state or federal court to return an indictment, presumably
the defendant would have to know he's under indictment before
he's subject to criminal sanction here, but that results in
deprivation of many constitutional rights.  And this Second
Amendment rights are just another one of those, and it's no
different; it was that way in various shapes and forms at the
time of the founding, so 922(n) poses no constitutional
problem.  What's your response?

        MR. GRAY:  But there are a number of constitutional
rights that don't actually take effect until this process gets
started.  Due process, right to remain silent.  So to say that
some rights apply and some rights don't apply, I think we have
to really take a look at the larger context of the
application.  But I think it's a little glib to say that it's
okay to deprive Americans of their rights, even for a little
bit, simply because we feel like it's okay.  And I think
that's a thread that's also within a lot of what we're seeing
in this discussion with regard to Heller and Bruen.

        THE COURT:  So I mean, the time of the founding, I
mean, there were -- if you were arrested, once you were
indicted, you could be arrested and all of that, and you may
or may not have had a right to bail.  And the other -- another

argument is that the -- any right to bail is one of legislative grace, not one of constitutional mandate.  And thus, since the legislature didn't have to even let you out of jail, where presumably it would seem to make sense you can't have a gun, today's legislature is saying once you're under indictment, you don't get to have a gun is reasonably close enough of a match that it's okay.  Why is that not the case?

        MR. GRAY:  Well, I think when we start taking a look at those issues of legislative grace, I think in the end, ultimately what's taking place here is these are restrictions that are coming from the bench with regard to a person's, quite frankly, decision.  You can give up your guns or you can go to prison; which one do you want?  Now, I think, and this Court is more than familiar with it, there have been instances where there have been people under indictment federally where the government has asked for that person to be able to use a firearm or possess a firearm -- not use, possess a firearm.  That was accepted by the court and ultimately ruled upon by the court.  To me, this is not a big, indistinguishable fact, because what we're really dealing with here is an interpretation of a lawful statute that the courts get a chance to make their means-end analysis on.  But when we start taking a look at things such as our Second Amendment rights, the court's already said means-ends is not going to work anymore; let's take that analysis to something simpler.

THE COURT:  I guess what I want to get at, though, is I mentioned earlier, look, what we're talking about here is governmental power, what is the power of the government in this space.  And it appears that in the context of what happens to you after you're arrested, you don't have a right to bond and all that, and your right to be arrested -- or the ability to arrest you and deprive you of your liberty exists more or less at the moment of indictment.  Obviously, a little paperwork needs to be done, but generally you are then subject to arrest and restriction on your rights.  And so why -- if the government has the power to deprive you of your liberty effectively at the moment of indictment, why does it also not have the power at that moment of indictment to restrict your Second Amendment rights?  If it could take away all of your liberty, why can't it take away a smaller portion of it?

MR. GRAY:  And that is the question, Your Honor.  The question really comes down to what extent can the government take away somebody's rights.  And ultimately, when it came to the issue of that Second Amendment right, we've seen an evolution and how we've interpreted that.

And I think when we take a look at the Carter decision from the Fourth Circuit that we've cited, that is a great illustration of that tension.  It's the reason why the Fourth Circuit punted on the question, because the real answer is we didn't know until we got a clear analysis chain in order

to make that decision.  And that was done in Bruen.  And
that's why I started off this argument by saying we've all
gone through and read a number of cases where we've got to sit
there and pull out and divine and interpret and hold up
against the light to figure out what the court is saying.  But
Bruen actually made this one pretty simple.  Is this a right
that applies to everybody?  If it is, we've got to be really
conscious as a government to take away that right.  The way
that we're going to exercise that consciousness is by taking a
look and seeing what existed prior.  And that's why the burden
is on the government to show that what they're doing now
looked like something they did back then.  This is an
uncomfortable position for the government.  I completely
understand that.  Because now it is really in a position where
it's got to shift its thought process away from means-end to
something that's, quite frankly, a lot more bright line.

        But that is what we have.  We have the bright line.
And we would ask the Court in this instance to examine the
issue, to examine the facts and our arguments, and ultimately
determine that under this line of analysis, under the
examination of Bruen, Mr. Alston's rights have been violated,
his constitutional right to possess a firearm has been
violated, and that these two statutes are in violation of the
Second Amendment of the United States Constitution.  Subject
to that, Your Honor, I'll take any other questions that you

have.

THE COURT:  Thank you.

I know we've been at this for a while, but Ms. Nokes, I'll give you the opportunity to make any last comments or responses to what Mr. Gray shared.

MS. NOKES:  Sure, Your Honor.  Thank you for giving me that opportunity.  Let me just push first on the shall issue regimes.  The Supreme Court made it clear that, "Nothing in the analysis in Bruen" -- I think this is what the Court was pushing on -- "should be interpreted to suggest the unconstitutionality of the forty-three states shall issue licensing regimes which often require applicants to undergo a criminal background check and are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens."  That's in Bruen note 9, page 2,138, quoting Heller.  And then there's a similar provision in the Kavanaugh concurrence saying that shall issue licensing regimes are constitutionally permissible.

Defendant says that this is somehow narrow and applies only to the law that the Bruen court was reviewing, the New York law that said that the folks needed to have some reason why they were going to have a gun and had to sort of get that approved by New York before they could have a gun. But that's just plain not what the opinion says.  The opinion says that nothing within it is meant to cast any doubt on

J.A. 171

these shall issue regimes.  Why is that important in this context?  Well, many of those regimes actually restrict drug users and those under felony indictment from possessing firearms.  So if the Supreme Court says, "Nothing in this analysis is casting any doubt on those regimes," which do include these same prohibitions, then the Bruen court has spoken on that, at least by reference.

THE COURT:  I'm not sure it's as open and shut as you would propose there.  I don't know that challenges are going to be -- simply because the State has chosen to ask a question on a shall issue license, the court will consider that a closed matter.  But that particular question is beyond the scope of what we're doing here.

MS. NOKES:  Sure, Your Honor.  Thank you.  With respect to the fact that it can take years to resolve an indictment, speedy trial -- we all have speedy trial rights; that's part of the Constitution.  And the fact that these things take a long time doesn't change the fact that courts can burden the other rights in the Bill of Rights, the Fourth Amendment right, the First Amendment right, the Sixth Amendment right.  So again, it's logical that the Court could burden a Second Amendment right for however long it takes to get that indictment resolved.

Your Honor, I would also point again to the Bruen opinion here now in the Alito concurrence stating on page --

well, it's the second page of the Alito concurrence that in
that opinion -- in the opinion that was decided by Bruen, they
were holding that a state may not enforce a law that
effectively presents its law-abiding residents from carrying a
gun from this -- for this purpose.  And that is all the court
decided.  As the Court is well aware, throughout the opinion,
I think it's fourteen times, the court references law-abiding
citizens.  It does speak about all Americans in another piece
of the opinion.  But throughout the opinion, throughout the
concurring opinions, over and over and over again, it talks
about law-abiding citizens.  So the government believes that
people who are not law-abiding do not have the same Second
Amendment protections as those who are.

          One point with respect to the analogizing and the
historical context, if I'm hearing defendant correctly, he's
saying that there's no one-to-one analogy here in either
context, in the drug user context or in the receipt under
indictment context, and so that means that the modern day
statutes are unconstitutional.  But that's just not what Bruen
says.  Bruen asks us to do this difficult historical analysis,
to make these analogies that are broader in scope than just
looking at is there a law that looks the same as the law that
is in our modern day statute books?  Well, if not, well, then
we got to throw it all out.  That's not what Bruen tells us to
do.  Bruen tells us to do this entire historical analysis, to

look at the how and the why for how restrictions were put upon
people's Second Amendment rights back in the day, and to
consider whether the current modern-day statutes are
consistent with that history and tradition with the founders'
understanding.  So just as the Second Amendment covers guns,
covers weapons that the founders could never have imagined, an
AR-15, for example, that the court may find is a legitimate
weapon, a legitimate tool of self-defense.  I think we'd all
agree that at this point the Second Amendment covers those
types of weapons.  We also have to look at the Second
Amendment as being flexible enough as incorporating that
analogy where we say, yes, muskets and AR-15s look really
different.  Well, some of the statutes restricting firearms
rights look somewhat different than they look in today's
world.  But the Second Amendment is flexible enough.  The
Constitution is flexible enough to allow us to do that
historical analysis, to allow us to create these analogies,
and to understand why restrictions existed at the time of the
founding and how they relate to restrictions that exist now in
order to say that, yes, what exists now, what exists today
doesn't look like exactly what was on the books at the time,
but it is nonetheless consistent with the history and
tradition of firearms regulations in this country, and that
these statutes, for example, are thus constitutional.

           THE COURT:  Thank you, Counsel.  Thank you for the

briefing on this.  It's a very complicated issue requiring
different kinds of research I think we're usually used to on
all of our fronts.  I appreciate the work everyone's put into
it.  I also appreciate it that one or perhaps both sides will
want to take up my decision with Judge Flanagan at some point,
so I'm going to endeavor to get this done in the next few
weeks so you all can move on from here.  Certainly don't feel
obliged to object, but I understand one or both sides may be
dissatisfied with some or all of my decisions.  So that will
take time, and I want to make sure this resolves relatively
quickly, so I'll endeavor to get this done as soon as
possible.  But again, thank you all very much for your
briefing on this.  I'll take it under advisement.  We'll be in
recess.

             THE CLERK:  All rise.  This Honorable Court stands in
recess.

                    (Court is adjourned)

                    *  *  *  *  *

CERTIFICATE OF TRANSCRIBER


I, Rachel Wiley, court-approved transcriber, in and
for the United States District Court for the Eastern District
of North Carolina, do hereby certify that pursuant to Section
753, Title 28, United States Code, that the foregoing is a
true and correct transcript from the official electronic sound
recording of the proceedings held in the above-entitled matter
and that the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States.


Dated this 24th day of June, 2023.


/s/ _____
RACHEL WILEY, CDLT-251

COURT-APPROVED TRANSCRIBER

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CR-00021-FL-RN-1

| | |
|---|---|
| **United States of America**, | |
| v. | **Memorandum & Recommendation** |
| **Carlos Alston**, | |
| Defendant. | |

The Second Amendment protects the people's right to keep and bear arms from improper government interference. But the contours of the Amendment's protections are hotly disputed. This dispute has only intensified since the Supreme Court ruled that a firearms regulation's constitutionality depends on its historical pedigree—not a means-ends balancing test.

This case asks the court to examine the Second Amendment's scope. In doing so, it poses two questions that are easy to ask but difficult to answer: To begin with, do drug users and those under felony indictment have Second Amendment rights? And if so, do modern federal laws limiting their exercise of that right find support in this nation's history and tradition of firearms regulation?

I.    **Background[1]**

Early in January 2023, a local police officer approached Defendant Carlos Alston as he was waiting in a restaurant drive-thru lane. The officer reportedly told Alston that there were warrants for his arrest and ordered him to put his hands up.

---

[1] The factual background comes from the parties' briefs. The parties do not appear to disagree, at least for now, about the material facts.

The government contends that Alston then grabbed a handgun and pointed it at the officer. The officer responded by shooting Alston. Alston tried to flee, but he quickly collapsed from his injuries. Authorities recovered Alston's handgun and searched his car. Inside, they found a marijuana cigarette, digital scales, plastic baggies, and about 26 grams of marijuana.

Alston was not a felon at the time of this encounter. He was, however, out on bond after a North Carolina grand jury indicted him for the felony offense of assault with a deadly weapon with intent to kill inflicting serious injury. *See* N.C. Gen. Stat. § 14–32(a) (classifying this crime as a Class C felony).

In January 2023, the United States charged Alston through a criminal complaint with possessing a firearm while being a drug addict. About two weeks later, agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives arrested and questioned Alston. Alston revealed that he used marijuana daily. He also shared that he knew he was under indictment when he received the gun he allegedly brandished at the officer.

Shortly after Alston's arrest, a federal grand jury indicted him for possession of a firearm by an unlawful user of, or person addicted to, a controlled substance, in violation of 18 U.S.C. § 922(g)(3). It also charged him with receipt of a firearm by a person under felony indictment, in violation of 18 U.S.C. § 922(n).

Alston then moved to dismiss the federal indictment.

## II.    Discussion

Alston contends that, after the Supreme Court's ruling in *New York State Rifle and Pistol Ass'n* v. *Bruen*, 142 S. Ct. 2111 (2022), § 922(g)(3) and § 922(n) violate the Second Amendment. *See* Mot. Dismiss at 31–32, D.E. 17. Alston argues that these statutes are unconstitutional because

the United States cannot identify "a robust historical tradition of firearm regulation that disarmed citizens based on drug use or being under indictment[.]" *Id.* at 7.

The United States takes a different view. It first claims that the Second Amendment does not apply to unlawful drug users or individuals under felony indictment. Resp. Opp'n Mot. Dismiss at 6, 17, D.E. 20. And even if it does, the government maintains that both § 922(g)(3) and § 922(n) are grounded in historical traditions regulating firearms. *See id.* at 10, 23. According to the United States, laws prohibiting those who are mentally ill, intoxicated, or dangerous from possessing guns provide historical support for § 922(g)(3). And § 922(n), the government contends, is analogous to historical laws detaining those under indictment before trial and disarming individuals the government found untrustworthy. The government thus concludes that each law survives a facial challenge to its constitutionality.

A.      **Second Amendment Precedent**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. For much of this nation's history, the Second Amendment received little judicial attention. It was not until 15 years ago that the Supreme Court determined that—at the very least— the Amendment protects Americans' right to keep handguns in the home for self-defense. *District of Columbia* v. *Heller*, 554 U.S. 570, 636 (2008). At issue in *Heller* was a District of Columbia law that forbade its residents from keeping handguns in their homes. *Id.* at 628. The Court held that the District's law contravened the Second Amendment. *Id.* at 635.

In reaching this conclusion, the Court first framed its interpretive strategy: Judges must endeavor to understand the Amendment's text according to its original public meaning at the time

it was adopted. *Id.* at 576–77. The first part of the text[2]—which the Court termed its prefatory clause—announces its purpose but does not grammatically limit the words that follow. *Id.* at 577.

The rest of the Amendment[3]—its operative clause—does two things. First, it "codifies a right of the people." *Id.* at 579 (internal quotation marks omitted). Comparing the text of the Second Amendment to other provisions in the Constitution that mention "the people," the Court found that it gives rise to "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Second, the operative clause lays out "the substance of the right: to keep and bear Arms." *Id.* (internal quotation marks omitted). Taken together, the components of the operative clause "guarantee the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

But this right is not plenary. The Court noted that historical tradition did not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citations omitted). Mid-19th-century evidence, for instance, suggests that the government may prohibit carrying concealed weapons in public. *Id.* (citations omitted). And although the Court did not provide an exhaustive list of permissible firearm regulations, it noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

That said, *Heller* establishes a floor for constitutional protection—not a ceiling. *Id.* at 635 ("And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth

---

[2] "A well regulated Militia, being necessary to the security of a free State . . ."
[3] ". . . the right of the people to keep and bear Arms, shall not be infringed."

and home."). Considering the District of Columbia's total prohibition on personal firearm possession within the home, then, the Court had no trouble concluding that it was unconstitutional. *Id.*

Two years later, in *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010), the Court held that the Second Amendment is not confined to the federal government—it applies to states as well. In *McDonald*, a handful of local ordinances produced a regulatory scheme akin to the one the Court struck down in *Heller. See id.* at 749. Much of the Court's analysis focused on the incorporation of the right to keep and bear arms through the Fourteenth Amendment, but it emphatically reaffirmed *Heller*'s core holding: "[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *Id.* at 780. Consistent with other protections guaranteed by the Bill of Rights, the Court held the right to bear arms may not be infringed by state governments. *Id.* at 791. Thus, the ordinances were unconstitutional. *Id.*

*Heller* and *McDonald* established that, at the very least, law-abiding Americans enjoy a Second Amendment right to possess conventional firearms within their homes for self-defense. In the decade that followed *McDonald*, circuit courts developed a two-step test for determining whether other firearms regulations satisfied the Amendment's command. *See generally Bruen*, 142 S. Ct. at 2126–27 (describing circuit court practice). First, the court would determine whether a challenged law fell within the historical scope of the Second Amendment. *See, e.g.*, *Kanter* v. *Barr*, 919 F.3d 437, 441 (7th Cir. 2019). If not, "the regulated activity [was] categorically unprotected, and the law" was constitutional. *United States* v. *Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (quoting *Ezell* v. *City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

But if the challenged law plausibly fell within the ambit of the Second Amendment, the court would proceed to step two. There, it would apply tiered scrutiny to determine whether the law complied with the Constitution. *See Kanter*, 919 F.3d at 441–42. If the law burdened the Second Amendment's "core"—which circuit courts generally constrained to self-defense in the home—the court would apply strict scrutiny. *See, e.g.*, *Gould* v. *Morgan*, 907 F.3d 659, 671 (1st Cir. 2018). To survive this analysis, the government would have to show that the law was "narrowly tailored to achieve a compelling governmental interest." *Kolbe* v. *Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (citation omitted). But if the law did not burden the Second Amendment's core right, circuit courts would apply intermediate scrutiny and uphold the law if it was "substantially related to the achievement of an important governmental interest." *Libertarian Party of Erie Cnty.* v. *Cuomo*, 970 F.3d 106, 128 (2d Cir. 2020) (quotation omitted).

Last year, the Supreme Court prescribed a different approach. *See Bruen*, 142 S. Ct. at 2126–28. In *Bruen*, the Court reviewed New York's regulatory scheme governing public-carry pistol licenses. *Id.* at 2122. Unlike most states, New York required those who wanted to possess a handgun for self-defense in public to demonstrate that they had "a special need for self-protection distinguishable from that of the general community." *Id.* at 2123 (quotation omitted). These licenses were hard to come by, and judicial review upon the denial of a license heavily favored the government. *Id.*

Two New Yorkers applied for unrestricted public carry licenses, but the state only offered them restricted licenses because they could not show that they had a special need for self-defense. *Id.* at 2125. While the restricted licenses allowed the applicants to carry their handguns sometimes, they did not allow them to possess a handgun in public generally. *Id.* When the applicants challenged the denial of their unrestricted license applications, the district court denied their

claims—it found that New York's licensing regime didn't burden the core of the Second Amendment and satisfied intermediate scrutiny. *Id.* The Second Circuit affirmed. *Id.*

On review, the Supreme Court held that lower courts' two-step approach was "one step too many." *Id.* at 2127. While the first step of the analysis—assessing whether a challenged law burdens conduct protected by the Second Amendment—accords with *Heller* and *McDonald*, those cases do not endorse any form of means-ends scrutiny in determining whether the law is constitutional. *Id.* Instead, to establish that a gun law complies with the Constitution, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[4] *Id.*

Testing a firearms restriction's historical pedigree is easier in some cases than in others. *See id.* at 2130–32. If, for instance, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. But some cases present unprecedented problems unimaginable to those who drafted the Amendment hundreds of years ago. In those situations, courts must reason by analogy, deciding whether historical laws that regulated gun ownership are "relevantly similar" to the law before the court. *Id.* at 2132 (quotation omitted).

---

[4] Alston contends that 18 U.S.C. § 922(g)(3) and § 922(n) are unconstitutional on their face. Outside the First Amendment context, the Supreme Court has determined that litigants alleging a statute is facially unconstitutional can only succeed if they prove that "no set of circumstances exists under which the Act would be valid[,]" *United States* v. *Salerno*, 481 U.S. 739, 745 (1987), or establish that the statute has no "plainly legitimate sweep[,]" *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotation omitted).

This familiar standard might conflict with *Bruen*. On the one hand, facial challengers usually bear the burden of proving that the disputed law has no constitutional application. *See Salerno*, 481 U.S. at 745. But on the other, *Bruen* places the burden on the government to establish that a firearm regulation has its roots in American history and tradition. 142 S. Ct. at 2127. Because the burden allocation in *Bruen* is clear, the undersigned will decline to apply the more traditional facial challenge standard.

While the Court did not exhaust the ways two laws can be "relevantly similar," it instructed lower courts to consider two factors: how and why a law burdens an individual's right to keep and bear arms. *Id.* at 2132–33. If a modern law and historical practice impose a similar burden on individuals' Second Amendment rights—and do so for similar reasons—the modern law has a greater chance of passing constitutional muster. *Id.* at 2133.

The Court stressed that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* Courts should distinguish modern gun laws with robust historical roots from those that trace back to outlier statutes that most Americans would not have accepted. *Id.* And the government, in meeting its burden of proving that a modern regulation fits within the traditional constitutional order, need not dredge up "a historical *twin*"— but it must "identify a well-established and representative historical *analogue*[.]" *Id.* As in *Heller*, the *Bruen* Court declined to exhaustively demarcate the bounds of historical firearms regulation. *Id.* at 2134. Instead, it expressed faith in the lower courts to assess the strength of the government's purported historical analogues using familiar tools of constitutional analysis.[5] *Id.*

Turning to the facts before it, the Court found that the "two ordinary, law-abiding" New Yorkers who were denied unrestricted carry licenses were no doubt part of "'the people' whom the Second Amendment protects." *Id.* (citation omitted). It also found that their proposed course of conduct—carrying handguns in public for self-defense—implicated the textual protections conferred by the Second Amendment. *Id.* Thus, the Court concluded, the Amendment

---

[5] Conducting historical analysis can be challenging. *See* Antonin Scalia, *Originalism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 856 (1989) ("[I]t is often exceedingly difficult to plumb the original understanding of an ancient text."). But the need for judges and lawyers to engage with history to resolve a dispute is hardly unique to the Second Amendment, *see* Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. Rev. (forthcoming 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4366019#, or constitutional analysis, *see* William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 812 (2019).

"presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense." *Id.* at 2135.

Because the applicants' conduct fell within the Second Amendment, the burden shifted to the government to "identify an American tradition justifying New York's proper-cause requirement." *Id.* at 2138. In an attempt to meet this burden, the government offered evidence from five historical eras to serve as analogies for its proper-cause requirement: pre-revolutionary England, the colonies and early Republic, antebellum America, Reconstruction, and the late-19th century. *See id.* at 2135–36.

In considering this evidence, the Court noted that "not all history is created equal." *Id.* at 2136. The further a historical practice strays from 1791—the year in which the Second Amendment was adopted—the less probative it is when determining whether a law complies with the Amendment's command.[6] *Id.* Thus, "courts must be careful when assessing evidence concerning English common-law rights" because English practice "at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." *Id.* Relatedly, they "must also guard against giving postenactment history more weight than it can rightly bear." *Id.* To the extent that evidence from the late-19th century and beyond conflicts with evidence contemporaneous with the passage of the Second Amendment, the more recent tradition "cannot provide much insight" into the Amendment's meaning. *Id.* at 2154 (citations omitted).

---

[6] The Supreme Court did not squarely address how much weight lower courts should accord historical practices near the adoption of the Fourteenth Amendment. *Bruen*, 142 S. Ct. at 2138. Though it noted the scholarly debate surrounding the effect of the Fourteenth Amendment on the freedoms guaranteed by the Bill of Rights, the Court was content to conclude that public perception of the right to carry arms in public varied little in the decades between the ratification of the Second and Fourteenth Amendments. *Id.*; *see also id.* at 2163 (Barrett, J., concurring) ("[T]he Court avoids another ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 or when the Bill of Rights was ratified in 1791. Here, the lack of support for New York's law in either period makes it unnecessary to choose between them.") (cleaned up).

After wading through the historical evidence, the Court held that the government failed to meet its burden in justifying the proper-cause requirement. *Id.* at 2156. "Apart from a few late-19th-centry outlier jurisdictions," the Court found, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* Nor did they force citizens to prove that they had a special need for self-defense unshared by the rest of the population. *Id.* Thus, New York's regulatory scheme was unconstitutional. *Id.*

In a footnote, the Court briefly discussed the other restrictions that states impose on firearm ownership. *See id.* at 2138 n.9. When the Court decided *Bruen*, 43 states maintained "shall issue" public carry licensing schemes. *Id.* at 2123–24. In these states, authorities were given little discretion—they had to issue public carry licenses so long as the applicant satisfied certain objective threshold requirements. *Id.* Six states and the District of Columbia had "may issue" schemes like New York's. *Id.* Regulators in may-issue states enjoyed more leeway in denying citizens' applications to carry in public, "usually because the applicant ha[d] not demonstrated cause or suitability for the relevant license." *Id.* at 2124.

While the Court determined that New York's may-issue licensing framework impermissibly burdened the right to keep and bear arms, it noted that "nothing in [its] analysis should be interpreted to suggest" that other states' shall-issue schemes were unconstitutional. *Id.* at 2138 n.9 (quotation omitted). This is because those schemes "do not require applicants to show an atypical need for armed self-defense" and therefore do not prevent "law-abiding, responsible citizens" from exercising their rights. *Id.* (same). Justice Kavanaugh echoed this sentiment in his concurrence. *Id.* at 2162 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." (citation omitted)).

Against this constitutional backdrop, the undersigned will turn to the government's arguments in favor of § 922(n) and § 922(g)(3).

### B.    Whether Alston, as an Indicted Drug User, Enjoys the Second Amendment's Protections

The United States first contends that the Second Amendment does not apply to Alston because—as an unlawful drug user under indictment—he is not a member of "the people" who enjoy the Amendment's protections. Resp. Opp'n Mot. Dismiss at 6–10, 17–23. It offers two justifications for this conclusion: First, both *Heller* and *Bruen* focused on the rights of law-abiding citizens, and Alston falls outside that category. *See id.* at 6–9, 17–18. Second, both the majority opinion and Justice Kavanaugh's concurrence in *Bruen* noted that the Court's opinion was not intended to disturb 43 states' shall-issue public carry licensing regimes, many of which preclude drug addicts and those under indictment from obtaining firearms. *See id.* at 9–10, 19. The government is wrong.

The United States correctly notes that the majority and Justice Kavanaugh repeatedly refer to the Second Amendment rights of law-abiding citizens. But those references do not support the government's position that "the Supreme Court repeatedly described the Second Amendment right as belonging *only* to law-abiding citizens." *Id.* at 18 (citation and internal quotation marks omitted) (emphasis added). At no point in *Bruen* (or *Heller* or *McDonald*) did the Supreme Court hold that only those with an unblemished criminal record enjoy Second Amendment rights.

In fact, the Court had no occasion to consider this question in *Bruen*. Instead, it merely noted that it was "undisputed" that the petitioners were "two ordinary, law-abiding, adult citizens" who were considered "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (citation omitted). From there, the Court moved on to whether the Second Amendment

protected their proposed conduct. So the United States cannot rely on *Bruen* to categorically exclude Alston and those like him from the Second Amendment's protections.[7]

What's more, the Supreme Court's statements on who falls within the scope of "the people" for Second Amendment purposes cut against the government's position. For example, the Court began its analysis in *Heller* "with a strong presumption that the Second Amendment right is exercised individually and belongs to *all* Americans." 554 U.S. at 581 (emphasis added). This presumption arose based on a review of similar language throughout the Constitution. The Court explained that each time the Constitution mentions "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. So long as an individual is "part of [the] national community or . . . [has] otherwise developed a sufficient connection with this country to be considered part of that community[,]" the Constitution confers its individual rights—including the right to keep and bear arms—upon him. *Id.* (quoting *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

To agree with the United States, this court would need to understand "the people" in the Second Amendment context differently than it interprets that phrase in every other section of the Constitution. But the Supreme Court has rejected this approach. *See Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.") (citation and internal quotation marks omitted). Courts should thus give "the people" in the Second Amendment

---

[7] Undoubtedly, being a law-abiding citizen has some benefits in the context of a Second Amendment challenge. The Supreme Court has noted that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. But to say that law-abiding citizens stand at the peak of the Second Amendment's protections is not to say that they stand alone.

its most natural (and internally consistent) interpretation—as encompassing all members of the political community.

This court, in other words, must determine whether Alston's drug use and felony indictment remove him from the political community entitled to constitutional protections. The United States has provided no reason to reach that conclusion, and the Supreme Court's guidance discussed above shows that Alston enjoys the same constitutional rights as every other citizen. So the undersigned rejects the United States' argument that Alston falls outside the Second Amendment's protection based solely on his status as a drug user under indictment.[8]

The United States' second argument about Alston's eligibility for Second Amendment rights fares no better. That argument claims that *Bruen*'s approval (in a footnote in the majority opinion and in a concurring opinion by Justice Kavanaugh) of the shall-issue licensing regimes used by most states establishes "that the Second Amendment's protections do not extend to people who are not law-abiding." Resp. Opp'n Mot. Dismiss at 19.

But, once again, *Bruen*'s language does not go as far as the United States would like. The Court approved of shall-issue regimes as a general matter because they "do not require applicants to show an atypical need for armed self-defense," and therefore "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9 (citation and internal quotation marks omitted). Thus, while states cannot give regulators unfettered discretion to determine who can carry a firearm in public, they

---

[8] The conclusion that someone is a member of "the people" described in the Second Amendment does not deprive the government of the ability to restrict the rights protected by that Amendment. Then-Judge Barrett explained this point in her *Kanter* dissent. Mere membership in the national community does not automatically guarantee "the people" unfettered access to guns. *See Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). "Instead," she wrote, "it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.* In other words, while the court may uphold a law because its pedigree traces back to the longstanding historical practices of this nation, it may not simply justify the law by stating that a class of "the people" lacks constitutional protections to begin with.

may condition an applicant's receipt of a public carry license on objective measures like passing a background check or completing a firearms safety course. *Id.* Justice Kavanaugh made similar points. *Id.* at 2162 (Kavanaugh, J., concurring) (noting that shall-issue regimes rely on objective criteria and "do not require a showing of some special need apart from self-defense").

The Court's discussion of shall-issue regimes does two things. First, it reinforces the substantial Second Amendment rights enjoyed by those who qualify as ordinary, law-abiding citizens. And second, it recognizes, in a general sense, that states can restrict the public carry rights of criminals or otherwise irresponsible citizens. It goes no further than that.

And there is no question that shall-issue regimes are subject to constitutional challenges after *Bruen*. The majority noted that individuals can still challenge shall-issue licensing regimes if they are "put toward abusive ends[.]" *Id.* at 2138 n.9 (majority opinion). And Justice Kavanaugh pointed out that "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if" the regime does not operate constitutionally in practice. *Id.* at 2162 (Kavanaugh, J., concurring). So the Supreme Court's general approval of shall-issue licensing regimes does not mean that drug users or those under indictment are excluded from the Second Amendment's protections wholesale.

In sum, *Heller* and *Bruen* may have focused on the rights of law-abiding citizens, but the Second Amendment's protections extend to a broader political community—a community that includes Alston. So the undersigned now turns to whether Alston's particular conduct—receiving and possessing a firearm—is protected by the Second Amendment. If so, the government must establish that its restrictions on Alston's ability to engage in that conduct have a basis in our country's historical tradition of firearms regulation.

### C.     Whether 18 U.S.C. § 922(n)'s Restriction on Alston's Ability to Ship, Receive, or Transport Firearms while Under Felony Indictment Is Constitutional

Alston is charged with violating 18 U.S.C. § 922(n). Indictment at 1, D.E. 11. That statute makes it illegal for anyone "under indictment for a crime punishable by imprisonment for a term exceeding one year" to ship, receive, or transport a firearm or ammunition.[9]

The statute's roots trace back to the 1938 Federal Firearms Act, which barred individuals under federal indictment for a crime of violence from shipping firearms in interstate commerce.[10] 5 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). The FFA aimed to "combat roaming criminals crossing state lines." *United States* v. *Quiroz*, 629 F. Supp. 3d 511, 517 (W.D. Tex. 2022) (citation omitted). Congress amended the statute in 1961, removing the requirement that the charged crime was one of violence. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed).

It later passed the Gun Control Act of 1968 "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence[.]" Pub. L. No. 90–618 § 101, 82 Stat. 1213, 1213 (codified at 18 U.S.C. § 921 et seq.). That statute outlawed the receipt of a firearm by any individual under felony indictment—state or federal. *See* Pub. L. No. 90–618 § 102, 82 Stat. 1213, 1216, 1220. And nearly 20 years later, "Congress combined all prohibitions against persons under indictment into what is now § 922(n)'s current form." *Quiroz*, 629 F. Supp. 3d at 518.

Alston concedes that his state indictment implicates § 922(n). *See* Mot. Dismiss at 23. And although his conduct—receiving a firearm—enjoys presumptive Second Amendment protection,

---

[9] The statute also requires that the action have a nexus to interstate or foreign commerce. 18 U.S.C. § 922(n).

[10] The FFA also made it a crime to ship firearms to individuals who the seller had reason to believe were under indictment.

the government has shown that § 922(n) is constitutional because it is part of a longstanding tradition of restricting the rights of those under indictment.

> **1.    Does Alston's Alleged Conduct Fall Within the Second Amendment's Protections?**

As discussed above, Alston is a member of "the people" protected by the Second Amendment. Under § 922(n), his conduct at issue is the receipt of a firearm. This conduct enjoys presumptive Second Amendment protection. As a logical matter, it is impossible to "keep" or "bear" arms without first receiving them. If the Second Amendment protects the possession and use of firearms, it must also protect their acquisition—otherwise, the Amendment would protect nothing at all. *See, e.g.*, *Teixeira* v. *Cnty. of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017); *Ezell*, 651 F.3d at 704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use[.]"). Thus, the government must prove that this nation's historical tradition justifies the statute. *Bruen*, 142 S. Ct. at 2126.

> **2.    Is the United States' Regulation of Alston's Conduct Under § 922(n) Consistent with the Nation's Historical Tradition of Firearms Regulation?**

The United States points to two historical analogues to support § 922(n)'s constitutionality. First, it relies on the historical practice of detaining indicted defendants before trial. Resp. Opp'n Mot. Dismiss at 25–28. And second, it maintains that there is a historical tradition of disarming those seen as dangerous or untrustworthy.[11] *Id.* at 28–31.

*Bruen* instructs that, when considering a statute's constitutionality under the Second Amendment, courts must assess whether the government has shown that the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

---

[11] Because the government's first argument on this point is persuasive, the undersigned will not (at this point) address the dangerousness argument.

In this case, the United States has not pointed to any laws explicitly restricting the ability of those under indictment to ship, receive, or transfer firearms or ammunition.

Instead, the government argues that the burdens imposed by laws allowing pretrial detention of indicted defendants are sufficiently analogous to justify § 922(n)'s constitutionality. *See* Resp. Opp'n Mot. Dismiss at 30–31. While some defendants were allowed out on bond while they awaited trial, there is no evidence that defendants had a constitutional right to bail. And if the government had the ability to completely deprive a defendant of his liberty ahead of trial, it stands to reason that it had the ability to impose lesser restrictions on a defendant's conduct, such as restricting a defendant's right to ship, receive, or transport firearms while awaiting trial. The undersigned agrees.

Since the English Bill of Rights was enacted, the government has been able to detain those accused of serious crimes—whether violent of not—before trial. *See Carlson* v. *Landon*, 342 U.S. 524, 545–46 (1952). In England, for example, nonviolent crimes like "embezzling or destroying the king's armor or warlike stores" worth more than 20 shillings and counterfeiting certain coins were felonies punishable by death. *See* 4 William Blackstone, Commentaries on the Laws of England 94, 98–99, 101 (Cooley ed. 1871). And "[i]n felonies," Blackstone wrote, "no bail [could] be a security equivalent to the actual custody of the person." *Id.* at 296. Even in non-felony cases, Parliament had the authority to mandate that those accused of certain crimes be detained before trial. *Id.* at 297 ("Regularly, in all offences either against the common law or act of parliament, that are below felony, the offender ought to be admitted to bail, unless it be prohibited by some special act of parliament.").

English justices of the peace, therefore, had no authority to release murderers, arsonists, or those suspected of treason before trial. *Id.* at 297–98. But they had some discretion to bail

"[p]ersons charged with other felonies, or manifest and enormous offences, not being of good fame[.]" *Id.* at 298. Unlike justices of the peace, the court of king's bench could bail those suspected "of any crime whatsoever . . . according to the facts of the case." *Id.*

Taken together, English practice suggests that a person under felony indictment had no fundamental right to bail, but he could be released based on an individual assessment of his situation in some cases. And even if a presumptive right to bail for less serious crimes existed, Parliament could abrogate it by statute.

The American federal government largely inherited this tradition. The Judiciary Act of 1789 created a statutory right to bail "except where the punishment may be death[.]" Ch. 20, § 33, 1 Stat. 73, 91. In capital cases, the Act allowed judges to exercise discretion over pretrial release based on "the nature and circumstances of the offense, and of the evidence[.]" *Id.*

The Eighth Amendment's ratification in 1791 did not limit the government's authority in this area. Although the Eighth Amendment prohibits excessive bail, it "fails to say all arrests must be bailable." *Carlson*, 342 U.S. at 546; *see also Salerno*, 481 U.S. at 754 ("The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil."). So it was Congress—not the Constitution—that determined "the classes of cases in which bail shall be allowed in this country." *Carlson*, 342 U.S. 545.

History from both England and the founding era establish the government's authority to immediately and totally deprive someone under felony indictment of their liberty pending trial. Any right to pretrial release was a matter of legislative grace—not constitutional mandate.

But that still leaves whether this historical practice is an appropriate analogue for § 922(n).

To resolve this question, *Bruen* instructs courts to consider "how and why" the modern regulation and its purported historical analogue burden the right to self-defense. 142 S. Ct. at 2133. The court's "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified[.]" *Id.* (cleaned up).

On the question of comparable burden on the right of armed self-defense, §922(n) fares well when compared to the historical practice of pretrial detention for serious crimes. Pretrial detention burdened an individual's right to keep and bear arms completely, though temporarily. People in prison cannot possess guns, but founding-era defendants could re-arm themselves if they were acquitted (or, often, convicted). *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009) ("[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I.").

Section 922(n), on the other hand, provides a more limited restriction on a defendant's right to self-defense. While he cannot obtain new firearms while under indictment, the statute does not prohibit him from retaining a firearm he already possesses and using it for self-defense. At worst, § 922(n) imposes an equal burden on a defendant's right to armed self-defense when compared to pretrial detention. If someone comes under indictment without already possessing a gun, he will not be able to obtain one under the statute. But in the aggregate, § 922(n) imposes a lesser burden than pretrial incarceration because those who already own firearms can retain them.

And both the historical practice of pretrial detention and §922(n) find their justification from the same source: a grand jury's formal accusation that there is probable cause to believe the defendant committed a serious crime. That accusation—memorialized by an indictment— fundamentally alters the relationship between the state and the accused. The most extreme effect

of an indictment is that it allows the state to "immediately depriv[e] the accused of her freedom." *Kaley* v. *United States*, 571 U.S. 320, 329 (2014). And if an indictment can justify a total and immediate deprivation of liberty, it also justifies lesser deprivations—like limiting a defendant's ability to ship, transport, or receive a firearm. *See id.*

Compared to this nation's historical tradition of allowing pretrial detention for serious offenses, § 922(n) imposes a lesser overall burden on the right to armed self-defense. And like pretrial detention, § 922(n) requires a finding of probable cause by a grand jury before it can restrict an indicted individual's liberties. Put differently, the challenged statute accomplishes a similar "why" through a less restrictive "how." So while the United States has not identified a "historical twin" for § 922(n), it has established that the historical system of pretrial detention in founding-era America is "analogous enough to pass constitutional muster." *Bruen*, 142. S. Ct. at 2133 (emphasis removed). Thus, the court should deny Alston's motion to dismiss the first count of his indictment.

### D.      Whether § 922(g)(3)'s Restriction on Alston's Ability to Possess a Firearm Due to His Regular Drug Use Is Constitutional

The indictment's second charge alleges that Alston violated the federal prohibition on possession of a firearm by anyone who is "an unlawful user of [or] addicted to any controlled substance[.]" Indictment at 1 (quoting 18 U.S.C. § 922(g)(3)). Federal courts have concluded that "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people." *United States* v. *Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (citations omitted). And in its attempt to "suppress[] armed violence[,]" Congress concluded that drug users are too risky to possess firearms. *Id.* at 684.

Although the statute does not define "unlawful user," courts of appeal have generally required the government to prove that the defendant regularly used controlled substances, did so

for a long time, and possessed a firearm near the time of drug use. *See, e.g.*, *United States* v. *Tanco-Baez*, 942 F.3d 7, 15 (1st Cir. 2019) (finding that the government must prove "(1) the defendant used controlled substances regularly, (2) that the use took place over a long period of time, and (3) that the use was proximate to or contemporaneous with his possession of a firearm") (citations omitted); *see also United States* v. *Bowens*, 938 F.3d 790, 793–94 (6th Cir. 2019) ("[T]he Government needed to prove that the defendants were regular and repeated users of marijuana[.]") (citation omitted); *United States* v. *Purdy*, 264 F.3d 809, 812 (9th Cir. 2001) (explaining that drug use must be "consistent, prolonged, and close in time to [the defendant's] gun possession") (citation and internal quotation marks omitted). *But see United States* v. *Carnes*, 22 F.4th 743, 749 (8th Cir. 2022) (requiring the government to prove that the defendant "was actively engaged in the use of a controlled substance during the time he possessed firearms").

Alston admitted to ATF agents that he uses marijuana (a controlled substance under federal law) daily. Thus, the undersigned assumes that he is an "unlawful user" or drug addict under § 922(g)(3).[12] He also does not dispute that he possessed a firearm. *See* Mot. Dismiss at 8.

Alston's conduct—possessing a firearm—implicates the Second Amendment and is entitled to presumptive protection. And the government has identified no suitable historical analogue justifying its prohibition on unlawful users of controlled substances (or drug addicts) possessing firearms.

### 1.    Does Alston's Alleged Conduct Fall Within the Second Amendment's Protections?

Because Alston is a member of "the people" who enjoy Second Amendment protection, the court need only determine whether § 922(g)(3)'s prohibition on possession burdens conduct

---

[12] The conclusion that Alston is an "unlawful user" or drug addict for the purposes of his facial challenge to § 922(g)(3) does not affect whether he is an "unlawful user" or drug addict at any later stage of his case.

protected by the Amendment. It does. In both *Heller* and *Bruen*, the Supreme Court made clear that the Second Amendment protects an individual's right to possess firearms. *See Heller*, 554 U.S. at 636 (establishing that Americans have a right to keep handguns in their homes for self-defense); *Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not a second-class right[.]") (citation and internal quotation marks omitted). Thus, to justify § 922(g)(3), the government must supply the court with an appropriate historical analogue.

### 2. Is the United States' Regulation of Alston's Conduct Under § 922(g)(3) Consistent with the Nation's Historical Tradition of Firearms Regulation?

The United States contends that three historical practices are similar enough to § 922(g)(3) to render the statute constitutional. First, it claims that the statute is similar to laws detaining the mentally ill. Resp. Opp'n Mot. Dismiss at 12–13. It then alleges that the statute is similar to early American laws regulating gun use while intoxicated. *Id.* at 13–16. And the government's final justification for § 922(g)(3) is a bit of a catch-all—it maintains that the legislature has long had the power to disarm "individuals deemed to be dangerous or risky[.]" *Id.* at 16. By the government's own admission, "none of the pre-twentieth century historical analogues are a 'dead ringer' or 'historical twin' for 18 U.S.C. § 922(g)(3)." *Id.* (quoting *Bruen*, 142 S. Ct. at 2133). Still, it asks the court to find that its cited sources are "analogous enough . . . to pass constitutional muster." *Id.* (quoting *Bruen*, 142 S. Ct. at 2133).

### a) The Mentally Ill

The United States first alleges that "longstanding prohibitions on the possession of firearms by . . . the mentally ill" may serve as a proper historical analogue to § 922(g)(3). *Id.* at 12 (quoting *Heller*, 554 U.S. at 626). "Although being under the influence of a controlled substance is not tantamount to mental illness," the government contends, "both conditions can render a person

incapable of safely and responsibly possessing a firearm." *Id.* As historical support for this argument, it cites one piece of scholarship discussing English practice, several sources suggesting that the founders equated drunkenness with madness, and four court cases (three of which are nonbinding).

The government's analysis begins with English history. "In England," it contends, "justices of the peace could lock up dangerous lunatics and seize their property." *Id.* (citing Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1880)*, 19 L. & Soc'y Rev. 487 (1985)). Moran's article is the sole source the United States provides for this assertion. The piece centers around the trial (and successful insanity plea) of one man—James Hadfield—after he was charged with treason for attempting to murder King George III in 1800. *See* Moran, *supra*, at 492–508. Before Hadfield's trial, the criminally insane were rarely detained. *See id.* at 515. But the outrage that ensued after his acquittal prompted Parliament to pass the Criminal Lunatics Act of 1800, which "formalized the detention of alleged offenders otherwise beyond the statutory reach of the criminal law." *Id.* Among other things, the law allowed for the detention of any individual "who, upon arraignment, [was] found to be insane." *Id.* at 513.

Although the government makes no direct reference to it, Moran's article does briefly discuss at least one statute passed before the ratification of the Second Amendment: the Vagrancy Act of 1744. *See id.* at 488, 509–10. That law, passed by Parliament, provided that "it shall and may be lawful for any two or more Justices of the Peace, where such Lunatick or mad person shall be found . . . to cause such Person to be apprehended, and kept safely locked up in some secure Place" for treatment. 17 Geo. 2, c. 5, § 20.

Once a mentally unstable person was detained, the Act allowed local officials to deport the "Lunatick" to his place of legal residence. *Id.* The authorities could also seize a limited amount of

his property to pay for his removal, lodging, and treatment. *Id.* The individual could be detained only for as long "as such Lunacy or Madness shall continue[,]" and the cost of keeping, relocating, and curing him had to be "proved upon Oath" before his property could be seized. *Id.* But the Act did not mandate prison time or removal—as an alternative, it provided that "any Friend or Relation of such Lunaticks" could "take them under their own Care and Protection" if they so chose. *Id.* § 21.

The United States cites to two pre-*Bruen* circuit court cases to suggest that, like English officials, 18th-century American justices of the peace could lock up lunatics the community considered dangerous. Resp. Opp'n Mot. Dismiss at 12 (citing *Yancey*, 621 F.3d at 685; *Beers* v. *Att'y Gen. of the U.S.*, 927 F.3d 150, 157 (3rd Cir. 2019), *vacated*, 140 S. Ct. 2758 (2020)). These cases, in turn, both cite a single law review article claiming that, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Jud. Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (quoting Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774)).

*English Liberties*, which lies at the bottom of this pile of citations, does not go as far as the government suggests. The line of scholarship (and resulting caselaw) discussed above traces back to a single page in the piece, which provides a template "Warrant to Secure a Lunatic." Care, *supra*, at 329. The example warrant is not American in origin—it, alongside over 100 pages of other stock documents, was drafted by an English legal scholar named Dr. Richard Burn. *Id.* at 246. These templates were included in *English Liberties* "[f]or the help and improvement of Justices of the Peace[.]" *Id.*

Unsurprisingly, then, the template "Warrant to Secure a Lunatic" largely mirrors the English practice under the Vagrancy Act of 1744. Two witnesses had to swear an oath that the suspect was "by lunacy so far disordered in his senses, that he [was] dangerous to be permitted to go abroad[.]" *Id.* at 329. Upon that showing, the warrant ordered officials to apprehend the suspect and place him into the care of a third-party—not a government detention facility—"only so long as such lunacy or disorder shall continue, and no longer." *Id.* And the third party was entitled to a "reasonable allowance" from the suspect for housing him. *Id.*

The government bears the burden of identifying a historical analogue that justifies § 922(g)(3). *Bruen*, 142 S. Ct. at 2127. But neither *English Liberties* (which does not appear in the government's brief) nor the scholarship and cases that cite it show that the stock "Warrant to Secure a Lunatic" (or anything like it) saw use in the American colonies. *See id.* at 2149 (discounting the analogical value of surety laws because the government "offer[ed] little evidence that authorities ever enforced" them). Even if the colonies did import mid-18th-century English practice governing the detention of the insane, however, this tradition cannot serve as a suitable historical analogue to § 922(g)(3).

First, the laws serve different purposes. Broadly understood, both the Vagrancy Act of 1744 and § 922(g)(3) are intended to promote public safety. Beyond this highly general similarity, however, the laws address different societal problems. Most obviously, the historical practices discussed above did not attempt to regulate firearms or other weapons. Instead, the Vagrancy Act of 1744 sought to remedy the danger posed to society when someone falls victim to temporary insanity. Section 922(g)(3), by contrast, aims to disarm all individuals who regularly use controlled substances.

Compared to the English law, § 922(g)(3) is both over-and-underinclusive—many people who use controlled substances are not so irrational that they cannot function in society generally, and many severely mentally ill people are not unlawful users of controlled substances. Thus, the laws seek to remedy different problems and target different subsects of the people.

The United States concedes that "being under the influence of a controlled substance is not tantamount to mental illness[.]" Resp. Opp'n Mot. Dismiss at 12. It maintains, however, that "both conditions can render a person incapable of safely and responsibly possessing a firearm." *Id.*

This may be true. But the government cites no examples of early American laws or traditions that treated the intoxicated and the insane similarly. Instead, the United States cites a book written by Benjamin Rush that "equated drunkenness with a temporary fit of madness" and a more recent work that claims 18th-century commentators "designated habitual drinking as a form of insanity." *Id.* at 12–13 (citations and internal quotation marks omitted). The scattered opinions of a few founding-era observers—whose private thoughts on drinking were not codified into law— do not shed meaningful light on the historical pedigree of § 922(g)(3).

But even if the court finds that the laws serve the same purpose, § 922(g)(3)'s operation bears little resemblance to the Vagrancy Act of 1744 (or any early-American practice that traces back to it). Under English law, if a mentally ill individual imperiled the community, he could be deported to his location of origin or detained—but only until his fit of madness wore off. *See* 17 Geo. 2, c. 5, § 20; Care, *supra*, at 329. In fact, neither the Vagrancy Act of 1744 nor the template warrant in *English Liberties* mandated incarceration at all—both allowed the mentally ill individual to be placed with a willing third party rather than serve time in jail. *See* 17 Geo. 2, c. 5, § 21; Care, *supra*, at 329. And while the individual's property could be seized, the seizure was limited to assets necessary to pay back the costs of detaining, relocating, and curing him. *See* 17

Geo. 2, c. 5, § 20; Care, *supra*, at 329. None of the individual's possessions—including his weapons—could be taken simply because the government thought he was too dangerous to own them.

Section 922(g)(3), by comparison, punishes a broader swath of conduct and does so more severely. While English law only allowed officials to apprehend those who were experiencing a mental break, § 922(g)(3) allows the government to disarm and punish all unlawful users of a controlled substance regardless of their sobriety or mental acuity at the time they possessed a firearm. A person who uses controlled substances and owns a gun—but never mixes the two—could be convicted under the statute. Thus, even if intoxication is like a "temporary fit of madness," *see* Resp. Opp'n Mot. Dismiss at 12 (quotation omitted), § 922(g)(3) allows the government to prosecute individuals for possessing a firearm when they are not "mad." Section 922(g)(3) also imposes up to 15 years in prison for its violation.[13] *See* 28 U.S.C. § 924(a)(8). This is a far cry from the punishments contemplated by the Vagrancy Act of 1744 and the template warrant in *English Liberties*, which only authorized detention until the fit of lunacy subsided.

This is not to say that those at risk of a mental breakdown may enjoy unfettered access to firearms. But Congress has already enacted a law curbing access to firearms by the mentally unwell. The United States Code prohibits anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing a gun. 18 U.S.C. § 922(g)(4). Drug users and the mentally ill are distinct (if sometimes overlapping) subsections of the people. The legislature, in enacting both § 922(g)(3) and § 922(g)(4), recognized this difference. So even if regulations preventing the mentally ill from possessing firearms are "presumptively lawful[,]"

---

[13] If the defendant has three previous convictions for a violent felony or serious drug offence, the court must impose at least a 15-year sentence and can sentence an offender to life in prison. 18 U.S.C. § 924(e)(1).

*Heller*, 554 U.S. at 626 n.26, the government still bears the burden of showing why this lawfulness extends to § 922(g)(3). It has not done so here.

In sum, English and colonial American traditions regulating the mentally ill differ from § 922(g)(3) in both purpose and operation. The government has not identified "a well-established and representative historical analogue," *Bruen*, 142 S. Ct. at 2133 (emphasis removed), for § 922(g)(3) arising out of these regulations.

### b)    The Intoxicated

The government next maintains that § 922(g)(3) is analogous "to historical laws that prohibited carrying a firearm while under the influence of alcohol." Resp. Opp'n Mot. Dismiss at 13. It cites three founding-era laws, a handful of Reconstruction-era acts, and several state statutes enacted since 1931. *See id.* at 13–15. The undersigned will discuss the laws from each historical era in turn.

The three founding-era laws the government offers as historical analogues for § 922(g)(3), broadly speaking, prevented people from discharging firearms or possessing them in public while drunk. *See id.* at 13. First, in 1655, colonial Virginia criminalized "shoot[ing] any gunns at drinkeing" unless the shooting took place at a marriage or a funeral. 1 William Hening, *Statutes At Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 401–02 (1823). A violation of this act carried with it no carceral penalty—instead, the offender had to forfeit 100 pounds of tobacco to the colonial militia. *Id.* Second, shortly before the founding, New York imposed a fine of 20 shillings on anyone who discharged a firearm in residential areas on New Year's Eve and the first two days of January, fearing that intoxicated colonists would cause damage in their revelry. Ch. 1501, 5 Colonial Laws of New York 244–46 (1984). And third, a 1746 New Jersey statute provided that soldiers could have their weapons taken

away if they showed up to training "in Arms disguised in Liquor[.]" Samuel Allinson, *Acts of the Gen. Assembly of the Province of New-Jersey* 140 (1776). If the soldier did appear intoxicated at training, he could be placed under supervision and fined. *Id.* at 141.

Taken together, these laws fail to serve as a historical analogue to § 922(g)(3) for two reasons.

First, in *Bruen*, the Supreme Court cast doubt on the notion that a few isolated colonial laws can establish a robust historical practice. *See* 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original). Here, the government can point to only three statutes passed within a span of more than 100 years of colonial history regulating the use of firearms while intoxicated. Such a spotty historical tradition cannot form a firm foundation for § 922(g)(3).

Second—and more fundamentally—these laws did not burden conduct protected by the Second Amendment in a similar way to § 922(g)(3). At the highest level of abstraction, both the colonial laws and § 922(g)(3) get at the same "why": drugs and guns don't mix. But the similarities end there. The Virginia law was enacted to make sure colonists knew when their settlement was under attack,[14] and the New Jersey law aimed to ensure the orderly functioning of the militia.[15]

Understood broadly, § 922(g)(3) also seeks to prevent the intersection of intoxicants and firearms. But the challenged statute goes further: it attempts to promote general safety by completely disarming all individuals who frequently use drugs. Put differently, while the three

---

[14] When the Virginia law was passed, colonists warned others about impending Indian attacks by discharging weapons. The government banned "shoot[ing] any gunns at drinkeing" because it feared that colonists would be unable to differentiate between warning shots and drunken volleys. *See* Hening, *supra*, at 401. It also worried that colonists were wasting gunpowder "in vaine, that might be reserved" for conflicts with Native Americans. *Id.*

[15] The New Jersey restriction discussed above was part of a colonial statute entitled "An Act for Better Settling and Regulating the Militia of This Colony of New-Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions." *See* Allinson, *supra*, at 139.

J.A. 205

colonial acts were passed to prevent the simultaneous use of drugs and guns, § 922(g)(3) seeks to prevent the potential combination of drugs and guns generally.

But even if the colonial laws and § 922(g)(3) strike at the same "why," the methods they employ to prevent the interaction of drugs and guns are patently different. None of the three colonial statutes prohibited intoxicated individuals—much less those who are habitually, though not presently, intoxicated—from possessing weapons. The Virginia law only criminalized firing weapons while drinking, and it made exceptions for weddings and funerals. The New York law prohibited everyone (intoxicated or sober) from firing weapons in certain locations for three days out of the year. And while the New Jersey law barred individuals from showing up to military training drunk, it only applied to soldiers. The act neither prevented the average citizen from discharging weapons while intoxicated nor prohibited soldiers from shooting guns while drinking outside of training. And not one of the three laws imposed incarceration or disarmament for violation—each, at most, carried with it a fine.

Compared to these historical regulations, § 922(g)(3)'s sweep is staggering. Unlike the colonial laws, which sought to prohibit the active combination of liquor and firearms, the challenged statute completely prohibits individuals from possessing firearms based solely on their status as an "unlawful user" of controlled substances. In other words, it doesn't matter whether the individual was intoxicated when he possessed a gun.

Section 922(g)(3) is also far more punitive—as discussed above, those who violate it can spend years in prison. *See* 18 U.S.C. § 924(e)(1). Put simply, the operation of § 922(g)(3) bears little resemblance to the colonial laws regulating the intersection of guns and intoxicants. The challenged statute applies to those who are not presently intoxicated, and it imposes a complete

ban on gun possession. The three colonial acts regulating firearm use while drinking are not "analogous enough" to § 922(g)(3) "to pass constitutional muster." *Bruen*, 142. S. Ct. at 2133.

The government next points to a handful of Reconstruction-era laws to justify § 922(g)(3). *See* Resp. Opp'n Mot. Dismiss at 14. In *Bruen*, the Court did not settle the analogical value of laws passed near the ratification of the Fourteenth Amendment. 142 S. Ct. at 2137–38; *id.* at 2163 (Barrett, J., concurring). It did, however, note that "post-Civil War discussions of the right to keep and bear arms . . . 'do not provide as much insight into [the Second Amendment's] original meaning as earlier sources.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614). And these discussions are of even less value here than in *Bruen* because § 922(g)(3) is a creature of federal, not state, law. The original public meaning of the Second Amendment, as applied to the federal government's actions, was fixed upon the Constitution's ratification in 1791—not the Fourteenth Amendment's ratification in 1868. *Id.* at 2132 (explaining that the Constitution's "meaning is fixed according to the understandings of those who ratified it") (citation omitted). Thus, when assessing federal laws, courts should give less weight to laws from the mid-to-late-1800s than they give to laws from the founding era.

But even if the government's proffered Reconstruction-era laws were entitled to full weight, they fail to support § 923(g)(3)'s constitutionality. The United States cites to six state laws that barred "intoxicated persons from possessing, using, or receiving firearms." Resp. Opp'n Mot. Dismiss at 14. But like the colonial laws discussed above, these statutes only targeted the *active* combination of alcohol and guns. *See* Kan. Gen. Stat., Crimes & Punishments § 282 (1868) (prohibiting "any person under the influence of intoxicating drink" from "carrying on his person a pistol, bowie-knife, dirk or other deadly weapon" in the state); 1878 Miss. Laws 175–76, § 2 (criminalizing the sale of pistols and pistol cartridges to the intoxicated); 1883 Mo. Laws 76, § 1

(outlawing the concealed carry of deadly weapons while intoxicated); 1883 Wis. Sess. Laws 290, ch. 329, § 3 ("It shall be unlawful for any person, in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (prohibiting public officers from carrying arms while intoxicated); 1899 S.C. Acts 97, no. 67, § 1 (prohibiting intoxicated individuals—or those pretending to be intoxicated—from "discharg[ing] any gun, pistol, or other firearms while upon or within fifty yards of any public road, except upon his own premises").

Like the colonial statutes discussed above, none of the Reconstruction-era laws imposed a total ban on firearm possession for those who drink. Instead, they prohibit specific conduct *while* drunk: purchasing a firearm or carrying it in public. And while some of these laws contemplated prison sentences for their violation, none was nearly as severe as § 922(g)(3). *See, e.g.*, 1899 S.C. Acts 97, no. 67, § 1 (misdemeanor with maximum sentence of 30 days); Kan. Gen. Stat., Crimes & Punishments § 282 (1868) (misdemeanor with maximum sentence of three months); 1878 Miss. Laws 175–76, § 2 (requiring violators to pay a fine and, if they refused, to complete hard labor). Thus, the Reconstruction-era laws the government cites undermine—rather than bolster—the validity of § 922(g)(3).

Finally, the United States offers several 20th-century laws that allegedly support § 922(g)(3)'s constitutionality. *See* Resp. Opp'n Mot. Dismiss at 15–16. But the further the government strays from the founding, the less potent its examples become. The court should give little—if any—weight to state statutes passed in the 1900s if they conflict with earlier understandings of the Second Amendment. *See Bruen*, 142 S. Ct. at 2154 n.28 ("[T]he 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

That is the case here. The government cites laws from five states and the District of Columbia prohibiting the sale of firearms to drug addicts—the earliest of which was passed in 1931. *See* Resp. Opp'n Mot. Dismiss at 15. It also remarks that, in the present day, at least 27 jurisdictions "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Id.* (quoting *Yancey*, 621 F.3d at 684). But present practice does not necessarily inform historical understanding, and the modern laws the government offers in support of § 922(g)(3) conflict with this nation's traditions closer to the founding.

In 1931, Pennsylvania became the first state to criminalize "deliver[ing] a firearm . . . to one who he has reasonable cause to believe . . . is a drug addict[.]" 1931 Pa. Laws 499, no. 158, § 8. Within the next several years, other jurisdictions followed suit. *See* 47 Stat. 652 § 7 (1932) (D.C.) (prohibiting sale of firearms to drug addicts); 1936 Ala. Laws 52, no. 82, § 8 (criminalizing the delivery of pistols to drug addicts and habitual drunkards); 1935 S.D. Sess. Laws 356, ch. 208, § 8 (same); 1935 Wash. Sess. Laws 601, ch. 172, § 8 (same).

These laws were the first in the nation's history to condition an individual's ability to receive a firearm on his status as someone who is not addicted to drugs or alcohol. The government has provided no evidence that, before 1931, citizens could have their ability to bear arms entirely curtailed because they use intoxicants. While earlier laws might support the proposition that the actively intoxicated may be disarmed and punished, they did not wholly foreclose those who use intoxicants from possessing guns when they were sober. This is a significant departure from historical practice—the 20th-century laws sweep more broadly, and they target an individual's status as a drug user generally rather than his specific, irresponsible use of firearms themselves.

Thus, the 1931 Pennsylvania law and its progeny cannot inform the court's view on the historical protections of the Second Amendment.[16]

Surveying the government's historical record in its entirety, the undersigned cannot conclude that it has identified a tradition of disarming the intoxicated that can serve as a proper analogue for § 922(g)(3).

### c)     The Dangerous

Finally, the United States contends that the court should uphold § 923(g)(3) because the government has long held the power to disarm "individuals deemed to be dangerous or risky[.]" Resp. Opp'n Mot. Dismiss at 16. This argument—which spans less than a page—does not give the court much to work with. Despite bearing the burden of identifying a discreet analogue to justify § 922(g)(3), the government makes only one passing reference to a historical source on disarming the dangerous in its discussion of the challenged statute. Instead, its argument hinges on caselaw—most of which is not binding on this court.

Later in its brief, the government cites some primary sources on regulating the dangerous to justify § 922(n). *Id.* at 28–31. It does not, however, offer any argument at all to suggest that these sources may serve as an analogue to § 922(g)(3). Out of an abundance of caution, the undersigned will look to the handful of cases the government cites in its discussion of § 922(g)(3) as well as the sources it provides when justifying § 922(n) to determine whether it has identified a historical analogue to § 922(g)(3).

Citing two pre-*Bruen* Seventh Circuit cases and *Bruen* itself, the United States contends that historical practice supports disarming of the dangerous. *Id.* at 16. The government begins by

---

[16] These laws also regulate different conduct than § 922(g)(3). While the challenged statute imposes criminal liability on drug users who receive, possess, or transfer a firearm, the 1930s laws only targeted individuals who transferred a firearm *to* a drug user. Thus, even if the court did find these statutes informative, it is unclear whether they are sufficiently analogous to support § 922(g)(3)—which targets the drug user himself.

referencing then-Judge Barrett's dissent in *Kanter*, in which she found that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." 919 F.3d at 454 (Barrett, J., dissenting). The Supreme Court allegedly recognized that the dangerous may be disarmed in *Bruen* because the Court cited a mid-1880s decree from General Daniel Edgar Sickles claiming that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." 142 S. Ct. at 2152 (quoting Cong. Globe, 39th Cong., 1st Sess., at 908–09). And to link dangerousness with drug use, the government cites *Yancey*, in which the Seventh Circuit found that Congress passed § 922(g) "to keep guns out of the hands of presumptively risky people" and prevent "armed violence." 621 F.3d at 683 (citations omitted).

But in the nation's infancy, not all sources of danger received equal legislative treatment. Upon closer inspection, founding-era laws disarming the dangerous centered around a single *type* of danger: threats to state security. *See* Marshall, *supra*, at 727–28 ("[T]o the extent that one can distill any guidance from the . . . Revolutionary disarmament, it would seem at most to be that persons who by their actions . . . betray a likelihood of violence *against the state* may be disarmed.") (emphasis added). As the government points out in its discussion of § 922(n), six of the former colonies allowed authorities to confiscate weapons owned by those who would not swear an oath of allegiance to the new nation. Resp. Opp'n Mot. Dismiss at 29 (collecting laws); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020) ("Most disarmament efforts during the colonial period targeted disaffected persons.").

At least two colonies, following English practice, specifically targeted Catholics. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (citing Robert H. Churchill, *Gun Regulation, the*

*Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007); Alexander DeConde, *Gun Violence in America* 22–23 (2001)). But unlike in England, colonial Catholics who swore an oath of allegiance to the new nation could keep their weapons.[17] *See* Churchill, *supra*, at 157.

As then-Judge Barrett pointed out in *Kanter*, the oaths of allegiance were meant to "deal with the potential threat coming from armed citizens who remained loyal to" the crown. 919 F.3d at 457 (Barrett, J., dissenting) (quoting Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)). Once colonial governments were satisfied that their citizens supported rule from this side of the pond, they allowed disfavored individuals to regain their right to bear arms.[18] *See id.*; Greenlee, *supra*, at 268 ("[O]nce the perceived danger abated, the arms disability was often lifted.").

Other groups were not so lucky. Slaves and Native Americans, for instance, were "disarmed as a matter of course" because early American governments feared that they might use firearms to rebel. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (citations omitted). What's more, at the time of the Second Amendment's ratification, these groups may have fallen outside "the people" who receive constitutional protections altogether.[19] *See McDonald*, 561 U.S. at 822 (Thomas, J., concurring in part & concurring in the judgment) ("[The Fourteenth Amendment]

---

[17] And even while under English rule, some colonial governments allowed the potentially politically disloyal to retain enough weapons to protect themselves and their homes. *See, e.g.*, 7 William Hening, *Statutes At Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 35–36 (1820).

[18] In theory, 18 U.S.C. § 925(c) allows an American stripped of his Second Amendment rights under § 922 to petition for their reinstatement. That statute provides that "[a] person who is prohibited from possessing, shipping, transporting, or receiving firearms or ammunition may make application to the Attorney General for relief from the disabilities imposed by Federal [firearms] laws[.]" *Id.* And if the Attorney General denies someone's application, he may seek relief in the courts. *Id.* But Congress has prohibited the Executive Branch from using appropriated funds "to investigate or act upon applications for relief from [f]ederal firearms disabilities under" § 925(c) for more than 30 years. Consolidated Appropriations Act, 2022, Pub. L. No. 117–103, 136 Stat. 49; *United States* v. *Bean*, 537 U.S. 71, 74–76 (2002). And without the Attorney General's denial of a petition, federal courts lack jurisdiction to grant the relief § 925(c) allows. *Bean*, 537 U.S. at 75–78. Thus, while this rights-restoration provision exists in theory, it is illusory in practice.

[19] Such race- and faith-based constitutional deprivations would not pass muster today.

overruled *Dred Scott*'s holding that blacks were not citizens of either the United States or their own State and, thus, did not enjoy the privileges and immunities of citizens embodied in the Constitution.") (citation and internal quotation marks omitted); Indian Citizenship Act of 1924, Pub. L. No. 68–175, 43 Stat. 253 (1924) (granting citizenship to non-citizen Indians born within the United States).

The United States identifies no founding-era gun law that supports disarming a member of "the people" based on general public safety concerns rather than the threat of armed rebellion.[20] *Cf. Kanter,* 919 F.3d at 454 (Barrett, J., dissenting) ("The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws."). It does, however, contend that two ratification debates before the Second Amendment's adoption "confirm the founders' belief that disarming select groups for the sake of public safety was compatible with the right to arms[.]" Resp. Opp'n Mot. Dismiss at 29 (quotation omitted).

First is the Pennsylvania ratification convention minority's dissent,[21] which argued "[t]hat the people have a right to bear arms for the defence of themselves . . . unless for crimes committed, or real danger of public injury from individuals[.]" 2 Bernard Schwarz, *The Bill of Rights: A Documentary History* 665 (1971). Second, the government points to a proposed amendment

---

[20] While the United States does maintain that "gun safety regulation was commonplace in the colonies," Resp. Opp'n Mot. Dismiss at 28 (quotation omitted), it does not identify any colonial laws that step beyond the fledgling nation's interest in protecting itself from armed rebellion. To be sure, some public safety firearm regulations did exist near the founding—scholarship has identified Revolution-era laws governing the militia, firearms registries, and the storage of gun powder. *See, e.g.*, Cornell & DeDino, *supra*, at 505–512 (cataloguing various early American laws). And in the antebellum era, some states limited the right to concealed carry and imposed time, place, and manner restrictions on gun use. *See id.* at 512–16 (same). But these laws have no apparent nexus to § 922(g)(3), which may explain the government's decision to argue in generalities rather than cite specific regulations.

[21] In *Heller*, the Supreme Court called this proposal "highly influential[,]" but this was in the context of the Court's conclusion that the Second Amendment protects an individual right rather than one tied to militia membership. 554 U.S. at 604.

suggested by Samuel Adams at the Massachusetts ratification convention urging "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms[.]" *Id.* at 681.

Although these two proposals advocated for a more constrained reading of the Second Amendment, their historical value is murky. As then-Judge Barrett explained in *Kanter*, neither proposal made its way into the Second Amendment—they didn't even carry a majority of their conventions. *See* 919 F.3d at 455 (Barrett, J., dissenting).

What's more, "proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion." *Id.* (citing Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 222 (1983)). And none of the four state constitutions enacted before the Second Amendment's ratification that included a provision analogous to the Amendment contained exclusions based on dangerousness or criminal history. *Id.* (citing Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006)). Thus, while these two minority proposals indicate that some Americans viewed the Second Amendment as implicitly recognizing exceptions for the violent or the criminal, they do not suggest that this was the prevailing interpretation of the Amendment's text.

Taken together, the founding- and antebellum-era sources that the government points to can be summarized as follows: Laws that disarmed loyalists, Catholics, slaves, and Native Americans did so largely to prevent armed rebellion. Both slaves and Native Americans arguably fell outside of "the people," rendering them unable to restore their right to possess weapons. But other Americans who were divested of the right to keep and bear arms could regain that right— usually by swearing a loyalty oath. And finally, while some citizens believed that the Second

Amendment contains within it a tacit carve-out for criminals and those who pose a threat of violence, their proposals did not win the day.

This historical tradition bears little resemblance to § 922(g)(3). First, the colonial regulations serve a different purpose than the challenged statute. Revolution-era jurisdictions prohibited certain people from owning guns because they feared that those individuals might use firearms to overthrow the nascent government. Section 922(g)(3), by contrast, seeks to promote everyday public safety by preventing individuals who might have decreased self-control from possessing a firearm. Nowhere does the government contend that unlawful users of controlled substances pose a grave danger to the independence and security of the nation itself.[22]

And even if the court finds that the Pennsylvania and Massachusetts minority proposals meaningfully inform the scope of the Amendment, it is unclear how they support § 922(g)(3)'s constitutionality. Samuel Adams's proposed language, which would have limited the Second Amendment right to "peaceable citizens," does not suggest that all unlawful drug users should be disarmed. When the ratification debates took place, "peaceable" meant "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (quoting 1 Samuel Johnson, *A Dictionary of the English Language* (5th ed. 1773)). And although the Pennsylvania minority's provision would divest citizens of Second Amendment protection "for crimes committed, or real danger of public injury," Schwartz, *supra*, at 681, no evidence suggests that the proposal supported the disarmament

---

[22] Although both armed insurrectionists and individuals addicted to drugs may impose a greater threat to public safety than the average citizen, the former group poses a more existential threat than the latter. This difference matters—if "dangerousness" is the sole metric, the government would have an arbitrary, near-limitless power to identify a disfavored group, declare it "dangerous," and revoke its constitutionally protected rights. Such an exception to the Second Amendment would swallow the rule. *Cf. Range* v. *Attorney General United States*, 69 F.4th 96, 102 (3rd Cir. 2023) ("At root, the Government's claim that only 'law-abiding, responsible citizens' are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from 'the people.'").

of *all* criminals regardless of proclivity for violence, *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting).

Thus—at best—the historical record suggests that early American history supports a carve-out for violent individuals. But § 922(g)(3) sweeps much more broadly. Rather than conditioning an individual's right to possess firearms on his peacefulness, it allows the government to disarm, fine, and incarcerate a nonviolent individual based solely on his status as an unlawful drug user. In both purpose and operation, § 922(g)(3) finds only extremely attenuated support in the founding-era record.[23] The historical tradition of disarming dangerous individuals, in other words, is not sufficiently analogous to § 922(g)(3).

\* \* \*

The government has failed to establish that historical laws regulating the mentally ill, the intoxicated, or the dangerous are sufficiently analogous to § 922(g)(3). The founding-era laws the government offers sought to remedy different problems than § 922(g)(3) does, and they did so through less-restrictive means. Taken together, the historical examples discussed above are not analogous enough to § 922(g)(3) to establish the statute's constitutionality.[24] The district court should therefore grant Alston's motion to dismiss count two of his indictment.

---

[23] Firearms regulations that bear even a passing resemblance to § 922(g)(3) did not begin to crop up until decades after the Civil War. Aside from state laws that attempted to disarm newly freed black Americans, many Reconstruction-era regulations sought to prevent men "begging for charity outside of their home county" (otherwise known as "tramps") from carrying firearms in public. Greenlee, *supra*, at 270 (collecting laws). These laws did not completely disarm their targets—they still allowed tramps to possess weapons inside their homes (or their home counties). *See id.* at 270–71.

[24] The United States' argument focused on finding a historical analogue to § 922(g)(3) in pre- and post-enactment history. But as noted in *Bruen*, there is another avenue to establishing a law's constitutionality under the Second Amendment. The Court explained that it is possible "that a regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution." *Bruen*, 142 S. Ct. at 2136 (cleaned up).

The theory of constitutional liquidation finds it genesis in James Madison's observation that "[a]ll new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation, are considered as more or less obscure and equivocal, until their meaning be liquidated by a series of particular discussions and adjudications." The Federalist No. 37, at 236 (James Madison) (Jacob E. Cooke ed., 1961).

## III.    Conclusion

While the right to keep and bear arms extends to all members of the political community, it is not plenary. The government may burden this right, but to do so it must "identify a well-established and representative historical analogue" that justifies a modern regulation. *Bruen*, 142 S. Ct. at 2133. The United States has only partially carried its burden—for the reasons discussed above, the district court should find that § 922(n) passes constitutional muster while § 922(g)(3) does not. Thus, it should grant Alston's motion to dismiss (D.E. 17) in part.

The Clerk of Court must serve a copy of this Memorandum and Recommendation ("M&R") on each party who has appeared here. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

---

This theory "centered around three things: an indeterminacy, a course of deliberate practice, and settlement." William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13 (2019). Thus, when the Constitution contains a vague or ambiguous provision, subsequent congressional practice may help fill the gaps in the provision's interpretation. *See id.* at 13–16. But not all practices can liquidate the meaning of the Constitution. For the doctrine to apply, Congress must repeatedly and deliberately act in accordance with its interpretation of the provision. *Id.* at 16–18. And Congress's interpretation must be more than just a leading theory—"[s]o long as [congressional] practice was an ongoing battle between two competing interpretations, even if one had the upper hand in reality, that did not mean that the course of practice had become binding." *Id.* at 18. Instead, Congress's interpretation must receive so little pushback (or attain sufficient popular support) that it can be considered settled. *See id.* at 18–21.

But the United States has neither argued nor shown that it is appropriate to apply that theory here. Nor has it proven that post-enactment practice was uniform enough to liquidate the meaning of the Second Amendment in its favor.

Dated:  July 18, 2023

Robert T. Numbers, II
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | GOVERNMENT'S OBJECTIONS |
| v. | ) | TO MAGISTRATE'S MEMORANDUM |
| | ) | AND RECOMMENDATION |
| CARLOS ALSTON | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby files its objections to the magistrate judge's Memorandum & Recommendation (DE 27) (hereinafter "M&R") regarding Defendant's Motion to Dismiss the Indictment (DE 17). In the M&R, the magistrate judge recommended this Court dismiss Count Two of the Indictment, charging possession of a firearm by an unlawful user of, or person addicted to, controlled substances, in violation of 18 U.S.C. § 922(g)(3), as unconstitutional. M&R at 40. For the reasons stated in its Response to the Motion to Dismiss (DE 20) and Supplemental Brief (DE 24), both incorporated herein by this reference, and for the reasons stated below, the government objects to the magistrate judge's conclusion that 18 U.S.C. §922(g)(3) is unconstitutional in light of the Supreme Court's recent holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*. 142 S. Ct. 2111 (2022).

1

## STANDARD OF REVIEW

The portions of the magistrate's M&R to which either party objects are reviewed by this Court de novo. 28 U.S.C. § 636(b)(1); *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023).

## ARGUMENT

**I.    Alston, as a regular unlawful drug user and person addicted to illegal controlled substances, is not a person covered by the Second Amendment's rights guarantee.**

The government objects to the portion of the M&R (Section II(B), pp. 11-14) finding that Alston is part of "the people" who enjoy an individual right of firearm possession under the Second Amendment. As the court noted elsewhere in the M&R, "*Heller* and *McDonald* established that, at the very least, *law-abiding Americans enjoy a Second Amendment right* to possess conventional firearms within their homes for self-defense." M&R at 5 (emphasis added). *Bruen* did not disturb the understanding of the Second Amendment's right belonging *only* to those who are law-abiding. *See Bruen*, 142 S. Ct. at 2122, 2124-25, 2131, 2132-22, 2134, 2135, 2138, 2150, 2156 (the majority opinion repeatedly refers to the Second Amendment protecting the rights of "law-abiding" citizens, as do the Alito and Kavanaugh/Roberts concurrences). The *Bruen* holding was consistent with the *Heller* and *McDonald* precedent on the point that the Second Amendment protects rights of law-abiding citizens. And though the magistrate would have this Court hold that the Second Amendment affords its rights to all Americans (M&R at pp. 12-13), this Court is

2

bound by the Fourth Circuit's interpretation of this issue post-*Heller*, which does not go so far as to include all Americans amongst those who enjoy Second Amendment rights.

The Bill of Rights secures rights "inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions." *Robertson* v. *Baldwin*, 165 U.S. 275, 281 (1897). "In incorporating these principles into the fundamental law there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." *Ibid.* The First Amendment, for example, allows legislatures to ban true threats, even though a threat is a form of "speech." See *Counterman* v. *Colorado*, 143 S. Ct. 2106, 2114 (2023). And the Second Amendment allows legislatures to ban dangerous and unusual weapons, such as short-barreled shotguns, even though they are "arms." See *Heller*, 554 U.S. at 624-625. So too, history and tradition establish that the Second Amendment allows legislatures to disarm persons who are not law-abiding, responsible citizens, regardless of whether they are among "the people."

The magistrate judge would read *Bruen*'s analytical framework to apply to "all members of the political community" regardless of whether they are law-abiding. M&R at 12-13. Per the magistrate judge, this interpretation would square with our understanding of other constitutional provisions, which generally apply to lawbreakers and law-abiding individuals without distinction. M&R at 12-13. But the Fourth Circuit has made it clear that the Second Amendment's rights are guaranteed

3

to a narrower category of individuals. In *United States v. Carpio-Leon*, a post-*Heller* decision, the Fourth Circuit stated explicitly that unlawful aliens do not possess Second Amendment rights because they cannot be considered law-abiding. 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of *law-abiding* members of the political community to whom the Second Amendment gives protection.") (emphasis added). In that decision, a decade prior to *Bruen*, the Fourth Circuit discussed its interpretation as squaring with the founding era understanding of firearms rights belonging to those who were law-abiding and non-dangerous. *Id.* at 979-81.

Similarly, in post-*Heller* opinions examining the constitutionality of 18 U.S.C. § 922(g)(1), the Fourth Circuit held that firearms regulations which did not proscribe conduct by law-abiding citizens in defense of hearth and home were "presumptively lawful." *United States v. Pruess*, 703 F.3d 242, 245-46 (4th Cir. 2012) (citing *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012)). The Fourth Circuit held that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). The court referred to a defendant's being a law-abiding responsible citizen as a *requirement* for a successful Second Amendment challenge. *Moore*, 666 F.3d at 320. A defendant who could not show that he was law-abiding had "no right—much less a fundamental right—to bear arms." *Pruess,* 703 F.3d at 247.

4

Defendant, who possessed nearly an ounce of marijuana—a federally controlled, Schedule I substance—at the time of his arrest and who was then a *daily* unlawful user of the drug, cannot be considered "law-abiding." As a result, the Second Amendment's guarantee of a right to "use arms in defense of hearth and home" to "law-abiding responsible citizens" does not apply to him. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).[1] Like the defendants considered in *Pruess*, *Moore* and *Hamilton*, Alston "flunks the law-abiding responsible citizen *requirement*." *Pruess*, 703 F.3d at 246 (emphasis added). As a result, he is not amongst "the people" who enjoy Second Amendment rights.

Justice Alito stressed *Bruen*'s limited reach, saying the majority "holds that a State may not enforce a law . . . that effectively prevents its *law-abiding residents* from carrying a gun" to "defend themselves." 142 S. Ct. at 2157 (Alito, J., concurring) (emphasis added). "That is *all* we decide," he emphasized. *Id.* (emphasis added). "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun." *Id.*; *see also id.* at 2162-63 (Kavanaugh, J., concurring) ("Going forward, . . . the 43 states that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so."). The magistrate judge's finding would do exactly what Justice Alito says the Supreme

---

[1] To the extent the Court does not read *Bruen*'s law-abiding language as a limitation on the Second Amendment right itself, the government argues in the alternative that *Bruen*'s analytical framework applies only to those cases dealing with law-abiding citizens, and a different analysis applies to category-based firearms regulations, like 18 U.S.C. § 922(g)(3), that apply to non-law-abiding citizens.

5

Court did not intend, by repurposing *Bruen* to expand the categories of who may lawfully possess a firearm. This Court should decline to engage in such unintended expansion by finding that Alston, as someone who is not law-abiding, is not amongst those covered by the Second Amendment's rights provision.

## II.     Alston's conduct, in possessing a firearm while a user of and addicted to controlled substances, is not protected by the Second Amendment.

The United States objects to the magistrate judge's conclusion that Alston's conduct is covered by the Second Amendment's rights guarantee (set out briefly in Section II(D) of the M&R, at pp. 21-22). The magistrate defined Alston's conduct as "possessing a firearm." M&R at 21. The government argues that Alston's conduct was, instead, *possessing a firearm while being an unlawful drug user*. The government argues that Alston's conduct in possessing the firearm cannot be divorced from the then-existing condition which made such possession inherently dangerous. Section 922(g)(3) does not proscribe possession of a gun; it proscribes possession of a gun by ongoing, long-term users of illegal drugs. Alston did not simply possess a gun. Rather, he possessed a gun while he had a raging drug use problem. This is the conduct proscribed by the statute, and it is not covered by the Second Amendment.

As the Fourth Circuit noted, in a post-*Heller* inquiry into the constitutionality of a challenged gun law, "[t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (internal citation omitted). This first step of the analysis remains in effect post-*Bruen*. 142 S. Ct. at 2127. In

6

*Chester*, the Fourth Circuit analyzed whether 18 U.S.C. § 922(g)(9) (disarming domestic violence misdemeanants) passed constitutional muster. In answering "the first question" regarding whether the conduct fell within the scope of the Second Amendment, the Fourth Circuit framed the question as "whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment." 628 F.3d at 680. Notably, the Fourth Circuit did *not* divorce the act (possession of a gun) from the characteristic which makes such possession unlawful (being a domestic violence misdemeanant) when making its determination of whether the conduct was covered by the Second Amendment. *See id*. This Court should do the same, finding that the conduct proscribed by Section 922(g)(3) is not *possession*, but *possession by an unlawful drug user*.

While the Second Amendment protects the rights of law-abiding individuals to possess guns within their homes for self-defense and to carry them outside the home for other lawful purposes, nothing about the Amendment's text guarantees this right to individuals who are actively engaged in long-term violation of the laws prohibiting illegal drug use. *See United States v. Le*, No. 4:23-CR-14, 2023 WL 3016297, at *5 (S.D. Iowa Apr. 11, 2023). Certainly, such conduct is not *clearly* covered by the plain text of the Second Amendment, and because it is not, the inquiry should end here – without the burden shifting to the government to prove that there is a historical statute analogous to Section 922(g)(3). *See Bruen*, 142 S. Ct. at 2127 (holding "when the Second Amendment's plain text covers an individual's conduct, the Constitution

7

J.A. 225

presumptively protects that conduct" after which showing, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."). Because the plain text of the Second Amendment does not cover the possession of a firearm by a regular drug user, the Court should use the standard of review applicable to all other facial constitutional challenges, which requires defendants prove "that no set of circumstances exists under which [the statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Defendant has made no such showing, and thus his facial constitutional challenge should fail.

## III. Section 922(g)(3) is consistent with historical tradition and is constitutional.

The United States objects to the magistrate's finding (set out in Section II(D) of the M&R, pp. 22-40) that 18 U.S.C. § 922(g)(3) is inconsistent with the nation's historical tradition of firearms regulation. Because Section 922(g)(3) addresses a societal problem in drug addiction and unlawful use which did not exist in widespread form until the twentieth century, there is no founding- or Reconstruction-era "historical twin" to the statute. In such cases, *Bruen* allows for reasoning by analogy to historical laws that are "relevantly similar." 142 S. Ct. at 2132. Section 922(g)(3) is sufficiently analogous, for constitutional purposes, to historical statutes disarming the mentally ill, intoxicated individuals and those believed to be dangerous. Other courts have so found. *See United States v. Seiwert,* No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022)*; United States v. Posey,* No. 22-cr-83, — F.Supp.3d —, 2023

8

J.A. 226

WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Randall*, No. 22-cr-99, —
F.Supp.3d —, 2023 WL 3171609 (S.D. Iowa Feb. 14, 2023); *United States v.
Stennerson*, No. 22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States
v. Cleveland-McMichael*, No. 21-cr-119, 2023 WL 2613548 (D. Alaska Mar. 23, 2023);
*United States v. Le*, No. 23-cr-14, — F.Supp.3d —, 2023 WL 3016297 (S.D. Iowa Apr.
11, 2023); *United States v. Costianes*, No. 21-cr-0458, — F.Supp.3d —, 2023 WL
3550972 (D. Md. May 18, 2023); *United States v. Hart*, No. 22-cr-114, 2023 WL
4144834 (W.D. Mo. June 6, 2023) (report and recommendation), adopted by 2023 WL
4141044 (W.D. Mo. June 22, 2023); *United States v. Ray*, No. 21-cr-57, 2023 WL
4378152 (S.D.W. Va. July 6, 2023); *United States v. Lewis*, No. 22-cr-222, —
F.Supp.3d —, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Beaty*, No.
22-cr-95, 2023 WL 4662247 (M.D. Fla. July 20, 2023); *but see United States v. Daniels*,
No. 22-60596, —F.4th— , 2023 WL 5091317 (5th Cir. 2023) (finding Section 922(g)(3)
unconstitutional as applied to a particular defendant while "emphasizing the
narrowness of [its] holding" and "not invalidat[ing] the statute in all its
applications").[2]

---

[2] The *Daniels* decision, which is not binding on the Fourth Circuit or this Court, was controlled, at least in part, by the
Fifth Circuit's decision in *United States v. Rahimi*, for which the Supreme Court has granted certiorari. 61 F.4th 443
(5th Cir. 2023), *cert. granted*, No. 22-915, — U.S. —, 2023 WL 4278450 (June 30, 2023). Relying on *Rahimi*, the
*Daniels* court rejected the government's argument that unlawful users of controlled substances are not "law-abiding,
responsible citizens." 2023 WL 5091317, at *4. The *Daniels* court also demanded too close a historical analogue for
Section 922(g)(3) and incorrectly rejected the "undeniable throughline in all [cited] historical sources," that
"Founding-era governments took guns away from persons perceived to be dangerous" as a historical analogue for
Congress's disarmament of dangerous illegal drug users. *Id*. at *13.

**A.  Drug abuse is a modern societal problem which did not exist at the time of the founding.**

The unlawful use of controlled substances was unprecedented at the founding. Through much of the 19th century there was no need for firearm prohibitions addressing drugs other than alcohol because such substances were not widely used as intoxicants in the United States until the late 19th and early 20th centuries. *See* David F. Musto, *Drugs in America: A Documentary History* 188-192 (NYU 2002); Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997) ("[N]arcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries."). Only in 1877 did Nevada became the first state to require a prescription for the purchase of any drug (in that case, opium). Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America*, 1776-1914 25 (2023). Because of this history, "[i]llegal drug trafficking," in particular, "is a largely modern crime." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (upholding sentencing enhancement for possessing dangerous weapon during drug offense after *Bruen*).

Marijuana is no exception. There are essentially "no accounts or reports" of "cannabis being used as an intoxicant during the period when the plant was widely cultivated as an agricultural commodity." John Rublowsky, *The Stoned Age: A History of Drugs in America* 98 (1974). Even by the 1930s, Americans lacked "any lengthy or broad experience" with marijuana, Musto, *supra*, at 192, and prohibitions did not emerge until the early 20th century. Because the widespread use of and addiction to illegal controlled substances is a modern problem not confronted in the founding era,

10

the government need only prove that there exists a relevantly similar historical analogue to Section 922(g)(3). 142 S. Ct. at 2132. For the reasons set forth below, it has done so.

**B. Section 922(g)(3) is analogous to historical statutes allowing the burdening of the rights of the mentally ill.**

The government objects to the magistrate judge's finding (at Section II(D)(2)(a), pp. 22-28 of the M&R) that historical regulations disarming the mentally ill are not sufficiently analogous Section 922(g)(3). The magistrate found that, compared to laws which burdened the rights of the mentally ill, Section 922(g)(3) is "both over-and-underinclusive." M&R at 26. But this misapplies *Bruen*. Expecting Section 922(g)(3) to be a perfect match to historical examples addressing different problems indicates the magistrate was incorrectly seeking something akin to a "historical twin." *Bruen*, 142 S. Ct. at 2133. *Bruen* itself says the government need not jump through that hoop. The government need only provide regulations which are "relevantly similar," which requires analysis of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33.

As the magistrate judge recognizes, English law in existence at the time of (and just after) the founding allowed for at least some detention of the acutely mentally ill. *See* M&R at 23-25. English law in existence at the time of the founding can rightly inform the Court regarding the founders' understanding of the scope of nascent American rights. *See Bruen*, 142 S. Ct. at 2139. These laws allowing for the temporary deprivations of mentally ill citizens' rights are relevantly similar to Section 922(g)(3)'s

11

gun rights restriction against illegal drug users. The "longstanding" burdening of the rights of mentally ill individuals was recognized in *Heller* and *McDonald*. *Heller*, 554 U.S. at 626 ("longstanding prohibitions on the possession of firearms by . . . the mentally ill" were among the constitutionally permissible regulations that the Court in *Heller* said should not "be taken to cast doubt on.").

Turning first to the *why* question, both historical regulations burdening the mentally ill and Section 922(g)(3) were crafted to protect the public. The existence of the historical regulations show that eighteenth century lawmakers were concerned with the dangerousness posed by those who were suffering from mental illness. Carlton F.W. Larson, *Four Exceptions in Search of a Theory*: District of Columbia v. Heller *and Jud. Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009); *accord* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 HASTINGS L.J. 1339, 1361 n. 136 (2009). So too was Congress when, in 1968, it enacted Section 922(g)(3) "to keep guns out of the hands of presumptively risky people," including unlawful drug users. *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010). As the Seventh Circuit reasoned in *Yancey*, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.* at 685.

With regard to the *how* question, the statutes are undoubtedly different, but the traditional route (physically detaining the mentally ill) was necessarily more

12

J.A. 230

burdensome than simple disarmament. As the magistrate judge noted in finding that Section 922(n) *is* constitutional, "it stands to reason" that if a statute that allows for the detention of an individual is constitutional, then the government "had the ability to impose lesser restrictions on a defendant's conduct, such as restricting a defendant's" firearms rights. M&R at 17. The magistrate judge notes that the detention of the mentally ill person was only allowed so long as the fit of madness lasted. M&R at 26. This is similar to the prohibition in Section 922(g)(3), which lasts only so long as the person is a recent, regular, long-time user of unlawful controlled substances. *Yancey*, 621 F.3d at 687. Both regulations burden rights only temporarily, and Section 922(g)(3) is *less* restrictive, because unlike the mentally ill individual, whose liberties were constrained based upon circumstances out of his ability to cease or control, a person subject to 922(g)(3)'s prohibition may regain his unfettered firearm possession rights at any time upon his choice to cease use of unlawful substances. *Yancey*, 621 F.3d at 686-87 ("[U]nlike those who have been convicted of a felony or committed to a mental institution and so face a lifetime ban, an unlawful drug user…could regain his right to possess a firearm simply by ending his drug abuse. In that sense, the restriction in § 922(g)(3) is far less onerous than those affecting…the mentally ill.").

In determining that Section 922(g)(3) is insufficiently analogous to eighteenth century statutes detaining the mentally ill, the magistrate judge notes that Section 922(g)(3) punishes an individual more severely than historical statutes temporarily

13

constraining the liberty of the mentally ill and cites the possible punishments for violation. M&R at 27. However, considering the potential punishment for the offenses is irrelevant to whether Section 922(g)(3) is constitutional under the Second Amendment. The questions for the court are whether (1) the defendant has a Second Amendment right, and (2) if so, whether it can be burdened. Straying into whether *punishment* under the laws is analogously similar to historical regulation goes beyond the question at issue.

Finally, both the *Heller* court and the Kavanaugh/Alito concurrence in *Bruen* were careful to state that the court's decisions were not meant to cast doubt on regulations disarming "felons and the mentally ill." *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J. concurring); *see* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA L.REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). Because possession of firearms by unlawful drug users is analogously dangerous to possession of firearms by the mentally ill, it stands to reason by analogy that the *Bruen* decision similarly should not cast doubt upon regulations prohibiting possession by unlawful drug users. *Yancey*, 621 F.3d at 685. Though Section 922(g)(4) disarms those found to be mentally defective, it misses wide swaths of people who are similarly dangerous as a result of their ongoing drug addictions who have not been previously committed to a mental institution. Section 922(g)(3)'s disarmament of

14

those who are current (or very recent) illegal drug users is necessary to protect the public in the same way that Section 922(g)(4) is necessary, and both are consistent with the founders' understanding that the temporary detention and rights deprivation of mentally ill persons was permissible under the constitution.

### C.  Section 922(g)(3) is analogous to historical statutes disarming the intoxicated.

The government objects to the magistrate judge's finding (at Section II(D)(2)(b), pp. 28-34 of the M&R) that historical regulations disarming the intoxicated are not sufficiently analogous Section 922(g)(3). Regulations aimed at curbing gun use or possession by intoxicated individuals have existed since colonial days. Section 922(g)(3)'s passage in the twentieth century reflects a natural evolution of these laws to address the proliferation of illegal addictive substances while addressing the need to preserve the safety of the public that the founding-era lawmakers recognized.

The founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Founding-era legislatures also adopted specific measures to separate firearms and alcohol,

15

including laws regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees actually became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *District of Columbia v. Heller*, 554 U.S. 570, 632 (2008) (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767). The M&R notes (pp. 28-32) that these laws did not restrict firearm possession outright, were short-lived, or may have been enacted for other public safety reasons. But they nevertheless show a tradition of limiting firearm use by specific groups viewed as *likely* to become intoxicated, just as Section 922(g)(3) limits firearm possession by persons with current, long-term illegal drug use problems, who are similarly likely to become intoxicated by such drugs.

Additionally, 18th-century militia laws reflected legislatures' significant authority to separate firearms and alcohol. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared

16

"in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober"). Many other laws forbade selling "any Strong Liquor" near the locations where militias mustered and trained, indicating again the colonial and founding-era understanding that guns and intoxicants should not mix. *See, e.g.*, 2 Vollmer, *supra*, pt. 5, Maryland, at 93 (1756 law); *id.* pt. 3, Delaware, at 13 (1756 law); *id.* pt. 8, New Jersey, at 31 (1746 law) *id.* pt. 11, Pennsylvania, at 100 (1780 law); *id.* pt. 13, South Carolina, at 30 (1721 law). Similar laws persisted into the 19th century, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

Despite the pervasiveness of alcohol at the founding, early laws understandably focused on the militia because social norms "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism." Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987). Community mores "held drinking excesses largely in bounds." *Id.* at 15. And the cumbersome nature of 18th-century firearms also mitigated the general risk created by intoxicated individuals. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17

17

(2019). As those circumstances changed during the 19th century, *see, e.g.*, Lender, *supra*, at 45-46, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms or pistols. *See* 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat. § 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms" even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Despite the M&R questioning the value of Reconstruction-era laws, this 19th-century evidence remains instructive. As *Bruen* reiterated, evidence of the Second Amendment's interpretation "'through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). And such evidence is particularly helpful where, as here, it supplies "'confirmation of'" earlier history. *Id.* at 2137. Laws regulating the general public's firearm possession while intoxicated largely arose later, but they were consistent

18

with earlier laws regulating individuals' ability to possess guns while drunk (or at events where drinking would occur) and militia-specific laws. The M&R identifies nothing in pre-19th-century practice demonstrating that legislatures were considered to *lack* authority to preclude the intoxicated public from using firearms. *Cf. id.* at 2133 (noting lack of "disputes regarding the lawfulness of [sensitive-place] prohibitions"). Concluding otherwise would unjustifiably deem legislatures' earlier silence as reflecting a *constitutional* limit, on the unfounded assumption that founding-era legislatures invariably regulated to the outer limit of their authority irrespective of popular demand or perceived need for particular laws.

The Court need also examine the *how* and *why* questions to determine whether Section 922(g)(3) is "comparably justified" to founding-era and nineteenth century intoxication statutes. *Bruen*, 142 S. Ct. at 2133. In terms of *why* Section 922(g)(3) restricts the Second Amendment right, the provision, like intoxication statutes, limits firearm possession or use at times an individual is deemed unlikely to use them responsibly. Intoxication-related statutes were enacted to prevent the "mischief" threatened by intoxicated persons "going abroad with firearms," *Shelby*, 2 S.W. at 469, and Congress likewise enacted Section 922(g)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous," *Barrett v. United States*, 423 U.S. 212, 218 (1976). For confirmation, this Court need only consider the parity with which legislatures treated alcohol and drugs once illegal drugs proliferated in the 20th century. At least one jurisdiction, Michigan, simply extended

19

J.A. 237

its by-then common restriction on carrying firearms while intoxicated to cover those under the influence of "any exhilarating or stupefying drug." 1929 Mich. Pub. Acts 55. Other jurisdictions elected to regulate more indirectly by prohibiting the *delivery* or *sale* of firearms to certain persons, but extended such laws to drug addicts and habitual drunkards alike. *See* 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932).

In terms of *how* Section 922(g)(3) burdens the right to self-defense, the M&R describes Section 922(g)(3)'s prohibition as much broader than colonial and nineteenth century laws. M&R at 30. But the statute—like historical intoxication laws—is a *temporary* restriction on possession that lasts only during the period an individual is deemed unlikely to use firearms responsibly. If a person ceases unlawfully using controlled substances, he may again possess firearms. *See Yancey*, 621 F.3d at 687. The M&R notes that Section 922(g)(3) prohibits *possession* of firearms, while alcohol statutes historically were limited to prohibiting *carrying* or *use*. That difference, however, is readily explained by the fact that illegal drugs, unlike alcohol, are *unlawful* in all circumstances. An individual who regularly obtains and uses those substances likely will have connection with criminality for which gun possession presents public safety risks. Indeed, as early as 1931, California prohibited outright firearm *possession* by drug addicts, not just use during periods of intoxication. 1931 Cal. Stat. 2316-17. Other states later followed suit, *see, e.g.*, 1951

20

Ala. Acts 1379; 1955 Kan. Sess. Laws 400. Because alcohol, by contrast, has generally been lawful, laws understandably allowed alcohol drinkers to *possess* firearms, limiting their use only during periods of intoxication. Given this clear distinction between unlawful drugs and alcohol, to demand a more exact "dead ringer" for Section 922(g)(3) would be inconsistent with *Bruen*'s assurances that the Second Amendment is not "a regulatory straightjacket" for modern legislatures. *Bruen*, 142 S. Ct. at 2133. Once more, an early legislature's choice to prohibit use rather than simple possession does not itself indicate legislators believed it lacked constitutional power to regulate simple possession if they chose.

Finally, as in part II(B) of this filing, *supra*, the government objects to the magistrate judge's focus on the comparative penalties for violation of historical laws relating to firearm possession while intoxicated and those applicable to Section 922(g)(3). *See* M&R at 28. The question before this Court is whether the government can place a restriction on the gun rights of habitual illegal drug users. The Court needs to determine whether this restriction on gun rights is consistent with the nation's history and tradition of gun regulation, *not* whether the punishment prescribed for such a violation mirrors historical punishments for related statutes.

### D. Section 922(g)(3) is analogous to historical statutes disarming those considered dangerous.

The government objects to the magistrate judge's finding (at Section II(D)(2)(c), pp. 34-40 of the M&R) that historical regulations disarming individuals considered dangerous are not sufficiently analogous Section 922(g)(3). Congress's decision to

21

disarm those engaging in regular, long-term illegal drug abuse follows a tradition of disarmament of individuals and groups which legislature found to be dangerous. As a result, the statute is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

English common law established the government's authority to disarm individuals posing a threat to the safety of others. Common law prohibited individuals from "go[ing] armed to terrify the King's subjects." Sir John Knight's Case, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to Protestant subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, see, e.g., Calendar of State Papers, Domestic: William III, 1700-1702, at 233-34 (Edward Bateson ed., 1937). Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statutes disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III, c.5 (1695) (Ireland). And in the first half of the 18th century, statutes disarmed Scottish persons believed to be loyal to James II. See, e.g., 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, c.39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. See 1692-1694 Mass.

22

Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[3] or the Revolution's cause;[4] enslaved persons;[5] and Native Americans.[6] These laws would be unconstitutional today under the Thirteenth or Fourteenth Amendments. But for Second Amendment purposes, they remain instructive. As repugnant as these laws are, they demonstrate that the Amendment was not historically understood to pose an obstacle to disarming, as a class, certain persons. *See, e.g., United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023).

Second Amendment precursors proposed in state ratifying conventions likewise confirmed that legislatures may disarm certain categories of individuals, including for "crimes committed, or real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). And that understanding persisted after

---

[3] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[4] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

[5] *See, e.g.*, 1700-1797 Del. Laws 104; 1692-1720 Md. Laws 117-18; 1715-1760 N.Y. Laws 162; 1715-1755 N.C. Sess. Laws 64; 1731-1743 S.C. Acts 168.

[6] *See, e.g.*, 1723-1730 Conn. Acts. 292; *Charter & General Laws of Massachusetts Bay* 133 (1814) (1633 law); 6 *Statutes at Large of Pennsylvania from 1682 to 1801* 319-20 (WM Stanley Ray ed., 1898) (1763 law); 1 Hening, *supra*, at 219 (1633 Virginia law).

the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

While at least some of the founding-era and nineteenth century laws disarming the dangerous did so in part because of the concern that certain groups would pose a threat to state security (*see* M&R at 35, 39), feared violence against the state undoubtedly meant violence against loyal soldiers or innocent civilians. The armed rebellions that the founders sought to prevent could only be effective in challenging state security if they involved violence or the threat of violence against American citizens, which means that the danger that legislators sought to prevent was not only to American sovereignty but also to its people. In passing Section 922(g)(3), Congress similarly recognized a need to protect innocent American citizens from improper gun use.

This history at a minimum "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting)–although the government's authority to disarm certain groups is not *limited* to such persons. *See, e.g.*, *Range v. Att'y Gen.*, *United States of Am.*, 69 F.4th 96, 105 (3d Cir. 2023) (describing disarming "distrusted" groups); *id.* at 110 (Ambro, J., concurring) (describing disarming those

24

who "pose a threat to the orderly functioning of society"). And Congress had ample reason to conclude that gun possession by unlawful drug users, as a class, poses a serious risk of danger to others.

Because of the *unlawful* nature of their activities, drug users are more likely than law-abiding citizens to have dangerous confrontations (particularly if guns are involved) with drug dealers, law enforcement officers (as occurred in Alston's case), and others—raising a concern of danger even beyond periods of actual intoxication. It thus is no surprise that individual judges have suggested "drug dealing" is "dangerous because [it] often lead[s] to violence," *Folajtar v. Attorney General*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting), and that Section 922(g)(3) aligns with a historically justified interest in "keeping guns out of the hands of those who are likely to misuse them," *Kanter*, 919 F.3d at 465-66 (Barrett, J., dissenting). The government does not refer to the dangerousness of illegal drug users to invite this Court to engage in the interest balancing *Bruen* rejected. Instead, as *Bruen* itself explained, the Second Amendment inquiry requires reasoning by analogy. 142 S. Ct. at 2132. And that "commonplace task for any lawyer or judge," *id.*, necessarily requires evaluating the similarity between the historical justification for disarming certain persons with the present-day dangers the legislature reasonably could find that a group, like unlawful drug users, poses.

Finally, in terms of *how* Section 922(g)(3) restricts the right, the statute is no more restrictive than historical laws disarming certain groups. As a *temporary*

prohibition, Section 922(g)(3) prohibits firearm possession only during the period

users of unlawful controlled substances are considered to present a risk of

dangerousness. *See Yancey*, 621 F.3d at 687. This is analogous to the historical

limitations on the dangerously disloyal, which only lasted until such persons could

show their loyalty to the nation. M&R at 36 (quoting Joseph G.S. Greenlee, *The

Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20

Wyo. L. Rev. 249, 265 (2020).

## **CONCLUSION**

*Heller* and *Bruen* are clear that the Second Amendment protects possession

and use of firearms and ammunition for lawful purposes by law-abiding, responsible

citizens. The Constitution does not protect the conduct prohibited by 18 U.S.C. §

922(g)(3). Moreover, even if such conduct were covered, the statutes are consistent

with the nation's historical tradition of firearm regulation. Section 922(g)(3) is thus

facially constitutional, and this Court should so find.

Respectfully submitted this 15th day of August, 2023.

> MICHAEL F. EASLEY, JR.
> United States Attorney
>
> BY:  /s/ Sarah E. Nokes
> SARAH E. NOKES
> Assistant United States Attorney
> Criminal Division
> 150 Fayetteville Street, Suite 2100
> Raleigh, North Carolina 27601
> Telephone:    (919) 856-4054
> Facsimile:     (919) 856-4487
> E-mail:         sarah.nokes@usdoj.gov
> VA Bar No.   82472

**CERTIFICATE OF SERVICE**

This is to certify that I have this 15th day of August, 2023, served a copy of the

foregoing response upon the defendant in this action by CM/ECF to:

Edward D. Gray
Attorney for Defendant


/s/ Sarah E. Nokes
Sarah E. Nokes
Assistant United States Attorney
Criminal Division

27

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-21-FL-RN-1

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CARLOS ALSTON | OBJECTIONS TO MAGISTTRATE JUDGE MEMORANDUM AND RECCOMENDATIONSW |

Defendant Carlos Alston, through undersigned counsel, respectfully provides the following concurrences and objections to the Magistrate Judge Memorandum and Recommendation.

## I.   BACKGROUND

### A. Procedural History

On January 24, 2023, Mr. Alston was charged in a two-count indictment with one count of being a person in receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n), and one count of being a person in possession of a firearm while a drug user, in violation of 18 U.S.C. § 922(g)(3). [DE 11]. On July 18, 2023, United States Magistrate Judge Robert Numbers issued a Memorandum and Recommendation on the issues presented in Defendant's Motion to Dismiss the Indictment based upon Second Amendment of the U.S. Constitution grounds.  [DE 27].

Mr. Alston concurs with the Magistrate Judge's recommendation with regard to the finding that § 922(g)(3) is unconstitutional in light of the Supreme Court's ruling in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  Mr. Alston objects to the conclusion that § 922(n) is a regulation that is consistent with the nation's historical tradition of firearms regulation.

### B. Factual Background

Mr. Alston was waiting in the drive-thru line of a restaurant located in Henderson, North Carolina, when police approached his car. [DE 1]. Mr. Alston anticipates that the government will argue Mr. Alston brandished a weapon at the approaching police officer after the officer gave verbal commands for Mr. Alston to show his hands and notified him of outstanding warrants. [DE 1]. The officer then shot Mr. Alston once, striking him in the lower body. [DE 1]. After a foot chase, Mr. Alston collapsed from his injuries and was taken into custody. [DE 1]. Police recovered a Smith & Wesson, SD9VE 9mm pistol near Mr. Alston's flight path, and they discovered marijuana in his car. Mr. Alston has a prior criminal conviction related to marijuana. [DE 1]. At the time of the shooting, Mr. Alston did not have any felony convictions.

### C. Standard of Review

A district court may refer a motion to suppress to a magistrate judge for a recommendation pursuant to Federal Rule of Criminal Procedure 59(b)(1). *See* Fed. R. Crim. P. 59(b)(1). A party may file written objections to magistrate judge's memorandum and recommendation within fourteen days of being served with a copy of the memorandum and recommendation. 28 U.S.C § 636(b)(1). " 'Any written objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.' " *Morgan v. N.C. Dep't of Health and Human Servs.*, 421 F. Supp. 2d 890, 893 (W.D.N.C. 2006) (emphasis in original) (*quoting Thomas v. Westinghouse Savannah River Co.*, 21 F. Supp. 2d 551, 560 (D.S.C. 1997)); s*ee also Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) ("[P]arties filing objections must specifically identify those findings objected to.") (quotation omitted).

## II.    RESTRICTIONS ON THE RIGHT TO BEAR ARMS IN LIGHT OF *BRUEN*

### A.  Mr. Alston concurs with the Court's finding that § 922(g)(3) is unconstitutional.

The United States argues that the Second Amendment does not apply to Alston because—as an unlawful drug user under indictment—he is not a member of "the people" who enjoy the Amendment's protections. [D.E. 20 at 6–10].  The Memorandum and Recommendation (M&R) properly reasoned that "[t]o agree with the United States, this court would need to understand "the people" in the Second Amendment context differently than it interprets that phrase in every other section of the Constitution; however, the Supreme Court has rejected this approach."  [*See* D.E. 27 at 12].

The theory pursued by the government in this case has failed to recognize that *Bruen* has changed the legal landscape in which all restrictions of Second Amendment rights must be analyzed. The Supreme Court's recent opinion in *Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*,142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller's* methodology. *Id.* at 2138.  Once again, it is the "means-ends" justification that the Government is attempting to posit as the basis to deprive Mr. Alston from his constitutional rights.  *See* DE 40, at 3-4.

The analysis within the M&R as to the constitutionality of § 922(g)(3) is not an outlier; it is consistent with the holding of *Bruen*.   Under *Bruen*, the government cannot meet its burden to identify a "relevantly similar" historical tradition of firearm regulation that supports disarming individuals who are alleged to be drug users as there is no clear set of pre-enactment positive-law statutes concerning narcotic use and firearms.  Last week, the United States Court of Appeals for the Fifth Circuit reached this same conclusion in *United States v. Daniels*, No. 22-60596, 2023

WL 5091317 (5th Cir. Aug. 9, 2023).   In *Daniels*, the Fifth Circuit similarly held that § 922(g)(3) was inconsistent with *Bruen*.  First the Daniels court found that the Second Amendment applied to persons like Daniels, admitted drug users.  *Id* at *2. Second the question was that there was not a similarly analogous statute that existed prior to the Second Amendment.  *Id* at *14.   The reasoning articulated within the M&R is identical to the reasoning of the Daniels court; as such, the M&R is not an outlier opinion without basis.  Accordingly, § 922(g)(3) fails the analysis of *Bruen.*

### B.  Mr. Alston objects to the court's finding that § 922(n) is a permissible restriction of rights analogous to pre-trial detention.

The Supreme Court could not have been clearer when it stated that "firearms restrictions are presumptively unlawful unless the government can demonstrate that the regulation is consistent with the Nation's historical tradition of firearms regulations." *Bruen,* 142 S. Ct. 2111, 2126 (2022). As such, Mr. Alston objects to the M&R with regard to the finding that § 922(n) "analogous enough to pass constitutional muster." [D.E . 27 at 20].   Further, Mr. Alston objects to the finding that § 922(n) is a permissible limitation on the right to self-defense in a manner similar to pre-trial detention.  *Id.* at 19.  Whether it is "analogous enough" is not the test as articulated by the court in *Bruen*.  Further, the court in *Bruen* as clearly stated that the "Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions."  *Bruen*, 142 S. Ct. at 2111, 2156.  Accordingly, the M&R analogizes a constitutional freedom of self-defense to a switchboard of rights that can be turned on and off under the allegation of wrongdoing.

When the M&R asserts that the limitation of the right to bear arms is analogous to the right to liberty, it is saying that the presence of an indictment's  probable cause determination is analogous to the 18 U.S.C. § 3142 determination of detention.  This analogy is not consistent with

the holding of *Bruen* and allows for the deprivation of a constitutional right without any safeguards other than a probable cause determination. As detailed within the M&R, a probable cause determination is all that is needed to acquire an indictment. [D.E. 27 at 19] However, to take a person's liberty more than probable cause is required.

Section 18 U.S.C. § 3142(e) of the Bail Reform Act, which governs release or detention pending trial, dictates that if, after holding a hearing, the court finds that no "condition or combination of conditions will reasonably assure the appearance of the person as required, and the safety of any other person and the community," such court shall order the detention of the person before trial. The factors to be considered in determining whether to release a defendant pending trial are set forth in 18 U.S.C. § 3142(g) and include: (1) nature and circumstances of the offenses charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including family ties, the person's character, ties to the community, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). To obtain an indictment, a grand jury simply must find that a crime had been committed by the defendant by the preponderance of the evidence. Under the Bail Reform Act, the clear and convincing evidence standard applies to a determination that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e). As such, a simple finding by the preponderance of the evidence that there is a crime is not sufficient. The Bail Reform Act recognizes that when a persons' constitutional right is taken away (in this case – the right to liberty) in the pretrial confinement context, the burden is higher than merely preponderance of the evidence. Accordingly, the court made a false equivalence in

analogizing pre-trial detention and the burden under § 922(n).  *Bruen* argues that a right as paramount as the right to bear arms cannot be removed by a preponderance of the evidence burden.

As articulated in *Bruen*, the right to bear arms is a right for all persons.  Only centuries after the Founding did Congress begin barring indicted individuals from receiving firearms. Congress first passed a law prohibiting transporting firearms for individuals under indictment for a crime of violence in 1938. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It was not until 1961 that Congress expanded the prohibition to include all individuals under indictment. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed). The statute was again clarified in 1968, to include indictments in state and federal court, but only for those felonies punishable by more than one year in prison. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).  Of note, all of these restrictions including the restriction under § 922(n) occurred post-enactment of the Second Amendment.

## C.  There is no well-established historical analogue.

The government cannot in identify a "well-established and representative historical analogue" from either era supporting the categorical disarmament of tens of millions of Americans who seek to keep firearms in their home for self-defense. *Bruen*, 142 S. Ct. at 2132; *see* Gabriel J. Chin, The New Civil Death: Rethinking Punishment in the Era of Mass Conviction, 160 U. Pa. L. Rev.1789, 1791 (2012) (explaining that "tens of millions" of free-world Americans have criminal records). It is understandable that the government has argued that there is a well-established historical analogue – as it must aruge to uphold all of the post enactment legislation regulating firearms; nevertheless, the standard announced by the Supreme Court in *Bruen* is the law of the land. It must be enforced. Under that standard, the government has failed to meet its burden.

The government cannot rely on the passage of § 922(n) in the mid-20th century to establish a long-standing historical tradition back to the enactment of the Second Amendment, particularly where it contradicts the plain language of the Constitution's text. *See Bruen,* 142 S. Ct. at 2136–37. The Supreme Court specifically declined to consider any 20th century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id* at 2154 n.28. The district court should do the same in this case.

Accordingly, the government cannot meet its burden to identify a "relevantly similar" historical tradition of firearm regulation that supports disarming individuals who have been merely indicted. As such, § 922(n)'s restriction on firearms does not meet the *Bruen* test.

## III.    CONCLUSION

The government has failed to demonstrate that § 922(g)(3) and § 922(n) are supportable by any historic tradition of firearm regulation in the United States, rendering them unconstitutional under *Bruen* and the Second Amendment. Mr. Alston agrees with the reasoning and conclusion of the Memorandum and Recommendation with regard to § 922(g)(3) and objects to the conclusions at to § 922(n). Mr. Alston continues to argue that this Court should dismiss both counts of the indictment against Mr. Alston.

Respectfully requested this 15th day of August, 2023.

G. ALAN DUBOIS
Federal Public Defender

/s/ Edward D. Gray
EDWARD D. GRAY
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
E-mail: Edward_Gray@fd.org
N.C. State Bar No. 37539
LR 57.1 Counsel Appointed

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served upon:

    Sarah E Nokes
    Assistant United States Attorney
    United States Attorney's Office
    Eastern District of North Carolina
    150 Fayetteville Street, Suite 2100
    Raleigh, NC 27601

by electronically filing the foregoing with the Clerk of Court on August 15, 2023, using the

CM/ECF system which will send notification of such filing to the above.

      This the 15th day of August, 2023.

                    G. ALAN DUBOIS
                    Federal Public Defender

                    /s/ Edward D. Gray
                    EDWARD D. GRAY
                    Assistant Federal Public Defender
                    Attorney for Defendant
                    Office of the Federal Public Defender
                    150 Fayetteville Street, Suite 450
                    Raleigh, North Carolina 27601
                    Telephone: 919-856-4236
                    E-mail: Edward_Gray@fd.org
                    N.C. State Bar No. 37539
                    LR 57.1 Counsel Appointed

J.A. 254

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CR-021-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| CARLOS ALSTON, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to dismiss the indictment for failure to state an offense. (DE 17). Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), United States Magistrate Judge Robert T. Numbers, II ("the magistrate judge") issued a memorandum and recommendation ("M&R"), wherein it is recommended that the court grant in part and deny in part defendant's motion. The government timely filed objections to the M&R and defendant responded. In this posture, the issues raised are ripe for ruling. For the reasons that follow, the court adopts the recommendation of the magistrate judge and grants in part and denies in part defendant's motion.

## BACKGROUND

Indictment filed January 4, 2023, charges defendant with one count of willfully receiving a firearm while knowing he was under indictment for a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. §§ 922(n) and 924 and one count of knowingly possessing a firearm while knowing he was an unlawful user of and addicted to a controlled substance in violation of 18 U.S.C. §§ 922(g)(3) and 924. Defendant moved to dismiss the indictment February 28, 2023, on the grounds that 18 U.S.C. §§ 922(n) and 922(g)(3) are

J.A. 255

unconstitutional. After obtaining an extension of time, the government responded, and the magistrate judge ordered supplemental briefing. A hearing on the motion was held before the magistrate judge May 31, 2023, and the M&R was issued July 18, 2023. After obtaining extensions of time, both parties filed objections August 15, 2023.

## COURT'S DISCUSSION

A.    Standard of Review

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12. At any time before trial, a defendant can raise a motion asserting "a defect in the indictment or information, including: . . . failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B).

The court may "designate a magistrate judge . . . to submit to a judge of the court proposed findings of fact and recommendations for the disposition [of a motion to dismiss indictment]." 28 U.S.C. § 636(b)(1). Any party may object to the magistrate judge's proposed findings and recommendations, and the court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Id. The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir.1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

2

B.      Analysis

The M&R recommends that this court find that § 922(n), willfully receiving a firearm while under felony indictment, "passes constitutional muster," but § 922(g)(3), knowingly possessing a firearm while knowingly being a user of and addicted to a controlled substance, does not. Defendant objects to the first recommendation and the government objects to the second. After de novo review of the magistrate judge's opinion, the court overrules both objections and adopts the recommendation in the M&R.

The Second Amendment to the Constitution provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Section 922(n) makes it unlawful for "any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce," and § 922(g)(3) forbids the same conduct by anyone "who is an unlawful user of or addicted to any controlled substance." In Bruen, the Supreme Court determined

> the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

New York State Rifle and Pistol Association, Inc. v. Bruen, 142 S. Ct. 2111, 2126 (2022). According to Bruen, some cases are relatively straightforward: "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the presence of a "similar historical regulation addressing the problem is relevant evidence that the challenged regulation" is consistent with "the understandings of those who ratified" the Constitution. Id. at 2131-32. "Other cases implicating unprecedented societal concerns or dramatic technological

3

changes may require a more nuanced approach." Id. at 2132. "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when in engaging in [the required] analogical inquiry." Id. at 2133. Precedent points to at least two metrics: "how and why the regulations burden" Second Amendment rights. Id.

    1.    § 922(n)

    Defendant argues that the government's authority to deprive those under felony indictment of their liberty pending trial is not an appropriate historical analogue for modern restrictions on those individuals' receipt of firearms. The court disagrees.

    The magistrate judge determined, and defendant agrees, that the plain text of the Second Amendment covers defendant's person and conduct. Defendant objects, however, to the magistrate judge's determination that the historical burdens imposed by laws allowing pretrial detention of indicted defendants are sufficiently analogous to modern-day restrictions on the receipt of firearms in interstate commerce by those individuals.

    The case of individuals under felony indictment is one of the "straightforward" instances noted in Bruen, in which the challenged law addresses a societal problem present at the time of the founding. The English Bill of Rights, adopted after "James II was overthrown in the Glorious Revolution," is the ancestor of both the Second and Eighth Amendments. Timbs v. Indiana, 139 S. Ct. 682, 688 (2019); see also District of Columbia v. Heller, 554 U.S. 570, 598 (2008) (explaining the circumstances of the adoption of that document). The Eighth Amendment provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," and the analogous clause of the English Bill of Rights provides much the same thing. See Timbs, 139 S. Ct. at 688. Neither provision, however, "has been thought

4

to accord a right to bail in all cases," especially "where the punishment may be death," <u>Carlson v. Landon</u>, 342 U.S. 524, 545 (1952), as was the case with most felony offenses at the time of the founding. <u>See</u> <u>Lange v. California</u>, 141 S. Ct. 2011, 2023 (2021) ("The felony category then was a good deal narrower than now . . . , with the felony label mostly reserved for crimes punishable by death."). The same document thus provides historical support for the individual's right to bear arms and the government's ability to detain that individual, suspending temporarily any right to armament, upon probable cause that the individual has committed a felony. Where § 922(n) restricts the right of those under felony indictment to bear arms to a lesser degree than restrictions present at the founding, the government has carried its burden to show that the provision is consistent with the Nation's historical tradition of firearm regulation.[1]

Defendant argues that indictment and pretrial detention are not sufficiently analogous where different burdens of proof apply to each. Although a defendant may be indicted upon a finding by a grand jury that the defendant committed a crime by the preponderance of the evidence, he may be detained pending trial only upon a determination that clear and convincing evidence shows that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(e). This difference in the burden of proof, however, is a modern distinction not operative at the time of the founding. <u>See</u> Patricia M. Wald & Daniel J. Freed, <u>The Bail Reform Act of 1966: A Practitioner's Primer</u>, AM. BAR ASS'N J., Oct. 1966, at 630-39 (explaining that the law "mark[ed] the first major overhaul of federal bail law since 1789").

---

[1]    District courts are divided on whether § 922(n) is consistent with the Second Amendment, and no circuit courts have decided the issue. <u>See, e.g.</u>, <u>United States v. Holden</u>, 70 F.4th 1015, 1018 (7th Cir. 2023) (finding it likely that § 922(n) would survive a facial challenge in a case that did not present such challenge squarely); <u>United States v. Kays</u>, 624 F. Supp. 3d 1262, 1268 (W.D. Okla. 2022) (holding that § 922(n) does not violate the Second Amendment where proper historical analogues exist); <u>United States v. Quiroz</u>, 629 F. Supp. 3d 511 (W.D. Tex. 2022) (finding "little evidence that § 922(n) . . . aligns with this Nation's historical tradition).

5

J.A. 259

Accordingly, defendant's argument that § 922(n) is unconstitutional under the Second Amendment is without merit, and defendant's motion in this part is denied.

2.      922(g)(3)

The government objects to the magistrate judge's recommendation that the court dismiss defendant's charge of knowingly possessing a firearm while knowing he was an unlawful user of and addicted to a controlled substance in violation of 922(g)(3), on the grounds that defendant is not a person with Second Amendment rights, that his conduct is not protected by the Second Amendment, and that the provision is consistent with the Nation's traditions of firearms regulation. The court disagrees.

a.          Whether defendant has Second Amendment rights

The government argues that only law-abiding Americans, from which class unlawful users of controlled substances are excluded, are entitled to keep and bear arms. As explained in the M&R, however, the Supreme Court had no occasion in <u>Bruen</u> to consider whether unlawful drug users possess Second Amendment rights, because it was "undisputed that petitioners . . . [,] two ordinary, law-abiding, adult citizens[, were] part of 'the people' whom the Second Amendment protects." <u>Bruen</u>, 142 S. Ct. at 2134. The Supreme Court has remarked previously that the Constitution's use of the phrase "the people" in "six other provisions" to refer "unambiguously . . . to all members of the political community," creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." <u>Heller</u>, 554 U.S. at 581. Supreme Court precedent therefore suggests strongly that all Americans, including those who confess to regular unlawful drug use, enjoy Second Amendment protection.

In light of these remarks by the Supreme Court, the government's references to decisions by the United States Court of Appeals for the Fourth Circuit assertedly withdrawing Second

Amendment rights from certain classes of people are unconvincing and inapposite. Before <u>Bruen</u> was decided, the Fourth Circuit applied a "streamlined analysis" for challenges to regulations stated in <u>Heller</u> to be "presumptively lawful." <u>Hamilton v. Pallozzi</u>, 848 F.3d 614, 623 (4th Cir. 2017). This analysis "supplant[ed] the historical inquiry with the more direct question of whether the challenger's conduct is within the protected Second Amendment right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" <u>Id.</u> at 624 (citing <u>Heller</u>, 554 U.S. at 635). The streamlined inquiry, however, applied to a limited set of regulations, such as bans on possession of firearms by those who entered the country illegally, <u>see United States v. Carpio-Leon</u>, 701 F.3d 974, 981 (4th Cir. 2012), or those with felony convictions. <u>See United States v. Moore</u>, 666 F.3d 313, 320 (4th Cir. 2012). When the constitutionality of 922(g)(3) was presented squarely to the Fourth Circuit, that court declined to adopt the government's view that "dangerous and non-law-abiding citizens are categorically excluded from the historical scope of the Anglo-American right to bear arms . . . , assum[ing] that [the defendant's] circumstances implicate[d] the Second Amendment," and decided the case before it on other issues. <u>United States v. Carter</u>, 669 F.3d 411, 416 (4th Cir. 2012). Where the Supreme Court has suggested strongly that all Americans enjoy some degree of Second Amendment protection, and where the Fourth Circuit has never held users of illicit drugs to be excluded from that protection, the court adopts the magistrate judge's determination that, for purposes of his § 922(g)(3) charge, defendant remains a person who possesses Second Amendment rights.

        b.      Whether defendant's conduct is protected by the Second Amendment

The government argues that the relevant conduct for purposes of constitutional inquiry is "possessing a firearm while being an unlawful drug user," contending that defendant's "conduct in possessing the firearm cannot be divorced from the then-existing condition which made such

7

J.A. 261

possession inherently dangerous." (DE 30 at 6). This argument is directly foreclosed by Bruen, which analyzed separately whether petitioners were "part of 'the people' whom the Second Amendment protects," and "whether the plain text of the Second Amendment protect[ed] petitioner's] proposed course of conduct." 142 S. Ct. at 2134. The government's position conflates the inquiry conducted above with the separate question of whether the statute at issue burdens the right to "keep and bear arms." U.S. Const. amend. II. The court "has little difficulty concluding that" § 922(g)(3), which prohibits the receipt of firearms, burdens conduct within the ambit of the Second Amendment. Id.

      c.      Whether § 922(g)(3) is consistent with historical traditions

Cases implicating societal concerns not present at the founding, such as unlawful drug use, require a nuanced approach. See Bruen, 142 S. Ct. at 2132. While courts "should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have anticipated . . . , analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." Id. at 2133 (emphasis in original). The government offers three categories of historical analogue, all of which were canvassed thoroughly by the magistrate judge.

The government first points to "English law in existence at the time of (and just after) the founding [which] allowed for some detention of the acutely mentally ill." (DE 30 at 11). But the government provides no evidence that this English practice "was acted on or accepted in the colonies." Bruen, 142 S. Ct. at 2136. In addition, the government's citation to a concurring opinion in Bruen by Justices Kavanaugh and Alito, in which the justices expressed their view that regulations disarming "felons and the mentally ill" are constitutional, is inapposite given that

8

neither § 922(g)(1), which disarms felons, or § 922(g)(4), which disarms the mentally ill, are at issue in this case.

The government argues next that colonial, early American, and Reconstruction-era statutes limiting the use of firearms by intoxicated persons provide a sufficient historical analogue. The government points to laws from colonial Virginia, New York, and Rhode Island that forbade shooting guns at drinking events, in taverns, or on certain holidays. (See DE 30 at 16). None of these laws, however, forbade the possession or acquisition of firearms; they outlawed only the active use of such weapons at sensitive times. The government's reference to nineteenth century laws limiting the intoxicated from using firearms similarly falls short where those laws apply only to actually intoxicated persons, not persons likely so to become.

Finally, the government contends that there is "a tradition of disarmament of individuals and groups which [the] legislature found to be dangerous." (DE 30 at 22); see also Kanter v. Barr, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting) ("History . . . support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous[,] . . . mak[ing] that judgment on a class-wide basis."). Colonial Massachusetts and New Hampshire disarmed "those who carried arms in a manner that spread fear or terror," (DE 30 at 22), and other colonies disarmed "entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony or the Revolution's cause; enslaved persons; and Native Americans." (Id. at 23) (citing to statutes in Connecticut, Delaware, Massachusetts, New Jersey, New York, North Carolina, Pennsylvania, and Virginia). While these restrictions would not pass constitutional muster today, they do show an understanding present at the founding that certain groups may present a special danger when armed. The "how" of these laws is relatively straightforward: those "disaffected to the cause of America," for example, simply were disarmed.

9

J.A. 263

See, e.g., Act of Mar. 14, 1776, ch. VII, 1775-76 Mass. Act 31-32, 35 ("[E]very male person above sixteen years of age . . . who shall neglect or refuse to subscribe a . . . declaration of [loyalty], . . . shall be disarmed and have taken from him in manner hereafter directed, all such arms, ammunities [sic] and warlike implements, as by the strictest search can be found in his possession or belonging to him"); Act of May 5, 777, ch. 3, Va. Stat. 281-82 (directing county officials "to cause . . . recusants to be disarmed"); Act of June 13, 1777, ch. 756 §§ 2, 4, 1777 Pa. Laws 110, 111-13 ("[A]ll male white inhabitants of [Pennsylvania] above the age of eighteen years, shall . . . take and subscribe [an] oath or affirmation . . . and every person above the age aforesaid refusing or neglecting to take and subscribe the said oath or affirmation . . . shall during the time of such neglect or refusal . . . be disarmed."  Native Americans' ability to acquire guns was curtailed where colonists were prohibited from selling arms to them.  See, e.g., Ch. 58, § 2 (1633), Charters and General Laws of the Colony and Province of Massachusetts Bay 132, 133 (1814) ("And it is ordered, that no person whatsoever, shall . . . . sell, give or barter, directly or indirectly, any gun or guns, powder, bullets, shot, lead, to any Indian whatsoever").[2]

The "why" of these laws, however, do not neatly map onto the purpose of § 922(g)(3): colonial and early American laws preventing dangerous individuals from owning guns reflected a fear that those guns might be used to overthrow the government, whereas § 922(g)(3) simply seeks to promote public safety.  See, e.g., Act of Apr. 1, 1778, ch. 796, §§ 1-3, 5, 10 (disarming recusants where "the welfare and happiness of the good people of this commonwealth do, next under God, entirely depend upon the maintaining and supporting the independence and sovereignty of the state").  Although the government is correct that "violence against the state undoubtedly meant

---

[2]      The text of these statutes is drawn from the Repository of Historical Gun Laws, an online database maintained by the Center for Firearms Law at Duke University School of Law.

violence against loyal soldiers or innocent civilians," (DE 24), historical laws protecting one interest are not a good analogue for modern laws protecting a byproduct of that interest.[3]

Accordingly, the government has not met its burden of proving that § 922(g) is consistent with the Second Amendment. Thus, defendant's motion in this part is granted, and count two of the indictment is dismissed.

## CONCLUSION

Based on the foregoing, the court ADOPTS the recommendation of the M&R. Defendant's motion to dismiss the indictment (DE 17) is GRANTED IN PART and DENIED IN PART. Count two of the indictment is DISMISSED.

SO ORDERED, this the 24th day of October, 2023.



LOUISE W. FLANAGAN
United States District Judge

---

[3]    District courts are divided on the constitutionality of § 922(g)(3), and the Fifth Circuit is the only federal appellate court to decide the issue to date. See, e.g., United States v. Daniels, 77 F.4th 337, 355 (5th Cir. 2023) (finding "the government's theory of danger-based disarmament" unconvincing when advanced in support of the constitutionality of § 922(g)(3)); United States v. Posey, No. 2:22-CR-83, 2023 WL 1869095 at *9, (N.D. Ind. Feb. 9, 2023) (finding that the historical record contains sufficient analogues for § 922(g)(3)); United States v. Harrison, No. CR-22-328, 2023 WL 1771138 at *6 (finding such analogues insufficient).

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:23-CR-21-FL1

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NOTICE OF APPEAL |
| CARLOS ALSTON | |

Notice is hereby given that the United States of America, by and through the United States Attorney for the Eastern District of North Carolina, appeals to the United States Court of Appeals for the Fourth Circuit from the Order entered by the District Court on October 24, 2023, finding that 18 U.S.C. § 922(g)(3) is unconstitutional.

Respectfully submitted this 20th day of November, 2023.

MICHAEL F. EASLEY, JR.
United States Attorney


BY:    /s/ Sarah Nokes
         SARAH NOKES
         Assistant United States Attorney
         150 Fayetteville Street
         Suite 2100
         Raleigh, North Carolina 27601
         Telephone: 919-856-4530

J.A. 266

CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2023, I electronically filed

the foregoing with the Clerk of the Court using the CM/ECF System, which

will send notice of such filing to the following registered CM/ECF user:

Sonya M. Allen
Office of the Federal Public Defender


/s/ *Sarah Nokes*
SARAH NOKES
Assistant United States Attorney