No. 23-4705

IN THE

# United States Court of Appeals
# for the Fourth Circuit

UNITED STATES OF AMERICA,
*Appellant*,

v.

CARLOS ALSTON,
*Appellee*.

———————————

On Appeal from the United States District Court
for the Eastern District of North Carolina (Flanagan, J.)

———————————

**RESPONSE BRIEF FOR APPELLEE**

———————————

G. ALAN DUBOIS
FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA

ANDREW DESIMONE
ASSISTANT FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236

September 20, 2024      *Counsel for Appellee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................ii

STATEMENT OF ISSUE...................................................................................1

STATEMENT OF THE CASE ...........................................................................2

1. Mr. Alston is arrested and charged with a federal firearm offense.................3

2. Mr. Alston moves to dismiss the charge as violating his Second Amendment right to armed self-defense.............................................................................4

3. The magistrate judge holds a hearing on Mr. Alston's motion to dismiss.........6

4. The magistrate judge rules that Section 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense. ......................................... 9

5. The district court adopts the M&R, rules that Section 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense, and dismisses the charge.....................................................................................................11

SUMMARY OF ARGUMENT ...........................................................................13

ARGUMENT ......................................................................................................14

The magistrate judge and district court correctly ruled that 18 U.S.C. § 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense...........................14

A. This Court should affirm, whether it rules facially, as applied to all marijuana users, or as applied only to Mr. Alston................................................15

B. The lower courts correctly ruled that Mr. Alston is a member of "the people" whose conduct is protected by the Second Amendment's plain text..............18

C. The government bore the burden to prove Section 922(g)(3) was "distinctly similar" to the American tradition of firearm regulation. But it failed even to prove Section 922(g)(3) was "relevantly similar" to our tradition..........................23

D. The lower courts correctly ruled Section 922(g)(3) is not relevantly similar to any American tradition stripping the mentally ill of their Second Amendment right to armed self-defense...............................................................................25

i

E. The lower courts correctly ruled Section 922(g)(3) is not relevantly similar to any American tradition stripping users of intoxicants of their Second Amendment right to armed self-defense……………………………………………...……………35

F. The lower courts correctly ruled Section 922(g)(3) is not relevantly similar to any American tradition stripping "dangerous" people of the right to armed self-defense…………………………………………………………………....41

CONCLUSION...................................................................................................47

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

### CASES

*Citizens United v. FEC,*
558 U.S. 310 (2010) ........................................................................16

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .................................................................*passim*

*Doe v. Reed,*
561 U.S. 186 (2010) ........................................................................16

*Garland v. Range,*
144 S. Ct. 2706 (2024) ............................................... 19, *footnote*

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022)......................................................................*passim*

*Planned Parenthood S. Atl. v. Kerr,*
95 F.4th 152, 165 (4th Cir. 2024) ................................... 19, *footnote*

*Range v. Att'y Gen. United States of Am.,*
69 F.4th 96 (3d Cir. 2023) (en banc).........................................19

*Rhode v. Bonta*,
　　2024 U.S. Dist. LEXIS 17052 (S.D. Cal. Jan. 30, 2024) ........................................22

*United States v. Arroyo-Jaimes*,
　　608 F. App'x 843 (11th Cir. 2015) ...........................................................27

*United States v. Carter*,
　　669 F.3d 411 (4th Cir. 2012) ...................................................................22

*United States v. Chapman*,
　　666 F.3d 220 (4th Cir. 2012) ...................................................................14

*United States v. Chester*,
　　628 F.3d 673 (4th Cir. 2010) ...................................................................21

*United States v. Connelly*,
　　2024 U.S. App. LEXIS 21866 (5th Cir. 2024)...............................................*passim*

*United States v. Davey*,
　　2024 U.S. Dist. LEXIS 16030 (D.C. Kan. Jan. 30, 2024)...................................20

*United States v. Duarte*,
　　101 F.4th 657 (9th Cir. 2024) ...................................................................19

*United States v. Espinoza-Melgar*,
　　687 F. Supp. 3d 1196 (D. Utah Aug. 16, 2023)......................................20

*United States v. Harrison*,
　　654 F. Supp. 3d 1191 (W.D. Okla. Feb. 3, 2023) ...........................................*passim*

*United States v. Lewis*,
　　682 F. Supp. 3d 1038 (S.D. Ala. July 17, 2023)......................................20

*United States v. Salerno*,
　　481 U.S. 739 (1987) ...................................................................15

*United States v. Staten*,
　　666 F.3d 154 (4th Cir. 2011) ...................................................................14

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) ........................................................*passim*

*United States v. Russell,*
    971 F.2d 1098 (4th Cir. 1992) ......................................27, 35, 42

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) ......................................................34

*United States v. Zayyad,*
    741 F.3d 452 (4th Cir. 2014) ......................................27, 35, 42

*Vincent v. Garland,*
    144 S. Ct. 2708 (2024)……………………………………...19, *footnote*

*Weidman v. Exxon Mobil Corp.,*
    776 F.3d 214 (4th Cir. 2015) ...............................................14,18

## STATUTES

18 U.S.C. § 922(g)(1) ...............................................................19, *footnote*

18 U.S.C. § 922(g)(3) ........................................................*passim*

18 U.S.C. § 922(g)(4) ...............................................................28

18 U.S.C. § 922(g)(8) ...............................................................25, *footnote*

18 U.S.C. § 922(g)(9) ...............................................................21

18 U.S.C. § 922(n) ...................................................................2

1837 Mass. Acts 273 .................................................................38

1837 Me. Laws 424 .................................................................38

1844 R.I. Pub. Laws 503 .............................................................38

1899 S.C. Acts 97, No. 67, § 1 ................................................................ 41

2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation:
    The American Tradition, pt. 11 Pennsylvania, at 97 ............................ 37

A Collection of All Such Acts of the General Assembly of Virginia
    (vol. 1) 244-245 (1792) .......................................................................... 29

Acts and Laws of the State of Connecticut, in America
    (vol. 1) 236 (1796) ...................................................................... 29, 35, 36

Acts of the General Assembly of the Province of New-Jersey
    303 (1752) ................................................................................................ 37

Laws of the State of Maine (vol. 1) 453 (1821) ...................................... 30

Laws of the State of New York (vol. 2) 644-645 (1788) ......................... 28

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ............................................................................... 16

U.S. Const. amend. II ........................................................................ *passim*

## OTHER AUTHORITIES

Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind*
    6 (8th ed., Boston, James Lording 1823) ..................................... 24-25

Carton F.W. Larson, Four Exceptions in Search of A Theory:
    *District of Columbia v. Heller* and Judicial *Ipse Dixit*,
    60 Hastings L.J. 1371 (2009) ............................................................. 26

David F. Musto, *The American Experience with Stimulants and Opiates*,
    2 Persps. on Crime & Just. 51 (1998) ............................................... 24

Drug Facts: *Understanding Drug Abuse and Addiction,*
   National Institute on Drug Abuse, available at
   https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction
   (last visited Sep. 11, 2024) ........................................................................33

Letter from John Adams to William Willis (Feb. 21, 1819),
   in 10 The Works of John Adams,
   Second President of the United States 365
   (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856) ...........................24

Henry Care,
   *English Liberties, or the Free-Born Subject's Inheritance*
   329 (6th ed. 1774) ....................................................................................31

## STATEMENT OF ISSUE

Whether the magistrate judge and district court correctly ruled that 18 U.S.C. §

922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense?

# STATEMENT OF THE CASE

*Procedural History*

On January 24, 2023, a federal grand jury in the Eastern District of North Carolina returned an indictment charging Appellee, Carlos Alston, with (1) receiving a firearm while under felony indictment, in violation of 18 U.S.C. § 922(n), and (2) possessing a firearm "knowing he was an unlawful user of and addicted to any controlled substance, including marijuana," in violation of 18 U.S.C. § 922(g)(3). J.A. 15.

On February 28, 2023, Mr. Alston moved to dismiss the indictment "because 18 U.S.C. § 922(g)(3) and 18 U.S.C. § 922(n) violate Mr. Alston's Second Amendment right to keep and bear arms." J.A. 18-50. The government filed its response in opposition on March 28, 2023. J.A. 51-82. Following supplemental briefing and a hearing, J.A. 83-176, Magistrate Judge Robert T. Numbers, II, issued a Memorandum & Recommendation (M&R), ruling that "the district court should find that § 922(n) passes constitutional muster while § 922(g)(3) does not." J.A. 83-218. The magistrate judge therefore recommended that the district court deny Mr. Alston's motion to dismiss the charge under Section 922(n) but grant his motion to dismiss the Section 922(g)(3) charge. J.A. 177-218.

Both the government and Alston filed objections to the M&R. J.A. 219-254. On October 24, 2023, the district court adopted the recommendations in the M&R. J.A. 255-265. The district court therefore denied Mr. Alston's motion to dismiss the charge

of receiving a firearm while under indictment pursuant to Section 922(n) and granted his motion to dismiss the charge of possession of a firearm by a person who is an unlawful user of, or addicted to, a controlled substance under Section 922(g)(3). J.A. 255-265. On November 29, 2023, the government filed notice of appeal "from the Order entered by the District Court on October 24, 2023, finding that 18 U.S.C. § 922(g)(3) is unconstitutional." J.A. 266-267.

Mr. Alston did not file notice of appeal from the district court's denial of his motion to dismiss the charge under Section 922(n). Therefore, only the constitutionality of Section 922(g)(3) is at issue in this appeal. Accordingly, Mr. Alston limits the factual background below to the lower courts' rulings that Section 922(g)(3) violated his Second Amendment right to armed self-defense.

### *Relevant Factual Background*

### 1. Mr. Alston is arrested and charged with a federal firearm offense.

On January 6, 2023, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives swore out a criminal complaint against Mr. Alston for gun possession by a person who is an unlawful user of, or addicted to, a controlled substance under 18 U.S.C. § 922(g)(3). J.A. 8-14. The complaint alleged that around 8:00 p.m. on January 4, 2023, Mr. Alston sat in his car in the drive-thru lane of a restaurant in Henderson. J.A.10. An officer approached from the passenger side, told Mr. Alston there were active warrants for his arrest, and told him to show his hands. J.A. 10. Mr.

Alston brandished a firearm and the officer shot him. J.A. 10. Mr. Alston ran across the street, discarded the firearm, collapsed, and was arrested. J.A. 10-11.

Back at the car, officers smelled what they thought was marijuana. J.A. 11. They found what they recognized as a marijuana cigarette, weighing 1.1 grams, on the passenger side. J.A. 11. They also found a plastic bag with twenty-six grams of a substance they recognized as marijuana in the driver-side door pocket. J.A. 11. The complaint further alleged that Mr. Alston's probation was revoked in 2021 after he tested positive for marijuana and that he had been arrested in 2019 and 2021 after possessing marijuana. J.A. 12.

Mr. Alston was arrested on the criminal complaint on January 18, 2023, and admitted to daily marijuana use. J.A. 2, J.A. 53. But there is no evidence in the record that Mr. Alston was intoxicated at the time of his arrest. J.A. 8-176. On January 24, 2023, a federal grand jury in the Eastern District of North Carolina returned an indictment charging Mr. Alston with, *inter alia*, possessing a firearm "knowing he was an unlawful user of and addicted to any controlled substance, including marijuana," in violation of 18 U.S.C. § 922(g)(3). J.A. 15.

## 2. Mr. Alston moves to dismiss the charge as violating his Second Amendment right to armed self-defense.

Mr. Alston moved to dismiss the Section 922(g)(3) charge as violative of his Second Amendment right to armed self-defense based on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). J.A. 18-50. Mr. Alston argued, "If 'the Second

Amendment's plain text covers an individual's conduct,' then under *Bruen*, 'the Constitution presumptively protects that conduct.'" J.A. 19 (quoting *Bruen*, 142 S. Ct. at 2129-30). Mr. Alston asserted, "The Second Amendment's operative clause contains three textual elements: it protects the right of (1) 'the people' to (2) 'keep and bear' (3) 'Arms.' Here, Mr. Alston satisfies all three elements." J.A. 24-25. Accordingly, he argued the Second Amendment's plain text covered his conduct and the "government must show that [the] challenged law 'is consistent with the Nation's historical tradition of firearm regulation.'" J.A. 19 (quoting *Bruen*, 142 S. Ct. at 2129-30).

Because firearm possession by users of intoxicating substances was "a problem that existed in 1791 and is not historically 'unprecedented,'" Mr. Alston argued "the government must point to a robust tradition of '*distinctly similar* historical regulation[s] as of 1791." J.A. 30-34 (quoting *Bruen*, 142 S. Ct. at 2131). But even if the problem of gun possession by users of intoxicants was new, the government could not establish a "relevantly similar" tradition of regulation that imposed comparable burdens on gun possession by users of intoxicants for comparable reasons. J.A. 36-38. Specifically, Mr. Alston argued, "The government cannot identify a historical tradition of firearm regulation that supports disarming citizens based on using marijuana." J.A. 30. Mr. Alston never limited his Second Amendment claim to a facial challenge. J.A. 18-50.

The government responded by asserting, "Section 922(g)(3) proscribes conduct outside the scope of Second Amendment protections because it prohibits firearm possession by non-law-abiding individuals." J.A. 54. Specifically, the government

asserted, "Chronic drug users are neither law-abiding nor responsible and they are not afforded the Second Amendment protections enjoyed by responsible, law-abiding individuals." J.A. 59.

Alternatively, the government argued, "Even if the Court finds that the Second Amendment applies to unlawful drug users, Section 922(g)(3) is consistent with historical tradition." J.A. 60. The government asserted that "Section 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is analogous to 'longstanding prohibitions on the possession of firearms by … the mentally ill' and the intoxicated." J.A. 61 (citation omitted). The government briefly asserted that history also supported the "disarmament of individuals deemed to be dangerous or risky[.]" J.A. 66.

## 3. The magistrate judge holds a hearing on Mr. Alston's motion to dismiss.

The magistrate judge held a hearing on Mr. Alston's motion to dismiss. The government declined to present evidence, asserting, "I think both parties' briefs set forth the facts pretty similarly." J.A. 103. The government reasserted its claim that Mr. Alston was not a law-abiding, responsible citizen and therefore had no Second Amendment protection. J.A. 103-118. Alternatively, the government argued Section 922(g)(3) was supported by a tradition of similar regulation. J.A. 122-132. Specifically, the government argued that historical laws "dispossessing individuals because they are drunkards or intoxicated by alcohol, and dispossessing individuals who are mentally ill[,]" are "the two best historical analogues in this context." J.A. 124.

As to intoxicated people, the government asserted that "at the time of the founding and then into the 1800s, there was this evolution of disarming individuals who were intoxicated, who were drunkards from having firearms because they were considered to be dangerous." J.A. 126. Addressing the government's argument, the magistrate judge asserted that "two of those three colonial era cases that you cited talked about firing firearms. And the one about the military officers seemed to involve disarming someone. But it seemed like the historical tradition outside of the military was more to prohibit use as opposed to possession of the firearms." J.A. 127. The government responded that the "two different activities" of "firing firearms" and "possession of firearms" should not "matter in the Court's analysis because we can show this historical tradition." J.A. 127-128.

The magistrate judge then asked the government whether its three colonial-era laws were passed for similar public-safety reasons as Section 922(g)(3). In response, the government conceded, "I don't have any statements upon the promulgation of any of those laws that show that in 1655 the legislature of the Colony of Virginia was primarily or solely concerned with the public safety in passing a law preventing someone from possessing a firearm while drinking." J.A. 129.

The government then moved on to its argument "that 922(g)(3) is analogous to the disarmament of the mentally ill." J.A. 130. The magistrate judge asked the government, "You're talking about that there were laws about disarming the mentally ill and all that. Where in your brief are those laws?" J.A. 131. The government

7

responded that it "cited opinions discussing longstanding prohibitions on possession of firearms by the mentally ill; that's from Heller." J.A. 131. The government continued, "We cited Yancy for the proposition that in 18th century America justices of the peace were authorized to lock up lunatics who were dangerous—too dangerous to be permitted to go abroad. We didn't, as in the situation with disarming drunk individuals, cite specific statutes from 1600 or 1700s so." J.A. 131.

At the hearing, the government never argued that any tradition of disarming "dangerous" people supported the constitutionality of Section 922(g)(3). J.A. 103-132. By contrast, the government argued that the tradition of disarming "dangerous" people supported the constitutionality of Section 922(n), which is not at issue in this appeal. J.A. 132, 136-140.

In response, Mr. Alston argued the Supreme Court has held the Second Amendment applies to "all Americans," not just the law-abiding. J.A. 145. Therefore, "the burden is on the government to show that what they're doing now looked like something they did back then" when the Second Amendment was ratified. J.A. 170.

Mr. Alston further argued the government's proffered analogues were dissimilar because they only "restricted the person who was intoxicated from using the firearm. That is the how and why right there. We don't have that in this case[,]" where Section 922(g)(3) flatly prohibits all possession of firearms regardless of intoxication. J.A. 162. Mr. Alston also argued the government's burden to prove an analogous tradition of gun regulation was the same whether the court viewed the challenge as facial or as-applied:

"So when it comes to the question of whether it's unconstitutional as applied or just facially, those two answers -- those two questions are answered when we take a look at that line of questioning. The how and why is where's your analysis, where's your analogy." J.A. 162. Mr. Alston asked the Court "to examine the issue, to examine the facts and our arguments, and ultimately determine that under this line of analysis, under the examination of *Bruen*, Mr. Alston's rights have been violated[.]" J.A. 170.

### 4. The magistrate judge rules that Section 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense.

On July 18, 2023, the magistrate judge issued the M&R, noting, "The factual background comes from the parties' briefs. The parties do not appear to disagree, at least for now, about the material facts." J.A. 177.

First, the magistrate judge ruled Mr. Alston was a member of "the people" who enjoys Second Amendment rights. J.A. 187-189. The magistrate judge also found that "Alston's conduct—possessing a firearm—implicates the Second Amendment and is entitled to presumptive protection." J.A. 197.

Second, the magistrate judge rejected the government's argument that "'longstanding prohibitions on the possession of firearms by … the mentally ill' may serve as a proper historical analogue to § 922(g)(3)[.]" J.A. 198. Initially, the magistrate judge found the government failed to prove that the English practice of temporarily detaining "lunatics" upon issuance of a warrant "saw use in the American colonies." J.A. 201. The magistrate judge then found that "English and colonial American

9

traditions regulating the mentally ill differ from § 922(g)(3) in both purpose and operation." J.A. 204.

Third, the magistrate judge rejected the government's argument that "§ 922(g)(3) is analogous 'to historical laws that prohibited carrying a firearm while under the influence of alcohol.'" J.A. 204-210. The magistrate judge found that the three colonial laws cited by the government failed to 'establish a robust historical practice." J.A. 205 (citing *Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.")). But more fundamentally, the magistrate judge found the laws served different purposes and "the methods they employ[ed] to prevent the interaction of drugs and guns [were] patently different." J.A. 205-206. The magistrate judge also rejected the government's reliance on Reconstruction-era and 20th-century laws, finding those laws minimally probative and relevantly dissimilar. J.A. 207-209.

Fourth, the magistrate judge rejected the government's passing argument that it "has long held the power to disarm 'individuals deemed to be dangerous or risky[.]'" J.A. 210. As the magistrate judge found, "This argument—which spans less than a page—does not give the court much to work with. Despite bearing the burden of identifying a discreet analogue to justify § 922(g)(3), the government makes only one passing reference to a historical source on disarming the dangerous[.]" J.A. 210. While the government cited "some primary sources on regulating the dangerous to justify § 922(n)[,]" it did not "offer any argument at all to suggest that these sources may serve

as an analogue to § 922(g)(3)." J.A. 210. Nevertheless, the magistrate judge looked to all the sources cited by the government and found they were dissimilar. J.A. 211-215.

In sum, the magistrate judge found, "Taken together, the historical examples discussed above are not analogous to § 922(g)(3) to establish the statute's constitutionality." J.A. 216. The magistrate judge recommended that the district court grant Mr. Alston's motion to dismiss the charge under Section 922(g)(3). J.A. 216.

**5. The district court adopts the M&R, rules that Section 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense, and dismisses the charge.**

On August 15, 2023, the government filed objections "to the magistrate judge's conclusion that 18 U.S.C. § 922(g)(3) is unconstitutional in light of the Supreme Court's recent holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*[,] 142 S. Ct. 2111 (2022)." J.A. 219. Mr. Alston "concur[red] with the Magistrate Judge's recommendation with regard to the finding that § 922(g)(3) is unconstitutional." J.A. 246-249.

On October 24, 2023, the district court entered an order adopting the recommendations of the magistrate judge. J.A. 255-265. Specifically, the district court adopted the magistrate judge's determinations that Mr. Alston possessed Second Amendment rights and that Section 922(g)(3) "burdens conduct within the ambit of the Second Amendment." J.A. 262.

The district court also ruled "the government has not met its burden of proving that § 922(g)([3)] is consistent with the Second Amendment." J.A. 265. The district court therefore granted Mr. Alston's motion to dismiss the Section 922(g)(3) charge.

J.A. 255-265. On November 20, 2023, the government filed notice of appeal to this Court "from the Order entered by the District Court on October 24, 2023, finding that 18 U.S.C. § 922(g)(3) is unconstitutional." J.A. 266-267.

## SUMMARY OF ARGUMENT

When the Second Amendment's "plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 17, 24 (2022). For a firearm regulation to survive the amendment's "unqualified command" that "the right of the people to keep and bear Arms … shall not be infringed[,]" U.S. Const. amend. II, the government must prove the law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24. Specifically, the government must prove that a "well-established and representative" historical tradition of regulation "impose[d] a comparable burden on the right of armed self-defense" that was also "comparably justified." *Id.* at 29-30.

Here, the lower courts correctly ruled Mr. Alston was part of "the people" whose conduct is presumptively protected by the Second Amendment. The lower courts also correctly ruled the government failed to meet its burden to identify an American tradition justifying 18 U.S.C. § 922(g)(3)'s prohibition on gun possession by people who use, or are addicted to, controlled substances. The Founders simply did not strip regular users of intoxicants of their fundamental right to armed self-defense. So Congress cannot do so now. This Court should therefore affirm.

13

# ARGUMENT

**The magistrate judge and district court correctly ruled that 18 U.S.C. § 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense.**

## *Standard of Review*

This Court reviews *de novo* a Second Amendment challenge to a federal statute. *United States v. Staten*, 666 F.3d 154, 157-58 (4th Cir. 2011). This Court "'may affirm a judgment for any reason appearing on the record.'" *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 220 (4th Cir. 2015) (citation omitted).

## *Argument*

In *Bruen*, the Supreme Court mandated a course correction for analysis of Second Amendment claims. At the time *Bruen* was decided, the Court had already held the Second Amendment codified an individual right to possess and use firearms, and that self-defense was the "central component" of that right. *District of Columbia v. Heller*, 554 U.S. 570, 592, 599, 624 (2008). But after *Heller*, courts not only asked whether a challenged law comported with the Second Amendment's text and history, but also applied means-end scrutiny. *See, e.g., United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012).

*Bruen* disavowed that two-step framework as "one step too many." *Bruen*, 597 U.S. at 19. In its place, the Court adopted a "text-and-history standard" consistent with *Heller*'s first step. *Id.* at 39.

Under *Bruen*, when the amendment's "plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17, 24. For a firearm regulation to survive the amendment's "unqualified command" that "the right of the people to keep and bear Arms … shall not be infringed[,]" U.S. Const. amend. II, the government must prove the law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 24. In doing so, the "central considerations" are whether the government proves that a "well-established and representative" historical tradition of regulation "impose[d] a comparable burden on the right of armed self-defense" that was also "comparably justified." *Id.* at 29-30. In other words, "how and why" the Framers burdened the right to armed self-defense must be analogous to "how and why" the modern regulation does so. *Id.*

Here, the lower courts correctly ruled the government failed to meet its burden to identify an American tradition justifying 18 U.S.C. § 922(g)(3)'s prohibition on gun possession by people who regularly use, or are addicted to, controlled substances. This Court should therefore affirm.

## A. This Court should affirm, whether it rules facially, as applied to all marijuana users, or as applied only to Mr. Alston.

The government maintains that "because Alston has made a *facial* constitutional challenge, he must demonstrate that there is no set of circumstances under which Congress could constitutionally prohibit individuals who regularly and unlawfully use illegal drugs from possessing firearms." Gov't Br. 44 (citing *United States v. Salerno*, 481

U.S. 739, 745 (1987)). The government asserts, "There are, at minimum, some circumstances in which Section 922(g)(3) is constitutionally sound." Gov't Br. 44.

But no matter how many times the government says it, Mr. Alston did not limit his challenge to a facial one. J.A. 18-50. And for good reason—"The label is not what matters." *Doe v. Reed*, 561 U.S. 186, 194 (2010). "[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

In *Doe v. Reed*, for example, the Court pointed out the plaintiffs' First Amendment claim was "'as applied' in the sense that it does not seek to strike the [Washington Public Records Act] in all its applications, but only to the extent it covers referendum petitions." 561 U.S. at 194. But the claim was also "'facial' in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions." *Id.*

Mr. Alston's pleadings, which focused on his individual circumstances, made clear that he was bringing an as-applied challenge tailored to his status as a marijuana user. His motion repeatedly asserted that Section 922(g)(3) "violate[s] *Mr. Alston's* Second Amendment right to keep and bear arms." J.A. 18, J.A. 24 (emphasis added). He asserted his "indictment under § 922(g)(3) criminalizes his possession of a firearm, based merely on *his use of marijuana*, which presumptively violates *his* right to bear arms under the Second Amendment." J.A. 24 (emphases added). Mr. Alston argued he did

16

not "lose membership in our political community merely by way of *using marijuana*[.]" J.A. 30 (emphasis added). And he asserted "[t]he government cannot identify a historical tradition of firearm regulation that supports disarming citizens *based on using marijuana*." (emphasis added)).

Counsel's arguments at the hearing further demonstrated the as-applied nature of his claim. Alston's counsel argued the government presented "no evidence that there was an addiction." J.A. 160. In fact, the government presented no evidence that Mr. Alston was intoxicated at the time of his arrest or that marijuana use makes someone violent. J.A. 8-176.

Alston's counsel also argued the government's burden to prove an analogous tradition of gun regulation was the same whether the court viewed the challenge as facial or as-applied: "So when it comes to the question of whether it's unconstitutional as applied or just facially, those two answers -- those two questions are answered when we take a look at that line of questioning. The how and why is where's your analysis, where's your analogy." J.A. 162. And counsel asked the court "to examine the issue, *to examine the facts and our arguments*, and ultimately determine that under this line of analysis, under the examination of Bruen, *Mr. Alston's rights have been violated*[.]" J.A. 170 (emphases added).

The magistrate judge also recognized that Mr. Alston's claim was not limited to a facial one: "I mean, it's not the standard facial challenge." J.A. 144. The magistrate

judge therefore "decline[d] to apply the more traditional facial challenge standard[,]" J.A. 183 n.4, a ruling the government does not contest on appeal.

This Court "'may affirm a judgment for any reason appearing on the record.'" *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 220 (4th Cir. 2015) (citation omitted). This Court could therefore decline to rule on the facial constitutionality of Section 922(g)(3). Rather, this Court could uphold the lower courts' rulings as applied to marijuana users or as applied only to Mr. Alston, and hold only that Section 922(g)(3) "imposes a far greater burden on [*Mr. Alston's*] Second Amendment rights than our history and tradition of firearms regulation can support." *United States v. Connelly*, 2024 U.S. App. LEXIS 21866, *26 (5th Cir. 2024) (emphasis added).

**B. The lower courts correctly ruled that Mr. Alston is a member of "the people" whose conduct is protected by the Second Amendment's plain text.**

At the threshold of *Bruen*'s first step—whether the amendment's "plain text covers an individual's conduct"—the government initially asserts that Mr. "Alston, as a regular unlawful drug user, is not law-abiding or responsible, and thus he does not enjoy Second Amendment protections." Gov't Br. 15. The government is mistaken.

The plain text of the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The phrase, "'the people' . . . unambiguously refers to all members of the political community, not an unspecified subset," and covers "a class of persons who are part of a national community or who

18

have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (2008) (cleaned up). Thus, the Second Amendment right to armed self-defense belongs to "'all Americans.'" *Bruen*, 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581). Because there is no dispute that Mr. Alston is an American and a member of the "national community," he is among "the people" who enjoy Second Amendment rights.

To exclude Mr. Alston from "the people," the government relies on *Heller*'s and *Bruen*'s "scattered references to 'law-abiding' and 'responsible' citizens." *United States v. Duarte*, 101 F.4th 657, 670 (9th Cir. 2024), *vacated by reh'g en banc*. But "the criminal histories of the plaintiffs in *Heller* . . . and *Bruen* were not at issue in those cases," so "their references to 'law-abiding, responsible citizens' were dicta." *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc).[1] And any "reference in dicta to 'law-abiding citizens' cannot possibly be read as overturning the very holding upon which it relies." *United States v. Harrison*, 654 F. Supp. 3d 1191, 1197 n.20 (W.D. Okla. Feb. 3, 2023). "Though district courts have split on § 922(g)(3)'s constitutionality, they agree on *Bruen* step one, holding 'the people' includes all Americans—even drug

---

[1] In July, the Supreme Court granted the government's certiorari petition in *Range*, vacated the Third Circuit's opinion (which had held 18 U.S.C. § 922(g)(1) violated the Second Amendment as applied), and remanded for further consideration in light of *United States v. Rahimi*, 144 S. Ct. 1889 (2024). *Garland v. Range*, 144 S. Ct. 2706 (2024). The "issuance of a GVR does not speak to the underlying merits of the case." *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 165 (4th Cir. 2024). Indeed, on the same day the Supreme Court GVR'd *Range*, it also GVR'd several other cases in which lower courts had *upheld* 18 U.S.C. § 922(g)(1). *See, e.g.*, *Vincent v. Garland*, 144 S. Ct. 2708 (2024).

users." *United States v. Davey*, 2024 U.S. Dist. LEXIS 16030, *6 (D.C. Kan. Jan. 30, 2024) (citations omitted).

"*Heller* used 'law-abiding' and 'responsible' … to describe only the bullseye of the Second Amendment, not its entire target." *United States v. Lewis*, 682 F. Supp. 3d 1038, 1046 (S.D. Ala. July 17, 2023). Or as the magistrate judge correctly ruled, "*Heller* establishes a floor for constitutional protection—not a ceiling." J.A. 180.

Moreover, since the government filed its brief in this case, the Supreme Court has unequivocally rejected its argument that only "responsible" citizens enjoy Second Amendment rights. *United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024). The Court held the term "responsible" is "vague," "unclear," and does not "derive from our case law." *Id.*

The same holds true for the term "law-abiding." Such an amorphous exclusion "would raise a host of questions regarding who qualifies as a 'law-abiding' citizen." *United States v. Espinoza-Melgar*, 687 F. Supp. 3d 1196, 1201-1202 (D. Utah Aug. 16, 2023). "Who among us, after all, isn't a 'lawbreaker'? For sure, there may well exist some adult who has never exceeded the speed limit, changed lanes without signaling, or failed to come to a complete stop at a stop sign, but they are few and far between." *Harrison*, 654 F. Supp. 3d at 1198. And just as the Supreme Court's prior opinions "said nothing about the status of citizens who were not 'responsible,'" they have said nothing about the status of citizens who are not "law-abiding." *Rahimi*, 144 S. Ct. at 1903. The question of non-law-abiding citizens' rights to keep and bear arms "was simply not presented"

in *Heller* or *Bruen*. *Id*. Thus the government is wrong to assert the Supreme Court has limited Second Amendment rights to those who are "law-abiding" (whatever that means).

Resisting the inevitable conclusion that Mr. Alston is among "the people," the government asserts the conduct prohibited by Section 922(g)(3) is not merely possession of a firearm, "but rather possession of a firearm *by a person who regularly and unlawfully uses drugs*." Gov't Br. 24 (emphasis added). The government relies on this Court's pre-*Bruen* case of *United States v. Chester*, where this Court analyzed whether 18 U.S.C. § 922(g)(9) (disarming domestic violence misdemeanants) violated the Second Amendment. 628 F.3d 673 (4th Cir. 2010). The government points out that this Court framed "the first question" under *Heller*—"whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee"— as "whether the possession of a firearm in the home *by a domestic violence misdemeanant* is protected by the Second Amendment." Gov't Br. 24-25 (emphasis added).

But after *Bruen*, *Chester* cannot guide the way. Step one under this Court's post-*Heller* cases involved a combined analysis of text and history "to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Chester*, 628 F.3d at 680. When text and history were combined into a single inquiry, it made sense that this Court would "*not* divorce the simple physical act (possession of a gun) from the characteristic which makes such possession unlawful

(being a domestic violence misdemeanant) when making its determination of whether the conduct was covered by the Second Amendment." Gov't Br. 25.

Now that the historical analysis is part of *Bruen*'s second step, however, step one's textual inquiry is limited to whether "the Second Amendment's plain text covers an individual's *conduct*," *i.e.,* whether that conduct involves keeping or bearing arms. *Bruen*, 597 U.S. at 17 (emphasis added). The government's argument is simply "a rhetorical device to over-describe in detail the asserted constitutional wrong"—and then, "[h]aving over-described the alleged constitutional right," to claim no such right appears in the Second Amendment's text. *Rhode v. Bonta*, 2024 U.S. Dist. LEXIS 17052, at *11 (S.D. Cal. Jan. 30, 2024).

The government's reliance on other post-*Heller*, pre-*Bruen* cases also fails. Gov't Br. 16-18. In *Carpio-Leon*, this Court declined to resolve the scope of "the people," recognizing only that "the *core* right historically protected by the Second Amendment is the right of self-defense by "'*law-abiding*, responsible citizens.'" 701. F.3d 974, 978-979 (4th Cir. 2012) (first emphasis added). But the distinction between core and non-core rights is an artifact of pre-*Bruen* cases when courts needed some metric for deciding the applicable level of scrutiny. *See United States v. Carter*, 669 F.3d 411, 416-417 (4th Cir. 2012). Because *Bruen* did away with means-end scrutiny, that distinction no longer has the same meaning.

And *Moore* held only that when a statute is "presumptively lawful," pursuant to *Heller*'s dicta, a challenger could rebut the presumption by demonstrating he was a law-

22

abiding, responsible citizen. 666 F.3d 313, 319-320 (4th Cir. 2012). But Section 922(g)(3) was not mentioned in *Heller*'s dicta as presumptively lawful. *See Heller*, 554 U.S. at 626-627. After *Bruen*, when a person's conduct is covered by the Second Amendment's plain text, the statute is presumptively *unlawful*, not presumptively *lawful*. *See Bruen*, 597 U.S. at 17, 24.

In sum, the "conduct" covered by the plain text of the Second Amendment is "keep[ing]" and "bear[ing]" arms. U.S. Const. amend. II. To "keep arms" means to "have weapons[,]" *Heller*, 554 U.S. at 582, and the "plain meaning of 'have' is 'to be in possession of.' Thus, the Second Amendment's 'keep and bear arms' language plainly encompasses possession.'" *Banuelos*, 640 F. Supp. 3d at 722 (citation omitted). "Marijuana user or not, [Mr. Alston] is a member of our political community and thus has a presumptive right to bear arms." *Connelly*, 2024 U.S. App. LEXIS 21866, at *7-8.

**C. The government bore the burden to prove Section 922(g)(3) was "distinctly similar" to the American tradition of firearm regulation. But it failed even to prove Section 922(g)(3) was "relevantly similar" to our tradition.**

At the threshold of *Bruen*'s second step—whether the government has proven that Section 922(g)(3) is "consistent with this Nation's historical tradition of firearm regulation"—the government asserts the statute addresses a problem that did not exist at the founding, *i.e.*, gun possession by unlawful drug users. Gov't Br. 26. The government therefore asserts it "need only show that it is relevantly similar to historical statutes[,]" not distinctly similar. Gov't Br. 26.

This argument attempts to over-define the relevant problem. Under *Bruen*, courts must ask whether a challenged statute addresses "a *general* societal problem that has persisted since the 18th century"—not whether it addresses the exact same problem that confronted the founding generation. 597 U.S. at 26 (emphasis added). And the "general" societal problem "addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse is not new." *Harrison*, 654 F. Supp. 3d at 1199, 1199 n.29 (citing 21 U.S.C. § 811 (recognizing "potential for abuse" is the driving factor when it comes to whether a substance is "controlled" under the Controlled Substances Act.")).

"[E]arly Americans, including the Founders, consumed copious amounts of alcohol." *Connelly*, 2024 U.S. App. LEXIS 21866, at *20. "In the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)." *Id.* at 20 n.4 (quoting David F. Musto, *The American Experience with Stimulants and Opiates*, 2 Persps. on Crime & Just. 51, 52 (1998)). John Adams claimed that Americans "'exceed all other and millions of people in the world in this degrading, beastly vice of intemperance.'" *Id.* (quoting Letter from John Adams to William Willis (Feb. 21, 1819), in 10 The Works of John Adams, Second President of the United States 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856)).

Consequently, "The Founders were well familiar with the commonsense notion that those presently impaired by alcohol lack the restraint needed to handle firearms safely." *Id.* (citing Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the*

24

*Human Body and Mind* 6 (8th ed., Boston, James Lording 1823)). Accordingly, this Court should hold the government to its burden of proving a tradition of "*distinctly* similar historical regulation addressing that problem[.]" *Bruen*, 597 U.S. at 26 (emphasis added).[2]

But the government cannot even show a robust tradition of relevantly similar laws. "The laws it relies on materially differ from the application of § 922(g)(3) to [Alston] in regard to both of *Bruen*'s 'central consideration[s]': 'the burden on the right of armed self-defense' imposed by the regulation and the justification for the burden." *Harrison*, 654 F. Supp. 3d at 1200 (quoting *Bruen*, 597 U.S. at 29).

**D. The lower courts correctly ruled Section 922(g)(3) is not relevantly similar to any American tradition stripping the mentally ill of their Second Amendment right to armed self-defense.**

The government first posits that "[h]istorical statutes which provided for the detention or burdening of the rights of the mentally ill are relevantly similar to Section 922(g)(3)'s prohibition on firearm possession by unlawful drug users." Gov't Br. 28. The government is wrong.

---

[2] *Rahimi* does not require a different result. In that case, the Supreme Court wrote that when applying *Bruen*'s second step, courts "must ascertain whether [a challenged] law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898. But *Rahimi* did not pause to consider whether the general societal problem addressed by 18 U.S.C. § 922(g)(8)—domestic abusers' access to firearms—was longstanding or instead quintessentially "modern." *Bruen*, 597 U.S. at 28. Most likely, the Court concluded domestic violence was not considered a "societal problem" at the founding to the same extent it is today. Regardless, nothing in *Rahimi* repudiated *Bruen*'s clear dichotomy between (1) laws targeting longstanding societal problems, which are subject to the "distinctly similar" standard, and (2) laws targeting more modern societal problems, which are subject to the "relevantly similar" standard.

At the outset, the magistrate judge and district court correctly ruled the government did not prove that the English practice allowing "some detention of the acutely mentally ill" was "acted on or accepted in the colonies.'" J.A. 201, J.A. 262 (quoting *Bruen*, 142 S. Ct. at 2136). That failure of proof resulted from the government's inability to identify any American statutes authorizing detention. Indeed, the government conceded below that it "didn't, as in the situation with disarming drunk individuals, cite specific statutes from 1600 or 1700s[.]" J.A. 131. Rather, as the magistrate judge found, the government merely "cited one piece of scholarship discussing English practice, several sources suggesting that the founders equated drunkenness with madness, and four court cases (three of which are nonbinding)." J.A. 199. Evidence limited to English customs is insufficient to carry the government's burden. *See Bruen*, 597 U.S. at 35 (explaining courts should not rely on English practice that "never was acted upon or accepted in the colonies.").

For the first time on appeal, the government cites statutes from New York, Virginia, Connecticut, and Maine, and asserts the lower courts were wrong because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Gov't Br. 29-30 (quoting Carton F.W. Larson, Four Exceptions in Search of A Theory: *District of Columbia v. Heller* and Judicial *Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009)).

This Court should decline to review that new evidence because the government bore the burden below to prove that Section 922(g)(3) was "consistent with this

Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 33-34, the magistrate judge and district court were "entitled to decide [the] case based on the historical record compiled by the parties[,]" *id.* at 25 n.6., and the government failed to "object on the same basis below as [it] contends is error on appeal," *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014); *see also*, *United States v. Russell*, 971 F.2d 1098, 1112 (4th Cir. 1992) (holding a party "may not raise a claim on direct appeal relating to evidence that is not a part of the record[.]"). Just as this Court routinely dismisses new arguments by criminal defendants made for the first time on appeal, it should apply the same rule to the government. *See United States v. Arroyo-Jaimes*, 608 F. App'x 843, 849 (11th Cir. 2015) (recognizing "what is good for the goose is good for the gander.").

However, even if this Court considers that new evidence, the government fails to meet its burden. Initially, the government cites only four laws, which is hardly a "well-established and representative" historical tradition. *See Bruen*, 597 U.S. at 30, 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.")).

But the historical regulations it does cite are relevantly dissimilar. The government cites a 1788 New York law authorizing apprehension of people who "are furiously mad" or "so far disordered in their senses that they may be dangerous to be permitted to go abroad[.]" Gov't Br. 29. But the government fails to mention (1) the law did not authorize detention of such people in a jail, "house of correction," or "bridewell," as it did for "disorderly person[s]" in other parts of the same law, (2) the

justices of the peace could act only "by warrant[,]" and (3) the law allowed "any friend or relation of such lunatic" to take the person "under their own care and [] protection." Laws of the State of New York (vol. 2) 644-645 (1788) (Add. 001-003).[3]

Thus, unlike Section 922(g)(3), the 1788 New York law required a finding of dangerousness. Moreover, it was neither aimed at disarmament nor did it necessarily cause disarmament; the government failed to prove that any "such lunatic" in the care of family or friends lost the right to armed self-defense. Furthermore, like Section 922(g)(4), the modern law disarming the mentally ill, the 1788 New York law required pre-deprivation process in the form of a warrant. *See* 18 U.S.C. § 922(g)(4) (prohibiting gun possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution"). By contrast, Section 922(g)(3) is not so limited—"not all members of the set 'drug users' have been adjudicated as such (or found to require institutionalization)." *Connelly*, 2024 U.S. App. LEXIS 21866, at *13.

As to the 1792 Virginia law, the government is correct that the law allowed people of "unsound" mind to be committed to the care of a friend or confined in a hospital. Gov't Br. 29. But the government fails to mention that justices of the peace could act only "BY warrant[,]" and confinement was only while the person remained mentally ill—"THE directors shall enlarge every person confined in the hospital, who

---

[3] Pursuant to Rule 28(f) and Local Rule 28(b), counsel includes the relevant portions of the historical statutes cited by the government in an Addendum at the end of this brief to facilitate this Court's appellate review.

shall appear to them to be perfectly cured of insanity[.]" A Collection of All Such Acts of the General Assembly of Virginia (vol. 1) 244-245 (1792) (Add. 004-005).

Again, unlike Section 922(g)(3), the 1792 Virginia law was not aimed at disarmament, and the government did not prove that people of "unsound" mind were disarmed when committed to the care of a friend or a hospital. Also, unlike Section 922(g)(3), the 1792 Virginia law required pre-deprivation process. And commitment lasted only as long as the person remained of "unsound" mind. But as will be discussed below, the disarmament occasioned by Section 922(g)(3) is not nearly as limited or temporary as the government asserts.

The government next cites a 1796 Connecticut law authorizing some confinement of a "distracted or lunatic Person … who is dangerous and unfit to be without restraint[.]" Gov't Br. 29-30. But the government fails to mention (1) the law applied only to a "distracted or lunatic" person who was "dangerous and unfit to be without restraint, *whereby any Person may be endangered in Person or Estate*," (2) the Civil Authority and Selectmen could act only "by warrant," and (3) confinement was only authorized "during the continuance of such distraction or insanity[.]" Acts and Laws of the State of Connecticut, in America (vol. 1) 236 (1796) (Add. 006). Thus, unlike Section 922(g)(3), the 1796 Connecticut law required a specific finding of danger to another, required pre-deprivation process in the form of a warrant, and again, lasted only so long as the person remained insane.

As to the 1821 Maine law, the government correctly states that the law only applied to a person who "is lunatic, and so furiously mad, as to render it dangerous to the peace or the safety of the good people, for such lunatic person to go at large," and that confinement was only "till he or he be restored to his right mind[.]" But again, the government fails to mention that justices of the peace could confine such a person only "by warrant." Laws of the State of Maine (vol. 1) 453 (1821) (Add. 007). And again, Section 922(g)(3) is dissimilar because it requires no pre-deprivation process whatsoever.

Based on its new historical sources, the government now asserts, "Turning first to the *why* question, both historical regulations burdening the mentally ill and Section 922(g)(3) were crafted to protect the public." Gov't Br. 31. But it is safe to assume that virtually every firearm regulation is meant to "protect the public" in some way. Defining a regulation's "why" at such a sky-high level of generality renders *Bruen*'s analogical inquiry meaningless. As the magistrate judge found, "Beyond this highly general similarity, … the laws address different societal problems. Most obviously, the historical practices discussed above did not attempt to regulate firearms or other weapons." J.A. 201.

"Section 922(g)(3), by contrast, aims to disarm all individuals who regularly use controlled substances." J.A. 201. Furthermore, "while the individual's property could be seized" under some of the statutes, "the seizure was limited to assets necessary to pay back the costs of detaining, relocating, and curing him." J.A. 202-203 (citing 17

Geo. 2, c. 5, § 20; Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774)). "None of the individual's possessions—including his weapons—could be taken simply because the government thought he was too dangerous to own them." J.A. 203. The fact that seizure was limited to assets needed to pay costs suggests that the purpose of taking a person's assets was related to finances, not danger.

"With regard to the *how* question," the government concedes "the statutes are undoubtedly different[.]" Gov't Br. 32. Nevertheless, the government maintains that "historical laws allowing for the physical detention of the mentally ill were necessarily more burdensome than simple disarmament." Gov't Br. 32. According to the government, "these severe restrictions on the liberty of the mentally ill made specific restrictions on firearm possession unnecessary at the time, as a detained individual was disarmed as a byproduct of his detention." Gov't Br. 30.

However, as the government's sources demonstrate, and as the magistrate judge found, the historical practices did not "mandate[] incarceration at all—[they] allowed the mentally ill individual to be placed with a willing third party rather than serve time in jail." J.A. 202. And the government points to no evidence that such a person lost their right to armed self-defense while they stayed with friends or family.

Moreover, as the government's sources show, and as the magistrate judge found, a mentally ill person "could be deported to his location of origin or detained—*but only until his fit of madness wore off.*" J.A. 202 (emphasis added). Indeed, "'Our common law heritage has long recognized that mental illness is not a permanent condition.'" *Connelly*,

2024 U.S. App. LEXIS 21866, at *11 (citation omitted). "Since at least the time of Edward I (1239-1307), the English legal tradition provided that those who had recovered their sanity should have their rights restored." *Id.* at *11. Thus, "confinement of the mentally ill was limited to as 'long as such lunacy or disorder shall continue, and no longer.'" *Id.* at *12. "'This comports with the Founding-era conception of rights because that which a person recovered when he overcame a serious mental illness was his reason, the faculty necessary to exercise his rights.'" *Id.*

By contrast, Section 922(g)(3) "punishes a broader swath of conduct and does so more severely." J.A. 203. The statute "allows the government to disarm and punish all unlawful users of a controlled substance regardless of their sobriety or mental acuity at the time they possessed a firearm." J.A. 203. "A person who uses controlled substances and owns a gun—but never mixes the two—could be convicted under the statute. Thus, even if intoxication is like a 'temporary fit of madness,' … § 922(g)(3) allows the government to prosecute individuals for possessing a firearm when they are not 'mad.'" J.A. 203. "[J]ust as there is no historical justification for disarming citizens of sound mind (including those adjudged mentally ill but who have been reevaluated and deemed healthy, *i.e.*, no longer under an impairing influence), there is no historical justification for disarming sober citizens not presently under an impairing influence." *Connelly*, 2024 U.S. App. LEXIS 21866, at *12. "Section 922(g)(3) also imposes up to 15 years in prison for its violation[,]" which is a "far cry" from historical practice, "which only authorized detention until the fit of lunacy subsided." J.A. 203.

32

The government is also wrong that the disarmament engendered by Section 922(g)(3) is similarly temporary because it "lasts only so long as the person is a recent, regular, long-time user of unlawful controlled substances." Gov't Br. 32. First, even while someone is in a state of "current use," they do not necessarily lack self-control because "current use" covers times at which a person is not actually intoxicated.

Second, federal regulations allow for an inference of "'current use'" from "'a conviction for use or possession of a controlled substance within the past year.'" *Connelly*, 2024 U.S. App. LEXIS 21866, at *25 (quoting 27 C.F.R. § 478.11). A person who achieved eleven months of sobriety could still be prosecuted.

Third, the government ignores Section 922(g)(3)'s prohibition on gun possession by addicts. Addiction is a chronic, potentially lifelong disease. Drug Facts: *Understanding Drug Abuse and Addiction,* National Institute on Drug Abuse, available at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last visited Sep. 11, 2024) (defining addiction as a "chronic disease characterized by drug seeking and use that is compulsive, or difficult to control, despite harmful consequences."). Thus, Section 922(g)(3) would allow conviction and disarmament years or decades after a person stopped regularly using controlled substances, so long as the government proves the person remains an addict. This "burden" is not remotely "comparable" to that imposed by colonial "lunatic" laws. *Bruen*, 597 U.S. at 29.

The government's new historical sources also "limit[ed] disarmament to *dangerous* lunatics." *Harrison*, 654 F. Supp. 3d at 1214. But "the mere use of marijuana does not

33

indicate that someone is in fact dangerous, let alone analogous to a 'dangerous lunatic.'" *Id.* Here, the government presented no evidence that marijuana use makes someone dangerous or that Mr. Alston was violent because he used marijuana. J.A. 8-176. More specifically, as applied to Mr. Alston, the government failed to prove he had "an addiction[,]" J.A. 160, or that he was intoxicated at the time of his arrest. J.A. 8-176. Section 922(g)(3) therefore imposes a much more substantial "burden on the right of armed self-defense" than colonial "lunatic" laws did. *Bruen*, 597 U.S. at 29.

The government's argument that "'habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control[,]'" Gov't Br. 31 (quoting *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010), also has "no limit." *Harrison*, 654 F. Supp. 3d at 1214. "The Diagnostic and Statistical Manual of Mental disorders, for example, lists autism, attention deficit disorder, and nicotine dependence as mental disorders." *Id.* "All those groups 'have difficulty exercising self-control,' and yet, it is hard to see how any of those groups could be categorically prohibited from the right to armed self-defense on that basis." *Id.* at 1214-1215. And again, the government failed to prove that Mr. Alston, specifically, lost control because of consuming marijuana.

In sum, and as the lower courts correctly found, "English and colonial American traditions regulating the mentally ill differ from § 922(g)(3) in both purpose and operation. The government has not identified 'a well-established and representative historical analogue,' *Bruen*, 142 S. Ct. at 2133 (emphasis removed), for § 922(g)(3) arising out of these regulations." J.A. 204, J.A. 262-263.

34

**E. The lower courts correctly ruled Section 922(g)(3) is not relevantly similar to any American tradition stripping users of intoxicants of their Second Amendment right to armed self-defense.**

Next, the government argues that "[h]istorical statutes which provided for the disarmament of those intoxicated by alcohol" are "relevantly similar" to Section 922(g)(3) "in both how and why they regulated the conduct of early Americans." Gov't Br. 33. Again, the government is mistaken.

Initially, as with its analogies to founding-era laws regarding the mentally ill, the government cites a slew of new historical statutes for the first time on appeal. Again, this Court should decline to review that new evidence because the government bore the burden below, *Bruen*, 597 U.S. at 33-34, the lower courts were entitled to decide the case based on the record the parties presented, *id.* at 25 n.6., and the government should not be allowed to make new arguments based on new evidence for the first time on appeal, *see Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014); *see also*, *Russell*, 971 F.2d at 1112 (holding a party "may not raise a claim on direct appeal relating to evidence that is not a part of the record[.]").

But again, this Court should affirm even if it considers the new evidence. The government now claims that "[m]any states enacted statutes that allowed 'habitual drunkards' to be committed to asylums or placed under guardians in the same manner as the mentally ill." Gov't Br. 34 (citing Acts and Laws of the State of Connecticut, in America (vol. 1) 363–65 (1796)) (Add. 008-010). But it cites only such state, Connecticut. And one state's practice does not amount to a "well-established and

35

representative" historical tradition. *See Bruen*, 597 U.S. at 30, 46 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.")).

Moreover, the 1796 Connecticut law served a different purpose than Section 922(g)(3), at least in part. The law aimed to "correct[]" the people covered and "set[] them to work," which suggests the law sought to morally reform drunkards. Acts and Laws of the State of Connecticut, in America (vol. 1) 365 (1796) (Add. 010).

Additionally, the government fails to mention that common drunkards and everyone else covered by that law could only be detained "upon due Conviction of any of the Offences or Disorders aforesaid." *Id.* (Add. 010). Again, Section 922(g)(3) requires no pre-deprivation process at all. *See Connelly*, 2024 U.S. App. LEXIS 21866, at *13. Moreover, the government points to no evidence that people "placed under guardians" were disarmed while under the supervision of their guardians.

The government next asserts, "Early militia regulations also support the contention that the Founding generation regulated the possession of firearms by the intoxicated in order to protect the public interest." Gov't Br. 34. The only statute the government cited below was the 1746 New Jersey statute. J.A. 63, J.A. 125-126, J.A. 204-205. But "[t]he purpose behind" that militia law concerned "military service," not public safety—"intoxicated servicemembers cannot perform their duties while impaired." *Connelly*, 2024 U.S. App. LEXIS 21866, at *22-23. Accordingly, the lower courts correctly held, "the New Jersey law aimed to ensure the orderly functioning of the militia[,]" not to protect the public. J.A. 205. And although the government does

36

not mention it, a drunk soldier could be disarmed only "during the Time of the Company's being in Arms, and no longer[.]" Acts of the General Assembly of the Province of New-Jersey 303 (1752) (Add. 011). Thus, a soldier would get his gun back after his active service ended, even if he was still drunk.

For the first time on appeal, the government cites a 1780 Pennsylvania law, which it says disarmed militia members "found drunk," and a 1782 South Carolina law allowing officers to be cashiered or "confined till sober[.]" Gov't Br. 34. "Again, this comparison misses the mark. The purpose behind these militia laws concerns military service—intoxicated servicemembers cannot perform their duties while impaired. More than that, these laws applied only to militia members; none of them spoke to a militia member's ability to carry outside of military service." *Connelly*, 2024 U.S. App. LEXIS 21866, at *22-23.

Furthermore, the 1780 Pennsylvania law only applied to non-commissioned officers and privates, only on "occasion of parading the company[,]" and only "until the company is dismissed[.]" 2 Arthur Vollmer, U.S. Selective Serv. Sys., Military Obligation: The American Tradition, pt. 11 Pennsylvania, at 97 (Add. 012). And the South Carolina law only allowed non-commissioned officers or privates to be confined; commissioned officers could only be cashiered. *Id.* pt. 13 South Carolina, at 96 (Add. 013). Moreover, the law only applied while soldiers were "on guard" or during a "time of duty[.]" *Id.* (Add. 013).

Also for the first time on appeal, the government cites mid-19th-century laws from Rhode Island, Maine, and Massachusetts, which it says "outright excluded 'common drunkards' from the militia[.]" Gov't Br. 34. But not only did they serve different purposes than Section 922(g)(3), like the previously-cited militia regulations, *Connelly*, 2024 U.S. App. LEXIS 21866, at *22-23, the Rhode Island and Massachusetts laws did not actually exclude "common drunkards" from service; they merely excepted them from compulsory service. 1844 R.I. Pub. Laws 503 ("excepting … common drunkards" from the group of people who "shall be enrolled in the militia") (Add. 014); 1837 Mass. Acts 273 (same) (Add. 015). And the Maine law only excluded "common drunkard[s]" from being officers; it did not exclude them from military service altogether. 1837 Me. Laws 424 (Add. 016).

The government next argues that "[o]ther historical statutes prohibited use of firearms at events where individuals were likely to become intoxicated[,]" relying on a 1655 Virginia law prohibiting "shoo[ting] any gunns at drinkeing[,]" (Add. 017-018), and a 1771 New York law that prohibited firing guns during the New Year's holiday. Gov't Br. 34-35 (Add. 019-021). Along with the 1746 New Jersey statute, these were the only founding-era statutes cited by the government below. J.A. 63. Thus, the lower courts correctly recognized that, "in *Bruen*, the Supreme Court cast doubt on the notion that a few isolated colonial laws can establish a robust historical practice." J.A. 205 (citing *Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original)). The lower

38

courts therefore correctly ruled, "Such a spotty historical tradition cannot form a firm foundation for § 922(g)(3)." J.A. 205.

But "more fundamentally—these laws did not burden conduct protected by the Second Amendment in a similar way to § 922(g)(3)." J.A. 205. The 1655 Virginia law manifestly served a different purpose than Section 922(g)(3)'s concern for public safety. Virginia enacted it as "a gunpowder preservation measure (which was at a premium), and because ill-timed gunshots could be mistaken as a signal that Natives were attacking." *Connelly*, 2024 U.S. App. LEXIS, at *21. "[T]he Virginia law's justification had nothing to do with the status of the persons firing the guns or even the fact that they were intoxicated." *Harrison*, 654 F. Supp. at 1202.

While the New York law may have served a "similar purpose as § 922(g)(3)— preventing the 'great Damages' done by those 'intoxicated with Liquor—it was very narrow." *Connelly*, 2024 U.S. App. LEXIS 21866, at *21. Indeed, "it is difficult to see how this law could indicate any sort of 'well-established,' constitutionally relevant tradition: The law was in effect for only two years … and restricted the discharge of firearms for only three days a year[;]" thus, the law was in effect for a total of six days of American history. *Harrison*, 654 F. Supp. at 1203. The law also excepted weddings and funerals, applied only to "certain places in one county and two towns," and "applied to all persons, not just intoxicated persons or those who use intoxicants." *Id.* As the magistrate judge correctly ruled, "None of the three colonial statutes prohibited

intoxicated individuals—much less those who are habitually, though not presently, intoxicated—from possessing weapons." J.A. 206.

In comparison, "§ 922(g)(3)'s sweep is staggering." J.A. 206. As the magistrate judge correctly ruled, "Unlike the colonial laws, which sought to prohibit the active combination of liquor and firearms, the challenged statute completely prohibits individuals from possessing firearms based solely on their status as an 'unlawful user' of controlled substances." J.A. 206. Moreover, "not one of the three laws imposed incarceration or disarmament for violation—each, at most, carried with it a fine." J.A. 206. "Section 922(g)(3) is … far more punitive[.]" J.A. 206.

Next, the government argues that after "ratification of the Fourteenth Amendment in 1868, … many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms." Gov't Br. 35. But *Bruen* and *Heller* recognized that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence[,]" *i.e.*, when similar laws did not exist at the founding. *Bruen*, 597 U.S. at 66 (quoting *Heller*, 554 U.S. at 614). As the magistrate judge found, post-Civil War sources are of "even less value here than in *Bruen* because § 922(g)(3) is a creature of federal, not state, law. The original public meaning of the Second Amendment, as applied to the federal government's actions, was fixed upon the Constitution's ratification in 1791—not the Fourteenth Amendment's ratification in 1868." J.A. 207.

But these sources also fail to support the government's position. As the magistrate judge found, "Like the colonial statutes …, none of the Reconstruction-era laws imposed a total ban on firearm possession for those who drink. Instead, they prohibit[ed] specific conduct *while* drunk: purchasing a firearm or carrying it in public." J.A. 208. Thus the burden imposed by these laws was much lighter than § 922(g)(3)'s, which persists for up to a year following a defendant's last use of drugs (or longer, in the case of an addict). Moreover, the 1899 South Carolina law, prohibiting intoxicated people from firing guns near public roads, had a "just cause or excuse" exception and did not apply on a person's "own premises," regardless of proximity to roadways. 1899 S.C. Acts 97, No. 67, § 1 (Add. 022).

In sum, and as the magistrate judge found, "The government has provided no evidence that, before 1931, citizens could have their ability to bear arms entirely curtailed because they use intoxicants." J.A. 209. The Framers simply did not strip people of their Second Amendment right to armed self-defense because they drank regularly. Consequently, the government cannot now deprive regular users of intoxicants of their constitutional right to armed self-defense.

**F. The lower courts correctly ruled Section 922(g)(3) is not relevantly similar to any American tradition stripping "dangerous" people of the right to armed self-defense.**

Finally, the government relies upon another boatload of previously-uncited historical sources in service of its claim that "Section 922(g)(3) is analogous to the tradition of disarming dangerous individuals." Gov't Br. 37. In contrast to its extensive

briefing to this Court on this point, the government's argument below "span[ned] less than a page" and "ma[de] only one passing reference to a historical source on disarming the dangerous[.]" J.A. 66, J.A. 210. While the government "cite[d] some primary sources on regulating the dangerous to justify § 922(n)[,]" it did not "offer any argument at all to suggest that these sources may serve as an analogue to § 922(g)(3)." J.A. 210.

This Court should therefore decline to review the government's new evidence because the government bore the burden below, *Bruen*, 597 U.S. at 33-34, the lower courts were entitled to decide the case based on the record the parties presented, *id.* at 25 n.6., and the government should not be allowed to make new arguments based on new evidence for the first time on appeal, *see Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014); *see also*, *Russell*, 971 F.2d at 1112 (holding a party "may not raise a claim on direct appeal relating to evidence that is not a part of the record[.]").

But even if this Court reviews the new evidence, it should still affirm. The government first asserts an entirely new argument, not raised at all below, that English and early American statutes "allowed for the confiscation of arms from individuals who carried them in a manner that spread fear or terror." Gov't Br. 37-38. But "[t]he use of marijuana … is not in and of itself a violent, forceful, or threatening act. It is not a 'crime of violence.' Nor does it involve 'the actual use or threatened use of force.'" *Harrison*, 654 F. Supp. 3d at 1213. What's more, "the use of marijuana does not become a violent, forceful, or threatening act merely because a legislature says that it is." *Id.* And again, the government presented no evidence that Mr. Alston was intoxicated at the

time of his arrest or that marijuana intoxication would render someone dangerous. A law that prohibits terrifying others with weapons does not have a justification that is comparable to a law that prohibits simply possessing a firearm. *Bruen*, 597 U.S. at 29. Thus, this new argument falls flat.

The government also renews its assertion that "[o]ther early statutes disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony or the Revolution's cause." Gov't Br. 39. But those laws "cannot possibly serve as constitutionally relevant analogues to § 922(g)(3) because the justifications for these laws—one of the two central considerations under *Bruen*—are dissimilar." *Harrison*, 654 F. Supp. 3d at 1220. "The Founders did not disarm English loyalists because they were believed to lack self-control; it was because they were viewed as political threats to our nascent nation's integrity." *Connelly*, 2024 U.S. App. LEXIS 21866, *16.

The government further asserts the Militia Act of 1662 allowed crown officers to disarm those "'judge[d] dangerous to the Peace of the Kingdom.'" Gov't Br. 37 (quoting 13 & 14 Car. 2, c.3, § 13 (1662)). But "[w]hile the English were concerned about preventing insurrection and armed rebellion," Section 922(g)(3) is concerned with public safety. *See Rahimi*, 144 S. Ct. 1889, 1935 (Thomas, J. dissenting). And in fact, the abuse represented by such laws is exactly what prompted the colonists to ratify the Second Amendment: "The sweeping disarmament authority wielded by English

officials during the 1600s, including the Militia Act of 1662, prompted the English to enshrine an individual right to keep and bear arms." *Id.* at 1934 (Thomas, J. dissenting).[4]

Thus, the magistrate judge correctly concluded that "founding-era laws disarming the dangerous centered around a single *type* of danger: threats to state security." J.A. 211. The government "identifies no founding-era gun law that supports disarming a member of 'the people' based on general public safety concerns rather than the threat of armed rebellion." J.A. 213. But even then, "some colonial governments allowed the potentially disloyal to retain enough weapons to protect themselves and their homes." J.A. 212 n.17 (citation omitted).

The government also points to post-Civil War acts disarming disorderly persons, vagrants, and disturbers of the peace, and 20th-century laws imposing age restrictions on firearm purchases and banning firearm possession by those of unsound mind, vagrants, or intoxicated people. Gov't Br. 39-41. But *Bruen* and *Heller* recognized that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 (quoting *Heller*, 554 U.S. at 614). And the *Bruen* Court did "not address any of the 20th-century historical evidence" because, "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.*

---

[4] No member of the *Rahimi* majority disagreed with Justice Thomas on this point.

at 66 n.28. This Court therefore need not address the government's 19th and 20th-century analogues. But even if it does, the government has failed to demonstrate those laws were relevantly similar to Section 922(g)(3).

Finally, the entire gist of the government's new argument, which attempts to shoehorn marijuana users into the "dangerous" category, is a bridge too far. "This is yet another attempt by the United States to transform distinct historical examples into roving warrants applicable to whatever conduct it desires." *Harrison*, 654 F. Supp. 3d at 1215 n.134. The government should not be allowed to "[t]ake a distinct class of persons …, extract from it a broad principle (e.g., concerns about people 'lacking self-control'), and then fit into that broad category new classes of people (e.g., marijuana users), even if they aren't remotely the sort of persons that were historically regulated." *Id.*

Moreover, when *Rahimi* rejected the government's argument that people who are not "responsible" could be disarmed consistent with the Second Amendment, it was also necessarily rejecting the argument that "dangerous" people could be disarmed. *See Rahimi*, 144 S. Ct. at 1903. Indeed, the government argued in *Rahimi* that "irresponsible" was just a synonym for "dangerous." *See, e.g.*, *United States v. Rahimi*, No. 22-915, Gov't Br. 6. And the government doubled down at oral argument, confirming that it was "using 'responsible' as a placeholder for dangerous with respect to the use of firearms." *United States v. Rahimi*, No. 22-915, Tr. of Oral Arg. 10. But as with the term "responsible," the term "dangerous" is "vague," "unclear," and does not "derive from our case law." *Id.*

45

As the magistrate judge found, "if 'dangerousness' is the sole metric, the government would have an arbitrary, near-limitless power to identify a disfavored group, declare it 'dangerous,' and revoke its constitutionally protected rights." J.A. 215 n.22. "But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home[,]" *Heller*, 554 U.S. at 636, and in public. *Bruen*, 597 U.S. at 32-33.

In sum, the magistrate judge rightly concluded that, "[i]n both purpose and operation, § 922(g)(3) finds only extremely attenuated support in the founding-era record." J.A. 216. The historical tradition of disarming "dangerous" individuals is therefore "not sufficiently analogous to § 922(g)(3)." J.A. 216.

## CONCLUSION

The government failed to prove that Section 922(g)(3) was supported by a well-established and representative American tradition of distinctly or relevantly similar laws. The lower courts correctly concluded that Section 922(g)(3) violates Mr. Alston's Second Amendment right to armed self-defense. This Court should therefore affirm.

Respectfully submitted,

G. ALAN DUBOIS
FEDERAL PUBLIC DEFENDER

/s/ *Andrew DeSimone*
ANDREW DESIMONE
ASSISTANT FEDERAL PUBLIC DEFENDER
EASTERN DISTRICT OF NORTH CAROLINA
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
(919) 856-4236

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft 365 in 14-point Garamond font.

/s/ Andrew DeSimone
Andrew DeSimone

CHAP. 31.]      ELEVENTH SESSION.      **643**

interest of any of the bills of credit which have been or may be loaned, the treasurer shall, and he is hereby required from time to time to exchange such gold or silver for such bills at the value expressed on such bills; and the bills so recieved in exchange shall be cancelled, accounted for, and disposed of, in the manner directed by the sixth section of this act. *Loans to be exchanged for bills.*

*And be it further enacted by the authority aforesaid,* That if the treasurer shall not by means of such exchange as aforesaid, have redeemed the whole of the said bills of credit on or before the first Monday of November, in the year one thousand eight hundred, he shall, by advertisements to be published in three of the news papers printed in this State, require all persons having any of the said bills of credit in possession, to come and exchange the said bills for gold or silver, on or before the last day of December then next ensuing; and if any of such bills shall remain in circulation after the said last day of December, they shall not be so exchanged, but shall nevertheless be recieved in all payments into the treasury of this State. *Bills to be exchanged by December 31, 1800.*

*And be it further enacted by the authority aforesaid,* That the treasurer shall pay the expences which shall accrue for engraving the plates, procuring the paper, printing the bills, and inspecting the printer, and all other incidental expences which may arise in or about the execution of this act; and also to each of the persons authorized to sign the bills to be emitted by virtue of this act, at the rate of two shillings for every hundred of the said bills which they shall respectively sign, and at the rate of one shilling and six pence for every hundred of the said bills which they shall respectively number; the accounts of the said expences and charges being first audited by the auditor of this State, for the time being. *Expense of issuing bills directed to be emitted.*

*And be it further enacted by the authority aforesaid,* That if at any time before a sale by the loan officers the respective mortgagors their heirs or assigns shall pay to the loan officers the whole of the monies by reason of the neglect to bring in and pay which such sale shall have been advertised, together with the expences of advertising, the loan officers shall not proceed to a sale; and the several mortgagers and their respective heirs and assigns shall, on such payment be, with respect to the equity of redemption, and their estate and right of in and to the mortgaged premises, restored to and be in the same condition as if there had not been a neglect to bring in and pay the said monies, any thing in the herein recited act to the contrary notwithstanding. *Mortgagors may redeem lands at any time before sale by loan officers.*

---

# CHAP. 31.

AN ACT for apprehending and punishing disorderly persons.

PASSED the 9th of February, 1788.

*Be it enacted by the People of the State of New York represented in Senate and Assembly and it is hereby enacted by the authority of the same,* That all persons who threaten to run away and leave their wives or children to the city or town, and all persons who shall unlawfully return to the city or town, from whence they shall respectively have been legally removed by order of two justices of the peace, without bringing a certificate from the city or town whereto they respectively belong; and also all persons, who not having wherewith to maintain themselves, live idle *Disorderly persons, who considered as; punishment of.*

Digitized by Google      Original from HARVARD UNIVERSITY

Add. 001

without employment, and also all persons who go about from door to door or place themselves in the streets, highways or passages, to beg in the cities or towns where they respectively dwell, and all juglers, and all persons pretending to have skill in physiognomy, palmestry or like crafty science or pretending to tell fortunes, or to discover where lost goods may be found; and all persons who run away and leave their wives or children, whereby they respectively become chargeable to any city or town; and all persons wandering abroad and lodging in taverns, beer houses, out houses, market places or barns, or in the open air, and not giving a good account of themselves, and all persons wandering abroad and begging, and all idle persons not having visible means of livelihood and all common prostitutes, shall be deemed and adjudged disorderly persons; and it shall and may be lawful for any justice of the peace to commit such disorderly persons (being thereof convicted before him, by his own view or by the confession of such offenders respectively, or by the oath of one or more credible witness or witnesses) to the bridewell or house of correction of such city or town, there to be kept at hard labour for any time not exceeding sixty days or until the next general sessions of the peace to be holden in and for the city or county in which such offence shall happen.

*And whereas* doubts have arisen and hereafter may arise, where authority is given to any justice or justices of the peace to commit offenders to the bridewell or house of correction for offences cognizable before them out of the general sessions of the peace, how long offenders may be there detained and in what matter treated, where the time and manner of their punishment is not by law expressly directed, limited or appointed; therefore

Commitment and discharge of offenders.

*Be it further enacted by the authority aforesaid,* That where any offenders shall be committed as aforesaid, by virtue of any law now in being or hereafter to be made, other than in cases of petit larceny, and the time and manner of their punishment is not expressly limited, directed and appointed, the said justice or justices shall commit such offender to the bridewell or house of correction, there to be kept to hard labour until the next general sessions of the peace or until discharged by a due course of law; and it shall and may be lawful for two justices (of whom the justice who committed such offender to be one) to discharge such offender before the said general sessions of the peace, if they shall see cause; and if he or she shall not be so discharged, the said general sessions of the peace may either discharge him or her or continue him or her in custody for such time as they shall see fit, not exceeding six months.

General sessions, punishment of person adjudged disorderly by.

*And be it further enacted by the authority aforesaid,* That where any offender against this act shall be committed, as aforesaid, to the bridewell or house of correction, there to remain until the next general sessions of the peace, and the justices at such sessions, shall, on examination of the circumstances of the case, adjudge such person to be a disorderly person within the intent and meaning of this act, they may, if they think convenient, order such disorderly person to be detained and kept in the said bridewell or house of correction to hard labour, for any further time not exceeding six months; and during the time of such confinement, to be corrected by whipping in such manner and at such times and places, as, according to the nature of such persons offence, they in their discretion shall think fit.

Id.

*And be it further enacted by the authority aforesaid,* That where any person offending against this act shall have been committed as aforesaid, to the bridewell or house of correction, there to remain until the next

Generated on 2024-09-19 17:40 GMT / https://hdl.handle.net/2027/hvd.32044014403307
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

general sessions of the peace, if upon the examination of the person so committed as aforesaid, the last legal place of settlement of such person cannot be found, the justice shall, at the said general sessions, order such persons so to be detained and employed in the bridewell or house of correction until they can provide for themselves or until the justices of the peace at their next general sessions of the peace can place them out in some lawful calling, as servants, apprentices, mariners or otherwise; which the said general sessions of the peace are hereby impowered to do, in such manner as they shall think fit.

*And be it further enacted by the authority aforesaid,* That the several goals in the respective cities and counties in this State, in which no bridewell or house of correction is or shall be built, shall be used and considered as houses of correction, for all or any of the purposes, in and by this act directed, with respect to houses of correction and the government thereof, until there shall be such house or houses of correction built as aforesaid; and the keepers of the respective goals, for the time being, or such persons as they respectively shall appoint, shall be masters or keepers of such goals as houses of correction as aforesaid and shall have the same authority and be under the same regulations, as in this act are before given and provided respecting houses of correction; and all and every person and persons ordered to be sent to a house of correction according to this act, shall be sent to and received in such goals respectively and there be kept, taken care of and governed according to the directions of this act, until such house or houses of correction shall be provided as aforesaid. <span style="font-variant:small-caps">Jails to be deemed houses of correction</span>

*And whereas* there are sometimes persons, who by lunacy or otherwise are furiously mad, or are so far disordered in their senses that they may be dangerous to be permitted to go abroad; therefore

*Be it further enacted by the authority aforesaid,* That it shall and may be lawful for any two or more justices of the peace, where such lunatick or mad person shall be found, by warrant under their hands and seals, directed to the constables and overseers of the poor of the city or town or some of them, to cause such person to be apprehended and kept safely locked up in some secure place within such city, or within the county in which such town shall lie, as such justices shall, under their hands and seals, direct and appoint; and (if such justices shall find it necessary) to be there chained, if the last legal place of settlement shall be in such city or in any town within such county: And if the last legal place of settlement of such person shall not be in such city or county, then such person shall be sent to the place of his or her last settlement in the manner directed in and by the laws relating to the poor and shall be locked up or chained, by warrant from two justices of the city or county to which such person shall be so sent in manner aforesaid. And the reasonable charges of apprehending, maintaining, keeping and removing such person shall be satisfied and paid by the overseers of the poor of the city or town in which such person shall be legally settled as aforesaid, in the manner in and by the said laws directed. *Provided always,* that this act or any thing therein contained, shall not extend or be construed to extend to restrain or abridge the power or authority of the chancellor of this State for the time being, touching of concerning such lunaticks or to restrain or prevent any friend or relation or such lunatick from taking them under their own care and protection. <span style="font-variant:small-caps">Insane persons, provisions for the safe keeping of.</span>

*And whereas* it often happens that disorderly persons wander from the places of their legal settlement and are in circumstances sufficient to pay for their passage or journey home; therefore

244   IN THE SEVENTEENTH YEAR OF THE COMMONWEALTH.

1792.

### CHAP. CXX.

*An Act reducing into one, the several Acts making Provision for the Restraint, Support and Maintenance of Ideots and Lunatics, and the Preservation and Management of their Estates.*

[Passed the 24th of December, 1792.]

*Directors of the lunatic hospital incorporated.*

I.  BE it enacted by the General Assembly, That the present directors of the hospital for the reception of persons of unsound minds, and their successors, to be chosen when vacancies happen, by the Governor, with the advice of the Council, are hereby constituted and appointed a body politic and corporate, to have perpetual continuance, by the name of the directors of the hospital for the maintenance and cure of persons of unsound minds; and by that name may sue, and be sued, and may and shall have, and use a common seal, and are enabled to take and hold any estate, real or personal, given or to be given to the said hospital, or to themselves, for the use thereof, so as the annual revenue, or income of such donations, exceed not three thousand dollars; any law or statute to the contrary, notwithstanding.

*Annual income of the hospital not to exceed a certain sum.*

II.  THE said directors shall and may so often as it may be necessary, choose a president to continue in office until his death, resignation or removal; and they, or any seven of them, shall form a court, and shall from time to time ordain regulations for the government of the said hospital; and appoint a keeper and matron thereof, with nurses and guards when they shall be necessary; and provide for the accommodation, maintenance, and cure of the patients remaining and to be received therein.

*Directors may chuse a president; Seven to form a court. Keeper, matron, nurses, guards.*

III.  BY warrant to be directed to the sheriff or serjeant, a justice of the peace shall order to be brought before him, any person whose mind from his own observation, or the information of others, he shall suspect to be unsound, and with two other justices, who at his request, shall associate with him, shall enquire into the state of such person's mind, and the said justices shall write down as well what shall appear to themselves, as what shall be testified by witnesses, touching the supposed insanity; and if two of them adjudge the party to be such a person as ought to be confined in the hospital, and some friend will not become bound with surety, to restrain and take proper care of him, or her, until the cause for confinement shall cease, the said justices, or two of them, shall order the insane to be removed to the said hospital and there received, and for that end direct a warrant to the sheriff or serjeant, and a mittimus to the said keeper, transmitting therewith to the latter, the examinations of the witnesses, and a relation of such facts as the said justices shall think pertinent to the subject, to be laid before the directors.

*Justices to examine insane persons;*

*And send them to the hospital unless security be given for their restraint.*

IV.  THE said keeper immediately after the person removed shall be delivered to him, the receipt of whom he shall acknowledge, in a writing signed by him, and delivered to the sheriff or serjeant, shall inform the president thereof, who shall require his colleagues to meet as soon as may be, and at such meeting, which shall not unnecessarily be delayed, the directors, if having considered the case, they concur in opinion with the justices, shall register the insane as a patient, but they may at any time afterwards deliver him or her to a friend, becoming bound to restrain and take care of him or her, in the same manner as the justices might have done.

*How to be received, examined and registered.*

*But may be delivered to their friends, giving security for their restraint.*

*Or discharged if the directors do not think it necessary to confine them.*

V.  IF upon the examination of any person charged with being a lunatic or ideot, or otherwise insane, the said court shall be of opinion, that he or she ought not to be confined, it shall be lawful for the said court forthwith to discharge him or her.

*Justices to send with an insane person a certificate of his estate.*

VI.  WHEN any insane person shall be removed as aforesaid to the said hospital, the justices before whom such person was examined, shall cause a certificate of the estate of such insane person (if any there be) and of the probable annual profits arising therefrom, to be sent to the said directors, together with the proceedings before directed, to be transmitted to them; and shall also certify such removal, and the insane's estate, to the next court to be holden for the county, city, or borough, whence such removal was. On receipt of such certificate, it shall be lawful for such court, to appoint a committee, in whose hands shall be committed such insane's estate, for the safe keeping and good management thereof; which committee shall have power to sue for, and recover all debts due to, and be liable to be sued

*Committees to be appointed to manage estates of insane persons,*

LLMC DIGITAL

USCA4 Appeal: 23-4705    Doc: 40    Filed: 09/20/2024    Pg: 60 of 77

1792.

for all debts due from such insane person, in the same manner as executors to deceased persons are or may be; and out of the profits of such insane person's estate, the said court may direct to be defrayed, the expences attending, as well the removal as the annual support of every such person while remaining in the said hospital, to be paid to the said court of directors.  *Provided*, That such county, city, or borough court, may allow a reasonable support to the family of such insane person, (if any he hath) out of his estate, so that neither the expences attending such insane person, nor the allowance to his family, shall defeat the claims of his or her creditors.  Upon the appointment of any such committee by the court as aforesaid, such court shall take bond, with good security, in a sufficient penalty, for the true and faithful performance of the trust thereby reposed in them; and in case of failure in the examining justices to perform the duties by this act enjoined, or in case of failure in any such court, to appoint committees as aforesaid, and to take such bond and security as is hereby required, the justices in either case so refusing or neglecting, shall forfeit and pay for every such refusal or neglect, one hundred and fifty dollars, to be prosecuted for, and recovered by the attorney general in the name of the said court of directors, for the use of the commonwealth.

*[margin: Profits thereof to be applied to the support of them and their families.]*

*[margin: Committees to give bond with security. Penalty on the justices for neglect.]*

VII.  IF any person possessing lands or other property in this commonwealth, shall have removed, or shall hereafter remove out of the State, the high court of chancery, or the court of the county or corporation in which the greater part of such person's property is, (on satisfactory proof being made that such person has become insane) shall and may appoint a committee, into whose hands shall be committed such insane's estate, for the safe keeping thereof, and for the necessary support of such insane, and his or her family; which committee shall give the like security, have the same powers, and be governed by the same rules as are prescribed for the committees appointed by virtue of a certificate from justices of the peace, who have examined insane persons, agreeably to the directions of this act.

*[margin: How a committee shall be appointed, where an insane person removes out of the state.]*

VIII.  IN case an infant child or ward, be suggested by the parent or guardian of such infant child or ward, to be of unsound mind, the court of the county, city or borough, wherein such person may reside, shall appoint three justices to examine into the state of his or her mind; and upon the report of the said justices, if the suggestion appears to be true, such court shall order the insane to be removed to the hospital, in the manner before directed, where he or she shall be received and registered.

*[margin: Insane infants to be examined and sent to the hospital.]*

IX.  THE expence of maintaining and endeavouring to cure a registered insane, shall be paid by the public, and reimbursed out of his estate, (if any such there be); and in case of an infant, not an orphan, shall be reimbursed by the parent, if of sufficient ability to support such infant; to be adjudged of, and certified by the court of that county where the parent resides, and may in either case be recovered by an action, in the name of the directors, who shall account for what shall thus come to their hands.

*[margin: Expence of maintaining and curing registered insanes, how to be defrayed.]*

X.  ACCOUNTS of expences incurred in the execution of this act, as well as for repairing the hospital, and other necessary incidental works and services, shall be audited and discharged in the same manner as other public accounts.

*[margin: Hospital accounts to be audited and discharged as other public accounts.]*

XI.  THE directors shall enlarge every person confined in the hospital, who shall appear to them to be perfectly cured of insanity, and give such person a certificate thereof.

*[margin: Persons cured of insanity to be discharged.]*

XII.  A PERSON registered in the hospital, shall nevertheless, during the time of his or her confinement, be deemed an inhabitant of that county, in which was his or her legal settlement at the time of his or her removal to the hospital.

*[margin: Persons confined in the hospital to be deemed inhabitants of the counties from which they were removed.]*

XIII.  IN case of the absence of the president of the directors, the members present may choose a president, *pro tempore*.

*[margin: Directors may choose a president pro tempore.]*

XIV.  ANY director who shall remove to the distance of twenty miles or upwards, from the said hospital, shall be considered as having vacated his office.

*[margin: How directors shall vacate their seats.]*

XV.  NOT more than two persons shall be paid as a guard for removing any insane person to the said hospital; which two shall have the same allowance made them for their services, as is at present allowed to guards employed in removing criminals, and who shall be paid by the court of directors, out of the monies appropriated for the use of the hospital.

*[margin: Two guards allowed for removing an insane to the hospital.]*

O o o

LLMC DIGITAL

# ACTS AND LAWS.

on their Perfons or Eftates, as Minors under Guardians by Law are; until fuch Time as fuch Perfons by their Induftry, good Management and Application to Bufinefs fhall obtain under the Hands of fuch Authority and Select-men that they are releafed, and their Eftate put into their own Hands and Improvement again.

**Contracts void** 17. And all Bargains, Sales and Contracts made, or pretended to be made contrary to this Act, fhall be, and they are hereby declared to be null and void.

**Lunatics, who are dangerous not to go at large.** 18. *Be it further enacted,* That if any diftracted or lunatic Perfon fhall go at large, who is dangerous and unfit to be without reftraint, whereby any Perfon may be endangered in Perfon or Eflate, it fhall be the Duty of the Civil Authority and Select-men, of the Town where fuch lunatic or diftracted Perfon be

**Civil authority and felectmen to take care that they be confined.** longs, or refides, to order and direct that he be confined in fome fuitable Place; and in cafe the Perfon, or Perfons, under whofe Care fuch lunatic or diftracted Perfon fhall be or who are bound to provide for and fupport him, fhall refufe or neglect to confine fuch lunatic or diftracted Perfon, in fuch Place and Manner, as by faid Civil Authority and Select-men, fhall be directed; then the faid Civil Authority and Select-men may, and fhall take all proper, and effectual Meafures, to prevent fuch lunatic or diftracted Perfon or Perfons, from going at large, and for his or her confinement in fome fuitable Place, and for his or her Support and Overfight therein. And the faid Civil Authority and Select-men may, if by them found neceffary, order fuch infane Perfon, or Perfons, to be committed to the Gaol in that County

**May caufe them to be committed to prifon.** where he or fhe dwells, there to be clofely and fecurely kept during the continuance of fuch diftraction or infanity, or until releafed as is hereafter provided; which faid Commitment fhall be by Warrant, figned by an Affiftant, or the Senior Juftice of faid Civil Authority, who fhall order the fame; and thereupon the keeper of faid Gaol fhall be fully authorifed to receive fuch lunatic, infane, or diftracted Perfon, or Perfons, into fuch Gaol, there to be kept as aforefaid.

**Perfons having been tried for murther & acquitted on the ground of infanity, to be confined during fuch infanity.** 19. *And be it further enacted,* That whenever any Perfon fhall on Trial had for Murther or Homicide, be acquitted on the fole ground of Infanity, the Court before whom fuch Trial is had, may, if they fee fit, commit fuch Perfon to the Gaol of the County wherein fuch Trial is had, there to be clofely confined during fuch Infanity, unlefs fome Perfon or Perfons fhall undertake, and become bound before faid Court to their Satisfaction, to confine faid diftracted or infane Perfon, in fuch Manner as faid Court fhall direct and order.

**May petition the county court for enlargement.** 20. *And be it further enacted,* That faid Perfon, or Perfons, confined as aforefaid, or his, or her Relations, fhall have Right to apply by Petition to the County Court of that County in which fuch confinement is, for his, or her enlargement from confine

**Petition to be ferved on felect-men.** ment, which faid Petition fhall be ferved on the Select-men of faid Town, as by Law is provided for the fervice of Petitions; and faid Court fhall thereupon order and decree, as to them fhall

craft, juggling or unlawful games or plays, or feigning them-
selves to have knowledge in phisiognomy, palmistry, or pre-
tending that they can tell destinies or fortunes, or discover
where lost or stolen goods may be found; common pipers, fid-
dlers, runaways, common drunkards, common night walkers,
pilferers, wanton and lascivious persons, in speech, conduct or
behaviour; common railers or brawlers, such as neglect their
callings or employments, mispend what they earn, and do
not provide for themselves for the support of their families;
upon conviction of any of the offences or disorders aforesaid,
complaint thereof having been made in writing.

SEC. 6. *Be it further enacted*, That when it shall be
made to appear to any two Justices, *quorum unus*, that any
person being within their county, is lunatic, and so furiously
mad, as to render it dangerous to the peace or the safety of
the good people, for such lunatic person to go at large; the
said Justices shall have full power, by warrant under their
hands and seals, to commit such person to the house of cor-
rection, there to be detained till he or she be restored to his
right mind, or otherwise delivered by due course of law. And
every person so committed, shall be kept at his or her own ex-
pense, if he or she have estate; otherwise, at the charge of the
person or town upon whom his maintenance was regularly
to be charged, if he or she had not been committed; and
he or she shall, if able, be put to work during his or her con-
finement.

*Two Justices may send luna-tics and dangerous persons to house of correction.*

SEC. 7. *Be it further enacted*, That any person, standing
convicted before the Supreme Judicial Court or Circuit
Court of Common Pleas, for any crime punishable in part
or in whole by imprisonment, may be sentenced by either
of said Courts to suffer his imprisonment, either in the com-
mon gaol, or in the house of correction, at their discretion; to
be employed and kept to work therein, in the same manner,
as persons committed to said house pursuant to the provis-
ions of the fifth section of this Act.

*Courts may confine con-victed persons in common gaol, or house of correction.*

SEC. 8. *Be it further enacted*, That either of said Courts
may sentence any person standing convicted before them
respectively, of an offence punishable in whole or in part by
fine, to pay such fine with the costs of prosecution; and in
case he does not pay the same within ten days, that he be
immediately thereafter conveyed to the house of correction,

*Courts may sentence con-victs to house of correction conditionally, viz. on non-payment of fine and costs.*

LLMC DIGITAL

USCA4 Appeal: 23-4705    Doc: 40    Filed: 09/20/2024    Pg: 63 of 77

knowingly let, hinder, or hurt any Perfon or Perfons that fhall begin to proclaim, or go to proclaim according to the Proclamation hereby directed to be made, and be thereof convicted by due Courfe of Law, fhall forfeit, fuffer, or be punifhed in Manner and Form as aforefaid.

7. And that alfo every fuch Perfon or Perfons fo being unlawfully and riotoufly affembled to the Number of Three, as aforefaid, or more, to whom Proclamation fhould or ought to have been made, if the fame had not been hindred as aforefaid, fhall likewife, in cafe they, or any of them to the number of Three or more, fhall continue together, and not immediately difperfe themfelves after fuch Let or Hindrance fo made, having Knowledge of fuch Let or Hindrance fo made, and be thereof convicted by due Courfe of Law, fhall forfeit, fuffer, or be punifhed in Manner and Form as aforefaid. *Any number not lefs than three not diſperſing, &c. to be puniſhed, &c.*

8. *Provided always,* That no Perfon or Perfons fhall be profecuted by Virtue of this Act, for any Offence or Offences committed contrary to the fame, unlefs fuch Profecution be commenced within twelve Months after the Offence committed. *Proviſo.*

---

## An Act for reftraining, correcting, fuppreffing and punifhing Rogues, Vagabonds, common Beggars, and other lewd, idle, diffolute, profane and diforderly Perfons ; and for fetting them to work.

*WHEREAS there are frequently divers Perfons who wander about, and are vagabond, idle, and diſſolute Perfons, begging and committing many Infolences ; and many are guilty of profane and evil Difcourſe, and other Diſorders, to the corruption of Manners, the promotion of Idleneſs, and the detriment of good Order and Religion.* *Preamble.*

For preventing of which, and for the better Regulation of fuch evil and diforderly Perfons, and punifhing fuch Rudenefs and Mifbehaviour :

PAR. 1. **B**E it enacted by the Governor and Council, and Houfe of Reprefentatives, in General Court affembled. That in order there may be erected, built, or otherwife provided in each of the refpective Counties in this State, at the Charge of the faid Counties refpectively, a fit and convenient Houfe or Houfes of Correction, to be ufed and improved for the receiving, keeping, fetting to work, and correcting of Rogues, Vagabonds, common Beggars, and other idle, diffolute and diforderly Perfons :—the Judge of the County Courts in each County refpectively, by and with the Advice of faid Court, is hereby empowered to fummon the Civil Authority, viz. the Affiftants and Juftices of the Peace in faid County, to meet at fuch Time and Place in faid County as he fhall appoint for that Purpofe, or other Matters proper for them to confider and determine : And if the major Part of the Civil Authority, fo convened for that Purpofe, fhall agree upon and determine that fuch a Houfe or Houfes fhall be erected, built *Work-houſes how to be provided.* *Judge of county court to ſummon the civil authority.* *Major part to determine and fix the place.*

*A C T S.  A N D.  L A W S.*

## Rogues.

or provided, and also determine the Place where the same shall be fixed; in that Case said County Courts respectively are hereby authorized, empowered and directed forthwith to erect, build, or

**County court to proceed to build, &c.** otherwise provide, such House or Houses of Correction as aforesaid, and transmit to the General Assembly from Time to Time, an Account of their Proceedings therein, until such House or Houses are finished: Unless in any County there be such a House or Houses already provided; in which Case the County Court of

**Or put in repair,** that County, are required forthwith to put the same in good Repair and Order, and to transmit the Account thereof to the General Assembly as aforesaid.

2. *And the better to enable the said County Courts to do the same :*
• *Be it further enacted,* That the said County Courts be, and they

**To tax the county.** are hereby fully authorized and empowered to assess and tax the Inhabitants of the County to which said Court belongs, in such Sum or Sums as the Court shall judge needful for the Purpose aforesaid: And for the collecting such Tax or Assessment, to appoint Collector or Collectors, and them to authorize and empower, by Warrant or Warrants of Distress, signed by the Clerk of said Court, to levy and collect the same; which Collectors shall have the same Authority, and be under the same Regulations and Penalties as other Collectors by the Laws of this State, have, and are subject unto.

3. *Be it further enacted,* That the said County Courts respect-

**To appoint masters and overseers.** ively, shall and may nominate and appoint some honest, fit Person to be Master of said House of Correction or Work-house, and also one or two able and discreet Persons to be Overseers; and the said County Courts shall order and direct such Overseer or Over-

**To provide materials, &c.** seers (as soon as may be) to procure proper Materials to the amount of *Fifty Dollars,* for each Work-house; and shall deposit the same in some convenient and safe Place, to be used and improved according to such Rules and Orders as shall from Time to Time be given by said Courts respectively; and the said County

**County court to draw on State treasury, &c.** Courts are hereby authorized to draw on the State Treasurer for the aforesaid Sum, to enable the Overseers to procure the Materials suitable to work with and upon; and shall from Time to Time give such Orders for the regulating and governing such Work-houses, as they shall think proper, according to Law. And the said Overseers shall from Time to Time, as there may be Need, provide the necessary Materials for all Persons committed thereinto, to work with and upon; for which they shall be paid out of the County Treasury; and the same shall be drawn in and repaid to such Treasury according to the Direction and Provision herein after made.

4. And the said Overseers shall from Time to Time, order and

**Overseers to direct the master.** direct the Masters of the Work-houses, in the Government and Regulation, as well as in the correcting and keeping to work the Persons thereto committed, according to Law. Which Overseers shall render their Account to the County Court, from Time to

**Allowance.** Time, and shall have and receive such Allowance and Reward for their Services as said Court shall judge just and reasonable,

5. *And it is further enacted and provided,* That the County Courts of any two Counties may, and are hereby empowered to agree together to build one House of Correction, if the same may be convenient for both Counties ; and to proceed therein in such Form, Manner and Proportion as they shall agree ; and each County Court to tax their respective Counties as aforesaid. Provided always, the previous Consent of the major Part of the Civil Authority in said Counties respectively, to build the same, be first had and taken, as before directed.

*Two counties may join, &c.*

6. And the Authority of that County, uniting to build as aforesaid, wherein such House happens not to be, shall have as full Power and Authority to send and commit any Person or Persons to such House, as the said Authority would by Law have, were the said House within the County to which they belong.

7. *And be it further enacted,* That it shall and may be lawful for an Assistant or Justice of the Peace, in the respective Counties, and they are hereby fully authorized and empowered to send all the Rogues, Vagabonds, Sturdy Beggars, and other lewd, idle, dissolute, profane and disorderly Persons, that have no Settlement in this State, to such Work-Houses, and order them to be kept to hard Labour, under the Rules and Regulations of said House, until released by order of Law.

*Rogues, &c. to be sent to the work-house, &c.*

8. Also all Persons using, or pretending to use any subtil Craft, Jugling, or unlawful Games or Plays, or feigning themselves to have Knowledge in Physiognomy, Palmistry, or pretending they can tell Destinies, Fortunes, or discover where lost or stolen Goods may be found.

*Juglers, &c.*

9. Also common Pipers, Fiddlers, Run-aways, stubborn Servants or Children, common Drunkards, common Night-walkers, Pilferers, wanton and lascivious Persons, either in Speech or Behaviour, common Railers or Brawlers.

*Pipers, &c.*

10. Also such as are guilty of reviling and profane Speaking, or neglect their Callings, mispend what they earn, and do not provide for themselves, or the Support of their Families, upon a due Conviction of any of the Offences or Disorders aforesaid.

*Profane, &c.*

11. *Be it further enacted,* That in Addition to the Punishment of Theft already by Law provided, if the Conviction for Theft be before an Assistant or Justice of the Peace, the Person convicted shall be sentenced, and accordingly committed by such Authority to the Work-House, or House of Correction, there to be kept to hard Labour ; on the first Conviction, not less than one Month, and not exceeding three Months ; on the second Conviction, not less than one Year, and not more than three Years.

*Thieves.*

12. And in Case the Conviction for Theft shall be before the County Court, the Person convicted, shall, by said Court, be sentenced and committed to the House of Correction, to labour as aforesaid ; for the first Offence, at least six Months ; and so for a longer Time, as said Court before whom the Conviction is had, shall think proper and determine, having Respect to the Circumstances and Aggravations of the Offence, and the Number of Convictions had.

pay such Fine or Fines, then the said Captain, or Commanding-Officer, may make out his Warrant to one of his Serjeants or Corporals, commanding him to take to his Assistance one or more of the Soldiers under his Command, if Occasion should require, and take the Body of the said Offender or Offenders, and deliver him or them to the Gaoler of the said County, who is hereby required and commanded to take the said Offender or Offenders into his Custody, and keep him or them in close Gaol for such Time as shall be expressed in the Captain's Warrant, not exceeding three Days; and at the Expiration of said Time, or on Payment of the said Fine or Fines, then the said Offender or Offenders to be discharged, paying to the Gaoler *One Shilling* for his Fees, and no more.

4. AND BE IT FURTHER ENACTED by the Authority aforesaid, That no Officer shall beat or abuse any of the Soldiers whilst under Arms, on any such Days of Training as aforesaid: But if any Soldier shall during that Time use any reproachful or abusive Language towards any of his superior Officers, or shall quarrel himself, or promote any Quarrel amongst his Fellow-Soldiers, or appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer, to disarm such Soldier at the Head of his Company, and to set a Centinel over him during the Time of the Company's being in Arms, and no longer; or to fine him in Manner and Form aforesaid, as the said Captain or Commanding Officer in his Discretion shall think proper. *Officers and Soldiers to behave well when under Arms.*

5. BE IT FURTHER ENACTED by the Authority aforesaid, That every of the Persons aforesaid, that appears at the Times and Places aforesaid, without the Arms and Ammunition aforesaid, shall forfeit and pay to their respective Captain, or Commanding Officer as followeth; *viz.* For want of a Musket or Fuzee, *Two Shillings*; if not well fixed *One Shilling*; for want of three Charges of Powder, and three sizeable Bullets, *One Shilling*; for want of a Sword or Bayonet, *One Shilling*: Which said Sums of Money, shall be applied by said Captain, to the Purchasing Drums and Colours for his Company. *Penalties on appearing without Arms. &c.*

6. BE IT FURTHER ENACTED by the Authority aforesaid, That it shall and may be lawful for the Captain General, or Commander in Chief for the Time being, in Case of any Invasion, Insurrection, or Rebellion, to call so many of the Persons aforesaid together, for repelling the *Power of the Captain General in Case of Invasion, &c.*

Add. 011

died of his wounds, being produced to the orphans' court, and
also a certificate from the overseers of the poor and two other
reputable freeholders of the township, borough, ward or dis-
trict where the family of such deceased officer or private militia-
man shall dwell or reside at that time, setting forth the par-
ticular circumstances of such family, the age or ages of the
child or children and the necessity of granting them some
support, the said orphans' court, when possessed of the certifi-
cates aforesaid, is hereby authorized to give orders upon the
lieutenant of the city or county for such sum of money as they
may think just and necessary for the support of such family
from time to time.

(Section LVI, P. L.) Provided always, That the sum of money
aforesaid does not exceed the half pay and rations that such
officer, non-commissioned officer or private was entitled to at
the time of his death.

[Section XLV.] (Section LVII, P. L.) And be it further
enacted by the authority aforesaid, That if any field or other
commissioned officer, at any regimental review or on any other
occasion when the battalion or company to which he may be-
long, or in which he holds a command is paraded in arms, shall
appear, misbehave or demean himself in an unofficerlike
manner, he shall, for such offense, be cashiered or punished
by fine at he discretion of a general court martial as the
case may require in any sum not exceeding the price of six
days' labor; and if any non-commissioned officer or private
shall, on any occasion of parading the company to which he
belongs, appear with his arms and accoutrements in an unfit
condition, or be found drunk or shall disobey orders or use
any reproachful or abusive language to his officers, or any of
them, or shall quarrel himself or promote any quarrel among
his fellow soldiers he shall be disarmed and put under guard by
order of the commanding officer present until the company is
dismissed, and shall be fined in any sum not exceeding the
price of ten days' labor nor less than one day's labor.

[Section XLVI.] (Section LVIII, P. L.) And be it further
enacted by the authority aforesaid, That if the lieutenant-
colonel or commanding officer of any battalion shall neglect

97

684            **APPENDIX.**

*Acts relating to the Militia.*

3. Any person who shall presume to sleep out of camp, or be absent from duty without leave of his officer, shall, if an officer, forfeit ten dollars; if a private, he shall serve ten days longer than he was otherwise liable to; but if an action should happen during his absence from camp, if an officer, he shall be cashiered, and turned into the ranks, and shall be obliged to serve two months extraordinary, immediately after being so reduced; if a private, he shall be put into one of the continental regiments of this State, not exceeding twelve months.

4. Any non-commissioned officer or private, who shall be found guilty of plundering or taking the property of the inhabitants of this State, contrary to orders, shall serve in one of the continental regiments for any time not exceeding twelve months, as to a court martial shall seem fit.

5. If a commissioned officer shall be found guilty of the crimes last mentioned, he shall be cashiered and turned into one of the continental regiments of this State, as a private, in which he shall be obliged to serve for one year.

6. Any person, whilst on duty, who shall wilfully disobey the lawful commands of his superior or commanding officer, shall, for every such offence, if an officer, be cashiered and turned into the ranks, and shall be obliged to serve forty days extraordinary, immediately after being so reduced; if a private, be sentenced to serve for a term not exceeding one year, in the continental service.

7. Any officer or private who shall be found drunk on guard, or at any other time of duty, if an officer, be cashiered and turned into the ranks, or receive such other punishment as the court shall inflict; if a non-commissioned officer or private, he shall be confined till sober, and serve ten days longer than he was otherwise liable to.

8. Any person who shall, by discharging of fire arms, or by any other means whatsoever, intentionally occasion a false alarm in camp or garrison, if an officer, he shall be cashiered, reduced to the ranks, and shall be obliged to serve forty days extraordinary, immediately after being so reduced; if a non-commissioned officer or private, he shall serve fifteen days longer than he was otherwise liable to.

9. Any officer, non-commissioned officer or private, who shall be convicted of holding correspondence with, or giving intelligence to the enemy, either directly or indirectly, shall be tried in like manner as is hereafter provided for the trial of spies, and on conviction, shall suffer death, or such other punishment as shall be inflicted by the sentence of the court.

VI. *And be it further enacted* by the authority aforesaid, That the trial of every offender against this law shall be immediate and summary, and shall be had and held in manner following, that is to say:—if a non-commissioned officer or private, by five, or if they cannot conveniently be procured, by three commissioned officers; if a captain or subaltern, by five, or if they cannot conveniently be procured, by three commissioned officers, of which two shall be captains; if a field officer, by seven, or if they cannot conveniently be procured, by five officers, two of which shall be field officers; which trials shall be ordered, and the persons holding the same nominated, by the commanding officer of the detachment, regiment or brigade to which the person accused belongs. And that each member of the court, previous to his sitting on such trial, shall take the following oath.

*Offenders, how to be tried.*

I, A B, do swear, that I will impartially, without fear, favor or prejudice, hear and determine the offender's case, (or cases,) according to the

96

USCA4 Appeal: 23-4705　　Doc: 40　　Filed: 09/20/2024　　Pg: 69 of 77

SECTION
70. Penalty on surgeon receiving fee for certificate of inability—or granting certificate without proper examination.

*Courts Martial.*

71. What officers shall be liable to trial by courts martial—for what offences—court how composed—senior officer to preside—how appointed—no court to be called without the approval of the commander-in-chief—no expenses to be paid unless by order of general assembly—form of orders for calling court—detailing members—furnishing copy of charges—organizing court—mode of proceeding.

72. Judge advocate to be appointed and sworn.

73. Accused may challenge members of the court for cause—if number of court be thereby reduced to less than five, court shall adjourn, that others may be detailed—sentence of court to be concurred in by two-thirds, and approved by commander-in-chief officer

SECTION
cer under arrest refusing to appear, shall be fined and cashiered.
74. Witness refusing to attend may be committed—fees of court, witnesses, &c.,—commander-in-chief may approve, disapprove, mitigate or remit sentence—record to be deposited with adjutant general.

*Board of Officers and Courts of Enquiry.*

75. Commander-in-chief may call boards of officers.
76. Courts of Enquiry how composed and organized—vacancies how filled—oath of—witnesses before record of, to be transmitted to officer who ordered the court.
77. Pay and fees same as in courts martial.
78. Acts repealed—penalties accruing under them saved—charters of companies—not accepting provisions of the act, unimpaired —property of chartered companies accepting its provisions, not impaired.
79. When act shall take effect.

*It is enacted by the General Assembly, as follows :*

### OF THE ENROLLED MILITIA.

SECTION 1.  Every able bodied white male citizen in this state, who is or shall be of the age of eighteen years, and not exceeding the age of forty-five years, excepting persons absolutely exempted by the provisions of this act, and idiots, lunatics, common drunkards, paupers, vagabonds, and persons convicted of any infamous crime, shall be enrolled in the militia, as herein after provided.

SEC. 2.  The following persons shall be absolutely exempted from military duty in this state :

Those exempted by the laws of the United States, to wit : the vice-president of the United States ; the officers, judicial and executive of the government of the United States ; the members of both houses of congress and their respective officers ; all custom-house officers with their clerks ; all post officers and stage drivers, who are employed in the care and conveyance of the mail of the post office of the United States ; all ferry men employed at any ferry on the post road ; all inspectors of exports ; all pilots, and all mariners actually employed in the sea service of any citizen or merchant within the United States : also, all persons who have holden the office of governor, or lieutenant governor ; all persons who, after the last day of February, A. D. 1796, shall have holden any military commission or commissions, or staff office with the rank of an officer of the line, for the space of five years successively, and who shall have been engaged thereon accord-

Digitized from Best Copy Available

MILITIA.          *April* 20, 1837.      273

## CHAP. CCXL.

### An Act concerning the Militia.

BE *it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, as follows :*

SEC. 1. Every able bodied white male citizen resident within this Commonwealth, who is, or shall be, of the age of eighteen, and under the age of forty-five years, excepting idiots, lunatics, common drunkards, vagabonds, paupers and persons convicted of any infamous crime, shall be enrolled in the militia, and be included in the military returns: *provided*, that nothing herein contained shall be so construed as to render any of the exempts mentioned in the first, second and third sections of the twelfth chapter of the Revised Statutes, liable to do military duty otherwise than is therein provided. *All persons between 18 and 45 to be enrolled, except, &c.*

SEC. 2. Division inspectors and division quarter-masters shall hereafter be appointed by the respective major generals, and approved by the commander in chief. *Division inspectors and quarter-masters, how appointed.*

SEC. 3. The commissions of all staff officers, appointed by any commanding officer, shall expire after the commanding officer shall be discharged or vacate his commission, as soon as his successor is commissioned. *Staff commissions; when they expire.*

SEC. 4. The adjutant general shall annually in the month of February, lay before the governor and council, for adjustment, an account of all expenditures of money made by him, as adjutant general *Acting quarter-master general's expenditures; how examined and settled.*

35

MILITIA.

authorized and required to do by "An Act to
organize, govern and discipline the Militia of this
State," passed March 8, A. D. 1834, to which
this is additional; one half of the amount recovered
to be to the use of the Regiment, and the other
half to the use of the Officer; and the Officer so
prosecuting shall be a competent witness in the case.
All fines and forfeitures incurred under the first,
second and third sections of this Act, shall be
recovered by indictment, or by action on the case,
by any person whatever, one half of the sum
recovered to be to the use of the State, and the
other half to the use of the prosecutor.

SECT. 5.  *Be it further enacted,* That no
idiot, lunatic, common drunkard, vagabond, pauper,
nor any person convicted of any infamous crime, nor
any other than white, able-bodied, male citizens,
shall be eligible to any office in the Militia; and
whenever it shall appear to the Commander-in-
Chief, that any person thus ineligible has received
a majority of votes cast at any election of Officers,
he shall not commission him, but, with the advice
and consent of the Council, shall declare said elec-
tion null and void, and appoint some person to fill
the vacancy.

SECT. 6.  *Be it further enacted,* That all stu-
dents attending any of the several colleges, acade-
mies or seminaries of this State, shall be holden
and compelled to do military duty as other persons,
in the town where said colleges, academies or sem-
inaries are established.

SECT. 7.  *Be it further enacted,* That when-
ever any Company shall be paraded, the command-
ing Officer thereof is hereby authorized verbally to
notify the men so paraded, to appear on some future
day not exceeding thirty days from the time of such
notification, for any military duty required by law,
and such notification shall be legal as it respects the
men present.

*Marginal notes:*
No idiot, lunatic, common drunkard, vagabond, pauper, or person convicted of any infamous crime to be eligible for office,—nor unless able bodied, &c., &c.

Persons ineligible not be commissioned.

—vacancy to be filled.

Students in Colleges made liable to do military duty.

Verbal notice to appear on a future day may be given on parade.

That none have their quietus est vnder a year and a day after the confirmation of the administration.

*Quietus, when grantable.*

If any administrator be of no kin and have assets, that all the estate left after debts be paid, be imployed in the county where he lived for setting vp of manufactures or for other publique vses, the administrator being paid his reasonable charges and for his paines.

*Surplus estate after payment of debts to be employed in manufactures, &c. if the adm'r be of no kin to the intestate.*

This act shall be of noe force or effect vntil the 24th of June next, which will be in the yeare of our Lord 1656.

*Commencement of act.*

## ACT XI.

*BE it enacted by this Grand Assembly* that if any runnaway servant offend the second time against the act in March, 1642, concerning runnaway servants that then he shall onely be branded with the letter R: and passe vnder the statute for an incorrigible rogue, but also double his time of service so neglected, and soe likewise double the time that any time afterwards he shall neglect, and in some cases more if the comissioners think fitt: And be it further enacted by the authority aforesaid that he or she that shall lodge or harbour any such runaways shall not only pay 20 lb. of tobacco per night but also 40 lb. of tobacco per day as long as they shall be proved to entertaine them, contrary to an act of Assembly in March, 1642, relateing to hired servants.

*Runaway servants, for second offence, to be branded with the letter R. pass under the statute for an incorrigible rogue, and serve double the time lost. Penalty for harboring a runaway servant.*

## ACT XII.

*WHEREAS* it is much to be doubted, That the comon enemie the Indians, if opportunity serve, would suddenly invade this collony to a totall subversion of the same, and whereas the only means for the discovery of their plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking, whereby they proclaim, and as it were, justifie that beastly vice spending much powder in vaine, that might be reserved against the comon enemie, *Be it therefore enacted* that what person or persons soever shall, after publication hereof, shoot

*Preamble.*

*No guns to be shot ex-*

3 C

402                        LAWS OF VIRGINIA,

cept at mar-
riages & fu-
nerals, under
penalty of
100 lb. of to-
bacco.

any gunns at drinkeing (marriages and ffuneralls onely
excepted,) that such person or persons so offending
shall forfeit 100 lb. of tobacco to be levied by distresse
in case of refusall and to be disposed of by the militia
in amunition towards a magazine for the county where
the offence shall be comitted.

## ACT. XIII.

Comm'rs. or
justices of
the peace to
be recom-
mended by
the court and
appointed by
the gov. and
council.

*BE it enacted* by this present Grand Assembly that
noe person or persons, for the future, be admitted to
be a comissioner for any county court whatsoever, but
such as shall be desired by the court and appointed
by the Governour and Councill.

## ACT XIV.

Inhabitants of
the colony be-
ing sole own-
ers of vessels
exempted
from castle
duties.

**FFOR** the encouragement of trade *be it enacted* that
all persons inhabiting in this collony, being sole own-
ers of any vessell, shipp or barque, tradeing to any
lawfull port whatsoever, be exempted from all castle
duties but if any matter shall arise in question the
oathes of the owners shall be required to make it ap-
peare that they are such owners.

## ACT XV.

Western and
inland Indians
having seated
themselves
near the falls
of James ri-
ver.

**WHEREAS** information hath bin given that many
western and inland Indians are drawne from the
mountaynes, and lately sett downe neer the falls of
James river, to the number of six or seaven hundred,
whereby vpon many severall considerations being had,
it is conceived greate danger might ensue to this col-
lony, *This Assembly therefore do think fitt* to resolve
that these new come Indians be in noe sort suffered to
seate themselves there, or any place near vs it haveing
cost so much blood to expell and extirpate those perfi-
dious and treacherous Indians which were there for-
merly, It being so apt a place to invade vs and within
those lymitts which in a just warr were formerly con-
quered by us, and by vs reserved at the last conclusion

Coll. Edward
Hill, with a

of peace with the Indians, In pursuance whereof there-
fore and due respect to our own safety, *Be it enacted*

244      LAWS OF THE COLONY OF NEW YORK.

AND BE IT FURTHER ENACTED by the Authority afore-
said, That the Person who shall be elected and appointed a Col-
lector as aforesaid by virtue of this Act shall and he is hereby
required to pay such Taxes as shall be by him collected for the
purposes aforesaid into the Hands of the Treasurer of the said
County on or before the first Day of October next.

### [CHAPTER 1500.]

[Chapter 1500 of Van Schaack, where the title only is printed.   See
chapter 1453.]

An Act to extend an Act intitled "An
"Act for the better regulation of the Public
"Inns and Taverns in the Counties of Ulster
"and Orange," to the Manor of Cortlandt in
the County of West Chester.

[Passed, February 16, 1771.]

BE IT ENACTED by his Excellency the Governor the Council
and the General Assembly, and it is hereby Enacted by the
Authority of the same That the Act intitled "An Act for the
" better regulation of the Public Inns and Taverns in the Counties
" of Ulster and Orange," passed the twenty seventh Day of Janu-
ary one thousand seven hundred and seventy shall extend to the
Manor of Cortlandt in the County of West Chester. PROVIDED
ALWAYS that the said Act shall not be in force in the said
Manor till the first Day of May next, any Thing herein contained
to the contrary thereof in any wise notw'thstanding.

### [CHAPTER 1501.]

[Chapter 1501 of Van Schaack, where the title only is printed.  Expired
the 1st of February, 1773.  Provided for by chapter 1607.]

An Act to prevent the firing of Guns, Pis-
tols, Squibs and other Fire Works at the
Times and Places therein mentioned within
this Colony.

[Passed, February 16, 1771.]

WHEREAS great Damages are frequently done on the eve
of the last Day of December, and on the first and second Days
of January, commonly called New Years Days, by persons going
from House to House, with Guns and other Fire Arms and being
often intoxicated with Liquor, have not only put the Inhabitants
in great Terror, but committed many Mischiefs, for the prevention
whereof for the future.

BE IT ENACTED by his Excellency the Governor, the Council
and the General Assembly, and it is hereby Enacted by the
Authority of the same that if any Person or Persons of any Age
or Quality whatsoever shall fire or discharge any Gun, Pistol,
Rocket, Cracker, Squib or other fire Work in any House Barn or
other Building or before any Door or in any Garden, Street, Lane
or other Inclosure on the said Eve or Days within the County
of Richmond; and in the Precincts of Haverstraw and Orange
Town in the County of Orange, that then every such Person or
Persons so offending, and being thereof convicted before one or
more Justice or Justices of the Peace in the County or Precincts
where such Offence shall be committed either by the Confession
of the Party or Parties so offending, or the Oath of one or more
Witnesses, which Oath said Justice or Justices of the Peace is and
are hereby impowered and required to administer, shall for every
such Offence forfeit the Sum of twenty Shillings with Costs of
Suit: the said Forfeiture to be levied by distress and sale of the
Goods and Chattels of every such Offender, by Warrant under the
Hand and Seal of the said Justice or Justices of the Peace before
whom such Conviction or Convictions shall be as aforesaid made,
the which Forfeitures to be to the use of the Poor of the Town
or Place wherein such Offender shall be discovered, and if the
said Offender or Offenders shall not pay the said Forfeiture or
Forfeitures upon Conviction as aforesaid, and, for want of suffi-
cient Distress whereon to levy the same, than then every such
Justice or Justices of the Peace is and are hereby impowered and .
required by Warrant under his or their Hands and Seals to com-
mit every such Person or Persons so as aforesaid offending, to the
common Goal of the County where the said Forfeiture shall arise,
there to remain without Bail or Mainprize for the Space of one
Month unless such Forfeiture or Forfeitures be sooner paid. but
in Case such Offender or Offenders in the Premises last above
mentioned shall happen to be a slave or slaves and the Forfeiture
or Forfeitures aforesaid on Conviction as aforesaid shall not be
forthwith paid, that then it shall and may be lawful to and for
such Justice or Justices before whom the conviction shall be, to
cause such Slave or Slaves to be publickly whipped on the naked
Back, such Number of Stripes as he or they shall think proper
not exceeding thirty nine which Punishment shall be in lieu and
instead of the said Forfeiture: This Act to be in force from the

246    LAWS OF THE COLONY OF NEW YORK.

publication hereof until the first Day of February which will be in the Year of our Lord one thousand seven hundred and seventy three.

[CHAPTER 1502.]

[Chapter 1502 of Van Schaack, where the title only is printed. See chapter 1455. Repealed by chapter 1616.]

An Act to amend the Act therein mentioned relative to High Ways in the County of Orange.

[Passed, February 16, 1771.]

WHEREAS by the second section of an Act intitled "An Act "to amend an Act intitled An Act for the better laying out, "regulating and keeping in repair common, public and private "Highways on the North side of the Highlands in the County of "Orange." passed the twenty seventh Day of January one thousand seven hundred and seventy, it is among other Things Enacted that every Person who is obliged to work on Highways, and does dwell within certain Bounds in the said Section mentioned, shall work one Day in every Year on the Water side Roads in the Precinct of Cornwall; And Whereas many Persons choose rather to pay Money than be obliged to work on the said Roads.

BE IT THEREFORE ENACTED by his Excellency the Governor, the Council and the General Assembly, and it is hereby Enacted by the Authority of the same. That each Person who by the said Act is obliged to work one Day in a year on the said Water side Roads in the Precinct of Cornwall or on the New Road hereafter mentioned, shall be excused from working on the same provided he will (before the Day appointed for him to work,) pay the Sum of three shillings to the Overseer of the District in which he doth belong.

AND BE IT FURTHER ENACTED, That every Overseer shall pay all the Money which he shall or may receive for excusing Persons from working on the said Water side Roads or for Fines for their not working thereon into the Hands of Colonel Benjamin Tusteen, John Brewster, or Zachariah Dubois, who are hereby directed to lay out the same in repairing the said Water side Roads in such Manner as they or any two of them shall think proper, and to render an Account thereof on Oath to the Justices of the Annual Town Meetings of the Precincts of Goshen and Cornwall.

OF SOUTH CAROLINA. 97

Sec. 2. Any person violating the provisions of this Act, shall be fined in a sum not less than one hundred dollars nor more than five hundred dollars, or be imprisoned for not less than three months nor more than five years.

*A. D. 1899.*

*Punishment for.*

Sec. 3. This Act shall not apply to officers accepting rebates, not for their individual use, but for the benefit and in behalf of the State.

*Exception.*

Approved 6th day of March, A. D. 1899.

---

## No. 67.

### AN ACT TO PREVENT DRUNKENNESS AND SHOOTING UPON THE HIGHWAY.

Section 1. *Be it enacted* by the General Assembly of the State of South Carolina, That any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors, or while feigning to be under the influence of such liquors, or without just cause or excuse, shall discharge any gun, pistol or other firearms while upon or within fifty yards of any public road, except upon his own premises, shall be guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not more than one hundred dollars or be imprisoned for not more than thirty days.

*Drunkenness and shooting on highways punished.*

Approved the 3d day of March, A. D. 1899.

---

## No. 68.

### AN ACT TO AMEND SECTION 943 OF THE GENERAL STATUTES OF 1882, APPEARING AS SECTION 261 OF VOLUME 2 OF THE REVISED CRIMINAL STATUTES OF 1893, RELATING TO THE PRACTICE OF DENTISTRY WITHOUT LICENSE.

Section 1. *Be it enacted* by the General Assembly of the State of South Carolina, That section 943 of the General Statutes of 1882, appearing as section 261 of volume 2 of the Revised Criminal Statutes of 1893, be, and the same is hereby, amended by inserting before the word *"Provided,"* in said section, the

*Sec. 261 of C. S. amended.*

7—A